IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIAM BUSH,          )
                                )
       Petitioner,       )
                                )
v.                          )     CASE NO. 2:12-CV-345-RAH
                                )           [WO]
JEFFERSON S. DUNN,      )
Commissioner, Alabama Department )
of Corrections,          )
                                )
       Respondent.     )

## MEMORANDUM OPINION AND ORDER

On April 16, 2012, Petitioner William Bush ("Petitioner" or "Bush") filed this federal habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his February 1991 conviction for capital murder and sentence of death in the Montgomery County Circuit Court. On December 19, 2013, Petitioner filed a motion for an evidentiary hearing on his *Atkins* claim. (Doc. 45.) On February 20, 2014, the motion for an *Atkins* hearing was denied without prejudice because it was premature. (Doc. 47 at 16.) The motion was "subject to reconsideration in the event that [the court] concludes that the Alabama Court of Criminal Appeals' decision denying his mental retardation claim cannot survive application of [28 U.S.C.] § 2254(d)." (*Id.*) Because the parties have now filed their briefs regarding the merits of the petition for writ of *habeas corpus*, the issue of whether the state court's decision denying the

*Atkins* claim on the merits withstands scrutiny under § 2254(d) and will be considered.[1]

## I. BACKGROUND[2]

### A. The Offense

A summary of the facts as set forth by the Alabama Court of Criminal Appeals on direct appeal, *Bush v. State*, 695 So. 2d 70, 81-82 (Ala. Crim. App. 1995), indicates that, on July 26, 1981, Petitioner entered a convenience store in Montgomery, Alabama, with the intent to rob the cashier.  Petitioner shot both Larry Dominguez ("Dominguez"), the store clerk, and Dominguez's friend, Tony Holmes ("Holmes").  Dominguez died at the scene, but Holmes survived a gunshot wound to the throat.  Shortly thereafter, Petitioner and his co-defendant went to another

---

[1] On March 20, 2013, this Court granted Bush's motion for appropriation of funds. (Doc. 42.)  On April 9, 2013, Dr. Karen Salekin, Ph.D., was appointed as an expert in preparation for an evidentiary hearing. (Doc. 43.) In his memorandum in support of the petition, Bush proffers the anticipated testimony of Dr. Salekin, a clinical psychologist and professor at the University of Alabama. (Doc. 50 at 40.)  According to Bush, "Dr. Salekin has concluded to a reasonable degree of scientific certainty that Bush is mentally retarded and has been mentally retarded since before the age of 18, including at the time of the offense and adjudication." (*Id.*)

[2] The procedural history of Petitioner's case is more complex and detailed than recounted here and includes multiple trials in the state court, as well as a previous, successful, petition for habeas corpus relief in this Court. *See Bush*, 695 So. 2d at 80–81.  Because this order concerns only one of Petitioner's claims and does not dispose of the petition, a more thorough recitation of the facts and procedural history of this case will be left to this Court's anticipated decision on the petition for habeas corpus relief.

nearby convenience store.  There, Petitioner shot the clerk, Thomas Adams, killing him instantly.[3]

Petitioner gave two statements to the police in which he confessed to the crimes.  In the second statement, Petitioner admitted that he fired the shots that killed both Dominguez and Adams and that injured Holmes.  *Id.*

## B.  Post-Conviction Proceedings in State Court

On October 8, 1998, Petitioner filed a state post-conviction petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Montgomery County Circuit Court.  State Court Collateral Appeal Transcript, Vol. 22, R-42, C. 10

On March 19, 2004, Petitioner filed a motion for leave to amend the Rule 32 petition to include a claim that his sentence of death violates the Constitution because he suffers from intellectual disability, asserting that the Alabama Court of Criminal Appeals recently "ordered remands in cases in which *Atkins* claims had not been adjudicated at the circuit court level. *See Borden v. State*, [60] So. 2d [935, 936] (Ala. Crim. App. [] 2004) (*Atkins* hearing required even after petition dismissed); *Tarver v. State*, [940] So. 2d [213], (Ala. Crim. App. [] 2004) (mental retardation issue raised on appeal of Rule 32 denial)." (Vol. 25, R-65, C. 648-49.)  He also

---

[3] Although the Alabama Court of Criminal Appeals stated that Bush shot Adams, Bush was neither charged with, nor convicted of, the murder of Adams.  *See Bush v. State*, 695 So. 2d 70, 81 n.2 (Ala. Crim. App. 1995).  Edward Pringle was convicted of the murder of Adams and the attempted murder of Holmes.

3

requested that the state court grant his request for funding to prove his *Atkins* claim and for a hearing to determine whether his cognitive deficiencies and history of adaptive deficits preclude the death penalty in his case. (*Id.*)

Petitioner also simultaneously filed an amendment to the petition, asserting a claim that "pursuant to *Atkins v. Virginia* and the Fifth, Sixth, Eighth, and Fourteenth Amendments, the State of Alabama is precluded from executing William Bush because he suffers from mild mental retardation." (*Id*. at C. 652.)  Along with the amendment, he submitted the results of intelligence testing, including the results of the September 1979 Revised Beta Examination Second Edition (BETA-II) indicating a Beta intelligence quotient of 69 and an undated Weschler Adult Intelligence Scale indicating a full-scale IQ score of 74.  (*Id*. at C. 654-57.)  The State filed a response.

On March 25, 2004, the Montgomery County Circuit Court conducted a Rule 32 hearing.  Before the start of the hearing, the court heard oral argument on Petitioner's motion to amend the petition to add the *Atkins* claim and the request for additional funds.  The State argued that Petitioner's motion to amend and request for funding were untimely because the *Atkins* decision was released in June 2002 and the state court's decisions in *Borden* and *Tarver* were decided one month prior to the date of the Rule 32 hearing.  Petitioner's counsel, however, explained that as soon as she learned that, based on the *Borden* and *Tarver* decisions, the State itself "had

switched [its] own position in cases [with an *Atkins* issue] … saying the issues should be heard instead of defaulted" in state post-conviction proceedings, she filed the motion for leave to amend.[4]  (Volume 32, R-77, R. 115.)

