IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM BUSH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-345-RAH |
| | ) | |
| GREG LOVELACE,[1] Commissioner, Alabama Department of Corrections, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

**MEMORANDUM OPINION AND ORDER**

This Memorandum Opinion and Order addresses Claim E of Petitioner's habeas corpus petition, in which he alleges that the State of Alabama is precluded from executing him pursuant to *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), due to his alleged intellectual disability. The remainder of the petition's claims will be addressed in a separate order. For the reasons that follow, Claim E will be DENIED.

**BACKGROUND[2]**

Following this Court's August 5, 2020, order granting a hearing on Petitioner's *Atkins* claim, the parties commenced discovery. Discovery was impeded

---

[1] Greg Lovelace has replaced John Q. Hamm as the Commissioner of the Alabama Department of Corrections. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Lovelace is automatically substituted as respondent in this action. The Clerk of Court is DIRECTED to update the docket sheet and change the caption accordingly.

[2] In the order granting Petitioner an evidentiary hearing on his *Atkins* claim, this Court set forth the relevant factual and procedural background informing its analysis of Claim E pursuant to 28 U.S.C. § 2254(d). (Doc. 59 at 2–14.) This order will not repeat that summary.

somewhat by the COVID-19 pandemic and its attendant restrictions on access to Petitioner at Holman Correctional Facility. Ultimately, the evidentiary hearing commenced on October 31, 2022, with testimony over two days by three of Petitioner's expert witnesses. The hearing was forced to adjourn for several months, however, due to the unavailability of Petitioner's remaining expert witness. The hearing resumed in April 2023 with testimony from that witness and Respondent's lone witness.

In total, the parties presented testimony from five expert witnesses along with hundreds of pages of documentary exhibits. Petitioner presented testimony from the following experts: Dr. Mark Tassé, a professor of psychology and a leading expert in the field of intellectual disability, who offered general testimony about the intellectual disability standard; Dr. Karen Salekin, a professor of psychology and clinical psychologist who diagnosed Petitioner with intellectual disability following an evaluation and composition of his "biopsychosocial" history; Dr. Robert Shaffer, a neuropsychologist who administered a battery of neuropsychological tests to Petitioner, as well as an intelligence test, and offered testimony about the neurocognitive implications of Petitioner's performance on these tests; and Dr. Daniel Reschly, a professor of psychology and former school psychologist, who testified primarily about impairments in Petitioner's adaptive functioning reflected in his available school records. Respondent presented the testimony of Dr. Glen D. King, a clinical psychologist who evaluated Petitioner for intellectual disability and concluded that he does not qualify for such a diagnosis. Following the preparation of hearing transcripts, at the Court's direction, the parties submitted proposed findings of facts and conclusions of law as well as post-hearing briefing.

## DISCUSSION

### I. Standard of Review

Because this Court previously determined that the decision of the Alabama Court of Criminal Appeals rejecting Petitioner's *Atkins* claim was based upon "an objectively unreasonable determination of the facts" in the record before that court (doc. 59 at 36), this matter is before the Court for *de novo* review. *See, e.g.*, *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1346 (11th Cir. 2024) (citing *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1249–50, 1255 (11th Cir. 2013)). "Whether a capital offender suffers from an intellectual disability is a question of fact." *Smith v. Comm'r, Ala. Dep't of Corr.*, 67 F.4th 1335, 1344 (11th Cir. 2023). Under Alabama law, Petitioner bears the burden of proving, by a preponderance of evidence, that he meets the criteria for establishing intellectual disability. *Smith v. State*, 213 So. 3d 239, 252 (Ala. 2007).[3]

### II. Proof of Intellectual Disability

This section will discuss the requirements of both the Constitution and Alabama law as they are to be applied to Petitioner's claim.

#### *A. Constitutional Requirements*

In the order granting the *Atkins* hearing, this Court set forth the constitutional requirements of *Atkins* and its progeny. The Supreme Court has not issued a substantive decision applying or refining *Atkins* since that order. Accordingly, this

---

[3] In *Atkins*, "the Supreme Court expressly 'le[ft] to the States the task of developing appropriate ways' to identify intellectual disability." *Raulerson v. Warden*, 928 F.3d 987, 1001 (11th Cir. 2019) (quoting *Atkins*, 536 U.S. at 317). Hence, subject to the constitutional minimums expressed in *Atkins* and further refined in subsequent Supreme Court decisions, federal courts look to state law for the applicable substantive and procedural framework, including the claimant's burden of proof, when assessing whether a habeas petitioner is intellectually disabled. *Id*. at 1001–02 (citations omitted).

order reproduces this Court's previous discussion of the constitutional principles governing Petitioner's claim.

> In *Atkins*, the United States Supreme Court concluded that the execution of intellectually disabled persons failed to fulfill either of the two justifications for capital punishment, *i.e.*, retribution and deterrence, and therefore the Eighth Amendment forbids the execution of intellectually disabled persons. *Atkins*, 536 U.S. at 318–21. The Supreme Court cited two clinical definitions of "mental retardation" (now referred to as "intellectual disability") with approval but, ultimately, left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.*, 536 U.S. at 317.
>
> Nonetheless, the Supreme Court recognizes that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins*, 536 U.S. at 309 n.5 (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000)); *see also Brumfield v. Cain,* 576 U.S. 305, 315 (2015) (quoting *Atkins*, *supra*). Thus, an IQ score of 75 is "squarely in the range of potential intellectual disability." *Brumfield*, 576 U.S. at 315.
>
> With regard to the first prong of the *Atkins* analysis, *i.e.*, establishing significantly subaverage intellectual functioning, the Supreme Court has held that, because of the imprecision inherent in IQ testing, a court must consider the standard error of measurement ("SEM") when assessing intellectual disability. *See Hall v. Florida*, 572 U.S. 701, 721–22 (2014):
>
>> The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.
>>
>> By failing to take into account the SEM and setting a strict cutoff at 70, Florida "goes against the unanimous

> professional consensus." APA Brief 15. Neither Florida nor its *amici* point to a single medical professional who supports this cutoff. The DSM–5 repudiates it: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM–5, at 37. This statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower," *Atkins, supra,* at 309, n.5, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.
>
> In *Moore v. Texas*, 581 U.S. 1 (2017), the Supreme Court further restricted states' ability to circumscribe the legal definition of "intellectual disability," holding (1) a state's determination under *Atkins* must be guided by current medical standards, and (2) states are not free to adopt criteria unsupported by medical science to evaluate a defendant's alleged subaverage intellectual functioning or deficits in adaptive skills. *See* 581 U.S. at 15–20 (holding a Texas appellate court erred in applying a set of non-clinical criteria known as the *Briseno* factors in evaluating a defendant's claim of intellectual disability because (1) some of the *Briseno* factors had implicitly been rejected by the medical community (in part because they were based on outdated stereotypes) and (2) all the *Briseno* factors were little more than lay perceptions of intellectual disability untethered to any clinical medical standard).

(Doc. 59 at 20–23 (footnotes omitted).) So, according to *Atkins* and its progeny, beyond forbidding the execution of intellectually disabled inmates, the Constitution prohibits a state from defining intellectual disability by reference to a rigid IQ score of 70 or below without consideration of the SEM and requires that a state's assessment of intellectual disability be informed by current medical standards.[4]

---

[4] Justice Alito recently summarized the three constitutional rules flowing from *Atkins*, *Hall*, and *Moore* as follows:

> Our case law has thus laid out three rules concerning IQ and *Atkins* claims. First, *Atkins* does not bar the execution of a defendant who fails to prove an

### *B. Alabama's Test for Intellectual Disability*

While explicitly leaving to the states "'the task of developing appropriate ways to enforce [*Atkins*'s] constitutional restriction upon [their] execution of sentences[,]'"[5] *Atkins* cited two clinical definitions of intellectual disability that were found in the professional diagnostic manuals of the American Association of Mental Retardation (now referred to as the American Association on Intellectual and Developmental Disabilities or "AAIDD") and the American Psychiatric Association ("APA"). *Atkins*, 536 U.S. at 308 n.3. These clinical definitions of intellectual disability are broadly similar and require, in essence, the presence of "significantly subaverage intellectual functioning" and "significant limitations in adaptive functioning," both of which must manifest during the developmental period (defined by the APA as prior to the age of 18 and by the AAIDD as prior to the age of 22). *Id*.

In *Carroll v. State*, 300 So. 3d 59, 64 n.5 (Ala. 2019), the Alabama Supreme Court observed that Alabama's legislature "has not adopted specific legislation for the purposes of applying *Atkins*[,]" and that, since *Atkins*, Alabama's state courts have applied the "'most common or broadest definition'" of intellectual disability, consistent with the tripartite clinical definition referenced in *Atkins*. That "broadest" standard was first recognized by the Alabama Supreme Court shortly after *Atkins* in *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002), and continues to be applied by

> IQ of 70 or lower. Second, when determining whether a defendant has met this 70-IQ threshold, a court may not treat any one score as dispositive without considering a confidence interval based on the test's standard error of measurement. And third, courts may not use extrinsic, defendant-specific details to infer where his IQ falls within a given interval.

*Hamm v. Smith*, 608 U.S. __, 146 S.Ct. 1251, 1275 (2026) (Alito, J., dissenting from the dismissal of certiorari).

[5] *Atkins*, 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986)).

Alabama's state courts in the absence of legislative action in this area. *Smith v. State*, 213 So. 3d 239, 247–48 (Ala. 2007).

Alabama's formulation of intellectual disability, therefore, as established in *Perkins* and reiterated in *Smith* and *Carroll*, "consists of the following three factors: (1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; *and* (3) the manifestation of these problems during the defendant's developmental period (i.e., before the defendant reached age 18)." *Smith*, 213 So. 3d at 248 (citation omitted) (emphasis in *Smith*). Furthermore, the Alabama Supreme Court in *Smith* clarified that intellectual disability in the *Atkin*s context requires that "the offender must *currently* exhibit subaverage intellectual functioning" and "*currently* exhibit deficits in adaptive behavior" in addition to showing the manifestation of those conditions before the age of eighteen. *Id*. (emphasis supplied).

The first prong of the intellectual disability standard—whether the individual has significantly subaverage intellectual functioning—"turns on whether he has an IQ equal to or less than 70." *Smith*, 67 F.4th at 1345. As established in *Hall*, however, because IQ testing is imprecise, the Constitution requires that assessment of the individual's IQ score consider the SEM. *Id*. Because the SEM establishes a range in which a clinician can confidently surmise the individual's true IQ may be found, "when the lower end of that range is equal to or less than 70, an offender 'must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.'" *Id*. (quoting *Hall*, 572 U.S. at 723).

Regarding the second prong, the APA's Diagnostic and Statistical Manual ("DSM") defines adaptive functioning as "'how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and social background.'" *Smith*, 67 F.4th at 1349 (quoting DSM-5, at 37). The AAIDD's manual similarly describes "adaptive behavior" as

"'the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.'" *Id*. (quoting AAIDD-12, at 29). As the Eleventh Circuit stated in *Smith*:

> "Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical." DSM-5, at 37.[6] Deficits in any one of those domains satisfies the adaptive-functioning prong. *See Moore*, 581 U.S. at 15–16 (citation omitted); DSM-5 at 38 (explaining that the adaptive-functioning criterion "is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired" such that "ongoing support" is necessary "for the person to perform adequately in one or more life settings at school at work, at home, or in the community"); AAIDD-12, at 31 (explaining that "the 'significant limitations in adaptive behavior' criterion" requires "an adaptive behavior score that is approximately 2 standard deviations or more below the mean in at least one of the three adaptive behavior domains, conceptual, social, or practical").