The court granted the motion for leave to amend the petition to add the *Atkins* claim and conditionally denied Petitioner's request for additional funding because the Petitioner filed the motion "on the eve of trial asking for such funds"[5] and he had previously received funding for another expert "[a]nd [the court did not] know what areas he [was] going to be offered to testify in" during the state post-conviction proceeding.  (Volume 32, R-77, R. 112.)  No expert or any other witnesses, however, testified regarding the *Atkins* issue during the Rule 32 hearing.[6]

At the close of the Rule 32 hearing, the court admitted several exhibits into the record, including certified records from the Alabama Department of Corrections

---

[4] During the state post-conviction proceedings, Petitioner was represented by Ruth Friedman, a licensed Alabama attorney with a law office in Washington, D.C.  She indicated that her representation of the petitioner was *pro bono*.

[5] Despite the state court's characterization of the timing of the filing, the record indicates that the motion for funds related to the *Atkins* claim was filed one week prior to the Rule 32 hearing.  (R-65, Vol. 25, C. 648-49.)

[6] During the Rule 32 hearing, Petitioner presented the expert testimony of Dr. Richard Leo, a sociologist with a J.D. and Ph.D in Jurisprudence and Social Policy from the University of California, Berkeley, as support for his claim that trial counsel was ineffective for failing to challenge the admissibility of his confession.  (R-77, R. 118, 123.)  Dr. Leo was offered as an expert in police interrogations.  (R-77, R. 118.)  In addition, Stephen R. Glassroth, a criminal defense attorney, testified regarding the claims of ineffective assistance of counsel related to his representation of Petitioner during the 1991 capital murder trial. (Volume 33, R. 316.)

("ADOC").   (State Collateral Appeal Transcript – First Supplement, Volume 30, Pet's Exhs. 19 and 23, R. 716-732.)  The ADOC records included a Revised Beta Examination Second Edition ("BETA-II") conducted on September 12, 1979, which indicated a Beta intelligence quotient (IQ) score of 69, and an undated Weschler Adult Intelligence Scale (WAIS) Record Form which indicated a full-scale IQ score of 74.[7]  Pet's Exh. 19, R. 718, 721.

The ADOC records also included a 1979 Confidential Psychological Summary conducted by Dr. Leslie H. Thompson, Ed.D.  Dr. Thompson evaluated Petitioner for the purpose of placing him in the correct prison classification after receiving a prior conviction and sentence for grand larceny.  The summary indicates that, after administering the BETA, Wide Range Achievement Test ("WRAT"), WAIS, Bender-Gestlast, and the Draw-a-Person Tree Test, Dr. Thompson found as follows:

ANALYSIS & IMPRESSION:

Results of the BETA indicated that Mr. Bush achieved a BETA IQ of 69 which placed him in the Mentally Deficient range of intellectual functioning.  He was administered a WAIS and the following results were achieved:  Verbal IQ 77, Performance IQ 74, and Full-Scale IQ 74 (all scores pro-rated).  These results placed him in the Borderline range of intellectual functioning and appear to be an accurate assessment of his intellectual potentials at that time.

---

[7] The identical WAIS form also appears to be an attachment to the report prepared by Dr. Leslie H. Thompson in 1979.   (State Collateral Appeal Transcript – First Supplement, Volume 30, Pet's Exh. 19, R. 724-727.)  Given that the WAIS scores referenced in Dr. Thompson's 1979 report are identical to the scores set forth in the undated WAIS form, the Court will assume for purposes of this opinion that the test was conducted in 1979.

According to his performance on the WAIS digit symbol, he appears to have adequate visual motor coordination. Other areas of the WAIS [were] inadequate. WRAT results revealed a reading achievement level of 3.9 and an arithmetic level of 2.7. These levels are greatly below his reported level of 6th grade education. As his reading level was very low, his personality was assessed with the Draw-A-Person Tree Test. These projectives suggested that the lack of independence, loss of autonomy and helplessness as well as evasiveness are prominent features of his personality at this time. Screening for organicity tended to rule out overt indications of central nervous system disorders. His performance does suggest some externalization of hostilities as he replaced dots with dashes. Impression: Borderline Mental Retardation (310.8) associated with environmental-cultural deprivation.

(State Collateral Appeal Transcript – First Supplement, Volume 30, R-67, Pet's Exh. 19, C. 722-23.)

The trial court also admitted two tests conducted on April 8, 1984: (1) a Weschler Adult Intelligence Scale – Revised ("WAIS-R") form, indicating that Petitioner received a full-scale IQ score of 75 and noting that he had a sixth-grade education; and (2) a WRAT, indicating Petitioner had a "grade rating level" of 3.7 in reading, 2.7 in spelling, and 3.3 in arithmetic.[8]  (Pet's Ex. 23, R. 742-51.)

At the end of the Rule 32 hearing, the following exchange occurred:

THE COURT:  Now, I have looked over your Exhibits 19 and 23. And is there anything else you want to say? I have conditionally denied your motion for funds. And looking at these, is there anything else you might want to say?

MS. FRIEDMAN (Petitioner's Counsel):  Yes, Your Honor. Those exhibits basically present what would be a prima facie case of mental

---

[8] The WRAT also indicate that Petitioner's scores were in the fourth percentile for reading, second percentile for spelling, and third percentile in arithmetic. (R. 748.)

retardation.  We would need an opportunity to prove.  We are not at this point able to prove without funds that Mr. Bush fits within the definition of mental retardation.  We would need funds for psychologists to be able to interpret and testify to these tests.  And we would need funds for investigation to be able to meet the adaptive deficits and onsets according to the prongs of The American Association of Mental Retardation test under *Atkins v. Virginia*.

MR. HAYDEN (Respondents' Counsel): In response, Your Honor, the State cited for the Court in its written response the case of *Ex parte Jerry Smith*.  In that particular case the issue was raised as to whether Smith was mentally retarded.  And . . . the Alabama Supreme Court stated that Smith's IQ score of 72 seriously undermined any conclusion that Smith suffered significant subaverage intellectual functioning as contemplated deemed under the broadest definitions, and that would be of mental retardation.

Before your Honor I think are three scores.  One is BETA score of 69.  One is a WAIS score.  I could not determine when that test was given.  I did not see a date.  That was a 74 score.  And then Dr. Karl Kirkland who is licensed in clinical and, I believe, forensic psychology administered a test in April of 1984, a full-scale IQ of 75.