67 F.4th at 1349–50. Importantly, "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Moore*, 581 U.S. at 15 (citing AAIDD-11, at 47; DSM-5, at 33, 38) (emphasis in *Moore*). Thus, the appearance of strengths in some areas of adaptive functioning will not preclude a finding of intellectual

[6] The DSM-5 describes the three domains of adaptive functioning as follows:

> The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences, empathy, interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others.

DSM-5, at 37–38.

disability where sufficient deficits in other areas of adaptive functioning are present. *Smith*, 67 F.4th at 1353.

## III. Petitioner's Factual Showing and Supporting Arguments

Because whether Petitioner is intellectually disabled is a question of fact on which he bears the burden of proof by a preponderance of the evidence, the parties were permitted to submit proposed findings of fact based upon the evidence introduced during the evidentiary hearing. This section will summarize the evidence and argument Petitioner offers to carry his burden.

### *A. Significantly Subaverage Intellectual Functioning*

Petitioner's proposed findings of fact relating to his proof of the first prong of the intellectual disability standard—significantly subaverage intellectual functioning ("SSIF")—rely primarily on two planks of the evidentiary record: Petitioner's scores on several IQ tests and his performance in neuropsychological testing administered by Dr. Shaffer. (Doc. 124 at ¶¶ 146–225.) Petitioner cites six IQ scores in the record:[7] 1) a full scale IQ (FSIQ) score of 78 on the WAIS in 1982 in conjunction with a competency evaluation at the Taylor Hardin Medical Facility; 2) a FSIQ of 75 on the WAIS-R in 1984 in conjunction with another competency evaluation by Dr. Karl Kirkland; 3) a FSIQ of 63 on the SB-5 administered by Dr.

[7] The evidence at the hearing established that the "gold standard" IQ tests utilized by the medical profession for assessing intellectual functioning are the Wechsler Adult Intelligence Scale ("WAIS") and the Stanford-Binet Intelligence Scales ("SB"). (*See, e.g.*, doc. 111 at 20 (Tassé).) The WAIS and SB intelligence tests have progressed through several iterations in their decades of existence and continue to be occasionally revised and standardized by their publishers. The particular version of the test under consideration is typically indicated with a short designation of the test's generation (*e.g.*, WAIS, WAIS-R, WAIS-III, WAIS–IV, and, as pertinent here, SB-5). Other tests referenced in the record, including short form tests or partially-administered intelligence tests, are not appropriate measures of intelligence and, accordingly, are not cited by Petitioner in support of his claim. (Doc. 124 at ¶ 177.)

Salekin in 2013; 4) a FSIQ of 81 on the WAIS-IV administered by Dr. King in June 2021; 5) a FSIQ of 74 on the WAIS-IV administered by Dr. Shaffer in July 2021; and 6) a FSIQ of 73 on the SB-5 administered by Dr. King in August 2021. Petitioner posits that, accounting for the SEM, and especially if his IQ scores are adjusted downward pursuant to the Flynn Effect,[8] substantially all his IQ scores fall in the range of intellectual disability. (Doc. 124 at ¶¶ 195–198, 394–95.)

In addition to his IQ scores, Petitioner submits that his generally poor performance across the battery of neuropsychological tests administered by Dr. Shaffer corroborates the presence of SSIF demonstrated by his IQ scores. (Doc. 124 at ¶ 399.) Specifically, he asserts his test results show that he has "substantial deficits in executive functions, which allow inhibition of automatic behavior and redirection of behavior to more appropriate actions[,]" and that he has "functionally deficient" "coordination of frontal lobe structures in relay with the brain centers of emotion and motivation[,]" all of which "reveals a pattern of consistently deficient abilities." (*Id*. at ¶¶ 221–23; *see also id*. at ¶ 399.)

### *B. Significant or Substantial Deficits in Adaptive Behavior*

Petitioner's evidentiary showing with respect to his claim of significant deficits in adaptive behavior encompasses his performance on standardized measures of adaptive behavior and neuropsychological testing, expert opinion about the significance of his school records, and reports of collateral sources. Petitioner

[8] The Flynn Effect, which describes the empirical phenomenon known as "norm obsolescence," "refers to findings by Dr. James Flynn that average IQ scores have increased steadily by roughly .3 points every year since the IQ test was normed." *Ferguson v. Comm'r, Ala. Dep't of Corr.*, 69 F.4th 1243, 1252 n.2 (11th Cir. 2023). To account for the Flynn Effect, "the evaluator looks at when the test was normed and when the test was administered, then determines the difference, and subsequently multiplies it by .3 to get a set number, which is subtracted from the full-scale IQ score." *Id.* (parentheticals omitted).

claims significant deficits in all three domains of adaptive behavior. The substance of his contentions and supporting evidence will be summarized below.

*1. Deficits in the Conceptual Domain*

Petitioner cites his performance on three standardized tests as evidence of his significant deficits in the conceptual domain. On the Woodcock-Johnson Test of Achievement administered by Dr. Salekin, Petitioner obtained a total achievement score of 63 along with scores of 66 on academic skills and academic knowledge. (Doc. 124 at ¶ 237.) According to Dr. Salekin, Petitioner's scores on the Woodcock-Johnson were consistent with an individual functioning at the early elementary school level of academic functioning, *i.e.*, second or third grade. (*Id.* at ¶ 235.)

Dr. King administered two tests which Petitioner cites as evidence of his significant deficits in the conceptual domain. Dr. King administered a portion of the Wide Range Achievement Test (WRAT) to assess Petitioner's literacy level and ability to self-administer the Adaptive Behavior Assessment System (ABAS), which is another standardized test designed to measure adaptive skills. Based upon Petitioner's score on the partial WRAT, Dr. King assessed that Petitioner reads at a second grade level and, therefore, could not self-administer the ABAS. (Doc. 124 at ¶¶ 240–41.) On the ABAS itself, which Dr. King read to Petitioner, Petitioner obtained a score of 69 in the conceptual domain. (*Id.* at ¶ 286.) In particular, Petitioner had "extremely low scores" in self-direction and academic skills. (*Id.* at ¶ 285.) As the ABAS is scored like the standardized IQ tests discussed previously, Petitioner's score of 69 in the conceptual domain is more than two standard deviations below the mean score of 100 and is indicative of a significant deficit in that domain of adaptive functioning. (*Id.* at ¶ 287.)

Petitioner also relies upon his school records, as interpreted and explained by Drs. Salekin and Reschly, to show his significant deficits in the conceptual domain. (Doc. 124 at ¶¶ 243–63.) Other than to quarrel with Petitioner's claim to have

"dropped out of school in the seventh grade"—Respondent maintains that Petitioner was arrested and sent to a juvenile detention facility rather than merely "dropping out"—Respondent does not object to Petitioner's contentions about the import of his school records in assessing his conceptual domain deficits. (Doc. 126 at ¶¶ 243–63.) Thus, this order need not belabor the point. In short, Petitioner's school records show that he attended segregated schools in Selma and Montgomery, Alabama, which were characterized by achievement levels below national averages at that time. His performance in these schools overall was very poor: despite mostly good attendance, he received poor grades, was held back twice before completing fifth grade, did not receive special education intervention because none was available to him in Alabama's segregated schools, and he only completed the sixth grade.

Petitioner also cites collateral source reports as proof of his deficits in the conceptual domain. (Doc. 124 at ¶¶ 264–76.) Respondent, again, does not object to Petitioner's characterization of the factual record. (Doc. 126 at ¶¶ 264–76.) The witness statements cited by Petitioner impart, generally, that he was perceived as "slow," he struggled with comprehension and understanding more so than his peers, and that he displayed numerous traits indicating poor self-direction, including impulsivity and the inability to plan for the future, learn from his mistakes, or anticipate consequences.

Finally, Petitioner cites his results in the neuropsychological testing administered by Dr. Shaffer as proof of his substantial deficits in the conceptual domain. In particular, he asserts his poor results on tests relating to conceptual processes like categorization and perception demonstrate deficits in neuropsychological functioning in the frontal lobes of his brain, which limit his performance of adaptive behaviors in the conceptual domain. (Doc. 124 at ¶¶ 277–81.) Respondent articulates no substantive objection to Petitioner's contentions

about the pertinence of the neuropsychological test results to the assessment of Petitioner's deficits in the conceptual domain. (Doc. 126 at ¶¶ 277–81.)

*2. Deficits in the Social Domain*

Petitioner cites collateral source accounts and school records to demonstrate his significant deficits in the social domain. This information includes witness reports stating that Petitioner failed to learn from his mistakes, repeatedly broke social and societal rules, could not foresee the consequences of his actions, and he acted impulsively. These behavioral deficiencies resulted in multiple juvenile and adult offenses prior to the crime for which Petitioner received a death sentence. (Doc. 124 at ¶¶ 289–292.) Considered cumulatively, Petitioner maintains, these behavioral tendencies "indicate deficits in social problem-solving ability and interpersonal skills[,]" two of the adaptive skills encompassed by the social domain. (*Id*. at ¶ 293.)

As with his deficits in the conceptual domain, Petitioner submits that the neuropsychological deficits indicated by Dr. Shaffer's testing corroborate his significant deficits in the social domain because "deficits in executive functioning" can cause behaviors like impulsivity and difficulty with the "inhibition of automatic behavior [and] redirection of behavior to more appropriate actions." (Doc. 124 at ¶¶ 295–96.)

Petitioner also highlights his gullibility as indicative of his significant deficits in the social domain. Collateral sources reported that Petitioner was easily manipulated or tricked by others into engaging in behaviors not in his best interest and that, generally, he was a follower rather than a leader. (Doc. 124 at ¶¶ 302–06.) In addition, Dr. Shaffer administered to Petitioner the Gudjonsson Test of Suggestibility to assess his gullibility. The test results were consistent with the collateral reports of Petitioner's historical gullibility: Petitioner's score placed him

in the 95th percentile of suggestibility, *i.e.*, he is more gullible than 95% of the population. (*Id.* at ¶ 310.)

*3. Deficits in the Practical Domain*

As with the conceptual and social domains, Petitioner asserts that the impairment in his executive functioning indicated in Dr. Shaffer's neuropsychological testing supports the presence of significant deficits in the practical domain as well. Specifically, his neuropsychological deficiencies relate to the practical domain because they inhibit his ability to "pursu[e] a sequence of acts through to a practical outcome, including matters related to eating, health, [and] management of money." (Doc. 124 at ¶ 314.)

Petitioner also submits that his work history demonstrates significant deficits in the practical domain because Social Security records show that he worked only menial jobs, that he could not maintain stable employment or acquire occupational skills, and that he cycled through numerous employers in short periods of time. (Doc. 124 at ¶¶ 315–18.) Collateral sources, too, corroborate Petitioner's struggles with finding and maintaining employment. (*Id.* at ¶¶ 319–21.) Even to the extent Petitioner developed skills as a mechanic, and obtained employment as a mechanic at times, he nevertheless maintains that he performed only simple mechanic tasks. (*Id.* at ¶¶ 322–25.) Although some collateral sources indicated that Petitioner was a gifted and capable mechanic, no records corroborate that Petitioner performed complex mechanic work like rebuilding an engine or replacing a transmission.

Finally, Petitioner cites collateral source reports depicting his inability to "perform tasks in the practical domain, including living independently, planning for the future, or managing his money." (Doc. 124 at ¶ 327.) As examples, witnesses opined that Petitioner could not be trusted to use a stove for safety reasons, that he never lived alone, that he was not capable of managing money and planning ahead

for future expenses, and that he never had a checking or savings account. (*Id*. at ¶¶ 328–32.)