On direct appeal of the last trial, the Court of Criminal Appeals specifically found that the fact the petitioner had dropped out of school at 7th grade was no indication of low IQ.  The Court noted that Mr. Bush had received training – technical training while he was in prison in Texas.

It's the State's position that based on the record of the trial, the facts, the fact that petitioner was 31 years old at the time of this offense creates no presumption or no indication that the petitioner is mentally retarded.

If Your Honor is inclined to take testimony on this, the State would suggest that Your Honor appoint your own expert.  I would suggest Dr. Kirkland who has already done one IQ score on Mr. Bush. The Court appoint an expert and have that expert go out and do whatever he or she, if it's someone other than Dr. Kirkland, feels is necessary to determine the issue and report back to the Court.  If there

are any questions, we can all come back at another time, I guess, and ask Dr. Kirkland questions or whomever else Your Honor might appoint.

(Volume 33, State Court Collateral Appeal Transcript (1st Supplement), R. 316-18.)

In response, Petitioner's counsel objected to the use of the State's witness, Dr. Kirkland, as the sole expert to conduct further assessments regarding the Petitioner's intellectual functioning and adaptive deficits.  She argued:

> MS. FRIEDMAN:  . . . [Petitioner] has to have the ability to prove his claim.  He doesn't – indigent petitioner.  He needs help from the Court in order to be able to prove his claims.  He can't be asked to rely on the same witnesses and documents, et cetera, that the entity that's trying to execute him and saying he does not fall within this category relies on.  He is . . . entitled to an opportunity to establish his claim if this Court is going to hear the claim.  He would need, as noted before, assistance in being able to prove that claim both through investigation and through the use of mental health testimony.  I don't know of any instance before this allowed in *Atkins* hearing and not giving the petitioner his own chance to prove his case for himself.
>
> I would also just add in terms of the numbers that the definitions of mental retardation in both DSM IV and the American Association on Mental Retardation's definitions include up to 75.  There is a five-point spread of possible error, which could mean up or down.  So certainly the scores that are in this record indicate that Mr. Bush might fall into that category.
>         . . .
>
> THE COURT:  *Atkins*, even though Alabama courts may have recently made some rulings related to *Atkins*, *Atkins* was decided in 2002?
>
> MR. HAYDEN:  November of that year, I believe, Your Honor.
>
> THE COURT:  Anyway, and looking over these exhibits, I am going to deny your motion. . . .

(*Id.*, at R. 318-321.)  Neither the State's suggestion for the court to appoint its own expert nor Petitioner's suggestion to be allowed to present his own expert during an *Atkins* hearing was accepted .

At the close of the state post-conviction proceeding, the Montgomery County Circuit Court acknowledged that, although it had granted the motion to amend the petition to add the *Atkins* claim, it denied the request to provide funds.  (R. 326.) The parties were, however, permitted to file post-hearing briefs regarding the *Atkins* claim and any other claims. (Volume 25, C. 711; Volume 33, R.321, 326.)  In May 2004, both parties filed post-hearing briefs which included their arguments regarding whether the Petitioner met the criteria for intellectual disability as set forth in *Atkins*.[9] (Volume 25, R-66, C. 762-64; R. 67, C. 790-91.)

## B.  State Court Disposition

In its July 1, 2004, final order, the Montgomery County Circuit Court addressed the *Atkins* claim on the merits, finding and concluding as follows:

> At the evidentiary hearing, the Court, over the State's objection, granted Bush's motion to amend his Rule 32 petition to include the allegation that he is mentally retarded and, thus, his execution would

---

[9] Specifically, Petitioner argued that the evidence, including his IQ scores between 69 and 75 and his notably poor communication and academic skills, demonstrated that he should be considered as belonging within the class that *Atkins* held should not be subject to execution.  (Volume 25, R-66, C. 762-64.)  The State argued that the evidence and the findings of the Alabama Court of Criminal Appeals on direct appeal, including that Petitioner completed a six-month mechanics course and had a relationship with his common-law wife and his child, establishes that Petitioner does not meet the criteria for intellectual disability.

violate the Supreme Court's holding in *Atkins v. Virginia*, 122 S. Ct. 2242 (2002). Prior to the hearing, the State was put on notice about this issue as Bush had filed a motion to amend his petition to add this claim and the State filed a response.

In this case, . . . Bush received technical training while incarcerated in Texas. There was also evidence that he had worked as a mechanic and in construction. Although he had poor academic skills, the Court has reviewed his statements and responses to the police that show that he was able to effectively communicate. Tests showed that Bush had an IQ between 69 and 74. In *Ex parte Smith*, Ms. 101267, 2003 WL 1145475, at *10 (Ala. March 14, 2003), the Alabama Supreme Court held that Smith's overall IQ of 72 "seriously undermines any conclusion that Smith suffers from significantly subaverage intellectual functioning as contemplated under even . . . the broadest definitions [of mental retardation]."

The Court is of the opinion that Bush failed to prove that he had "'significant or 'substantial deficits in adaptive behavior before or after age 18." *Ex parte Perkins*, 851 So. 2d at 456. Therefore, Bush's allegation that his mental retardation would prohibit execution is due to be denied by the Court. Rule 32.7(d), Ala.R.Crim.P.

(Volume 38, R-91, C. 818 (bracketing in original).)

Petitioner appealed the circuit court's denial of his amended Rule 32 petition, including its rejection of his *Atkins* claim.[10]  (Volume 35, R-78, App's Br.) The Alabama Court of Criminal Appeals affirmed, determining, in part, as follows:

---

[10] In his appellate brief, Petitioner argued that, based on his test scores and adaptive deficits, he had shown at the very least a *prima facie* demonstration that he met the definition of mental retardation as set forth in *Atkins v. Virginia*, 536 U.S. at 308 n. 8. (Volume 35, R-78, App's Br., p. 61.) In addition, he argued, in part, as follows:

But more importantly, petitioner was not given the tools with which to establish his case. To establish the second and third prongs of the mental retardation criteria, two methodologies are usually employed: the use of standardized adaptive behavior measures normed on the general population, such

The United States Supreme Court in *Atkins* held that it was a violation of the Eighth Amendment to execute a mentally retarded individual. The Supreme Court left it to the individual states to define mental retardation. Though Alabama has yet to enact any legislation on this issue, the Alabama Supreme Court in *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002), adopted the most liberal view of mental retardation held by any of the states that currently bar the execution of the mentally retarded. Under *Perkins*, to be mentally retarded, the defendant must have: (1) significant subaverage intellectual functioning, *i.e.*, an IQ of 70 or below; (2) significant or substantial deficits in adaptive behavior; and (3) these problems must have manifested themselves during the developmental years, *i.e.*, before the defendant reached the age of 18.