### *C. Onset During the Developmental Period*

On the last prong of the intellectual disability test, Petitioner asserts that, as testified by Drs. Salekin and Reschly, the available collateral source reports and school records demonstrate that Petitioner experienced significantly subaverage intellectual functioning and significant deficits in his adaptive functioning before reaching the age of majority. (Doc. 124 at ¶¶ 333–43.) Petitioner also highlights Dr. King's testimony that Petitioner performed very poorly in school and "experienced some intellectual deficits before the age of 18." (*Id*. at ¶ 344.)

## IV. Petitioner has not Proven that He Meets the SSIF Requirement of Alabama's Intellectual Disability Standard.

As discussed above, whether Petitioner has satisfied the SSIF prong of the intellectual disability standard "turns on whether he has an IQ equal to or less than 70." *Smith*, 67 F.4th at 1345. The law does not, however, impose a strict cutoff of 70; rather, this Court must observe the inherent imprecision of IQ testing and take account of the SEM applicable to each of Petitioner's scores. *Hall*, 572 U.S. at 721–22. Petitioner's IQ scores are in the range of intellectual disability where, after the SEM is applied, his IQ score may be as low as 70. *Smith*, 67 F.4th at 1345.

Dr. Salekin prepared a table listing each of the six IQ scores, along with the SEM and proposed Flynn adjustments applicable to each score, upon which she relied in formulating her opinion that Petitioner meets the SSIF prong of the intellectual disability standard. The table is reproduced below:

| Test (Date) | FSIQ unadjusted | Confidence Interval Based on SEM | Flynn Adjusted FSIQ Score | Flynn Adjusted Confidence Interval Based on SEM |
|---|---|---|---|---|
| WAIS (Taylor-Hardin) (1982) | 78 | 73-83* | 69.9 | 65-75* |
| WAIS-R (1984) | 75 | 70-80** | 74.1 | 69-79** |
| SB-5 (Salekin) (January 2013) | 63 | 60-68 | 59.7 | 55-65 |
| WAIS-IV (King) (June 2021) | 81 | 77-85 | 77.1 | 72-82 |
| WAIS-IV (Shaffer) (July 2021) | 74 | 70-79 | 70.1 | 65-75 |
| SB-5 (King) (August 2021) | 73 | 70-78 | 67.3 | 62-72 |
| * SEM not contained in WAIS manual so used +/-5. ** SEM not provided so used +/- 5. | | | | |

As the table illustrates, except for the SB-5 administered by Dr. Salekin, none of Petitioner's six unadjusted FSIQ scores is 70 or below. Three of the scores are in the range of intellectual disability, however, as the SEM applicable to the 1984 WAIS-R administered by Dr. Kirkland, the 2021 WAIS-IV administered by Dr. Shaffer, and the 2021 SB-5 administered by Dr. King all bottom at 70.[9] By that

[9] The table demonstrates that there is variance in the SEM applicable to some of Petitioner's IQ scores. For example, Dr. King's WAIS-IV administration is reported to have a SEM of +/- 4 points, while the SEM applicable to the WAIS and WAIS-R is expressed as +/- 5 points. The SB-5 tests, meanwhile, are reported with +5/-3 confidence bands. In general, the SEM applicable to each IQ test is identified in the test's manual. (Doc. 111 at 21–22,

same token, the remaining two scores, Petitioner's 78 on the WAIS administered at Taylor Hardin in 1982 and 81 on the WAIS-IV administered by Dr. King in 2021, are not within the range (70–75) recognized by the Supreme Court as potentially encompassing intellectual disability. *See Atkins*, 536 U.S. at 309 n.5; *Hall*, 572 U.S. at 714; *id*. at 722.[10]

52–53 (Tassé).) Where there is no SEM provided, the medical profession recognizes a "rule of thumb" SEM of +/-5 points. (*Id*. at 53.) It is this "rule of thumb" SEM that was referenced by the Supreme Court in *Hall*. *See* 572 U.S. at 713 (citing DSM-5, at 37).

[10] Although both of these unadjusted scores are above 75, Petitioner nevertheless asserts that they, too, are within the range of intellectual disability. He gets there by slightly different methods, however. With respect to the 1982 WAIS, he maintains that the "rule of thumb" five-point SEM applicable to his score of 78 results in a confidence band of 73–83, which supports a finding of intellectual disability, he contends, because the low end of the band falls between 70 and 75. (Doc. 124 at ¶ 149; doc. 131 at 7.) Regarding the June 2021 WAIS-IV, he asserts that if his FSIQ is adjusted for the Flynn Effect, thereby reducing the score from 81 to 77, the resulting Flynn-adjusted SEM of 72–82 similarly reaches at its bottom end to within five points of 70 and therefore supports a finding of intellectual disability. (Doc. 124 at ¶ 167; doc. 131 at 7.)

Putting aside for the moment Petitioner's argument about the Flynn Effect, his claim that an IQ score greater than 75 is nevertheless within the range of intellectual disability if the SEM applicable to the score reaches 75 or below, is without merit. As Respondent has argued (doc. 126 at ¶ 167), Petitioner relies on a method of "double counting" the SEM, *i.e*., adding five points upward from the 70 required to find SSIF while also subtracting, in this case, five points from the obtained score (with or without Flynn or other adjustments). Dr. King testified that this method of "double counting" is inconsistent with psychological practice. (Doc. 117 at 42–43.) Courts, too, have rejected this methodology. *See, e.g., Green v. Lumpkin*, 860 F. App'x 930, 937–38 (5th Cir. 2021) (describing as impermissible "double counting" of the SEM the habeas petitioner's argument that his obtained FSIQ of 78 was within the range of intellectual disability because "the lower end of his SEM adjusted IQ score falls into the 'between 70 and 75' range").

As explained in *Green*, "[t]he rule that a state court must consider a defendant's adaptive deficits if he demonstrates an IQ score 'between 70 and 75 or lower,' already accounts for the SEM." 860 F. App'x at 937 (quoting *Hall*, 572 U.S. at 722). Thus, an IQ score above 75 is not within the range of intellectual disability, even if the lower end of such score's SEM range falls between 70 and 75. *See Roberts v. Payne*, 113 F.4th 801, 810 (8th Cir. 2024) ("Roberts's 76 IQ score is six points above the recognized

With the exception of Dr. Salekin's 2013 SB-5, this Court accepts as accurate and reliable each of the unadjusted FSIQ scores and their provided SEM.[11] There is no evidence in the record that Petitioner malingered during the administration of any test, including the IQ tests listed in Dr. Salekin's table. Nor are there any examiner's notes or witness testimony indicating that any of the reported scores, other than the 2013 SB-5, are unreliable due to factors unrelated to Petitioner's effort. Consequently, the record includes the following five FSIQs for the Court's consideration in assessing whether Petitioner has an IQ of 70 or below: 78 (WAIS /

---

intellectually-disabled threshold of 70 IQ points. Even accounting for the standard error of measurement of plus-or-minus 5 IQ points, Roberts's IQ score is, at worst, 71, which is still above the range of intellectual disability."); *Smith v. Duckworth*, 824 F.3d 1233, 1245 (10th Cir. 2016) (observing that Oklahoma statute which precludes a finding of intellectual disability when the defendant obtains an IQ score of 76 or greater necessarily "accounts for the SEM as required by *Hall*"). The Eleventh Circuit similarly declines to engage in such "double counting" of the SEM. *See Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1276 (11th Cir. 2020) ("Even if Jenkins were somehow entitled to subtract the 5-point margin of error from his score and thereby lower his 'true' IQ to 71, he still would not satisfy the clinical intellectual component of intellectual disability."); *In re Henry*, 757 F.3d 1151, 1162–63 (11th Cir. 2014) (finding that an IQ score of 78 is not within the range of intellectual disability contemplated by *Hall*). So, as it is applied in *Hall* and other cases, the SEM contemplates that an individual's IQ may be as much as five points lower than his obtained score and, consequently, intellectual disability may not be excluded on the basis of an IQ score up to 75 where the SEM is equal to +/- 5 points. Neither *Hall* nor any other Supreme Court decision also contemplates an additional five-point increase to the threshold needed to show SSIF (*i.e.*, 70 + 5), such that, in effect, a score of 76 to 80 also may fall within the range of intellectual disability where the SEM is equal to +/- 5 points.

[11] The evidence in the record compels the conclusion that Petitioner's FSIQ of 63 on the 2013 SB-5 is invalid. Dr. Salekin acknowledged an administration error in one of the SB-5's subtests whereby she prematurely discontinued administering the subtest's questions contrary to test instructions. (Doc. 111 at 161.) Dr. Salekin admitted that the administration error resulted in the invalidation of the FSIQ of 63 Petitioner obtained on the test. (*Id*. at 163; doc. 112 at 9.) Furthermore, Dr. Salekin conceded that there is no way to attribute to Petitioner a valid FSIQ from her administration of the SB-5 because it is impossible to know how Petitioner would have scored on the remainder of the subtest had it been properly administered. (Doc. 111 at 162.)

1982 / Taylor Hardin), 75 (WAIS-R / 1984 / Dr. Kirkland), 81 (WAIS-IV / 2021 / Dr. King), 74 (WAIS-IV / 2021 / Dr. Shaffer), and 73 (SB-5 / 2021 / Dr. King).

This Court concludes that, notwithstanding the presence of three IQ scores that touch the highest threshold for a finding of SSIF at their lowest possible interpretation given the SEM applicable to each score, Petitioner has failed to demonstrate the presence of SSIF. This determination is informed by the following findings.

***A. This Court declines to apply the Flynn Effect to adjust Petitioner's obtained IQ scores.***

Petitioner's expert witnesses testified uniformly about their belief that individual IQ scores, including those of Petitioner, should be adjusted pursuant to the Flynn Effect. (*See* doc. 111 at 23–24 (Tassé); *id*. at 99 (Salekin); doc. 112 at 32–33 (Shaffer); doc. 116 at 40–41 (Reschly).) Respondent's expert disagreed. (Doc. 116 at 149–50 (King).) Mirroring this dispute among the experts at the hearing, both sides referenced and presented academic literature arguing for and against application of the Flynn Effect in individual cases. In sum, the expert testimony, as well as the academic literature referenced at the hearing, made clear that, while there is generally no dispute about the empirical existence of the Flynn Effect at the population level, there is disagreement within the profession about whether the Flynn Effect should be employed to adjust obtained individual IQ scores and how to do so. (*See, e.g.*, doc. 111 at 44–48, 60–61 (Dr. Tassé acknowledging differing opinions in the field about the propriety of applying the Flynn Effect in individual cases); doc. 116 at 40 (Dr. Reschly acknowledging "different opinions about how the Flynn effect ought to be applied"); *id*. at 41 (Dr. Reschly: "It can be argued whether or not the Flynn effect applies to every individual and, of course, that's impossible to determine."); *id*. at 41–42 (Dr. Reschly: "There is an academic debate about how it ought to be applied, and the main debate revolves around what the

current standard for psychological practice ought to be.") *id*. at 149–52 (Dr. King describing his and others' dispute with adjusting individual IQ scores pursuant to the Flynn Effect).)

Even if they appear to place greater weight in favor of applying the Flynn Effect in individual cases, the authoritative diagnostic manuals do not definitively resolve this dispute. The DSM-5 only cites the Flynn Effect as one of several "[f]actors that may affect test scores[.]" DSM-5, at 37.[12] The AAIDD arguably is more progressive, stating that "best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score." AAIDD-12, at 42. Yet even the AAIDD, like the DSM-5, does not appear to describe precisely how or when to apply the Flynn Effect to adjust individual IQ scores.[13]

Pertinent legal authorities do not provide substantial guidance on whether and how the Flynn Effect should be applied in individual cases, much less mandate its application. Notwithstanding the constitutional requirement that the determination of intellectual disability must be informed by current medical standards, the Supreme Court has not yet opined on whether the Constitution requires application of the

[12] The Eleventh Circuit has found that the DSM-5's mention of the Flynn Effect does not reflect "a general consensus in the medical community about the Flynn Effect" because "it does not provide any guidance as to how a clinician should actually apply the Flynn Effect, let alone mandate any 0.3 point-per-year reduction for IQ scores obtained from tests with outdated norms." *Ledford v. Warden, Ga. Diagnostic and Classification Prison*, 818 F.3d 600, 638 (11th Cir. 2016).