When addressing this claim, the circuit court stated:

> "At the evidentiary hearing, the Court, over the State's objection, granted Bush's motion to amend his Rule 32 petition to include the allegation that he is mentally retarded and, thus, his execution would violate the Supreme Court's holding in *Atkins v. Virginia*, 122 S. Ct. 2242 (2002). Prior to the hearing, the State was put on notice about this issue as Bush had filed a motion to amend his petition to add this claim and the State filed a response.

---

as the Vineland Adaptive Behavior Scales, and clinical judgment in analyzing information that is not captured in existing standardized instruments, which typically entails conducting a comprehensive life history investigation to identify developmental deficits. Mr. Bush's request for funding with which to develop such evidence was denied. . . . This was error. See, e.g., *Tarver v. State*, 940 So. 2d 312, 318-20 (Ala. Crim App. 2004) (remanding for evidentiary hearing on mental retardation claim where there was conflicting evidence on the matter, including a full scale IQ of 76 and a lack of detail regarding whether the petitioner had adaptive deficits in his adaptive behavior before he reached the age of eighteen); *Smith v. State*, [213] So. 2d [239, 251] (Ala. 2007) (remanding for evidentiary hearing, even though there was evidence that the defendant's "intellectual functioning and adaptive behavior as an adult places him above the mentally retarded range"). This case must be remanded so that Mr. Bush can similarly establish his claim.

35 SCR (Tab R-78), at pp. 63-64.

"In this case, . . . Bush received technical training while incarcerated in Texas. There was also evidence that he had worked as a mechanic and in construction. Although he had poor academic skills, the Court has reviewed his statements and responses to the police that show that he was able to effectively communicate. Tests showed that Bush had an IQ between 69 and 74.

"In *Ex parte Smith*, [[Ms. 1060427, May 25, 2007] ___ So. 3d ___ (Ala. 2007)], the Alabama Supreme Court held that Smith's overall IQ or 72 'seriously undermines any conclusion that Smith suffers from significantly subaverage intellectual functioning as contemplated under even . . . the broadest definitions [of mental retardation].'

"The Court is of the opinion that Bush failed to prove that he had 'significant' or 'substantial' deficits in adaptive behavior before or after age 18.' *Ex parte Perkins*, 851 So. 2d at 456. Therefore, Bush's allegation that his mental retardation would prohibit execution is due to be denied by the Court. Rule 32.7(d), Ala.R.Crim.P.'"

(C.R. 818-19.) The circuit court's ruling is supported by the record.

The record of the postconviction proceedings contains a copy of a psychological assessment conducted on Bush in 1979. Bush was born in 1950. The examiner states that he performed the Weschsler Adult Intelligence Scale ("WAIS") test on Bush and that Bush scored a verbal IQ of 77, a performance IQ of 74, and a full-scale IQ of 74. (Supplemental record, p. 723.) Also, the results of a second WAIS are also contained in the record. This WAIS was conducted in 1984. On that WAIS test Bush scored a verbal IQ of 74, a performance IQ of 84, and a full-scale IQ of 75. The record also shows that Bush was administered the BETA IQ test in 1979 and that he scored a 69 on that test.

Also, we have examined the record of the direct appeal. Bush testified at the suppression hearing and appeared articulate. Bush also acquired technical skills while he was in the federal penitentiary, completed a six-month mechanics course, and had worked as a

mechanic and on various construction-type jobs. Bush also had several long-term relationships and one child.

> The record affirmatively shows that Bush does not meet the most liberal definition of mental retardation adopted by the Alabama Supreme Court in *Perkins*. Thus, the United States Supreme Court's decision in *Atkins* does not bar Bush's death sentence.

*Bush v. State*, 92 So. 3d 121, 150-51 (Ala. Crim. App. 2009).

Petitioner sought certiorari review from the Alabama Supreme Court, arguing that the Alabama Court of Criminal Appeals failed to recognize the coexistence of weaknesses along with his strengths, that he was improperly denied expert assistance to establish his intellectual disability, and that he was denied the opportunity for a hearing to allow him to prove his case. Specifically, he asserted that the ruling of the Alabama Court of Criminal Appeals conflicted with *Atkins* and *Ake v. Oklahoma*, 470 U.S. 68, 82 (1985). On March 23, 2012, the Alabama Supreme Court denied Petitioner's certiorari petition.[11]

## II. AEDPA STANDARD OF REVIEW

Petitioner alleges that the trial court and the Alabama Court of Criminal Appeals "made determinations that were contrary to *Atkins v. Virginia*, 536 U.S. 304

---

[11] (Volume 38, R-93.)

(2002), were an unreasonable application of *Atkins*, and were unreasonable in light of the factual record before the courts.  See 28 U.S.C. §2254(d)." (Doc. 50 at 27.)

Because Petitioner filed his federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court's review of Petitioner's claims for federal habeas corpus relief, which were disposed of on the merits by the state courts, including the *Atkins* claim, is governed by the AEDPA.  *Penry v. Johnson*, 532 U. S. 782, 792 (2001).  Under the AEDPA standard of review, this Court cannot grant Petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Brown v. Payton*, 544 U. S. 133, 141 (2005); *Williams v. Taylor*, 529 U. S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) (1) have independent meanings.  *Bell v. Cone*, 535 U. S. 685, 694 (2002).  Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that

reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U. S. at 141; *Mitchell v. Esparza*, 540 U. S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U. S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U. S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d) (1), if the state court's

application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U. S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has explained:

> Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U. S. 86, 103 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle

17

or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  Under the AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions of the United States Supreme Court, not the precedent of the federal Circuit Courts.  *See Lopez v. Smith*, 574 U.S. 1, 2 (2014) (holding the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established").

The AEDPA also significantly restricts the scope of federal habeas review of state court fact-findings.  Title 28 U.S.C. § 2254(d)(2) provides federal *habeas* relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on *habeas* review, this does not

18

suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U. S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2). *See Wood v. Allen*, 558 U.S. at 300 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review.