[13] In addition, Dr. Tassé confirmed that neither the Wechsler nor Stanford-Binet manuals instruct test administrators to apply the Flynn Effect to adjust scores obtained using those instruments. (Doc. 111 at 55.)

Flynn Effect in individual cases.[14] Similarly, the Eleventh Circuit imposes no strict requirement relating to application of the Flynn Effect. Rather, the Eleventh Circuit leaves it to the district court to receive evidence about the Flynn Effect and use its discretion about whether it should be applied based on the facts and argument before the district court. *Ledford*, 818 F.3d at 636–37. The Eleventh Circuit, however, has echoed the Supreme Court's description of the Flynn Effect as "controversial," observing that "there is no consensus about the Flynn effect among experts or among the courts." *Raulerson*, 928 F.3d at 1008 (citations omitted).[15]

Ultimately, having received and considered the evidence about the Flynn Effect, this Court is not persuaded that it should be applied in this instance. There are at least two primary considerations at play in this judgment. *First*, the evidence raises the possible inference of "mission creep" in the medical community's limited, and seemingly conditional, embrace of the Flynn Effect. While Petitioner's experts were adamant that the Flynn Effect is not a mere theory and that there is widespread professional acceptance of its application in individual cases, it appears this "consensus" is limited to the determination of intellectual disability in the context of

---

[14] The Supreme Court has only mentioned that "the so-called Flynn Effect" is a "controversial theory involving the inflation of IQ scores over time[.]" *Dunn v. Reeves*, 594 U.S. 731, 736 (2021).

[15] Another federal appellate court has written about the "jarring" implications of the Flynn Effect and has declined to make downward adjustments to IQ scores without authoritative guidance from the Supreme Court:

> After all, if *Atkins* stands for the proposition that someone with an IQ score of 70 or lower in *2002* (when *Atkins* was decided) is exempt from the death penalty, then the use of Flynn-adjusted IQ scores would conceivably lead to the conclusion that, within the next few decades, almost no one with borderline or merely below-average IQ scores should be executed, because their scores when adjusted downward to 2002 levels would be below 70.

*Black v. Carpenter*, 866 F.3d 734, 749–50 (6th Cir. 2017).

capital litigation or, as Dr. Reschly described it, "high-stakes consequential decisions." (Doc. 116 at 112; *see also* doc. 111 at 51 (Dr. Tassé: "I certainly am of the camp that agrees that we should capture that source of measurement error in high-stakes cases such as death penalty where death is the highest of high stakes.").)

In putatively "lower-stakes" circumstances, the medical community is more circumspect. Take, for instance, Dr. Tassé's concession that, in a "clinical setting," individual IQ scores "are not typically adjusted for the Flynn Effect[.]" (Doc. 111 at 54.) Likewise, Dr. King, who regularly performs intellectual disability evaluations for the Social Security Administration, confirmed in his testimony that adjusting individual IQ scores to account for the Flynn Effect in such an evaluation is "prohibited." (Doc. 116 at 152; *see also id*. at 149 (Dr. King testifying that there has been no "suggestion that we [adjust IQ scores due to norm obsolescence] in any other circumstance" outside capital litigation).) In short, if application of the Flynn Effect reflects the medical profession's best practice in surmising an individual's true IQ score, the record is devoid of any explanation for why that practice is not applied in *all* instances, including in clinical and other forensic applications, in which an individual's IQ score might be relevant. The absence of such an explanation in the record indicates that other considerations may be driving the medical community's embrace of the Flynn Effect in the capital litigation context.

*Second*, and more importantly, on this record, the Flynn Effect appears to be more an agent of variability and inconsistency than certainty and reliability. Dr. Tassé testified that an individual's intellectual functioning is consistent throughout his or her life: "Measurement of intelligence is fairly stable into adolescence and adulthood. We don't have a lot of success at modifying it. Short of a brain injury or a brain disease, IQ is a stable construct throughout one's life through adolescence and adulthood." (Doc. 111 at 24.) Yet, application of the Flynn Effect here broadens, rather than narrows, the range of IQ scores Petitioner has obtained. As set

forth in Dr. Salekin's table, the range of Petitioner's five valid, unadjusted FSIQs is 73-81, a span of eight points. The range of his valid, Flynn-adjusted FSIQs is 67.3-77.1, a span of 9.8 points. In an inquiry that relies upon the application of statistical concepts like the standard deviation, and where intellectual functioning is presumed to be stable over time, the broadening of Petitioner's range of scores by nearly two whole points can be significant.[16]

Consider, too, Petitioner's three lowest unadjusted FSIQs of 73, 74, and 75, which result in a spread of only two points across the three tests. These scores were obtained in IQ tests nearly forty years apart which were administered by a court-appointed expert (Dr. Kirkland in 1984) and experts working on behalf of both Petitioner and Respondent in this action. Their consistency over such significant time, irrespective of the test's administrator and any bias which could have influenced the test's administration, provide compelling evidence of the lower range

[16] Dr. Salekin appeared to assert that applying the Flynn Effect had the opposite effect, *i.e.*, that it brought greater certainty to the estimation of Petitioner's IQ. She testified that, after applying the Flynn Effect, "you can see for the most parts the bandwidths [representing the SEM for each of Petitioner's IQ scores] are coming together." (Doc. 111 at 98; *see also id*. at 175 ("And as you could tell by the slides, that one - - I mean, once you did the Flynn Effect, it came much closer.").) Petitioner reiterated this contention in his post-hearing briefing. (*See* doc. 123 at 35 ("When properly adjusting to account for the Flynn Effect, Petitioner's IQ scores all converge and coalesce around consistent IQ confidence bands. In other words, Petitioner's IQ scores are more consistent and the standard errors of measure for each score overlaps when account for aging and norms.").) But Dr. Salekin's demonstrative tables do not support this claim. (*Compare* doc. 107-08 at 13 *with* doc. 107-08 at 14.) In short, the SEM bandwidths are more neatly stacked, meaning they better "converge and coalesce," in the plotting of obtained scores than in the Flynn-adjusted plotting. This stands to reason, as the spread of the SEM ranges for Petitioner's valid obtained IQ scores is fifteen points (70–85), while the spread of his Flynn-adjusted SEM ranges is twenty points (62–82). No doubt, as Dr. Salekin testified, applying the Flynn Effect has the effect of moving the median of Petitioner's scores closer to 70. It does not, however, bring the SEM bandwidths of his various scores into greater alignment. It does the opposite.

of Petitioner's intellectual functioning.[17] Yet, as Dr. Salekin's table shows, applying the Flynn Effect to these three scores makes them, respectively, 67.3, 70.1, and 74.1 and therefore has the effect of broadening the spread of these otherwise remarkably consistent scores considerably, from 2 points to 6.8 points. Furthermore, in apparent defiance of the Flynn Effect's premise that IQ scores artificially increase incrementally each year after the test is normed, of these three scores, Petitioner scored the highest on the least "obsolete" test and the lowest on the most "obsolete." (Doc. 123 at 33.)[18] Petitioner's consistent performance on these three instruments, irrespective of their relative obsolescence, illustrates a practical difficulty with applying the Flynn Effect to his individual scores.[19]

---

17 The Eleventh Circuit has recognized the potential for test administrator bias to influence IQ scores and therefore provide a basis for discrediting such scores. *Ledford*, 818 F.3d at 635.

18 Specifically, Petitioner scored a 75 on the WAIS-R in 1984, only three years after that instrument was normed. He scored a 73 on the SB-5 in 2021, eighteen years after that instrument was normed. (Doc. 123 at 33.)

19 Petitioner's IQ test results defy another common measurement of error discussed in the record. Dr. Tassé testified that "both the DSM-5 and the AIDD mention practice effects and Flynn effects when relevant." (Doc. 111 at 21.) He described the tendency of the "practice effect" to artificially enhance IQ test results:

> So the practice effect is present in situations where the person is assessed in a repeated fashion or a second time or more than once, either on the exact same test or on a similar test, within a short interval. And what happens in this case is although the person is not given the answers to the test, the way IQ tests work or tests of intelligence, there's a lot of these tasks and demands that are not typical and that require a certain timed aspect to it. And so when we readminister a test within a shorter interval, especially if it's the same test, then there's some ease or familiarity and they tend to do better, not because they're more intelligent, but because of this effect that we call the practice effect.

(*Id*. at 22.) Dr. Salekin's table shows that Petitioner was administered the WAIS-IV by Dr. King in June 2021, on which he scored 81, and then administered the very same test by Dr.

In short, it does not appear that the application of the Flynn Effect here produces greater certainty about what is Petitioner's true level of intellectual functioning. In several instances, very similar scores are rendered dissimilar while, overall, the range of Petitioner's scores expands, rather than contracts, despite that intellectual functioning is understood to be consistent throughout the individual's life. Considered in the context of the professional dispute about whether the Flynn Effect should be applied to adjust individual IQ scores—the existence of which is illustrated in the parties' experts' testimonies and the academic literature they cite—and the absence of its widespread adoption in other professional contexts, as well as the lack of legal authority requiring its application in individual cases, the Flynn Effect's introduction of higher variability and uncertainty in the analysis of Petitioner's IQ scores militates against its application in this case.[20]

---

Shaffer the following month, on which he scored 74. Thus, Petitioner scored seven points higher on the earlier administration of the WAIS-IV, plainly enjoying no benefit of any practice effect. Overall, therefore, Petitioner's test results demonstrate the precarity of applying one-way group level measurements of error like Flynn and the practice effect to his obtained scores.

[20] There was also presented at the hearing evidence of a reverse Flynn Effect observed in studies as far back as 2006. (Doc. 116 at 149.) Dr. King testified that Dr. Flynn himself, the namesake of the Flynn Effect, "published an article stating that the Flynn effect has faltered, and he went on to say that it appears to have peaked in the middle 1990s to early 1990s and has reversed ever since." (*Id*. at 149–50.) Petitioner dismisses the import of studies showing a purported reverse Flynn Effect because most of those studies "concerned population norms outside of the United States[.]" (Doc. 123 at 26.) Although Petitioner chides Respondent for "conveniently omitt[ing]" this fact (doc. 123 at 26), Dr. King in fact testified that the relevant studies were based upon "western Europe health data records." (Doc. 116 at 149.) In any event, Dr. King testified that the existence of the Flynn Effect itself was postulated, in large part, based upon Dr. Flynn's studies of the centralized health data of Western European countries. (*Id*. at 148–49.) It is thus fair to concede that European health data may likewise provide empirical evidence about the Flynn Effect's continued viability. Ultimately, this court makes no finding about the existence of any reverse Flynn Effect other than to observe that the debate about its existence underscores that the science surrounding the implications of the observed phenomenon of norm

### *B. Considered cumulatively, Petitioner's IQ scores indicate that he functions in the borderline range of intellectual functioning.*

Like the habeas petitioners in many of the cases cited throughout this order, Petitioner presents multiple IQ scores in support of his claim that he meets the first prong of the intellectual disability test. And, as discussed previously, the SEM applicable to three of Petitioner's valid, unadjusted FSIQs indeed reach, at their very bottom, just into the range of intellectual disability, while his remaining two scores are outside the range of disability. The question is what to make of all these scores in an inquiry that requires this court to assess whether Petitioner's intellectual functioning is more than two standard deviations below the mean.