*See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

### III.  THE *ATKINS* CLAIM

#### A.  The Claim

In his fifth claim for federal *habeas* relief, Petitioner argues he is ineligible for the death penalty under the Supreme Court's holding in *Atkins v. Virginia*, 536 U.S. 304 (2002), because he is intellectually disabled.  (Doc. 1, pp. 42-45 of 66; Petition for Writ of Habeas Corpus, pp. 39-42.)

#### B.  Clearly Established Federal Law

In *Atkins v. Virginia*, 536 U. S. 304 (2002), the United States Supreme Court concluded that the execution of intellectually disabled persons failed to fulfill either of the two justifications for capital punishment, *i.e.*, retribution and deterrence, and therefore the Eighth Amendment forbids the execution of intellectually disabled persons.[12] *Atkins v. Virginia*, 536 U.S. at 318-21.  The Supreme Court cited two

---

[12]   The Court in *Atkins* used the descriptive term "mentally retarded" rather than the term "intellectually disabled."  The Petitioner's pleadings in both the state habeas court and this Court also employ the terms "mental retardation" and "mentally retarded." The terminology in the courts and the medical community, however, has begun to change "because 'the term "mental retardation" has negative connotations,' and 'has become offensive to many people.'" *Jones v. Social Security Administration*, 695 F. App'x. 507 (11th Cir. 2017) (quoting Change in Terminology: "Mental Retardation" to "Intellectually Disability," 78 Fed. Reg. 46499 (Aug. 1, 2013)).  "But this change 'd[id] not affect the actual medical definition of the disorder or available

clinical definitions of "mental retardation" (now referred to as "intellectual disability") with approval but, ultimately, left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."[13]  *Id.*, 536 U.S. at 317.

Nonetheless, the Supreme Court recognizes that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."  *Atkins*, 536 U.S. at 309 n.5 (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000)); *see also Brumfield v. Cain,* 576 U.S. 305, 315 (2015) (quoting *Atkins*, *supra*).  Thus, an IQ score of 75 is "squarely in the range of potential intellectual disability."  *Brumfield*, 576 U.S. at 315.

---

programs or services.'"  *Id.* (quoting Change in Terminology: "Mental Retardation" to "Intellectually Disability," 78 Fed. Reg. at 49500).

Following the lead of the Supreme Court and Eleventh Circuit in recent opinions, this memorandum opinion uses the terms "intellectual disability" and "intellectually disabled" to describe the identical phenomenon.  *See Hall v. Florida*, 572 U.S. at 704-05 ("This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts, the manual is often referred to by its initials 'DSM,' followed by its edition numbers, *e.g.*, 'DSM-5.'"); *Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1310 n.1 (11th Cir. 2013) ("[W]e recognize that increasingly professionals in this field, such as the American Association on Intellectual and Developmental Disabilities (formerly the American Association on Mental Retardation), are replacing the term 'mental retardation' with 'intellectual disability' or 'intellectual developmental disability.'").  Therefore, except when directly quoting an opinion, the new nomenclature will be followed by this court.

[13] In *Bobby v. Bies*, 556 U.S. 825 (2009), the Supreme Court pointed out that *Atkins* did not provide definitive procedural or substantive guides for determining when a person who claims intellectual disability will be so impaired as to fall within *Atkins'* compass.  *Bobby v. Bies*, 556 U.S. at 831.

With regard to the first prong of the *Atkins* analysis, *i.e.*, establishing significantly subaverage intellectual functioning, the Supreme Court has held that, because of the imprecision inherent in IQ testing, a court must consider the standard error of measurement ("SEM") when assessing intellectual disability. *See Hall v. Florida*, 572 U.S. 701, 721-22 (2014):

> The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.

> By failing to take into account the SEM and setting a strict cutoff at 70, Florida "goes against the unanimous professional consensus." APA Brief 15. Neither Florida nor its *amici* point to a single medical professional who supports this cutoff. The DSM–5 repudiates it: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM–5, at 37. This statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower," *Atkins, supra,* at 309, n. 5, 122 S.Ct. 2242, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.

In *Moore v. Texas*, 137 S.Ct. 1039, 1048-53 (2017), the Supreme Court further restricted states' ability to circumscribe the legal definition of "intellectual disability," holding (1) a state's determination under *Atkins* must be guided by current medical standards, and (2) states are not free to adopt criteria unsupported by medical science to evaluate a defendant's alleged subaverage intellectual

functioning or deficits in adaptive skills. *See Moore v. Texas*, 137 S.Ct. at 1050-53 (holding a Texas appellate court erred in applying a set of non-clinical criteria known as the *Briseno* factors in evaluating a defendant's claim of intellectual disability because (1) some of the *Briseno* factors had implicitly been rejected by the medical community (in part because they were based on outdated stereotypes) and (2) all the *Briseno* factors were little more than lay perceptions of intellectual disability untethered to any clinical medical standard).

### D.  AEDPA Review

Whether Petitioner is intellectually disabled is a question of fact. *Ledford v. Warden, GDCP*, 818 F.3d 600, 632 (11th Cir. 2016), *cert. denied*, 137 S.Ct. 1432 (2017); *Conner v. GDCP Warden*, 784 F.3d 752, 766 (11th Cir. 2015), *cert. denied*, 136 S.Ct. 1246 (2016).  Thus, the state *habeas* court's determination on the merits that Petitioner is not intellectually disabled is a finding of fact entitled to deference under the AEDPA.  *Ledford v. Warden, GDCP*, 818 F.3d at 632; *Fults v. GDCP Warden*, 764 F.3d 1311, 1319 (11th Cir. 2014), *cert. denied*, 136 S.Ct. 56 (2015).

The purpose of the AEDPA is to ensure that federal *habeas* relief functions to guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.  *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)); *Hill v. Humphrey*, 662 F.3d 1336, 1347 (11th Cir. 2011) (*en banc*), *cert. denied*, 566 U.S. 1041 (2012).