The Supreme Court acknowledges that "the analysis of multiple IQ scores is a complicated endeavor." *Hall*, 572 U.S. at 714. Notwithstanding that it is "complicated," the Supreme Court "has not specified how courts should evaluate multiple IQ scores." *Hamm v. Smith*, 604 U.S. 1, 2 (2024) (citations omitted).[21] The

---

obsolescence at the population level is insufficiently settled to warrant any legal rule requiring application of the Flynn Effect in individual cases, including here.

[21] The Supreme Court's admission in *Smith* that it has not established a standard for evaluating multiple IQ scores is significant, as both *Hall* and *Moore* involved litigants with multiple IQ scores, including scores both within and without the range of intellectual disability. Specifically, the defendant in *Hall* had seven scores ranging from 71–80, 572 U.S. at 707, while the defendant in *Moore* had scores of 74 and 78, 581 U.S. at 10. Both *Hall* and *Moore* trained their analysis on the lowest IQ scores before them, with no apparent consideration of the significance of the higher scores. As the Tenth Circuit recently observed, "the high scores in *Hall* and *Moore* played no explicit role in the Court's analysis." *Fuston v. Quick*, __ F.4th __, 2026 WL 2451277, *10 (10th Cir. Aug. 21, 2026). It is therefore difficult to draw any durable guidance for the cumulative evaluation of multiple IQ scores from *Hall* and *Moore*. *See id*. at *9 (holding that *Atkins* and *Hall* do not clearly establish that a state court may not deny an *Atkins* hearing on the basis of a single IQ score above 76, even where the defendant presents multiple IQ scores below 70).

After the Supreme Court granted certiorari a second time in *Smith*, this time on the question of "[w]hether and how courts may consider the cumulative effect of multiple IQ

Eleventh Circuit's opinion on remand in *Smith* suggests that federal courts are to undertake a "'holistic approach to multiple IQ scores that considers the relevant evidence, including as appropriate any relevant testimony.'" *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 21-14519, 2024 WL 4793028, *1 (11th Cir. Nov. 14, 2024) (quoting *Smith*, 604 U.S. at 2). That same opinion makes clear that, where multiple IQ scores are in evidence, this Circuit *does not* employ a "lowest score controls" approach to assessing SSIF: "We unambiguously reject any suggestion that a court may ever conclude that a capital defendant suffers from significantly subaverage intellectual functioning based solely on the fact that the lower end of the standard-error range for his lowest of multiple IQ scores is 69." *Id*.[22]

The question becomes, therefore, how best to cumulatively evaluate Petitioner's multiple IQ scores where neither the Supreme Court nor the Eleventh Circuit have established a constitutional standard for doing so? Drawing upon relevant state and federal case law and testimony from the evidentiary hearing, this Court considers three methods for cumulatively evaluating Petitioner's IQ scores. Two involve the application of simple statistical concepts (mean and median), while the third entails a "holistic" analysis considering all of Petitioner's scores and related

---

scores in assessing an *Atkins* claim[,]" this Court effectively stayed its decision in this matter pending the Supreme Court's anticipated provision of guidance in this area. (Doc. 134.) On May 21, 2026, however, the Supreme Court dismissed its grant of certiorari in *Smith*. *Hamm v. Smith*, 608 U.S. , 146 S. Ct. 1251 (2026).

[22] This clarification is vital, as the prior Circuit opinion in *Smith* could be read to command that the defendant/petitioner's lowest IQ score was determinative. *See Smith*, 67 F.4th at 1346 (remarking, "a district court must move on to consider an offender's adaptive functioning when the lower end of his lowest IQ score is equal to or less than 70"). Thus, although Petitioner has shown that his three lowest IQ scores produce a SEM range with a bottom of 70—the very highest score that falls two standard deviations below the population's mean IQ—this Court must assess and give effect to all of Petitioner's scores in any "holistic" analysis.

evidence and testimony about the interpretation of his scores. Under all three methods, Petitioner's IQ is above 70, even with consideration of the SEM.

Start with taking the mean. Alabama law, which, again, provides the substantive standard for assessing whether Petitioner is intellectually disabled, appears to recognize that courts may determine the average of multiple IQ scores in order to give cumulative effect to all such scores. *See Ex parte Smith*, 213 So. 3d 313, 317 (Ala. 2010) (finding that the defendant's "various IQ scores, which average 67.5, consistently place him in the mentally retarded range"); *id.* at 320 (remarking, "it is clear that Smith has subaverage intellectual functioning as indicated by his IQ scores"). Indeed, many federal courts applying Alabama law in this Circuit have adopted the practice of calculating the mean of multiple valid IQ scores to arrive at the best estimation of an individual's true intellectual functioning. *See, e.g.*, *Clemons v. Thomas*, No. 2:10-cv-02218-LSC, 2016 WL 1180113, *20 n.7 (N.D. Ala. March 28, 2016) ("Clinical practice indicates that the appropriate method of determining an individual's IQ when there are several tests in the record is to average the scores of the various tests to reach a mean score."), *aff'd*, 967 F.3d 1231 (11th Cir. 2020).

The Eleventh Circuit many years ago approved of district courts employing this practice. *See Holladay v. Allen*, 555 F.3d 1346, 1357 (11th Cir. 2009) (affirming district court's finding of SSIF where petitioner presented "eleven test scores whose mean was distinctly below 70"); *see also Thomas v. Allen*, 607 F.3d 749, 757 (11th Cir. 2010) (finding that "the mean of Thomas's IQ scores during the developmental period is sufficiently below 70" to support the district court's finding of SSIF). More recently, the Court of Appeals reaffirmed that district courts are "permitted . . . to average multiple IQ scores" even if they "are not necessarily required to do so." *Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1342 (11th Cir. 2019).

Applying this methodology, Petitioner has failed to establish the presence of SSIF. Petitioner's five valid, unadjusted obtained FSIQs—78, 75, 81, 74, and 73—produce a mean score of 76.2. Even applying a "rule of thumb" SEM of +/- 5 points to this mean score,[23] thereby producing a confidence band of 71.2–81.2, Petitioner's mean score is above the threshold for a finding of SSIF and, therefore, is entirely outside the range of intellectual disability.[24] *See, e.g.*, *Jenkins*, 963 F.3d at 1276 ("Even if Jenkins were somehow entitled to subtract the 5-point margin of error from his score and thereby lower his 'true' IQ to 71, he still would not satisfy the clinical intellectual component of intellectual disability.").[25]

Another method "for estimating someone's 'true' IQ is to take the median value of his scores." *Smith*, 608 U.S. at __, 146 S.Ct. at 1277 (Alito, J., dissenting

---

[23] The "rule of thumb" SEM of +/-5 points overstates the SEM in Petitioner's favor. As Dr. Salekin's table reflects, the majority of Petitioner's FSIQ scores are not, individually, subject to a potential five-point reduction applying the SEM.

[24] For purposes of comparison, and although neither the district court nor the Eleventh Circuit in *Smith* relied upon any mean score, the average of Joseph Smith's five IQ scores (75, 74, 72, 78, and 74, *Smith* 67 F. 4th at 1341), is 74.6, which, applying the "rule of thumb" SEM of +/-5 points, places Smith's mean IQ score, unlike Petitioner's, just inside the range of intellectual disability.

[25] The Court is aware that, in their advocacy before the Supreme Court in *Smith*, professional medical associations argued that taking the mean of multiple IQ scores is a statistically unsound method for cumulatively assessing IQ. *See, e.g.*, Brief for Amici Curiae American Psychological Association, American Psychiatric Association, and Alabama Psychological Association in Support of Respondent at 18–20, *Hamm v. Smith*, 608 U.S. __ (2026) (No. 24-872), 2025 WL 2796841, at *18–*20. As discussed above, however, the Supreme Court in *Smith* declined to resolve how federal courts are to give cumulative effect to multiple IQ scores. Thus, whatever the validity of the professional associations' contentions in this regard, they do not displace Alabama law or prior Eleventh Circuit authority affirming this practice. Accordingly, in Alabama and in the Eleventh Circuit, calculating the mean remains a valid statistical method for giving cumulative effect to multiple IQ scores.

from the dismissal of certiorari) (citation omitted). Indeed, Dr. Salekin testified at the evidentiary hearing that "the most important thing" to her in assessing Petitioner's multiple IQ scores "is where the median lies[.]" (Doc. 111 at 99; *id*. at 100 ("Again, we have six scores here, and you want to look at the general tendency, the general—the way—I'm going to say average, the median.").)[26] The median is the middle value in a set of numbers. Quoting the American Psychiatric Association's Handbook of Intellectual and Developmental Disabilities, Justice Alito explained its utility in the cumulative evaluation of multiple IQ scores:

> The median score is a "reasonable estimate" of a defendant's "true" IQ that is "appropriate and useful" where the 95% confidence intervals for all an individual's scores overlap. Thus, when this condition is met, courts adjudicating *Atkins* claims can "reasonabl[y]" and "appropriate[ly]" conclude that a defendant's IQ is above 70 when his median score exceeds 70.

*Smith*, 608 U.S. __, 146 S.Ct. at 1277 (citations omitted).

Dr. Salekin's demonstrative PowerPoint slide plotting the confidence intervals for each of Petitioner's IQ scores shows that, excepting the invalid SB-5 score, there is substantial overlap in Petitioner's valid IQ scores. (Doc. 107-08 at 13.) Each of the five scores occupies an eight-to-ten point band in the fifteen-point range between 70 and 85. Each score overlaps with every other score by at least two

---

[26] The demonstrative tables Dr. Salekin utilized during her testimony appeared to conflate the distinct concepts of "median" and "average." (*See* doc. 107-8 at 13–14 (Salekin PowerPoint slides showing plot of obtained and Flynn-adjusted IQ scores appearing to describe "average" IQ as median value of plotted scores).) Her testimony, however, appeared to recognize and correct this error. (*See* doc. 111 at 97 ("And the median, as opposed to – it does say average, but it's referred to as - it is the median, even though it's referred to as average.").) In any event, this Court accepts Dr. Salekin's testimony that taking the median IQ score provides one psychometrically sound method for cumulatively evaluating multiple IQ scores.

points and several scores overlap a great deal more.[27] The median value of Petitioner's five valid obtained IQ scores is 75.[28] As Petitioner's median IQ score therefore exceeds 70, pursuant to the professional medical literature cited by Justice Alito, this Court can "'reasonably' and 'appropriately' conclude that [Petitioner's] IQ is above 70[.]" *Smith*, 608 U.S. __, 146 S.Ct. at 1277.[29]

Even if one applies some measure of the SEM to Petitioner's median IQ score, it remains that the preponderance of evidence demonstrates that his IQ is above 70. As noted previously, the "rule of thumb" SEM of +/-5 points overstates any "cumulative" SEM in Petitioner's favor. Indeed, on Dr. Salekin's table, the only IQ scores subject to a five-point SEM reduction are the 1982 WAIS and the 1984 WAIS-R, for which, according to Dr. Salekin, no SEM was provided in the test manuals she reviewed. The other valid IQ scores included on the table, the 2021 SB-5 and the two 2021 WAIS-IV administrations, are subject to three and four point

[27] The confidence intervals for all of Petitioner's valid IQ scores overlap in the 77–78 range.