It is significant for the purpose of this Court's AEDPA analysis of the state habeas court's denial of Petitioner's *Atkins* claim that both the state habeas court's July 1, 2004, "Final Order" denying Petitioner's Rule 32 petition and the Alabama Court of Criminal Appeals' Opinion issued May 29, 2009, affirming the trial court's denial of Petitioner's Rule 32 petition, were issued prior to the dates the Supreme Court issued its opinions in *Hall v. Florida, Brumfield v. Cain* and *Moore v. Texas*, discussed above.  Except insofar as they merely reiterated or applied the holding in *Atkins*, those subsequent opinions were not "clearly established" as of the date the state courts rejected Petitioner's *Atkins* claim on the merits.

### E.     ALABAMA'S APPLICATION OF *ATKINS*

In *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002), the Alabama Supreme Court held that the legal standard for evaluating intellectual disability within the context of *Atkins* requires a criminal defendant to show (1) significant subaverage intellectual functioning (defined as an IQ of 70 or below), (2) significant or substantial deficits in adaptive behavior, and (3) that these problems manifested themselves during the developmental period (*i.e.*, before the age of 18).   The Eleventh Circuit Court has consistently recognized that Alabama courts apply the three-component standard set forth in *Perkins* when considering an *Atkins* issue. *See*, *e.g.*, *Burgess v. Commn'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1321 (11th Cir. 2013); *Thomas v. Allen*, 607 F.3d 749, 752 (11th Cir. 2010); *Powell v. Allen*, 602

F.3d 1263, 1272 (11th Cir. 2010), *cert. denied*, 562 U. S. 1183 (2011); *Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009); *Wood v. Allen*, 542 F.3d 1281, 1286 (11th Cir. 2008), *aff'd*, 558 U. S. 290 (2010). In addition, the Eleventh Circuit has recognized Alabama's requirement that the criminal defendant must show that the problems existed at the time of the capital offense and currently. *See Burgess v. Commn'r, Ala. Dep't of Corr.*, 723 F.3d at 1321, n.13 (holding the Alabama Supreme Court requires that a defendant asserting an *Atkins* claim exhibit significantly subaverage intellectual functioning abilities and significant deficits in adaptive behavior during three periods: before the age of eighteen, on the date of the capital offense, and currently); *Thomas v. Allen*, 607 F.3d at 752-53 (holding the same); *Powell v. Allen*, 602 F.3d at 1272 ("it is implicit in that definition that the IQ and deficits in adaptive functioning exist not only prior to the age of eighteen but also at the time of the crime and currently"); *Holladay v. Allen*, 555 F.3d at 1353 ("it is 'implicit' that the problems also existed at the time of the crime" (quoting *Smith v. State*, 213 So. 3d 239, 248 (Ala. 2007) ("Implicit in the definition is that the subaverage intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18."). Furthermore, intellectual disability must be proven by a "preponderance of the evidence." *Ex parte Carroll*, 295 So. 3d 1, 3 (Ala. April 5, 2019) (citing *Ex parte Smith*, 213 So. 3d 313, 319 (2010)) (some citations omitted).

In *Smith v. Campbell*, 620 F. App'x. 734 (11th Cir. 2015) (unpublished), the Eleventh Circuit Court further summarized Alabama's application of the *Atkins* decision as follows:

> Neither the Alabama legislature nor the Alabama Supreme Court has defined what constitutes "significant or substantial deficits in adaptive behavior." See [*Perkins*, 851 So. 2d at 456.] But the Alabama Supreme Court has applied generally the "most common" or "broadest" definition of mental retardation, which reflects "the clinical definitions considered in *Atkins*." *In re Jerry Jerome Smith v. State*, No. 1060427, [213] So. 3d [239], [247-48 (Ala. 2007)]. And "significant or substantial deficits in adaptive behavior" means under the clinical definitions considered in Atkins, a petitioner must show "limitations in two or more of the following applicable adaptive-skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3, 122 S.Ct. at 2245 n. 3 (citing the American Association on Mental Retardation and American Psychiatric Association's definitions of mental retardation).[] Thus, we use that common clinical definition in considering this case.

620 F. App'x. at 747-48 (footnotes omitted).

## F.   Analysis of the Petitioner's *Atkins* Claim

The Alabama Court of Criminal Appeals considered Petitioner's *Atkins* claim on the merits when it affirmed the dismissal of the state post-conviction petition. The state appellate court specifically found that the trial judge's determination that Petitioner possessed an IQ between 69 and 74 and that he failed to prove that he had significant or substantial deficits in adaptive behavior before or after the age of 18, as well as its conclusion that Bush did not meet the definition of intellectual

disability adopted by the Alabama Supreme Court in *Perkins*, was supported by the record. This Court, therefore, will review the state court's ruling on Petitioner's intellectual functioning and adaptive behavior.

Although the Montgomery County Circuit Court and the Alabama Court of Criminal Appeals acknowledged that Petitioner received IQ scores between 69 and 74, neither court clearly specified whether he met the first component of the *Perkins* analysis, specifically whether he does in fact have "significant subaverage intellectual functioning, i.e., an IQ of 70 or below." Nonetheless, both these courts quoted *Ex parte Smith* for the proposition that "an overall IQ of 72 . . . 'seriously undermines any conclusion that that [a defendant] suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions '[of intellectual disability].'" (Vol. 38, R-91, C. 818, quoting *Ex parte Smith*, 213 So. 3d 214, 225 (Ala. 2003); Vol. 38, R-92, quoting *Ex parte Smith*, 213 So. 3d 239, 249 (Ala. 2007)). Assuming the validity of all Petitioner's test scores, the average of the full-scale IQ scores in the record would be 72. Thus, the state courts seem to infer that the average score "undermines" a conclusion that Petitioner has "significant subaverage intellectual functioning."[14]

---

[14] During the post-conviction proceeding, no expert testified concerning the validity of any of the scores.