[28] Dr. Salekin assessed Petitioner's median IQ score to be 74.5, which she rounded down to 74 for purposes of her prong one analysis. (Doc. 107-8 at 13 (Salekin PowerPoint slide).) She then appears to have applied a "rule of thumb" SEM of +/-5 points to this median IQ score, producing a confidence band of 69–79, in support of her testimony that Petitioner satisfies prong one of *Atkins*. (*Id*.) Dr. Salekin did not explain why she rounded the median 74.5 score down to 74, rather than up to 75. Nor did she explain why she applied a +/-5 point SEM to her median score when, as discussed previously, most of the individual IQ scores are subject to less than a potential five-point reduction applying the given test's SEM. In any event, Dr. Salekin's calculation of Petitioner's median score was flawed because she included her invalid SB-5 in the set of scores from which she derived the median. With the invalid SB-5 removed, there are five remaining scores (81, 78, 75, 74, 73), the middle value of which is exactly 75. Dr. Salekin confirmed this after her test administration error was identified in cross-examination. (Doc. 111 at 171.)

[29] For purposes of comparison, and acknowledging that neither the district court nor the Eleventh Circuit relied upon any median score in *Smith*, the median of Joseph Smith's five IQ scores is 74, which, again, places him inside the range of intellectual disability when applying a "rule of thumb" SEM of +/-5 points.

reductions, respectively. The average SEM reduction for Petitioner's five valid IQ scores is -4.2, while the median value is -4. Subtracting either potential SEM reduction from Petitioner's median score of 75 leaves him with an IQ score above 70, *i.e.*, 70.8 or 71.

Moreover, even if one applies the "rule of thumb" SEM of +/-5 points to petitioner's median score of 75, resulting in a confidence interval of 70–80, it does not follow that Petitioner has established significantly subaverage intellectual functioning. In that scenario, there is insufficient evidence to overcome a simple probabilistic analysis which tips in favor of a finding that Petitioner functions in the borderline, rather than disabled, range of intellectual functioning. The +/-5 SEM represents a 95% likelihood that Petitioner functions in the given ten-point range. (Doc. 111 at 92 (Salekin).) Nine of the ten points in Petitioner's mean range (70–80) are above the threshold for a finding of significantly subaverage intellectual functioning. There is nothing inherent in the standardizing of IQ tests which establishes that a test subject more likely functions at the very bottom of his SEM range rather than anywhere else in the range. *See Ledford*, 818 F.3d at 641 ("Further, the standard error of measurement is a bi-directional concept that does not carry with it the presumption that an individual's IQ falls to the bottom of his IQ range."); *see also Ferguson v. Comm'r, Ala. Dep't of Corr*, 69 F.4th 1243, 1255–56 (11th Cir. 2023) (citing *Ledford*, 818 F.3d at 640–41).[30]

Applying the SEM, if there is only a 2.5% probability that Petitioner's "true" IQ is 69 or lower, then it cannot be that there is a substantially greater likelihood that his "true" IQ is exactly 70. Furthermore, the record here lacks any compelling

---

[30] This facet of the SEM distinguishes it from the other measurements of error discussed at the hearing. While the Flynn Effect and the practice effect work in only one direction, reducing obtained IQ scores for the benefit of the litigant attempting to show intellectual disability in a capital case, nothing inherent in the SEM establishes that the lower end of the confidence band is more likely to represent the subject's true IQ than is the higher end.

reason to conclude that Petitioner functions at the very bottom of the confidence interval applicable to his median (or lowest) IQ score. Indeed, there is strong evidence—namely, Petitioner's two IQ scores (78 & 81) with confidence intervals entirely outside the range of intellectual disability—that Petitioner's intellectual functioning is higher than 70. Accordingly, even if application of the "rule of thumb" SEM to Petitioner's median score of 75 permits the narrowest possible basis for a finding that Petitioner's intellectual functioning is significantly subaverage, the evidence simply does not preponderate in favor of such a finding. *See Raulerson*, 928 F.3d at 1008 (finding that, "[i]n light of two IQ scores [78 and 83] comfortably above the range of intellectual disability that Raulerson received as a child," his two scores of 69 in IQ testing after his arrest do not "clearly and convincingly prove he has '*significantly* subaverage intellectual functioning'") (emphasis in *Raulerson*).

Finally, a holistic analysis considering all of Petitioner's scores, as well as expert testimony about the interpretation of such scores, again compels the conclusion that Petitioner's IQ is above 70, even with consideration of the SEM. In short, the expert testimony establishes that Petitioner's five valid IQ scores are largely consistent. (Doc. 111 at 97–98 (Salekin); *see also* doc. 116 at 134 (King: "I mean, there may be a few points difference, but I would see all of those scores as quite consistent.").)[31] Indeed, Dr. Salekin's demonstrative PowerPoint slide plotting

[31] Dr. King testified that, because Petitioner's valid IQ scores are statistically consistent, and all fall within the borderline range of intellectual functioning, neither the mean nor median of Petitioner's scores is of any particular import to him in the SSIF inquiry. (Doc. 116 at 147.) He offered the following holistic analysis of Petitioner's multiple IQ scores: "And if I may, what's remarkable about all those scores is that they occur across four different tests, over 40 years and four different examiners, and they are all in agreement." (*Id*. at 148.) Because the scores are in such agreement, Dr. King affirmed that it is "likely that Mr. Bush's true measure of intellectual functioning is somewhere between 73 and 81[.]" (*Id.*) He also explained the concept of "convergent validity," in which multiple consistent IQ scores are credited as likely reflecting the actual range of the subject's intellectual functioning. (*See* doc. 117 at 40–41 ("In other words, the more IQ scores you

the confidence intervals for all of Petitioner's IQ scores states the following: "If [the] 95% SEM confidence bands overlap or touch[,] this indicates that there is no statistically significant difference between the respective scores[.]" (Doc. 107-08 at 13 (emphasis omitted).) Because Petitioner's valid IQ scores are consistent, in that the confidence intervals for all scores overlap and there is therefore no significant statistical difference between his highest and lowest scores, it is reasonable to surmise that the precise range in which all such confidence intervals overlap offers the best cumulative estimate of Petitioner's true intellectual functioning. Here, the 95% confidence intervals for all of Petitioner's valid IQ scores overlap in the 77-78 range. It is therefore reasonable to conclude that Petitioner's "true" IQ is 77-78, which, for purposes of this order, this Court will express as 77.

It is important to recognize that this holistically-derived cumulative IQ score of 77 does not unduly privilege Petitioner's highest IQ scores. Because it is equal to the very bottom of the SEM for Petitioner's highest score, it plainly accounts for the possibility that Petitioner's highest score may be the product of some measurement error. Just as importantly, though, it does not privilege Petitioner's lowest IQ scores, as it recognizes that the lower scores may slightly underestimate Petitioner's true intellectual functioning. The testimony at the evidentiary hearing indeed supports such a finding.

Analogizing IQ testing with timed running, Dr. Salekin testified that it would be inappropriate to rely only upon Petitioner's highest IQ score when assessing his intellectual functioning:

> I'd like to think of it as running. A runner can run really fast one day, and everybody's behind them. They run however fast you need to run for a sprint. It's a good day. And so that might be their highest score, but the highest score is impacted by a lot of things. So if you're thinking

have using particular instruments, the more likely it is that the IQ score is within the range of the IQ scores obtained.").)

> about a runner, you're thinking about all sorts of things. There's new shoes, wind conditions, did they eat breakfast, whatever it might be on that day. And that impacts it, so you get a higher score. But then you'll see, you know, more typical functioning, they're not going to get that speed. And so the variability -- we always have variability, but what you're looking for is typical functioning. You're not looking for the highest score nor are you looking for the lowest score.

(Doc. 111 at 100.) Dr. Salekin's testimony on cross-examination, however, revealed the limits of her runner's analogy. Under questioning about her expert report, the following exchange occurred:

> Q. So what factors -- but yet you say on page 11 intelligence testing can be affected by a variety of events that result in over- or underestimates of an individual's measured intelligence.
> What testing conditions could result in an overestimate of someone's intelligence?
>
> A. In terms of temperature, I guess it could. I mean, I don't – off the top of my head, I can't think of something. I mean, an ideal setting would potentially assist with –
>
> Q. Getting the best score they can do?
>
> A. Yes.
>
> Q. But it's not going to artificially inflate their score. It's not going to make them perform above their ability if they're really comfortable; true?
>
> A. Well, when you -- let me go back to your question. When you think about -- they all interact together. So in terms of – you're talking about increasing scores or decreasing scores?
>
> Q. I'm talking about increasing scores.
>
> A. Okay. So if you get – it's going back to that runner example. If it's a perfect day, you've got great shoes, you've done really well, the temperature intermixes with everything. It's not a

single individual component. So you wouldn't look at any one factor as being something that would either raise or lower.

Q. Good shoes don't increase your performance on an IQ test, do they?

A. No. Just an example.

(Doc. 111 at 176–77.)

As can be seen from Dr. Salekin's testimony, although her report suggested that some testing conditions or circumstances might result in an "overestimate" of a person's intelligence, she failed to identify any factor or event which could have artificially inflated Petitioner's IQ score to the 78 he obtained in 1982 or the 81 he obtained in 2021. If anything, Dr. Salekin's testimony provides a basis for a finding that the factors she described—temperature, comfort, rest, satiation at the time of testing, *etc*.—better explain Petitioner's lower IQ scores than his higher scores.[32] To follow Dr. Salekin's analogy, it is evident how factors like headwinds, inadequate rest, energy, and effort, challenging surface conditions, or poor quality footwear, alone or in concert, may tend to impede performance and inflate running times. It is also evident how the inverse of these conditions can lead to better times. Indeed, a strong tailwind, favorable surface grade, or technologically advanced footwear might artificially reduce a runner's time beyond that which he is otherwise capable of achieving.

But Dr. Salekin's analogy fails to persuade this Court in the context of IQ testing. She did not identify any factor, whether internal or external, which might cause a person to perform better in IQ testing than his native intellectual functioning

[32] Dr. King agreed that many of the factors Dr. Salekin identified—like energy levels, "[a]ttentional problems," hunger, etc.—might depress IQ scores. (Doc. 116 at 146.)

would otherwise permit.[33] Nor did she explain how Petitioner's performance under even optimal testing conditions—assuming such conditions indeed correlated with his higher scores—represents anything other than his true intellectual functioning capacity. She also did not explain why Petitioner's lower scores, assuming they were the product of inhibiting factors like room temperature, rest, energy, *etc*., should take precedence over his higher scores in a cumulative analysis. Ultimately, this Court is tasked with determining whether Petitioner has established by a preponderance of the evidence that his IQ is 70 or below with consideration of the SEM. The test is not whether Petitioner can consistently top 70 despite sometimes challenging conditions (which he nevertheless appears to have done). Petitioner's higher IQ scores, with confidence intervals completely outside the range of intellectual disability, provide compelling proof that his IQ is indeed above 70 even if they were obtained in favorable or "comfortable" conditions.

Were Petitioner's two highest scores obvious outliers in a broad set of scores, then perhaps it would improperly skew any cumulative analysis to ascribe them much weight. But, according to Dr. Salekin, the higher scores, including the 81 Petitioner obtained in 2021, are not outliers. (Doc. 111 at 96.) Because the record therefore presents a set of remarkably consistent IQ scores and no evidentiary basis for discounting the higher scores beyond their SEM, it follows that the intersection of the confidence bands for all of Petitioner's valid IQ scores, 77 here, represents the best cumulative estimate of Petitioner's true IQ. This cumulative estimate is consistent with Dr. King's holistic analysis, in which he opined that Petitioner's IQ is "somewhere between 73 and 81[.]" (Doc. 116 at 147–48.) It also harmonizes all of Petitioner's IQ scores, affording appropriate recognition and impact to his higher

[33] Dr. King confirmed in his testimony that there are no external factors that would allow someone to perform better than their natural ability on an IQ test. (Doc. 116 at 146–47.)

scores while accounting for the measurement errors and other factors that likely explain his lower scores. Furthermore, this holistic, cumulative IQ score of 77 is largely consistent with the other cumulative analysis methods discussed previously. It is less than one point higher than Petitioner's mean IQ score of 76.2 and only two points higher than his median score of 75. If one concludes that Petitioner's IQ is 77, then as with the other methods of cumulative analysis discussed previously, his IQ is entirely outside the range of intellectual disability, even accounting for a "rule of thumb" SEM of +/- 5 points.