It is important to note, however, that Alabama caselaw does not rigidly apply a strict cutoff for IQ scores. "There is no Alabama case law stating that a single IQ raw score, or even multiple raw scores, above 70 automatically defeats an *Atkins* claim when the totality of the evidence . . . indicates that a capital offender suffers subaverage intellectual functioning." *Thomas v. Allen*, 607 F.3d 749, 757 (11th Cir. 2010). *See also Smith v. Campbell*, 620 F. App'x. at 749 (citing *Thomas*, *supra*, for the proposition that "Alabama law generally does not contain a strict IQ cut-off of 70 to establish intellectual disability"). Moreover, in *Atkins*, the Court noted that "between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score the for the intellectual function prong of the mental retardation definition." 536 U.S. at 309 n. 5 (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000)). The record indicates that, without considering the standard error of measurement or the validity of a particular test, Petitioner's full-scale IQ score may be as low as 69 or as high as 75.[15]   In addition, nothing in the record indicates that

---

[15] Although the record included the results of an additional WAIS test indicating Petitioner received a full-scale IQ score of 75, the lower court did not discuss this score; however, on appeal, the Alabama Court of Criminal Appeals found that Petitioner did receive a full-scale IQ score of 75 on the 1984 WAIS test, which is supported by the record.

An additional note is that the state courts did not account for the standard error of measurement applicable to IQ scores as considered in the subsequent decision of *Hall v. Florida*, 572 U.S. 701 (2014). Petitioner's counsel did, however, argue during the Rule 32 proceeding that Petitioner's scores indicate significant subaverage intelligence because "in terms of the numbers that the definitions of mental retardation in both DSM IV and the American Association on Mental

the state trial court provided the Petitioner (or the state) with an opportunity to challenge the validity of any of the test scores via expert testimony in a full *Atkins* hearing.

Furthermore, although the Alabama Court of Criminal Appeals refers to the 1979 psychological assessment conducted by a state psychologist, the appellate court failed to address inconsistencies within the psychologist's analysis and ignored parts of the report that did not support its final conclusion.  For example, the appellate court does not discuss Dr. Thompson's opinion that the BETA score of 69 "placed [Petitioner] in the <u>Mentally Deficient</u> range of intellectual functioning." (C. 723).  In addition, the court did not consider the psychologist's specific findings that Petitioner's reading achievement level of 3.9 and arithmetic level of 2.7 were "greatly below his reported level of 6th grade education" or that, due to Petitioner's low reading level, it was necessary to assess his personality with a drawing test.[16] (*Id*.)  Nonetheless, the psychologist assessed that Petitioner's full-scale IQ score of 74 on the WAIS placed Petitioner in the borderline range of intellectual functioning. (*Id*.)  Dr. Thompson concluded that Petitioner "appeared to be functioning at the <u>Borderline</u> range of intellectual functioning at the time of testing." (*Id*.)  Given that

---

Retardation's definitions include up to 75 [and] [t]here is a five-point spread of possible error, which could mean up or down." (Volume 33, R. 319.)

[16] An additional Wide-Range Academic Achievement Test in the record indicates that, in April 1984, Petitioner achieved a reading level of 3.7 and an arithmetic level of 3.3. (Volume 30, R. 67, C. 748.)

Dr. Thompson's assessment was prepared for the limited purpose of determining whether Petitioner should be institutionalized in community custody, rather than for *Atkins* purposes, and in light of the inconsistencies within the psychologist's assessment and the varying test scores and the standard deviation that could indicate a score as low as 64, an evidentiary hearing is necessary to further develop the record regarding the intelligence and adaptive functioning issues concerning the Petitioner.

In addition, both the state trial court and the Alabama Court of Criminal Appeals focused on Petitioner's adaptive functional abilities without considering his functional deficits. With the exception of one general reference to Petitioner having "poor academic skills," the state courts did not consider evidence suggestive of significant deficits in adaptive functioning. In *Atkins*, the Court noted there are two clinical definitions of intellectual disability which include limitations in adaptive skill areas as follows:

> The American Association on Mental retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. Mental retardation manifests before age 18." Mental Retardation, definition, Classification, and Systems of Supports 5 (9th ed. 1992).

> The American Psychiatric Association's definition is similar. "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by

> <u>significant limitations in adaptive functioning in at least two of the</u>
> <u>following skill areas: communication, self-care, home living,</u>
> <u>social/interpersonal skills, use of community resources, self-direction,</u>
> <u>functional academic skills, work, leisure, health and safety</u> (Criterion
> B). The onset must occur before age 18 years (Criterion C). Mental
> Retardation has many different etiologies and may be seen as a final
> common pathway of various pathological processes that affect the
> functioning of the central nervous system." Diagnostic and Statistical
> Manual of Mental Disorders 41 (4th ed. 2000). "Mild mental
> retardation is typically used to describe people with an IQ of 50-55 to
> approximately 70. *Id.*, at 42-43.

536 U.S. at 309 n.3 (emphasis added). Alabama courts have applied the *Atkins*

definitions of intellectual disablity when considering a capital defendant's

intellectual and adaptive functioning. *See Perkins*, 851 So. 2d at 455-56

(recognizing that the Legislature has not established a procedure for determining

whether a capital defendant is intellectually disabled and concluding that Perkins did

not "suffer from mental retardation under the definitions considered by the United

States Supreme Court in reaching its holding in *Atkins*….").

The record includes evidence suggestive of at least two limitations in the

adaptive-skill areas. *See Atkins*, 536 U.S. at 308 n.3, 122 S.Ct. at 2245 n. 3. First,

the evidence suggests that Petitioner had limitations in "functional academics."

There are references to Petitioner completing sixth grade and dropping out of school

in seventh grade. (Vol. 30, R-67, C. 722 (9/20/1979 Psychological Summary);

Alabama Board of Pardons and Paroles Report of Investigation, Vol. 5, Tab R-23,

p. 900 (Presentence Report)).

In addition, as an adult, Petitioner received consistently lower scores on the WRAT. Specifically, the 1979 WRAT results indicate Petitioner achieved a reading achievement grade level of 3.9 and an arithmetic grade level of 2.7. (Vol. 30, R-67, C. 723.) The 1984 WRAT results indicate Petitioner achieved reading, spelling, and arithmetic grade levels at 3.7, 2.7, and 3.3, respectively. (Vol. 30, R-67, C. 748.)

The record also includes Petitioner's motion to amend the Rule 32 petition to add the *Atkins* claim, in which counsel proffered that Petitioner "failed his subjects in school" and was held back twice. (Vol. 25, R-66, C. 649.) *Cf. Morrow v. State*, 928 So.2d 315 (Ala. Crim App. 2004) (finding that evidence that criminal defendant repeated the first grade three times and had poor grades in school were indicators of intellectual disability). Despite evidence of adaptive deficits and defense counsel's proffer, Petitioner was not allowed to seek expert testimony or otherwise develop the record regarding any limitations in the adaptive skill area of functional academics in a full evidentiary hearing.