As set forth above, every reasonable measure of cumulatively evaluating Petitioner's multiple IQ scores leads to the conclusion that his IQ is above 70, even accounting for the SEM. In order to conclude that Petitioner's IQ is 70 or below, one must either apply the Flynn Effect to achieve a roughly five point downward adjustment of any cumulative IQ score or refuse to undertake any cumulative analysis whatsoever, giving no effect to Petitioner's higher IQ scores, and find that Petitioner's IQ is at the very bottom of the confidence intervals for his three lowest scores, notwithstanding the presence of other, higher scores.[34] For the reasons stated in this opinion, this Court declines to follow either of these paths. Accordingly, this Court concludes that, considered cumulatively, Petitioner's IQ scores indicate that he functions in the *borderline* range of intellectual functioning rather than in the mildly intellectually disabled range of functioning.

Petitioner's low borderline IQ scores no doubt make it a close question whether he meets the requirement of SSIF. But the first prong of Alabama's intellectual disability test asks simply whether Petitioner has an IQ of 70 or below,

---

[34] Such analysis would be inconsistent with the Eleventh Circuit's reasoning in *Raulerson*, in which the Court of Appeals specifically found that Raulerson was unable to prove SSIF because his two childhood IQ scores, 78 and 83, were "comfortably above the range of intellectual disability," notwithstanding his two subsequent IQ scores of 69. 928 F.3d at 1008.

not whether his IQ is in the borderline range of functioning and is accompanied by more nebulous traits like struggles with academics and interpersonal relationships or deficits in independent living skills and the like. So long as prong one of Alabama's test imposes a constitutionally-sound requirement, and no federal appellate authority has held otherwise, then Petitioner must establish by a preponderance of the evidence that his IQ is 70 or below when considering the SEM. Otherwise, the first prong of Alabama's test of intellectual disability is effectively collapsed into the second prong. For the reasons stated above, Petitioner has failed to demonstrate by a preponderance of the evidence that his IQ is indeed 70 or below.

***C. Other evidence in the record does not indicate that, notwithstanding his consistent borderline IQ test results, Petitioner satisfies the SSIF requirement.***

*1. Dr. Salekin's SB-5 results do not support a finding of SSIF.*

Dr. Salekin conceded that her administration error in the fluid reasoning non-verbal subtest of the 2013 SB-5 invalidates the FSIQ of 63 that Petitioner obtained on that test. (Doc. 112 at 9.) In his proposed findings of fact, Petitioner posits that his 2013 SB-5 results nevertheless support his claim of SSIF because "the administration error on the fluid reasoning non-verbal subtest does not impact any of the other nine subtests." (Doc. 124 at ¶ 180.) He also maintains that, notwithstanding Dr. Salekin's error, evidence of his subaverage fluid reasoning is found in the results of the same SB-5 subtest administered by Dr. King in 2021, in which Petitioner scored only two points higher than the invalid score reported by Dr. Salekin, and in his results on three subtests of the Kaufman Adult Intelligence Test (KAIT) administered by Dr. Shaffer to test his fluid intelligence. (*Id*. at ¶¶ 181–90.)

This Court assigns little residual value to Dr. Salekin's invalid SB-5 results in assessing Petitioner's intellectual functioning and, accordingly, does not find that the test results support a finding of SSIF. *First*, Dr. Salekin conceded at the hearing

that it is not sound psychological practice to incorporate partial results from one test administration into the results of another administration of the same test. (Doc. 112 at 8–9.) Hence, the scores Petitioner obtained in Dr. King's administration of the SB-5 in 2021 can have no bearing on this Court's consideration of Dr. Salekin's 2013 test results. Likewise, Petitioner's results on a completely different instrument, like the KAIT, even if they demonstrate poor fluid intelligence under the auspices of that test, can have no practical bearing on this Court's assessment of Dr. Salekin's 2013 SB-5.

*Second*, the administration error presents considerable practical difficulties in assigning any value to the test results. Although the administration error occurred in the fluid reasoning non-verbal subtest, it is not merely one of ten subtests that is affected by Dr. Salekin's error. Dr. Salekin testified that her administration error affects both the FSIQ (63) and non-verbal IQ (62) she reported in her administration of the SB-5. (Doc. 112 at 4.) Dr. Salekin did not testify about which of the five "factors" of the SB-5 are affected by her administration error in the fluid reasoning non-verbal subtest, but the report of Petitioner's test results included in her expert report indicates that, even assuming that only the "Fluid Reasoning" factor is affected, on which she scored Petitioner at 59, then most of Petitioner's scores on the remaining factors are considerably higher. (*See* Pet.'s Exh. 5 (Salekin Report) at 31–32, doc. 107-7 (indicating Petitioner scored 69 on the "Knowledge" factor, 75 on the "Quantitative Reasoning" factor, 56 on the "Visual Spatial Reasoning" factor, and 83 on the "Working Memory" factor).) In short, with Petitioner's non-verbal and full scale IQ scores invalidated, and with several of the possibly unaffected SB-5 "factors" reflecting significantly higher functioning than Petitioner's functioning in fluid reasoning, it is difficult to assign any objective weight to Dr. Salekin's SB-5 results in the SSIF inquiry.

*Third*, even if Dr. Salekin's SB-5 score was not invalid, it appears to be a significant outlier and is therefore entitled to little weight. As stated previously, Petitioner's five FSIQs in the record, excluding Dr. Salekin's 2013 SB-5, range from 73 to 81. So, over nearly forty years of testing, across several different instruments administered by a host of examiners, Petitioner produced five IQ scores falling within an eight-point range. Dr. Salekin's reported 2013 SB-5 score is *ten* points lower than the lowest of his other scores, meaning that, as Dr. Salekin's own table shows, the *highest* value of the SEM applicable to her score (68) does not overlap with even the *lowest* value of the SEM applicable to any other score (70) obtained by Petitioner.[35] Although Dr. Salekin nevertheless testified that her 2013 SB-5 score is not an outlier (doc. 111 at 96), objectively speaking, where five scores are tightly clustered within eight points of each other, and where "IQ is a stable construct throughout one's life" (doc. 111 at 24 (Tassé)), a sixth score existing ten points removed from any other score in that cluster is plainly an outlier.[36] Because, relative to Petitioner's other scores, the 2013 SB-5 result is an outlier, and therefore likely does not reflect Petitioner's true level of intellectual functioning, this Court affords

[35] Dr. Salekin's demonstrative PowerPoint slide plotting Petitioner's six IQ scores visually depicts this. (Doc. 107-8 at 13.) Each IQ score is plotted with its 95% confidence band. There is substantial overlap among the five scores excluding the 2013 SB-5 because each of the scores occupies an eight-to-ten-point band entirely within the 70–85 range. Dr. Salekin's 2013 SB-5, however, is an island unto itself, with no overlap with any other score.

[36] Petitioner makes this very case—on substantially weaker evidence—in attempting to discredit his 81 on the WAIS-IV administered by Dr. King. (*See* doc. 131 at 7 ("Dr. King's WAIS-IV test appears to be an outlying score that is substantially higher than any of Petitioner's prior administrations of the WAIS examinations[.]").) But, of course, Dr. King's reported score of 81 is only three points higher than the score of 78 Petitioner obtained on the WAIS in 1982. If, in Petitioner's view, three points can make for a "substantially higher" outlying score, then ten points surely qualifies the 2013 SB-5 as a far more substantial outlier.

it no significant residual value in assessing whether Petitioner meets the SSIF requirement of intellectual disability.

2. *Dr. Shaffer's neuropsychological battery results, overall, do not demonstrate that Petitioner's intellectual functioning is significantly subaverage.*

Petitioner's proposed findings of fact posit that the results of Dr. Shaffer's neuropsychological testing demonstrate his SSIF. He describes the several neuropsychological tests Dr. Shaffer administered and the results he obtained on those tests. (Doc. 124 at ¶¶ 201–20.) Respondent does not object to Petitioner's description of the tests or his characterization of Dr. Shaffer's interpretation of the test results. (Doc. 126 at ¶¶ 201–20.) Petitioner's proposed findings of fact relating to the pertinence of Dr. Shaffer's neuropsychological testing to his intellectual functioning cite to Dr. Shaffer's expert report rather than his hearing testimony. (Doc. 124 at ¶¶ 221–22.) In pertinent part, Dr. Shaffer's findings in the report are as follows:

> 45. Mr. Bush's results on several tests indicate substantial deficit in executive neuropsychological functions. These include chiefly the Finger Tapping Test, the Wisconsin Card Sorting Test, the Tower of London Test, the Stroop Test.
>
> 46. "Executive" functions operate in the control and of sequence behaviors to a planned outcome. These functions allow inhibition of automatic behavior, redirection of behavior to more appropriate actions.
>
> 47. The coordination of frontal lobe structures in relay with brain centers of emotion and motivation is functionally deficient in Mr. Bush's test profile. There is deficiency involving inhibition of impulses based on incoming information.
>
> 48. These brain processes are vital in the appreciation of the consequences of acts. Impairment or dysfunction of these processes may result in actions that appear heedless of

> consequences in individuals who otherwise can logically explain and predict the same consequences. So, these deficits impair a person's ability to behave appropriately, especially in new or fastchanging situations.
>
> 49. The present assessment presents evidence of adaptive deficiency in a broad range of executive functions. This impacts the ability to control and direct one's thoughts over the course of actions to completion. Executive deficits therefore apply directly to nearly all types of adaptive behavior. The *practical* domain of executive functions is limited by Mr. Bush's difficulty pursuing a sequence of acts through to a practical outcome, including matters related to eating, basic health, management of money and other requirements of independent living.

(Pet.'s Exh. 11 (Shaffer Rpt.) at 13–14, doc. 107-13 at 13–14.)

A plain reading of Dr. Shaffer's report fairly indicates that his neuropsychological testing results relate more to identifying sources of deficits in Petitioner's adaptive behaviors rather than his raw intellectual functioning capacity. Not only does Dr. Shaffer make explicit reference to "deficits" in "nearly all types of adaptive behavior" and specifically mention several behaviors in the practical domain of adaptive functioning, he explains how the neuropsychological deficits revealed in his testing impair Petitioner's "inhibition of automatic behavior[,]" "redirection of behavior to more appropriate actions[,]" "inhibition of impulses based on incoming information[,]" and his "ability to behave appropriately, especially in new or fastchanging situations." The Court accepts Dr. Shaffer's opinion insofar as it goes, but finds his report lacking in establishing a durable nexus between his neuropsychological test results and proof of the SSIF component of the intellectual disability standard.

Dr. Shaffer's hearing testimony, which is not cited in the portion of Petitioner's proposed findings of fact in which he explains the pertinence of Dr. Shaffer's testing to the SSIF inquiry (*see* doc. 124 at ¶¶ 221–23), does little to

explain how Petitioner's neuropsychological test results are probative of Petitioner's purported SSIF in addition to his adaptive deficits. For instance, Dr. Shaffer explained that the neuropsychological tests he administered to Petitioner "are positioned between a person's intellect and their actual actions, their behavior. So it assesses how intellectual processes are actually translated into behaviors." (Doc. 112 at 24.) Asked how the tests are "validated in that regard[,]" Dr. Shaffer appeared to reference the tests' pertinence in demonstrating adaptive deficits: "Well, known groups of individuals with particular characteristics of behavior are submitted to organized series of tests which include neuropsychological test batteries, and the results then are compared between normal subjects and individuals that have known behavioral characteristics, including adaptive behavior deficits." (*Id*. at 25.) Dr. Shaffer later affirmed that the neuropsychological tests "are more closely identified with actual behaviors than are crystallized intellectual functioning, which sometimes I call armchair reasoning. So these are—this has much more to do with making decisions on—in real time." (*Id*. at 26.)

At one point, Dr. Shaffer testified that Petitioner's results on the Wisconsin Card Sorting Test, the Stroop Test, and the Finger Tapping Test "actually meet the prong one criteria"—the requirement of SSIF—of the intellectual disability standard. (Doc. 112 at 41.) His explanation for this contention, however, offered little clarity on how these tests demonstrate SSIF rather than provide a neurological basis for understanding Petitioner's deficits in adaptive behaviors:

> The frontal lobes of the brain are necessary for executive function. And many of these specific tests are designed in a manner that parallels executive functional actions and behaviors, that is, the ability to halt an ongoing series of actions, control the impulses, take in new information, and redirect to a more productive and responsible action. So those executive functions are highlighted in the core of several of these tests.

(*Id*. at 42.)[37]

Dr. Shaffer's description of these three tests in his expert report likewise emphasizes the utility of the tests in identifying deficits in adaptive behaviors. For instance, according to Dr. Shaffer's report, the Finger Tapping Test "measures executive functioning and fine motor ability. . . . Deficits in fine motor speed indicate deficiency in the frontal lobes of the brain, which are essential in the performance of executive neuropsychological functions. Finger tapping speed is predictive of adaptive behavior and rehabilitation outcomes following brain injury, stroke and aging." (Pet.'s Exh. 11 (Shaffer Rpt.) at 5, doc. 107-13 at 5.)

The Wisconsin Card Sorting Test also measures executive function, "primarily the ability to shift intentions based on new information." (Pet.'s Exh. 11 (Shaffer Rpt.) at 6, doc. 107-13 at 6.) The test measures an individual's "perseveration," which is "the tendency to repeat an incorrect act in spite of new information that it is no longer correct. The self-correcting neuropsychological function is considered an essential process in consideration of consequences of behavior, particularly in unfamiliar situations and represents one's ability to 'think on your feet.'" (*Id*.)

Finally, the Stroop Test also "measures frontal lobe brain functions, including executive functions, by measuring the ability to direct one's actions away from what is familiar to choose a competing action instead." (Pet.'s Exh. 11 (Shaffer Rpt.) at 7, doc. 107-13 at 7.) It "is a cognitive conflict task requiring inhibition of an

[37] Later, on cross-examination, Dr. Shaffer disagreed with the proposition "that you can use neuropsychological tests in and of themselves to diagnose someone with intellectual disability[.]" (Doc. 112 at 61.) Thus, to be clear, Petitioner's results on the Wisconsin Card Sorting Test, the Stroop Test, and the Finger Tapping Test could not have "met" "the prong one criteria." (*Id*. at 41.) If such tests cannot be used, "in and of themselves," to diagnose intellectual disability, there is no good explanation in the record for how they can demonstrate SSIF notwithstanding the presence of borderline IQ scores.

automatic response (reading) while performing a different response (color naming)." *Id*. There is no explanation in the report how these neuropsychological tests can demonstrate SSIF where, cumulatively, IQ testing does not.

In sum, the neuropsychological battery administered by Dr. Shaffer is, by his own description, most obviously pertinent in assessing Petitioner's adaptive behavior deficits. Dr. Shaffer's report and hearing testimony most naturally position these tests as a complement to IQ testing in the SSIF inquiry, *i.e.*, a means of developing a neuropsychological profile that provides context for interpreting IQ test results.[38] This Court accepts Dr. Shaffer's testimony that the testing he conducted can demonstrate deficient function in the areas of the brain that mediate intellectual ability. But the question before this Court is, where Petitioner's IQ scores indicate borderline, rather than significantly subaverage, intellectual functioning, how do the results of Petitioner's neuropsychological testing demonstrate that he meets the SSIF requirement notwithstanding his IQ scores? How, for example, does Petitioner's extreme "perseveration" in the Wisconsin Card Sorting Test demonstrate SSIF despite borderline IQ scores? Is it not possible, even probable, that an individual with low borderline intellectual functioning will also perform poorly in neuropsychological testing? How is Petitioner's "neuropsychological profile" quantifiable in distinguishing between low borderline and significantly subaverage intellectual functioning?

Neither Dr. Shaffer's testimony nor his report satisfactorily provide an answer to these questions. This may stem from the fact that Dr. Shaffer assessed that

[38] This appears to be how Petitioner described the utility of the neuropsychological testing to the prong one inquiry in his proposed conclusions of law: "Petitioner's significant substandard intellectual functioning is *corroborated* by a battery of neuropsychological testing, demonstrating performance in the significant substandard range on tests measuring Petitioner's frontal lobe function, verbal skills, executive functioning, self-regulation, and ability to learn from mistakes." (Doc. 124 at ¶ 399 (emphasis supplied).)

Petitioner meets the SSIF requirement based upon his Flynn-adjusted IQ score on the WAIS-IV that Dr. Shaffer administered. (*See* doc. 112 at 33 (describing Petitioner's Flynn-adjusted IQ as "a score between 67 and 74"); *id*. at 34 (Dr. Shaffer testifying that Petitioner's Flynn-adjusted IQ score "does satisfy prong one of the diagnostic criteria").) Thus, as he appears to indicate in his report's conclusions, rather than demonstrate SSIF, the neuropsychological testing results complement the results of Petitioner's intelligence testing in the overall intellectual disability analysis:

> The results obtained from the intellectual assessment of Mr. Bush using WAIS-IV and KAIT measures is in the range specified for Intellectual Disability as interpreted by current state of the professional standards. Taken together with the neuropsychological profile and social gullibility findings, the results of this evaluation support a finding of Intellectual Disability.

(Pet.'s Exh. 11 (Shaffer Rpt.) at 16, doc. 107-13 at 16.) Because Dr. Shaffer did not assess that Petitioner's intellectual functioning is in the low borderline range, however, Dr. Shaffer did not opine whether, in his judgment, Petitioner's "neuropsychological profile" supports a finding of SSIF notwithstanding the presence of overall borderline IQ scores.

Additionally, it is noteworthy that, although she relied upon Dr. Shaffer's WAIS-IV test results, Petitioner's "diagnosing expert," Dr. Salekin, made no reference to Dr. Shaffer's neuropsychological testing when describing in her report her own conclusion that Petitioner meets the SSIF requirement. (Pet.'s Exh. 5 (Salekin Report) at 35, doc. 107-7 at 35.)[39] Thus, this Court is left with little basis

[39] Dr. Salekin's expert report predicates her conclusion that Petitioner meets the SSIF prong entirely, and exclusively, on his IQ scores. (Doc. 107-7 at 35.) Notably, the report did not include Dr. King's 2021 WAIS-IV, on which Petitioner scored 81, among the scores Dr. Salekin considered. (*Id*.) In any event, perhaps Dr. Salekin did not opine on the import of Dr. Shaffer's neuropsychological testing in the SSIF inquiry because she is not a

to conclude that Petitioner's neuropsychological test results support a finding of SSIF notwithstanding his consistent borderline scores in intelligence testing.

## V. Because Petitioner has not Satisfied the SSIF Requirement of Alabama's Intellectual Disability Standard, the Court Need not Consider Evidence of his Adaptive Deficits.

As set forth above, it is this Court's conclusion that Petitioner does not meet the SSIF requirement of Alabama's intellectual disability standard because, considered cumulatively, his multiple IQ scores demonstrate that his intellectual functioning is outside the range of intellectual disability. By every rubric of cumulative analysis discussed above, Petitioner's IQ places him just outside the range of intellectual disability (70-75) in which this Court would be required to consider "additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Hall*, 572 U.S. at 723.

The Eleventh Circuit's recent decision in *Ferguson* is instructive on this point. There, notwithstanding the presence of some IQ scores in the range of intellectual disability, which the district court conceded rendered it "*possible* [Ferguson's] IQ falls within the range of intellectual disability," the district court concluded that, due to the presence of additional scores above the range of intellectual disability, Ferguson failed to show that he suffered "*significantly* subaverage intellectual functioning." *Ferguson v. Allen*, No. 3:09-cv-0138-CLS, 2020 WL 2572176, at *15 (N.D. Ala. May 21, 2020) (emphasis in original). Despite this conclusion, however, the district court proceeded to consider whether Ferguson satisfied the adaptive

---

neuropsychologist. But Petitioner has asserted that the professional guidelines for diagnosing intellectual disability establish that "'individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score.'" (Doc. 124 at ¶ 199 (quoting DSM-5, at 37).) Accepting that premise, it is reasonable to expect Petitioner's "diagnosing expert" to address the results of any neuropsychological testing in her diagnosis.

functioning prong of Alabama's intellectual disability standard. *Id*. Ultimately, after reviewing extensive evidence of Ferguson's historical adaptive functioning deficits, the district court held that Ferguson had failed to show that he *presently* suffers severe deficits in his adaptive functioning, as required by the Alabama Supreme Court's *Smith* opinion. *Id*. at *24–*25.

On appeal, Ferguson challenged both the finding that he failed to show SSIF and Alabama's requirement that he show that he presently suffers severe deficits in adaptive behaviors. 69 F.4th at 1254. The Eleventh Circuit concluded that it need not address Ferguson's argument about Alabama's adaptive functioning requirements because the district court did not err in concluding that Petitioner failed to show SSIF:

> Regardless of the validity of Alabama's requirement that Ferguson must demonstrate substantial *present* limitations in adaptive functioning, under *Smith*, Ferguson also has to show he possessed significantly subaverage intellectual functioning. Because the district court found Ferguson at no point had subaverage intellectual functioning, and because Ferguson has not shown the district court clearly erred in making that finding, we need not address whether requiring *present* significant deficits in adaptive functioning runs afoul of *Atkins*.

*Id*. at 1254–55 (emphasis in original).

Likewise here, because Petitioner has not shown that he suffers SSIF, or even that the SEM applicable to any reasonably-derived cumulative estimate of his IQ score places him in the range of intellectual disability, this Court need not move on to consider whether he suffers from severe deficits in his adaptive functioning.[40]

[40] *Raulerson*, too, is consistent with this analysis. There, the Eleventh Circuit, conducting *de novo* review of Raulerson's *Atkins* claim, held that, notwithstanding Raulerson's two IQ scores of 69, his higher scores (78 and 83) demonstrated that his intellectual functioning was not significantly subaverage. 928 F.3d at 1008. The Eleventh Circuit did not address whether Raulerson satisfied the adaptive functioning prong of Georgia's test or otherwise

Because Petitioner has not satisfied the SSIF requirement of Alabama's intellectual disability standard by a preponderance of the evidence, his claim pursuant to *Atkins* is due to be denied.

**CONCLUSION**

For all the foregoing reasons, Claim E of the habeas petition is DENIED.[41]

DONE, on this the 30th day of September 2026.

R. AUSTIN HUFFAKER, JR.
CHIEF UNITED STATES DISTRICT JUDGE

discuss whether Raulerson's adaptive deficits demonstrated intellectual disability notwithstanding his borderline intellectual functioning.

[41] Petitioner's remaining claims will be addressed in a separate order.