Next, there is also evidence suggesting that Petitioner had limitations in the adaptive-skill area of "self-direction." For example, the 1979 psychologist's report provided that "projectives suggested that [] lack of independence, loss of autonomy and helplessness as well as evasiveness are prominent features of his personality at this time." (Vol. 30, R-67, C. 723.) Lack of independence is a characteristic of individuals with an intellectual disability. *See Atkins*, 536 U.S. at 318 ("[T]here is

32

abundant evidence that in group settings [individuals with intellectual disability] are followers rather than leaders."); *Morrow v. State*, 928 So. 2d 315 (Ala. Crim. App. 2004) (citing *Ex parte Perkins*, 851 So. 2d at 317, which cites the list of significant or substantial deficits in adaptive behavior, including the adaptive skill areas of self care and self direction, set forth in *Atkins*, 536 U.S. at 308 n.3).

Despite evidence suggesting significant deficits in Petitioner's intellectual functioning and adaptive behavior, and even though the state trial court did not conduct a full evidentiary hearing or allow an expert to evaluate Petitioner's intellectual abilities and adaptive deficits, the Alabama Court of Criminal Appeals affirmed the state trial court's determination that Petitioner failed to prove that he had significant or substantial deficits in adaptive behavior before or after age 18. Instead, the appellate court turned its focus to Petitioner's alleged adaptive strengths. First, the appellate court found that Petitioner "appeared articulate" at the suppression hearing. The trial court, however, did not enter any findings regarding Petitioner's appearance or demeanor during the suppression hearing. Nonetheless, to the extent the appellate court found that Petitioner responded to questions at the suppression hearing, the finding is supported by the record.

Next, the appellate court found that Petitioner acquired technical skills while in the federal penitentiary, completed a six-month mechanics course, and had worked as a mechanic and on construction jobs. The trial record includes a 1991

Alabama Board of Pardons and Paroles Investigation Report indicating that Petitioner reported to an investigator that he "acquired technical skills while in the federal penitentiary in Texas, where he completed a six-month mechanics course" and that he worked for a construction company from 1978 to 1980 and as a mechanic for an automotive shop from 1980 to 1981. (Doc. 25-5, p. 106 of 174, C. 901.)  The specific nature of these jobs and courses, however, are not included and are based entirely on the Petitioner's own reporting.  These matters, however, may be further explored during a full evidentiary hearing on the *Atkins* issue.

The state courts also relied on Petitioner's adaptive strengths without allowing Petitioner to present evidence in support of his *Atkins* claim in a full evidentiary hearing when determining that Petitioner "failed to prove that he had 'significant' or 'substantial' deficits in adaptive behavior before or after age 18," *Bush*, 92 So. 2d 121, 150 (Ala. Crim. App. 2009) (quoting the trial court's order which quotes *Ex parte Perkins*, 851 So. 2d at 456).  The state courts failed to consider the specific evidence suggesting significant or substantial deficits in adaptive behavior, did not allow Petitioner to obtain an expert on the matter, and did not provide a full *Atkins* hearing. The record, therefore, was "simply not sufficient" to determine Petitioner's intellectual functioning.  *Cf.  Morrow v. State*, 928 So. 2d 315, 321 (Ala. Crim. App. 2004) (concluding that a determination of whether the petitioner was or was not intellectually disabled could not be made based on the insufficient record and that

conflicts in the evidence should be resolved by a trial court).  Thus, the Alabama Court of Criminal Appeals' determination that Petitioner does not meet the definition of intellectual disability as set forth in the *Perkins-Atkins* framework is based on a record insufficient to support its conclusions.

Recently, the Eleventh Circuit reaffirmed the standard to be applied when reviewing a habeas petition in regard to an evidentiary hearing on a claim of intellectual disability.

> "The district court abuses its discretion where 'such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.' " *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)). If [the petitioner] did not diligently attempt to develop the factual basis for this claim in the state court, absent certain circumstances, he is not entitled to a hearing and we will affirm the district court's denial. 28 U.S.C. § 2254(e)(2).

*Jenkins v. Comm'r, Alabama Dep't of Corr.*, 936 F.3d 1252, 1279–80 (11th Cir. 2019); *see also Smith v. Campbell*, 620 F. App'x. 734 (11th Cir. 2015)(reversed and remanded for consideration of Smith's request for discovery and an evidentiary hearing because Smith's trial preceded *Atkins*).  Although the state trial court allowed Petitioner to amend his Rule 32 petition on the morning of the state post-conviction proceeding, the lower court did not provide Petitioner with sufficient time to prepare for the *Atkins* hearing, obtain an expert, or otherwise develop the evidence that could prove his factual allegations. Under the circumstances, the state court's refusal to allow discovery or provide Petitioner with an opportunity to prepare for

the hearing on the *Atkins* claim did not allow him to "diligently attempt to develop the factual basis for this claim in the state court." *Id.*

Because the trial court prevented Petitioner from presenting sufficient facts in support of his *Atkins* claim in a full hearing, the Alabama Court of Criminal Appeals' conclusion that "Bush failed to prove that he had 'significant' or 'substantial deficits in adaptive behavior before or after age 18'" was an objectively unreasonable determination of the facts, *see Smith*, 620 F. App'x. at 750. Thus, Petitioner has satisfied the requirement of §2254(d)(2) and is entitled to an evidentiary hearing in which he may present evidence in support of his assertion that the Eighth Amendment forbids his execution based on intellectual disability.[17]

## IV.  ORDER

Accordingly, it is hereby **ORDERED** that:

(1) To the extent the Petitioner seeks reconsideration of the motion for an evidentiary hearing on the *Atkins* claim, the motion is GRANTED.

(2) On or before Wednesday, August 26, 2020, the attorneys are ORDERED to confer and submit three proposed dates for a status and scheduling conference.

---

[17] Because Petitioner has demonstrated that the state trial court's decision denying his claim on the merits cannot withstand scrutiny under §2254(d)(2), it is unnecessary to determine whether the denial of discovery and a hearing on the intellectual disability issue likewise meets §2254(d)(1).

DONE, this 5th day of August, 2020.

          /s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE