IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM BUSH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-cv-345-RAH |
| | ) | [WO] |
| GREG LOVELACE, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner William Bush, a death-sentenced inmate in the custody of the Alabama Department of Corrections, has filed a habeas corpus petition, pursuant to 28 U.S.C. § 2254, challenging his conviction for the capital murder of Larry Dominguez and the resulting death sentence he received. Bush claims that his conviction and sentence were obtained in violation of his rights under the United States Constitution. For the reasons stated below, the Petition will be DENIED.

## TABLE OF CONTENTS

**BACKGROUND** .......... **3**

I. The Offense .......... 3

II. Trial, Retrials, and Direct Appeal .......... 4

III. State Postconviction .......... 6

**PETITIONER'S CLAIMS** .......... **7**

**STANDARD OF REVIEW** .......... **8**

**DISCUSSION** .......... **12**

I. Claim A - The District Attorney Used His Peremptory Strikes to Remove Black Venirepersons on the Basis of Their Race .......... 13

II. Claim B – The State Failed to Provide Critical Impeachment Evidence .......... 61

III. Claim C – Petitioner Was Deprived Of His Right To Confront a Witness .......... 95

IV. Claim D – The Trial Court's Override of the Jury's Life Recommendation was Arbitrary and Unreliable .......... 112

V. Claim E – Alabama is Precluded From Executing Petitioner .......... 124

VI. Claim F – The Trial Court Refused to Consider Mitigating Evidence .......... 124

VII. Claim G – Petitioner Was Denied the Effective Assistance of Counsel .......... 138

VIII. Claim H – The Trial Judge Deprived Petitioner of the Basic Tools Necessary to an Effective Defense. .......... 170

IX. Claim I – Execution After Inordinate Delay Caused by State Actors Violates the Eighth Amendment .......... 175

X. Claim J – The State Courts Failed to Fully Transcribe All Rule 32 Proceedings .......... 182

**CERTIFICATE OF APPEALABILITY** .......... **197**

**CONCLUSION** .......... **199**

## BACKGROUND

### I. The Offense

The Alabama Court of Criminal Appeals ("ACCA") recited the following facts in its opinion affirming Petitioner's conviction and sentence on direct appeal.

> The state presented evidence showing that around 3:00 a.m., on July 26, 1981, the appellant and a companion, Edward Lewis Pringle, entered the Majik Market convenience store on Carter Hill Road in Montgomery, Alabama, with the intent to rob the cashier of money to buy drugs. When they entered, two people were in the store: Larry Dominguez, the store clerk, and his friend Tony Holmes. Dominguez was in the restroom. The appellant pointed a pistol at Holmes and forced him toward the restroom at the rear of the store. When Dominguez opened the restroom door, the appellant shot both Dominguez and Holmes. The appellant then returned to the front of the store and attempted unsuccessfully to open the cash register. Dominguez stumbled out of the restroom, and the appellant shot him again. Before departing, the appellant took two bags of "zodiac sign tags" from a rack behind the counter near the cash register. The first shot striking Dominguez passed through his chin, lodging in his neck and severing a large artery. The second shot striking Dominguez entered his right shoulder and passed through his lungs and heart. He died quickly at the scene from the injuries caused by the second shot; however, the injuries sustained as a result of the first shot were potentially fatal. Holmes was shot in the throat and, although seriously injured, he survived. He was able to describe his assailant, the pistol, and the automobile the assailants were driving. He described the automobile as a 1973 white-over-green Chevrolet Monte Carlo and the pistol as a nickel-plated .38 caliber short-barreled special.
>
> After leaving the Majik Market, the appellant and Pringle drove to a nearby Seven–Eleven convenience store on Narrow Lane Road in Montgomery, arriving there sometime before 4:00 a.m. The appellant entered the store and purchased a package of Kool cigarettes from the clerk, Thomas Adams. After Adams opened the cash register, the appellant forced him into an office area behind the counter and shot him

> in the neck with the same pistol he had used to shoot Dominguez and Holmes. The shot to Adams's neck shattered his spinal cord and killed him instantly. When the shot was fired, the barrel of the pistol was either touching Adams's neck or within a fraction of an inch of it. The appellant took between $20 to $30 from the cash register, along with a bank bag and checks.
>
> The appellant made a statement to the police in which he confessed to the crimes. Although in his first statement he claimed that Pringle was the triggerman in both shootings at the Majik Market and that he was the triggerman in the collateral capital offense at the Seven–Eleven store, in his second statement, he admitted that he fired the shots that killed Dominguez and Adams and that wounded Holmes. In assisting the officers in recovering the weapon, the appellant said to Officer R.T. Ward, when the pistol was recovered, "[T]hat's the weapon that was used to shoot all three people." Ballistic tests of the pistol—a nickel-plated .38 caliber short-barreled special—proved that it was the pistol that fired the shots in the commission of the three crimes.

*Bush v. State*, 695 So. 2d 70, 81–82 (Ala. Crim. App. 1995) (footnotes omitted).

## II. Trial, Retrials, and Direct Appeal

In November 1981, Petitioner was tried on four counts of capital murder pursuant to Ala. Code § 13A-5-40(a)(2), murder during the course of a robbery. *Bush*, 695 So. 2d at 80. "Each count of the indictment allege[d] the same offense based on the same facts, but each [was] worded slightly differently, and two counts include[d] alternative allegations of attempted robbery." *Id.* After his first trial, Petitioner was convicted of capital murder and, following the jury's unanimous recommendation, the trial court sentenced him to death. *Id.* His conviction and sentence were affirmed on direct appeal. *See Bush v. State*, 431 So. 2d 555 (Ala. Crim. App. 1982), *aff'd*, *Ex parte Bush*, 431 So. 2d 563 (Ala. 1983), *cert. denied*, 464 U.S. 865 (1983).

In 1983, Petitioner successfully petitioned for habeas corpus relief in the United States District Court for the Middle District of Alabama. Pursuant to a stipulation between the parties, "the federal court ordered that the writ be granted unless the state granted the appellant a new trial within 180 days." *Bush*, 695 So. 2d at 80.[1] At his second trial, in 1984, Petitioner was again convicted and, following the jury's 11-1 recommendation, was again sentenced to death. *Id*. at 81. On appeal, the ACCA reversed Petitioner's second conviction and remanded for a new trial after finding plain error in the trial court's instruction to the jury "indicating that the trial court had made a preliminary finding that [Petitioner's] confession was voluntary and that the jury could not disregard that finding[.]" *Id*. (citing *Bush v. State*, 523 So. 2d 538 (Ala. Crim. App. 1988)).

Petitioner's operative third trial, on the same indictment from 1981, commenced in 1991. Petitioner was again convicted on all counts in the indictment. *Bush*, 695 So. 2d at 81. This time, however, the jury unanimously recommended

---

[1] The ACCA described the basis for the parties' stipulation that Petitioner was entitled to federal habeas corpus relief as follows:

> This action was precipitated by a conflict over whether the prosecution had given to the defense a police memorandum showing that the only eyewitness to the capital murder [Holmes] had identified a person other than the appellant as the assailant. It was conceded that if this exculpatory information had been turned over to trial counsel, counsel's failure to develop it at trial would have constituted a Sixth Amendment violation, and if it had not been turned over, it would have constituted a Fifth Amendment violation. On these alternative bases, a new trial was ordered.

*Bush*, 695 So. 2d at 80 n.1. Specifically, the exculpatory information that resulted in the grant of habeas corpus was that Holmes identified Cornelius Pringle, Edward Pringle's brother, as the shooter in both a photo lineup and a subsequent live lineup. *Id*. at 82.

that Petitioner receive life imprisonment without parole. *Id*. The trial court overrode the jury's recommendation and sentenced Petitioner to death once again. *Id*. The ACCA affirmed Petitioner's conviction and sentence following his third trial. *Bush*, 695 So. 2d at 137. The Alabama Supreme Court ("ASC") affirmed. *Ex parte Bush*, 695 So. 2d 138 (1997). The United States Supreme Court denied certiorari review. *Bush v. Alabama*, 522 U.S. 969 (1997).

## III. State Postconviction

Petitioner next sought relief from his conviction and sentence pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. He filed his initial Rule 32 petition in October 1998. (Doc. 25-23 at 18–45.[2]) In July 1999, the Rule 32 court granted the State's motion to dismiss several of Petitioner's claims pursuant to various provisions of Rule 32. (Doc. 25-39 at 102–07.) Then, in October 2000, the Rule 32 court entered an order dismissing additional claims on procedural grounds. (Doc. 25-39 at 108–11.) Petitioner thereafter filed an amended Rule 32 petition. (Doc. 25-24 at 28–54.) In March 2001, the Rule 32 court granted the State's motion to dismiss several of the claims in the amended Rule 32 petition. (Doc. 25-39 at 112–21.) In July 2001, Petitioner filed his second amended Rule 32 petition. (Doc. 25-24 at 166–86.) In December 2002, the Rule 32 court entered an order denying two of the second amended petition's claims. (Doc. 25-39 at 122–25.)

In March 2004, in advance of his scheduled Rule 32 evidentiary hearing, Petitioner moved for leave to further amend his Rule 32 petition to present a claim

[2] Citations to the state court record, including the reporters' transcripts of Petitioner's trial and Rule 32 evidentiary hearings, as well as all pleadings and documents filed in federal court, will utilize the docket number and PDF page number generated in the ECF system and appearing at the top of the document, *e.g.*, "Doc. 25-23 at x."

that his sentence of death is unconstitutional, pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), due to his intellectual disability. (Doc. 25-26 at 52–54.) The Rule 32 evidentiary hearing commenced later that month. Following the hearing, in July 2004, the Rule 32 court entered its Final Order disposing of the Rule 32 petition's remaining claims, including Petitioner's claim pursuant to *Atkins*. (Doc. 25-39 at 126–52.) The ACCA affirmed, *Bush v. State*, 92 So. 3d 121 (Ala. Crim. App. 2009), and the ASC denied certiorari review. (Doc. 25-39 at 200.) On April 16, 2012, Petitioner filed the instant federal habeas corpus petition.

## PETITIONER'S CLAIMS

Petitioner asserts ten separately numbered grounds for habeas corpus relief, some of which contain additional subclaims. These ten claims are summarized as follows:

(A) The District Attorney Used His Peremptory Strikes to Remove Black Venire-members on the Basis of Their Race;

(B) The State Failed to Provide Petitioner with Critical Impeachment Evidence About Its Witnesses and Informants;

(C) The Admission at Petitioner's Third Trial of Patricia Pringle's Testimony from His First Trial Violated his Right to Confront the Witnesses Against Him;

(D) The Trial Court's Standardless Override of the Jury's Unanimous Life Determination was Arbitrary and Unreliable;

(E) The State is Precluded from Executing Petitioner Because He Suffers from Mental Retardation;

(F) The Sentencing Judge Refused to Consider Undisputed Mitigating Evidence of Petitioner's Narcotics Intoxication;

(G) Petitioner was Denied the Effective Assistance of Counsel;

(H) The Trial Court Deprived Petitioner of the Basic Tools Necessary to an Effective Defense;

(I) Executing Petitioner Following His Extended Imprisonment on Death Row is Unconstitutional; and

(J) The Failure of the State Courts to Transcribe Fully All Proceedings in State Postconviction Deprived Petitioner of Due Process.

## STANDARD OF REVIEW

Because all of Petitioner's claims have been exhausted and decided on their merits in the state courts,[3] this court is to apply the standard of review set out in 28 U.S.C. § 2254(d)(1) and (2), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d) provides as follows:

---

[3] Respondents initially asserted the defense of procedural default against one of Petitioner's ineffective assistance of counsel subclaims and his separate claim challenging the constitutionality of his execution following alleged excessive delay. (Doc. 24 at 30, 38.) Subsequently, Respondents filed an amended answer withdrawing their procedural default defense as to the ineffective assistance of counsel subclaim. (Doc. 34.) This court, W. Keith Watkins, United States District Judge, then entered an order rejecting Respondents' procedural default defense on the remaining claim because it had, in fact, been presented and decided on its merits in the state courts. (Doc. 47 at 11–12.) Accordingly, all of

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412–13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application

---

Respondents' procedural defenses have been withdrawn or adjudicated prior to this opinion.

must also be unreasonable." *Id.* at 411. In short, to satisfy § 2254(d)(1)'s "unreasonable application" standard, "a prisoner must show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020).

Likewise, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "In reviewing whether a state court's decision was based on an 'unreasonable determination of the facts' under § 2254(d)(2), [the court] presume[s] the state court's factual findings are correct, and the petitioner has the burden to rebut those facts by clear and convincing evidence." *Wellons v. Warden, GA Diagnostic & Classification Prison*, 695 F.3d 1202, 1206 (11th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)). "This statutory presumption of correctness applies to the factual determinations of both state trial and appellate courts." *Id.* (citing *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003)).

While "deference [in the habeas context] does not imply abandonment or abdication of judicial review" and does not "preclude relief," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), the deferential standard imposed by § 2254(d), as to both legal conclusions and factual determinations by the state courts, is formidable. As the Supreme Court has explained:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no probability fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against

> extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quotation and citations omitted). *See also Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. However it is phrased, the deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear.").

The force of AEDPA's "daunting" standard of review is demonstrated in other ways. For example, AEDPA deference is owed when a state court has summarily denied relief on a claim. That is, where there is no "opinion from the state court explaining the state court's reasoning," the habeas petitioner still must show "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. Thus, faced with a state court's summary disposition on the merits, "a habeas court must determine what arguments or theories supported, or . . . could have supported, the state court decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Id*. at 102.

Furthermore, even where the state court has provided a reasoned decision, AEDPA still requires the federal court to "consider any potential justification" for the state court's ultimate disposition, even those not expressly offered by the state court. *Pye v. Warden, Georgia Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir.

2022) (en banc); *id*. at 1037–38 (explaining that, where "a state court rejects a petitioner's claim in a written opinion accompanied by an explanation, the federal habeas court reviews only the state court's 'decision' and is not limited to the particular justifications that the state court supplied"). Put another way, while a federal court in habeas must "evaluate the reasons offered by the [state] court," if the state court's reasons can be justified "on a basis the state court did not explicate, the state-court decision must still stand." *King v. Warden, Georgia Diagnostic Prison*, 69 F.4th 856, 867 (11th Cir. 2023).

If Petitioner succeeds in surmounting the formidable obstacles imposed by AEDPA, then this court is "unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1255 (11th Cir. 2013) (citation and internal quotation marks omitted). Even in *de novo* review, however, with limited exceptions, the court may not grant habeas corpus relief if the state court error at issue was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). "In collateral cases, a federal constitutional error is harmless unless it imposed 'actual prejudice.'" *Sears v. Warden*, *GDCP*, 73 F.4th 1269, 1280 (11th Cir. 2023) (quoting *Brecht*, 507 U.S. at 637–38). Actual prejudice results when the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

## DISCUSSION

The court will address each claim, including subclaims, in the order in which they are presented in the Petition.

## I. Claim A - The District Attorney Used His Peremptory Strikes to Remove Black Venirepersons on the Basis of Their Race

### A. Petitioner's Allegations

Petitioner alleges that prosecutors at his third trial used their peremptory challenges to remove black jurors on the basis of their race. In support, he states the prosecution "used 59 percent—19 of 32—of its peremptory strikes to remove 19 of 26 African-Americans from the venire." (Pet. ¶ 52., doc. 1 at 21–22) He also claims the "jury selection process involved several indicia of racial discrimination, including the interracial nature of the charged crime and the heterogeneity of the stricken black jurors in terms of their age, education, marital status, occupations and other personal characteristics." (*Id*. (citations omitted).)

Moving from these broad circumstances supporting his claim, Petitioner alleges several discrete instances in which prosecutors discriminated against individual venirepersons. Specifically, he alleges prosecutors discriminated against Dorothy Thomas because they failed to provide any justification for their decision to strike her and, indeed, had no articulable race-neutral basis for the strike. (Pet. ¶¶ 54–58, doc. 1 at 22–23.) He claims prosecutors' peremptory strikes of Lucille Mapson, Tyrone McCray, Lucas Milligan, and Elizabeth Hamilton were race-based because, although prosecutors claimed each had been struck due to their views on capital punishment, those venirepersons indicated that they favored capital punishment. (Pet. ¶ 61, doc. 1 at 24–25.) Similarly, he asserts, prosecutors claimed to have struck Mary Walker and Ethel Vinson due to their views on capital punishment despite that "both jurors in their voir dire responses specifically denied being opposed to the death penalty and told the district attorney that they could vote for a death sentence if it were appropriate." (Pet. ¶ 62, doc. 1 at 25.) Petitioner

alleges that prosecutors "failed to apply" their purported concerns about these venirepersons' capital punishment views to certain white jurors whom they did not strike despite those jurors' expression of similar views. (Pet. ¶¶ 64–68, doc. 1 at 26–27.) Finally, regarding venireperson Hamilton, Petitioner alleges that prosecutors' discriminatory intent, and the trial court's "utter lack of substantive inquiry into the state's purported race-neutral justifications for its peremptory strikes[,]" is demonstrated by the trial court's having permitted prosecutors three attempts at articulating a race-neutral reason for their strike of Hamilton. (Pet. ¶ 70, doc. 1 at 28.) In sum, Petitioner alleges, "[b]ased upon the clear record of non-existent, false, pretextual, and discriminatory peremptory strikes, the prosecution systematically excluded African-Americans from the jury and denied Mr. Bush a fair trial." (Pet. ¶ 72, doc. 1 at 29.)

### B. Clearly Established Federal Law

In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." The Court also described the burden-shifting framework by which a defendant may prove a discriminatory juror challenge.

> [W]e have recognized that a black defendant alleging that members of his race have been impermissibly excluded from the venire may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion. The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties.

*Id*. at 93–94 (citations omitted). If the prosecutor succeeds in articulating a sufficiently race-neutral reason for his challenge, "[t]he trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id*. at 98. The ultimate burden of persuasion is, "of course, on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination." *Id*. at 93 (quotation marks and citation omitted).

At step one of *Batson*, "the trial court should consider all relevant circumstances" in determining whether the defendant has presented a prima facie case of discrimination. 476 U.S. at 96. Illustrative examples of such circumstances cited in *Batson* include "a 'pattern' of strikes against black jurors included in the particular venire" or that "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Id*. at 97. Other examples of relevant circumstances bearing upon the defendant's prima facie showing may include "the subject matter of the case . . . if it is racially or ethnically sensitive" and "evidence of past discrimination in jury selection." *Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1337 (11th Cir. 2012) (citations and internal quotations omitted).

The prosecutor's race-neutral reason at step two of *Batson* "need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97. Rather, the prosecutor need only "articulate a neutral explanation related to the particular case to be tried." *Id*. at 98. Indeed, step two of *Batson* "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The issue at step two "is the facial validity of the prosecution's explanation. Unless a discriminatory intent is inherent in the prosecutor's

explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991).

Step three of *Batson*, in which the trial court determines whether the defendant has shown purposeful discrimination, usually "involves an evaluation of the prosecutor's credibility." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (citing *Batson*, 476 U.S. at 98 n.21). The trial court must consider all the relevant circumstances—including those informing the determination at step one—in assessing whether the prosecutor's race-neutral reasons should be believed.[4] Because the trial court is uniquely positioned to observe the demeanor of the attorneys and jurors involved in the voir dire process, *id.*, "a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to great deference." *Davis v. Ayala*, 576 U.S. 257, 271 (2015) (internal quotation marks and citation omitted).

### C. *Batson* Proceedings in the Trial Court

With the full venire gathered ahead of trial, Montgomery County Circuit Judge Joseph Phelps inquired whether members of the venire had heard of the case in media reports. (Doc. 25-6 at 135.) Jurors who answered affirmatively were designated for individual voir dire on their exposure to pretrial publicity. Because prospective jurors had completed juror questionnaires which included multiple questions about their views on capital punishment, Judge Phelps proposed that,

[4] Additional factors and circumstances that may be relevant at step three of *Batson* include "disparate questioning and investigation of black and white prospective jurors in the case[,]" "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case" (sometimes referred to as comparative juror analysis), and "a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing." *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019).

where desired, the attorneys voir dire those same prospective jurors on their capital punishment views so that they would not have to be called back for another session of individual voir dire after they were examined on pretrial publicity. (*Id*. at 137–38.)

Judge Phelps and the attorneys proceeded to question several prospective jurors about their exposure to pretrial publicity and, where appropriate, their views on capital punishment as reflected in their juror questionnaires. (Doc. 25-6 at 140–252.) After this first batch of prospective jurors, Judge Phelps entertained challenges for cause by the attorneys. (*Id*. at 253–70.) Judge Phelps and the attorneys then proceeded with individual voir dire of a second batch of prospective jurors, this one selected by the State, due to those jurors' expression of views considered by prosecutors to be strongly opposed to capital punishment. (Doc. 25-6 at 277–doc. 25-7 at 63.) At the close of the first day of jury selection, Judge Phelps ruled on the State's for-cause challenges to prospective jurors based upon their capital punishment views, granting some and denying others. (Doc. 25-7 at 68–69.)

Jury selection resumed the following morning, with the defense calling for voir dire about 31 prospective jurors it perceived as expressing "strong" support for capital punishment in their questionnaires. (Doc. 25-7 at 72–212.) Following this third round of individual voir dire, the defense moved to strike several prospective jurors for cause. (*Id*. at 213.) As he had with the State's for-cause-challenges, Judge Phelps granted some of the defense's challenges and denied others. (*Id*. at 214.) After releasing the venirepersons excused for cause, Judge Phelps assembled the qualified venirepersons and conducted a "roll call" so that the attorneys could firm up their understanding of each venireperson's identity, including the prospective

juror's name and occupation as well as that of their spouse. (*Id*. at 221–222.) Judge Phelps and the attorneys then proceeded to strike the jury. (*Id*. at 228–29.[5])

After striking the jury, the defense lodged its first objection under *Batson*, arguing that prosecutors exercised their strikes "in a manner which excluded a vast number of the members of the black race[.]" (Doc. 25-7 at 229–30.) Judge Phelps convened a *Batson* hearing, at which the defense argued that the State used 18 of its 32 peremptory strikes to remove black venirepersons. (Doc. 25-1 at 11–13.) Judge Phelps was unsure whether the State's "18-14 division" of peremptory strikes established a prima facie case under *Batson*, but he nevertheless asked the State to provide the reasons for its strikes. (*Id*. at 13.) Because prosecutors claimed to be unsure which of the venirepersons they struck were black, Judge Phelps told prosecutors to explain who they struck and why. (*Id*.) The prosecutors then proceeded to go through each of the State's strikes, including black and white venirepersons, describing the basis for the State's strike of each venireperson. (*Id*. at 13–25.)

Two of the State's strikes warrant particular attention at this point. Regarding Dorothy Thomas, a black female, the prosecutor claimed Thomas's "sheet" (meaning, presumably, her juror questionnaire) was not in his papers and that he would "come back" to address that strike. (Doc. 25-1 at 20.) As to Elizabeth Hamilton, also a black female, the following exchange occurred:

> MR. GRADDICK: This is the Mental Health lady, worked for Mental Health. Her husband is deceased. She equivocated in front of Your Honor, as I recall, when she was answering questions. She states

[5] At this point, the qualified "venire consisted of 76 potential jurors, of which 26 were black, and 50 were white." *Bush*, 695 So. 2d at 95.

down here that she is for capital punishment but doesn't feel that it is a deterrent. But then again she turns around and says that she thinks it's a definite deterrent when she starts to checking things. I had a difficult time, quite honestly, her being a Mental Health worker. Over my 17 years I have found that Mental Health folks want to rehabilitate.

THE COURT: Well, the Supreme Court says you can't have just general things like that.

MR. GRADDICK: I know. I didn't feel comfortable with her position with regard to capital punishment.

THE COURT: She filled out the questionnaire?

MR. GRADDICK: Yes, sir. She would state one thing and then turn around and state something else. I just couldn't figure out how she really felt about capital punishment. She was one of the latter persons to be struck.

THE COURT: Is she black or white?

MR. BELSER: Black female.

THE COURT: The reason you struck her was the questions on the questionnaire and her demeanor?

MR. GRADDICK: Yes, sir. If you read it, it's just not consistent with how she feels about the death penalty. And her demeanor didn't give us any clue either.

THE COURT: Do you think capital punishment deters or prevents crime? No. She's for it in the answer. She says for it; but it doesn't deter crime. She would be able to recommend. Then down here she says capital punishment is a very definite deterrent.

MR. GRADDICK: Right. I couldn't tell whether she was for it or against it. With regard to her total outlook about it, I was just not comfortable with her.

THE COURT: All right. Anything further?

(*Id*. at 22–24.[6])

After prosecutors finished explaining their strikes—they did not circle back to address the Thomas strike—the defense objected that it was at a disadvantage in responding to the State's articulated reasons because it did not have all of the information possessed by the State—specifically, "information . . . obtained by the Alabama Crime Information computer[.]" (Doc. 25-1 at 25.) Judge Phelps provisionally accepted the State's articulated reasons and overruled the defense's *Batson* motion with the understanding that the defense might renew the motion, "if necessary" (meaning, presumably, in the event of a conviction), after the defense is permitted access to all the prosecution's information about the prospective jurors. (*Id*. at 26–28.) The defense clarified that it seeks "an opportunity to rebut the showing made by the prosecution to show that the explanations given by the prosecution, at least as to some of his strikes, some are pretextual and there were white jurors that had certain characteristics that were used in describing reasons for excluding blacks were not included." (*Id*. at 29.) Judge Phelps affirmed that, after the defense obtained all the prosecutors' information, the defense would be permitted "an opportunity to show [the trial court] that these standards were not

[6] Hamilton was not among the venirepersons subject to questioning in any of the three rounds of individual voir dire described previously. Neither the State nor the defense sought to voir dire her about her capital punishment views. Hence, the prosecutor's claimed uncertainty or discomfort with her capital punishment views stem not from her "demeanor" but, rather, from her responses on the juror questionnaire. As referenced by the prosecutor, Hamilton did provide inconsistent answers on the questionnaire. Specifically, while she wrote "no" in response to the question "Do you think that capital punishment deters or prevents crime?[,]" she subsequently indicated her agreement that "Capital punishment is a very definite[] deterrent to major crimes." (Doc. 25-15 at 76.)

applied on a consistent basis." (*Id.*) With this first leg of the *Batson* record established, Judge Phelps swore in the jury and began trial.

After trial, but before sentencing, Judge Phelps held the promised second *Batson* hearing. The defense started that hearing by asserting its belief that prosecutors used 19, rather than 18, of their peremptory strikes to remove black venirepersons. (Doc. 25-3 at 60–61.) After some back and forth, the State eventually agreed to that figure. (*Id*. at 64.) The defense limited its argument at the second *Batson* hearing to the State's peremptory challenge of Elizabeth Hamilton. (*Id*. at 66.) The defense first noted the State's previously articulated reason for the Hamilton strike: that it was difficult to ascertain her views on capital punishment and her demeanor. (*Id*. at 67.) Noting that Hamilton had not been subject to individual voir dire, the defense refuted that her demeanor could have provided any basis for the State's strike. (*Id*.) As to the State's other reason, the defense compared Hamilton's responses about capital punishment on her questionnaire to those given by several white jurors, and one black juror, whom prosecutors did not strike. (*Id*. at 67–86.)

After the defense completed its comparison of Hamilton's responses with those of seated jurors, Judge Phelps queried the attorneys about the burden of proof on the *Batson* issue and continued to express uncertainty about whether the State's division of its peremptory strikes between blacks and whites, alone, established a prima facie case. (Doc. 25-3 at 86–90.) Judge Phelps directed the attorneys to provide him with additional briefing about each party's burden and the standard of review relative to his finding about the defense's prima facie showing. (*Id.* at 91–93.)

Judge Phelps entered his written order denying the defense's *Batson* motion approximately six months after the second *Batson* hearing. (Doc. 25-6 at 28–36.) The order summarized the reasons given by the State at the first *Batson* hearing for its peremptory strikes of black venirepersons. (*Id*. at 30–32.) Judge Phelps found that prosecutors struck Dorothy Thomas because she "[d]id not return written questionnaire." (*Id*. at 31.) Regarding Elizabeth Hamilton, Judge Phelps summarized the State's reasons as follows:

> Veniremen Number 84 - Black Female - Equivocal with regard to the death penalty - stated in one place on the questionnaire that she was for capital punishment but did not feel capital punishment to be a deterrent - then later in responding on the questionnaire she stated that capital punishment was a definite deterrent - would state one thing and then turn around and state something else - District Attorney stated that he could not determine how she really felt about capital punishment - that she was struck due to questions on the questionnaire and demeanor.

(*Id*. at 32.) Judge Phelps further noted the defense's focus on Hamilton at the second *Batson* hearing and ultimately found the State's basis for the Hamilton strike to be "racially neutral and permissible under *Batson*[.]" (*Id*. at 33.) Judge Phelps reasoned that Hamilton had provided inconsistent answers on her juror questionnaire about whether she viewed capital punishment as a deterrent and that, after comparing the purportedly equivocal responses of white jurors cited by the defense, he could not "conclude from the totality of the evidence that the Defendant has demonstrated that the State used 'disparate treatment' within the purview of" state court precedents applying *Batson*. (*Id*. at 35.)

### D. State Court Appellate Review

On direct appeal to the ACCA, Petitioner argued that the State violated *Batson* as follows: 1) prosecutors wholly failed to explain the Thomas strike; 2) four black venirepersons (Lucille Mapson, Tyrone McCrary, Lucas Milligan, and Elizabeth Hamilton) were struck because of their capital punishment views despite that prosecutors did not voir dire them on that topic; 3) the prosecution's reasons for striking Mary Walker and Ethel Vinson were pretext for racial discrimination because those venirepersons never expressed opposition to capital punishment; 4) prosecutors' claim to have struck Lucas Milligan due to his age and failure to answer all questions on his juror questionnaire was pretext for discrimination; 5) prosecutors' unlawful discriminatory purpose was demonstrated by their failure to strike several white venirepersons who gave similarly vague and equivocal answers about capital punishment; and 6) prosecutors offered false and inadequate reasons in their first two attempts to justify the Hamilton strike. (Doc. 25-16 at 71–87.)

In its opinion affirming the trial court, the ACCA first described the racial makeup of the venire and the petit jury, as well as the composition of the prosecution's peremptory strikes.

> In this case, the trial court found that the jury venire consisted of 76 potential jurors, of which 26 were black, and 50 were white. Thus, the black venirepersons constituted 34% of the venire. The court found that the state struck 18 blacks and 14 whites and that the appellant struck 29 whites and 3 blacks. At least one black was excused for cause on motion of the appellant. Four blacks remained on the trial jury. Thus, blacks comprised 33% of the trial jury. The state used 43.75% of its peremptory strikes to strike white venirepersons and 56.25% to

> strike black venirepersons. We find that the record supports the findings of the trial court.

*Bush*, 695 So. 2d at 95–96 (footnote omitted).[7] The ACCA next recognized Judge Phelps's failure to specifically decide whether Petitioner established a prima facie showing of discrimination under *Batson* and noted its own finding that "we do not believe under the circumstances here that a prima facie case was established." *Id*. at 96. Nevertheless, because Judge Phelps required the prosecution to articulate the reasons for its strikes of black venirepersons, the ACCA proceeded to "evaluate the sufficiency of the ensuing explanations." *Id*. (citations omitted).

---

[7] The ACCA noted Petitioner's contention on direct appeal, which he had also presented at the second *Batson* hearing, that the prosecution used nineteen, rather than eighteen, of its peremptory strikes on black venirepersons. *Bush*, 695 So. 2d at 95 n.5. The ACCA found, however, that "one of the venirepersons—M.J. (116)—denoted by the prosecutor and assumed by the trial court to be black is actually white, according to the master list." *Id*. The ACCA's finding about the race of venireperson Margaret Johnston, as reflected on the master list, is supported by the record (*see* doc. 25-5 at 46), and is entitled to deference under § 2254(e)(1) unless petitioner presents clear and convincing evidence showing that the ACCA erred in crediting the master list over the prosecutor's description of Johnston's race at the *Batson* hearing. He has not done so.

Curiously, the voir dire transcript indicates that Margaret Johnston was questioned two separate times in individual voir dire. (Doc. 25-6 at 158 & Doc. 25-7 at 50.) There is no indication in the transcript that the parties or the trial court recognized the venireperson questioned during the latter session as one that had already appeared before them. Then, later in individual voir dire, the venireperson first introduced as Cynthia Joiner informed the defense attorney that her name is Johnston. (Doc. 25-7 at 95.) The venire master list has only one Johnston and one Joiner, both of whom it indicates are white. (Doc. 25-5 at 46.) All of this goes to show that the record is somewhat muddled on the identity of Johnston and whether the prosecutor might have simply erred or misremembered in describing her as black. In any event, Petitioner has not provided clear and convincing evidence that the ACCA erred in its finding about Johnston's race. Furthermore, even if Johnston was black, the statistical adjustment to the State's pattern of strikes observed by the ACCA (one additional strike of black venirepersons) would not be so dramatic that Petitioner's *Batson* claim is rendered significantly stronger.

The ACCA found that, after the prosecution articulated the reasons for its strikes at the first *Batson* hearing, Petitioner "offered nothing to rebut the state's reasons given for the strikes or to show that the strikes were pretextual[.]" *Bush*, 695 So. 2d at 96–97. The ACCA next found that, at the second *Batson* hearing after trial, Petitioner "attempted to rebut the prosecutor's explanation of only one venireperson," Elizabeth Hamilton. *Id*. The ACCA then reviewed Judge Phelps's findings in his written order denying *Batson* relief, quoting from that order the reasons cited by Judge Phelps for each of the black venirepersons struck by prosecutors. *Bush*, 695 So. 2d at 97–99.

The ACCA first held that its review was circumscribed by the limited nature of Petitioner's showing in the trial court:

> The only specific objection raised in the trial court to the prosecutor's explanation for striking a venireperson was to the explanation given concerning [Elizabeth Hamilton]. Had the appellant perceived anything suggesting a discriminatory motive in the prosecutor's strikes concerning the other venirepersons, he should have articulated his concerns to the trial court during its factual inquiry at the third step of the *Batson* hearing.
>
> With the exception of [Dorothy Thomas], the prosecutor articulated facially race-neutral reasons, which were reasonably specific and trial-related, for striking the other named venirepersons. The explanations were neither "implausible or fantastic." As noted, the appellant challenged only the reason given for [Elizabeth Hamilton]; he did not challenge the reasons given for the other named venirepersons. Thus, he failed to meet his burden of proving purposeful discrimination in regard to those venirepersons.

*Bush*, 695 So. 2d at 99. Turning to Petitioner's arguments about Hamilton, the ACCA found no merit in Petitioner's claim of disparate treatment of Hamilton *vis a vis* white jurors:

> We find it reasonable for the prosecutor to have cautiously concluded that [Hamilton's] equivocation on whether capital punishment truly deters crime was a real indication that she would not staunchly assert the death penalty. The prosecutor also struck white venirepersons who were opposed to or appeared reluctant to impose the death penalty. "Where whites and blacks are struck for the same reason, there is no evidence of disparate treatment." *Carrington v. State*, 608 So. 2d 447, 449 (Ala. Cr. App. 1992). Based on the reasons given by the prosecutor for his strikes, our review of the questionnaires of all the venirepersons, the voir dire, and the deference to be paid to the trial court's findings of fact on this matter, we conclude that the prosecutor's peremptory challenge of [Hamilton] was not discriminatory.

*Id*. at 100.

Finally, because the prosecutor never articulated any reason for his strike of Dorothy Thomas, and because Judge Phelps erred in his finding that prosecutors struck Thomas because she did not return the juror questionnaire, the ACCA addressed the Thomas strike. The ACCA found that the prosecution's failure to address the Thomas strike at the first *Batson* hearing "was inadvertent" and that Judge Phelps had been "simply mistaken" when he found that prosecutors struck Thomas due to a failure to return her questionnaire. *Bush*, 695 So. 2d at 100. Citing Alabama Supreme Court authority—namely, *Bui v. State*, 627 So. 2d 855 (Ala. 1992)—the ACCA explained that, where a prosecutor fails to offer any explanation for a peremptory strike, a reviewing court may "look at all of the existing circumstances" surrounding the strike to assess whether the unexplained strike was intentionally racially discriminatory. *Id*. at 101. The ACCA cited the following

circumstances in support of its conclusion that Thomas was not struck because of her race:

> The black-white ratio on the jury mirrored that of the venire[. . . ;] race-neutral reasons were given by the prosecutor for striking 17 of the 18 black persons removed from the venire; the prosecutor had the opportunity to strike all of the blacks on the venire but did not do so; the appellant was instrumental in removing one black venireperson for cause; there were 4 blacks left on the trial jury; extensive voir dire of the venire was conducted; the state was required to turn over to the appellant its files concerning the venire, which included questionnaires submitted by the venirepersons; and the trial court gave the appellant an opportunity, after he had reviewed the state's files, to rebut the reasons given for the strikes by the prosecutor.

*Id*. at 101–02. Based upon these circumstances, the ACCA concluded it could not "hold that the trial court's finding of an absence of racial discrimination with respect to the prosecutor's strike of [Thomas] was clearly erroneous." *Id*. at 102.

Petitioner next sought certiorari review in the ASC on his *Batson* claim relating to the Thomas strike. (Doc. 25-20 at 24.) Although the ASC granted certiorari review, it did not address the *Batson* claim in its opinion. *See Ex parte Bush*, 695 So. 2d at 139.

**E. Review Pursuant to § 2254(d)(1) and (2).**

Because it was the last state court to issue a reasoned decision on Petitioner's *Batson* claim, this court reviews the ACCA's decision pursuant to § 2254(d)(1) and (2). *King*, 69 F.4th at 867 (citation omitted). Petitioner articulates four separate arguments in support of his claim that the ACCA unreasonably applied *Batson* and based its decision upon an unreasonable determination of the facts before that court. *First*, he contends that the ACCA unreasonably applied *Batson* because, rather than

following the three-step analytical framework outlined in that decision, the ACCA did "nothing more than count the number of strikes, repeat the State's purported bases for those strikes, and count the number of black venire-members ultimately empaneled in order to deny the *Batson* claim." (Doc. 50 at 58–59.) *Second*, he submits that the ACCA "misapplied *Batson* by not requiring the State to provide any race-neutral basis for the strike of Dorothy Thomas as required by 'step 2' of the *Batson* analysis." (*Id*. at 59.) *Third*, he states that the ACCA's ruling "concerning the peremptory strike of Elizabeth Hamilton was an unreasonable determination of the facts" because the ACCA "ignored" the procedure by which the trial court obtained the State's reason for her strike and accepted the State's proffered reason despite that it was unsupported by the record, pretextual, and applicable to white venirepersons the State did not strike. (*Id*. at 61–62.) *Fourth*, he posits that the ACCA unreasonably applied *Batson* by failing to properly assess the purported disparate treatment of "other" black venirepersons by prosecutors. (*Id*. at 63.) The court will examine each argument in turn.

*1. The ACCA did not unreasonably apply Batson by failing to adhere to its three-step analytical framework or consider all relevant circumstances suggestive of discrimination.*

Petitioner complains that the ACCA did not "engage in a 'factual inquiry' and consider the totality of the circumstances in assessing the validity of the State's justifications" for its strikes. (Doc. 50 at 59.) Petitioner's claim of error appears to encompass what might be described as procedural and substantive components. On the procedural side, Petitioner appears to argue that the ACCA unreasonably applied *Batson* because its opinion insufficiently examined his claim. He maintains that, despite that *Batson* requires a "rigorous three step analysis," the ACCA "did little more than copy and paste the reasons provided by the State for the use of peremptory

strikes as they appeared in the trial court's order." (Doc. 50 at 59.) Substantively, Petitioner appears to argue that the ACCA unreasonably applied *Batson* because, had it properly considered all relevant circumstances, it would have found a violation.

To begin with, it is evident the ACCA's opinion comports with *Batson*'s three-step analytical framework. The ACCA prefaced its analysis by acknowledging and describing the *Batson* framework. *Bush*, 695 So. 2d at 95–96. It then meticulously reviewed the trial court record surrounding Petitioner's *Batson* claim before addressing his arguments. Specifically, the ACCA discussed the statistics Petitioner offered to meet his prima facie burden at trial;[8] "evaluate[d] the sufficiency" of the prosecution's stated reasons for its challenges notwithstanding its belief that Petitioner had not made a prima facie showing; found that, because he limited his argument at the second *Batson* hearing to the State's strike of Hamilton, Petitioner "failed to meet his burden of proving purposeful discrimination" regarding the numerous other venirepersons whom he argued on appeal were discriminatorily challenged; examined Petitioner's claim of disparate treatment of Hamilton; discussed the circumstances surrounding prosecutors' failure to provide any reason

[8] To be clear, Petitioner's prima facie showing in the trial court, at the first *Batson* hearing, relied entirely on his contention that the State disproportionately struck black venirepersons. (*See* doc. 25-1 at 11–12 (arguing that prosecutors used 18 of 32 strikes to remove "roughly sixty percent" of qualified black venirepersons).) Other factors stressed here by Petitioner as supporting his prima facie showing—"the interracial nature of the charged crime," the "heterogeneity of the stricken black jurors[,]" and "the long recorded and judicially-recognized history of the Montgomery County District Attorney's office discriminating against African-Americans in the use of peremptory challenges" (doc. 50 at 44–45)—were not argued by the defense at the *Batson* hearing. The defense did reference the heterogeneity of challenged black jurors in its post-hearing briefing in the trial court. (Doc. 25-5 at 93.)

for the strike of Thomas; and determined that the unexplained strike of Thomas "was not the result of intentional racial discrimination." *Id*. at 95–102. Petitioner's claim that the ACCA did "nothing more than count the number of strikes, repeat the State's purported bases for those strikes, and count the number of black venire-members ultimately empaneled in order to deny the *Batson* claim" (doc. 50 at 58), mischaracterizes the depth of the ACCA's findings and analysis of his *Batson* claim.

To the extent Petitioner's argument is that the ACCA unreasonably applied *Batson* because it did not explicitly address or reference every argument or circumstance he raised in his briefing before that court, he seeks to hold the ACCA to a burden greater than that required by *Batson*, especially under AEDPA review. *Batson* does not impose upon state appellate courts any heightened opinion-writing requirement: "When a court considers a *Batson* claim in an appeal or a state habeas proceeding, the 'state court's written opinion is not required to mention every relevant fact or argument' for its merits determination to receive deference on review by a federal court." *King*, 69 F.4th at 868 (quoting *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1223 (11th Cir. 2013)). So, while *Batson* requires that a state court consider all relevant circumstances, it does not require that the state court "explicitly mention[] *Batson*'s third step" or make "explicit findings about the prosecutor's credibility or about discriminatory purpose, or anything at all relating to that step." *Lee*, 726 F.3d at 1215–16. Instead, where a habeas petitioner asserts that a state court unreasonably applied *Batson* by failing to consider relevant circumstances, "the petitioner must prove that the state court failed to consider that argument or fact." *King*, 69 F.4th at 868 (citing *Lee*, 726 F.3d at 1222–23). Reliance on a state court's failure to address a fact, argument, or circumstance in its written opinion will not suffice.

Here, as set forth above, the ACCA plainly applied *Batson*'s three-part framework and Petitioner has failed to prove that it did not consider any relevant circumstance at step three of *Batson*. The ACCA extensively reviewed the trial court record surrounding petitioner's *Batson* motion, including the voir dire transcript and "the questionnaires of all the venirepersons," and found "no evidence here of disparate treatment between white venirepersons and black venirepersons." *Bush*, 695 So. 2d at 100. The ACCA did not explicitly exclude from its analysis any circumstance raised by Petitioner. Accordingly, the ACCA did not unreasonably apply *Batson* by failing to follow that decision's three-part analytical framework.

The remaining question is whether, as a substantive matter, the ACCA unreasonably applied *Batson* in its assessment of the totality of relevant circumstances, *i.e.*, whether fairminded jurists can agree with the ACCA's conclusion that Petitioner failed to prove racial discrimination in jury selection. *See, e.g.*, *Sockwell v. Comm'r, Ala. Dep't of Corr.*, 141 F.4th 1231, 1240 (11th Cir. 2025) (quoting *Lee*, 726 F.3d at 1213) (explaining that a state court unreasonably applies *Batson* under § 2254(d)(1) where there is "'strong evidence of discriminatory purpose,' such that no reasonable and fairminded jurist could have considered 'all relevant circumstances' and find no *Batson* violation"). Petitioner appears to argue that the ACCA unreasonably applied *Batson* because, rather than considering all relevant circumstances, the ACCA rested its opinion on "the proposition that the State may discriminate against some black venire-members but avoid a *Batson* violation by not striking *every* potential black venire-member." (Doc. 50 at 58 (emphasis Petitioner's).)

Petitioner does not here specifically tether his argument about the ACCA's unreasonable application of *Batson* to its consideration of any specific venireperson.

For reasons further explained in addressing Petitioner's other arguments of *Batson* error, and as found by the ACCA on direct review, his claim here is circumscribed by the limited nature of his showing in the trial court. At the second *Batson* hearing, Petitioner limited his argument about pretext, disparate treatment, and *Batson*'s relevant circumstances to his claim concerning the Hamilton strike. (Doc. 25-3 at 66.) On direct appeal, the ACCA found that, because of this limited argument in the trial court, Petitioner had "failed to meet his burden of proving purposeful discrimination in regard to" the other black venirepersons whom he argued on direct appeal had also been discriminatorily challenged. *Bush*, 695 So. 2d at 99. Because the ACCA's finding is supported by the record, this court reviews the ACCA's application of *Batson* to the relevant circumstances surrounding only the Hamilton strike.

Cumulatively, Petitioner has identified the following circumstances as relevant to his claim that the Hamilton strike was discriminatory: prosecutors disproportionately struck black venirepersons; "the interracial nature of the charged crime;" "the heterogeneity of the stricken black jurors;" the history of *Batson* violations involving the Montgomery County District Attorney's Office; prosecutors' failure to voir dire Hamilton about her capital punishment views despite claiming to have struck her because of her "equivocation" on that topic; prosecutors twice failed to articulate a race-neutral reason for the Hamilton strike before finally settling on her equivocation about capital punishment; and Hamilton's capital punishment views were no more equivocal than several white venirepersons whom the State did not strike. (Doc. 50 at 44–57.)

Fairminded jurists can agree with the ACCA's decision that, considered individually and cumulatively, the relevant circumstances highlighted by Petitioner

do not suffice to demonstrate a *Batson* violation. Although the first four circumstances referenced above were offered in the ACCA, and here, as proof of Petitioner's prima facie showing (*see* Doc. 25-16 at 72; Doc. 50 at 43–46), they are also relevant considerations at step three of *Batson*, as is the overall strength of Petitioner's prima facie showing. *Lee*, 726 F.3d at 1199. Here, the trial court never explicitly found that Petitioner met his prima facie burden and the ACCA opined that he had not. *Bush*, 695 So. 2d at 96. Regardless of whether Petitioner met his prima facie burden, his showing in that regard was not so strong that the ACCA could have unreasonably applied *Batson* in failing to afford it significant weight at step three.

Consider first Petitioner's statistical showing on the prosecution's pattern of jury strikes. The ACCA found that the qualified venire "consisted of 76 potential jurors, of which 26 were black, and 50 were white. Thus, the black venirepersons constituted 34% of the venire." *Bush*, 695 So. 2d at 95. The State used 18 of its 32 peremptory challenges (56.25%) to remove approximately 69% of the eligible black venirepersons. *Id.*[9] Although the proportion of black jurors (33%) was roughly equivalent to the share of qualified black venirepersons (34%), the State indeed struck black venirepersons at a rate disproportionate to their number in the venire.[10]

---

[9] The Hamilton strike at issue here was the State's 29th of its 32 strikes and was the last strike of a black venireperson. (Doc. 25-5 at 55.)

[10] The reason that the share of black jurors was roughly equivalent to the share of black venirepersons despite that the State struck a disproportionate share of black venirepersons is that Petitioner's legal counsel struck white venirepersons at an even more disproportionate rate. Petitioner's counsel used 29 of his 32 peremptory strikes (90.6%) to remove approximately 58% of white venirepersons. *Bush*, 695 So. 2d at 95–96. Petitioner's counsel exercised his strikes unburdened by *Batson*, suggesting that he purposely discriminated in his jury selection. (*See* doc. 25-3 at 75 (Defense Attorney

But disproportionate strikes, while relevant and due some consideration, are not determinative. *See, e.g.*, *King*, 69 F.4th at 863, 868–69 (affirming denial of habeas relief on *Batson* claim despite that prosecutor used 70% of his peremptory strikes to remove seven of eight prospective black jurors (88%) in a venire of 42). Likewise, while the presence of four black jurors cannot alone defeat Petitioner's *Batson* claim, it is probative of the strength of the claim, even where a disproportionate pattern of strikes is demonstrated. *See United States v. Dennis*, 804 F.2d 1208, 1211 (11th Cir. 1986) ("[T]he unchallenged presence of two blacks on the jury undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used three of the four peremptory challenges he exercised to strike blacks from the panel of potential jurors and alternates."); *see also United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044 (11th Cir. 2005) (observing that "whether members of the relevant racial or ethnic group served unchallenged on the jury" is a relevant consideration in assessing whether evidence of a discriminatory "pattern" of strikes establishes a prima facie case under *Batson*). In short, given the presence of four unchallenged black jurors on Petitioner's petit jury, Petitioner's statistical showing does not substantially advance his claim that Hamilton was struck because of her race without other significant evidence probative of discrimination.

The other factors Petitioner cites corresponding with his prima facie showing also do not substantially advance his claim. Petitioner does not explain his contention that the "interracial nature of the crime" makes it more likely that the

---

Glassroth: "*Batson* doesn't apply to me.").) Notably, a little over a year after the *Batson* hearing, while Petitioner's direct appeal was pending, the Supreme Court held "that the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." *Georgia v. McCollum*, 505 U.S. 42, 59 (1992).

prosecution exercised its strikes discriminatorily. He points to nothing in the record, whether witness testimony or prosecutorial argument, indicating some unusual emphasis on the race of the victims or defendant at his trial. There is no evidence that the victims were selected because of their race or that race otherwise had anything to do with Petitioner's actions. All victims just happened to be in the convenience stores Petitioner decided to rob that evening. Furthermore, if the "interracial nature of the crime" should be afforded any consideration in a *Batson* inquiry, then surely the presence of multiple black jurors the prosecution could have struck is a significant counterweight to that circumstance.[11]

The "heterogeneity" of the struck black venirepersons also is not especially significant when placed in its proper context. Petitioner argues, "the State's peremptory strikes spanned various demographics in terms of sex, age, and marital status with the common, recurring factor being the potential juror's race[.]" (Doc. 50 at 44.) In support, he cites the strikes of Dorothy Thomas, Lucas Milligan, Lucille Mapson, Elizabeth Hamilton, Pamela Casby, and Tyrone McCray. (*Id.* at 44–45.) These prospective jurors have more than just their race in common, however. Most, if not all, expressed opinions or beliefs which prosecutors interpreted, to varying degrees, might make them less likely than others to recommend a death sentence or, minimally, they expressed equivocal or conflicting views about capital punishment.[12] These jurors' expressions of conflicting, equivocal, or outright

[11] As will be further discussed below, despite that they had three strikes remaining after the Hamilton strike, prosecutors did not strike at least two black venirepersons—Kendrick Arrington and Charles Jackson—who expressed some views at least implicitly disfavoring capital punishment.

[12] For example, Dorothy Thomas testified during individual voir dire that the crimes which should be punishable by death are "[b]rutal crimes involving children, the elderly, and

unfavorable beliefs about capital punishment more likely explain the prosecution's strikes than does their race, notwithstanding the "heterogeneity" of other characteristics like their gender, age, or marital status.

Petitioner also relies upon the Montgomery County District Attorney's Office's history of *Batson* reversals as proof of his claim. Indeed, he describes this circumstance as the "most striking" component of his prima facie case. (Doc. 50 at 45.) No doubt, as Petitioner cites in his brief, the Montgomery County District Attorney's Office has had numerous of its convictions reversed on *Batson* grounds in Alabama's appellate courts. And, as the Eleventh Circuit recently explained in another case arising out of Montgomery County, a prosecutor's "[r]elevant history of prior peremptory strikes based on race bears on the question of present discrimination." *Sockwell*, 141 F.4th at 1241 (citing *Flowers*, 588 U.S. at 302).

Petitioner does not, however, point to any instance in which the prosecutor who took the lead in explaining the State's strikes, David Belser, or even the District Attorney, Charles Graddick, who assisted in explaining the State's strikes, have been directly involved in a conviction reversed on *Batson* grounds. Nor has he

---

where a person doesn't have any remorse for what he or she has done." (Doc. 25-7 at 133.) On her juror questionnaire, Lucille Mapson indicated her agreement with several statements suggesting some opposition to capital punishment, including, as cited by the prosecutor at the *Batson* hearing, that "[c]apital punishment is the most hideous practice of our time." (Doc. 25-1 at 17; doc. 25-11 at 152.) As already discussed, Hamilton's questionnaire was conflicting on whether she believed that capital punishment deters crime. (Doc. 25-15 at 76.) Pamela Casby indicated her belief that "[c[apital punishment has never been effective in preventing crime[,]" (doc. 25-9 at 142), and, in individual voir dire, she gave somewhat vague testimony prosecutors reasonably construed as indicating a general preference for a life without parole sentence. (Doc. 25-7 at 19.) Finally, Tyrone McCray's juror questionnaire reflected his agreement with several statements implicitly indicating opposition to capital punishment. (Doc. 25-1 at 18; doc. 25-11 at 207–08.)

demonstrated, as was considered especially salient in *Sockwell*, that either of those prosecutors have been called-out by name in a state court appellate opinion due to "serial *Batson* violations[.]" *Sockwell*, 141 F.4th at 1245 n.13. The District Attorney's Office's history, while problematic, is of limited value in proving a *Batson* violation absent some showing of the historical practices of the specific prosecutors involved in Petitioner's trial. *See McNair v. Campbell*, 416 F.3d 1291, 1312 (11th Cir. 2005) ("[A] prosecutor's history of discrimination, while a relevant consideration, is not dispositive. In addition, McNair has wholly failed to connect any conduct criticized in [previous cases reversed on *Batson* grounds] to McNair's own prosecutor, much less his conduct in this case.").

Petitioner also argues that the State's failure to voir dire Hamilton and certain other black venirepersons about their capital punishment views demonstrates that the State's reasons for its strikes of those venirepersons were pretext for discrimination. (Doc. 50 at 50–51 (citing *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005)).) The venire master list has 225 names. (Doc. 25-5 at 39–54.) There were at least approximately 100 venirepersons on hand at the start of individual voir dire.[13] To streamline jury selection with such a large venire, venirepersons were asked to complete juror questionnaires. The questionnaire has two pages calling for explanatory responses to general questions about capital punishment and asking venirepersons to indicate whether they agree with several statements bearing on topics like rehabilitation, deterrence, prevention, retribution, and the moral

[13] In addition to the 76 members of the qualified venire cited by the ACCA, the record shows that at least 25 venirepersons were excused for cause or due to hardship after individual voir dire. (*See* doc. 25-7 at 217 (listing 23 venirepersons excused for cause); *id*. at 220 (two additional venirepersons excused for hardship).)

implications of capital punishment. (*See* doc. 25-15 at 76–77 (Hamilton juror questionnaire).)

Based upon their review of the questionnaires, prosecutors sought to voir dire those venirepersons who "indicated that they had a problem with the death penalty." (Doc. 25-6 at 270.) The prosecutor's initial statement to the entire venire before the second round of individual voir dire demonstrates the venirepersons the prosecution sought to identify and examine in voir dire:

> I notice that some of you on your questionnaire had a real problem or some difficulty or concern, or maybe even deep conviction about the death penalty. And I guess maybe we can ask -- Let me just ask the general question and if you can answer it, maybe raise your hand, Are any of you unalterably opposed, in other words, just under no circumstances, if you felt that the individual charged in this case, Chic Bush, was guilty beyond a reasonable doubt, are you of the commitment that you could not sentence him to die in the electric chair if the Judge told you that was one of your options?

(*Id*. at 273–74.) The record thus shows that prosecutors relied upon the juror questionnaires to identify venirepersons whose views about capital punishment might support a challenge for cause and that they limited their individual voir dire accordingly. (Doc. 25-6 at 277.) Although Hamilton's questionnaire reflected conflicting views about whether she believed capital punishment truly deters crime, her responses did not indicate any opposition to capital punishment that would have supported a challenge for cause. Accordingly, the prosecution did not call her for individual voir dire. The question posed by Petitioner's claim is whether the ACCA unreasonably applied *Batson* by concluding that the prosecution's decision not to

voir dire Hamilton about her capital punishment views supports the inference that she was struck due to her race.[14]

To begin with, a prosecutor's peremptory challenge of a venireperson without individual voir dire concerning the basis for the strike is not, alone, proof that the challenge was discriminatory. *See Trawick v. Allen*, 520 F.3d 1264, 1268 (11th Cir. 2008) (quotation marks and citation omitted) ("However, the mere fact that . . . counsel decided to exercise peremptory challenges against jurors who had not been extensively questioned during voir dire does not establish a discriminatory purpose."). Petitioner presents no authority holding that, under *Batson*, where prosecutors possess detailed juror questionnaires extensively probing jurors' beliefs about capital punishment, prosecutors may not rely upon those questionnaires, in lieu of further questioning, when deducing which prospective jurors are more likely to recommend a death sentence. Furthermore, as will be discussed below, prosecutors also struck white venirepersons who expressed some support for capital punishment in their questionnaires without questioning those white venirepersons in

[14] Judge Phelps indicated that twenty-six venirepersons were called by prosecutors for individual voir dire. (Doc. 25-7 at 69.) This court counted twenty-five in its review of the voir dire transcript. (Doc. 25-6 at 277–doc. 25-7 at 63.) In any event, *none* of the prospective jurors called for individual voir dire by prosecutors served on the jury, as all such prospective jurors were excused for cause or hardship or peremptorily challenged by the parties, mostly by the State. So, the record demonstrates that, based upon the juror questionnaires, prosecutors plainly identified a batch of jurors, which did not include Hamilton, whom they considered problematic due to their capital punishment views and they succeeded in eliminating those prospective jurors. It appears that, having succeeded in eliminating their most problematic prospective jurors, prosecutors elected to use one of their few remaining surplus challenges on Hamilton due to their uncertainty about her view of deterrence.

voir dire.[15] As they did with Hamilton, prosecutors reasonably deduced from these white venirepersons' questionnaires that they would be less likely to recommend a death sentence. This circumstance renders the failure to question Hamilton about her views "not very persuasive" in Petitioner's effort to show the ACCA's unreasonable application of *Batson*. *McNair*, 416 F.3d at 1311.

The remaining circumstances highlighted by Petitioner in contending that the ACCA unreasonably applied *Batson*—that the ACCA ignored prosecutors' failure to provide a race-neutral reason for the Hamilton strike until aided by the trial court in a third attempt to do so and that prosecutors did not strike white venirepersons with even more equivocal views about capital punishment than hers—challenge specific aspects of the ACCA's factfinding. As set forth in this opinion's discussion of Petitioner's claim that the ACCA based its decision upon an unreasonable determination of the facts respecting the Hamilton strike, Petitioner has failed to present "clear and convincing" evidence that the ACCA erred in its findings on these circumstances or that it based its decision upon any unreasonable determination of the facts. Accordingly, the ACCA could not have unreasonably applied *Batson* in rejecting his claim notwithstanding his arguments about these circumstances.

In sum, the ACCA rejected Petitioner's *Batson* claim respecting the Hamilton strike based upon its review of all "relevant circumstances," including Petitioner's claim that Hamilton was treated disparately compared to several white jurors. The ACCA did not, as Petitioner here argues, conclude that the State was free to discriminate against Hamilton because it did not discriminate against every black

---

[15] As will be further discussed below, two examples are Bruce Bannister and Carroll Jeffcoat, both of whom indicated support for capital punishment but were struck by prosecutors with no individual voir dire of their beliefs.

venireperson. (Doc. 50 at 58.) Based upon all the foregoing, Petitioner has failed to show that the ACCA unreasonably applied *Batson* when it concluded that all the relevant circumstances he raised respecting the Hamilton strike do not demonstrate that prosecutors struck Hamilton because of her race.

*2. The ACCA did not unreasonably apply Batson in rejecting Petitioner's claim regarding the Thomas strike.*

Petitioner argues the ACCA unreasonably applied *Batson* "by not requiring the State to provide *any* race-neutral reason for the strike of Dorothy Thomas as required by 'step 2' of the *Batson* analysis." (Doc. 50 at 59 (emphasis Petitioner's).) He asserts that the ACCA's unreasonable application is illustrated by its reliance upon prior ASC authority, *Bui v. State*, 627 So. 2d 855 (Ala. 1992), which, after the ACCA's decision in *Bush*, was "reversed and remanded" by the Eleventh Circuit in habeas review. (Doc. 50 at 60 (citing *Bui v. Haley*, 321 F.3d 1304 (11th Cir. 2003)).) He maintains that, applying the ASC's decision in *Bui*, the ACCA "bypassed Step 2 of *Batson* and advanced the inquiry to a Step 3 analysis, improperly shifting the burden to Mr. Bush." (Doc. 50 at 60.) Because the Eleventh Circuit subsequently held that the ASC unreasonably applied *Batson* in *Bui*, the argument goes, "[t]he same result is required here." (*Id.*)

Petitioner mischaracterizes the substance of the Eleventh Circuit's holding in *Bui* and further fails to appreciate how his case is distinguishable. *Bui* involved a "Vietnamese immigrant" convicted of murder in Montgomery County in 1986. *Bui*, 627 So. 2d at 855. While Bui's conviction was on direct appeal, the United States Supreme Court decided *Powers v. Ohio*, 499 U.S. 400 (1991), in which it held that a defendant may challenge under *Batson* the discriminatory exclusion of a prospective juror who is not of the same race as the defendant. The state appellate

courts in *Bui* ultimately remanded to the trial court for a *Batson* hearing concerning the State's strikes of black venirepersons at Bui's trial. At that remand hearing, five years after trial, co-counsel to the prosecutor who exercised the State's peremptory strikes at trial provided what she surmised to be the reasons for those strikes. *Bui*, 627 So. 2d at 858.

The ASC held in *Bui* that the trial court "could have reasonably inferred" that the two prosecutors "worked as a team in striking the jury" and that the reasons provided at the *Batson* hearing "were the reasons underlying the state's use of its peremptory strikes at the trial." *Bui*, 627 So. 2d at 859. The ASC in *Bui* further held that the testifying prosecutor's inability to recall and articulate why one black venireperson had been struck did not establish a *Batson* violation because the circumstances surrounding jury selection permitted the inference that the unexplained strike was not racially motivated. *Id*. at 860.

In its opinion affirming Petitioner's conviction, the ACCA described the ASC's holding in *Bui* as follows:

> In *Bui*[], the Alabama Supreme Court held that a reviewing court must look at all of the existing circumstances to determine whether a trial court's conclusion that the prosecutor's reasons for its jury strikes are race-neutral is clearly erroneous. The court further held in *Bui* that under all of the circumstances of that case, the failure of the prosecutor to offer an explanation for one of its peremptory strikes did not mandate a finding that a *Batson* violation had occurred.

*Bush*, 695 So. 2d at 101. Relying upon *Bui*, the ACCA cited a number of circumstances surrounding jury selection at Petitioner's trial to conclude that,

notwithstanding the failure to articulate any reason for the Thomas strike, no intentional discrimination had been proven.

> Applying the rationale of *Bui* to the instant case, we conclude that the prosecutor's strike of [Thomas], although unexplained, was not the result of intentional racial discrimination. We considered the following facts in reaching this conclusion: The black-white ratio on the jury mirrored that of the venire . . . ; race-neutral reasons were given by the prosecutor for striking 17 of the 18 black persons removed from the venire; the prosecutor had the opportunity to strike all of the blacks on the venire but did not do so; the appellant was instrumental in removing one black venireperson for cause; there were 4 blacks left on the trial jury; extensive voir dire of the venire was conducted; the state was required to turn over to the appellant its files concerning the venire, which included questionnaires submitted by the venirepersons; and the trial court gave the appellant an opportunity, after he had reviewed the state's files, to rebut the reasons given for the strikes by the prosecutor.

*Id*. at 101–02.

The Eleventh Circuit has long recognized that the failure to articulate a race-neutral reason for every peremptory challenge does not, alone, dictate the conclusion that *Batson* has been violated. *United States v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986). Nothing in the Eleventh Circuit's decision in *Bui*, or any other decision cited by Petitioner, holds otherwise. In fact, *Bui* expressly affirms this principle:

> It is of course permissible for a trial judge to turn to circumstantial evidence to support an inference that a race-neutral reason underlies a particular strike, despite the lack of any explicit race-neutral explanation from the State. Thus, mere failure to explain every strike of black jurors will not necessarily prevent a prosecutor from successfully rebutting a prima facie case of race discrimination, where there is sufficient circumstantial evidence from which the court can deduce a race-neutral reason.

*Bui*, 321 F.3d at 1317. The problem in *Bui*, therefore, was not the mere fact that the State failed to provide a race-neutral reason for one of its strikes or that the ASC considered whether the circumstances surrounding the unexplained strike permitted the inference that it was race neutral. Indeed, the Eleventh Circuit concluded that the "district court correctly upheld the [ASC's] *application* of federal law as reasonable" on those points. *Id*. (emphasis supplied). Thus, the Eleventh Circuit in *Bui* plainly did not, in Petitioner's phrasing, hold that the ASC's relevant "analysis in *Bui* was an unreasonable application of *Batson*" pursuant to § 2254(d)(1). (Doc. 50 at 60.)

The problem in *Bui* was the ASC's factfinding. The Eleventh Circuit reversed the federal district court's denial of habeas relief in *Bui* under § 2254(d)(2) because the ASC based its decision upon an unreasonable determination of the facts in two respects. *First*, the Eleventh Circuit held that the ASC unreasonably found that the prosecutor who testified at Bui's *Batson* hearing could provide the race-neutral reasons relied upon by her co-counsel five years earlier because the record before the ASC did not permit the inference that the testifying prosecutor at the *Batson* hearing actually knew her co-counsel's reasons. *Bui*, 321 F.3d at 1315–16. *Second*, the ASC unreasonably adjudicated the facts when it concluded "that the record contained evidence sufficient to permit the trial judge or the supreme court itself, to conclude that the State had come forward with a race-neutral motivation" for its unexplained strike. *Id.* at 1317.

Although the Eleventh Circuit agreed that a court may turn to "circumstantial evidence" to "suggest the inference" that an unexplained strike was not discriminatory, the Eleventh Circuit ultimately concluded the ASC's factfinding regarding the circumstantial evidence it considered was unreasonable. *Id*. at 1317–

18. Specifically, four of the seven factors cited by the ASC in *Bui* were deemed "wholly irrelevant" by the Eleventh Circuit. *Bui,* 321 F.3d at 1318.[16] The Eleventh Circuit described the fifth factor—that the State provided race-neutral reasons for its remaining strikes—as one "that would otherwise be the strongest circumstantial evidence" supporting the inference that the lone unexplained strike was not discriminatory. *Id*. Yet the ASC's finding as to that factor was unreasonable because, as explained above, the prosecutor who exercised the strikes did not articulate race-neutral reasons and the record did not support the inference that the prosecutor who provided reasons five years later actually knew the striking prosecutor's rationale at the time of trial. *Id*. Finally, the remaining factors cited by the ASC in *Bui*—that one black person served on the jury and that neither the defendant nor the victim were black—while "significant" and "noteworthy," "were insufficient circumstantial proof from which a court could find that the State had a race-neutral reason for striking" the juror for whom the State had failed to provide any race-neutral reason at trial. *Id*.

In sum, *Bui* does not support Petitioner's argument that the ACCA's opinion in *Bush* misapplied *Batson* because, as Petitioner here argues, it permitted the State to "skip the second step of the three-step analysis." (Doc. 50 at 61.) Nothing in *Batson*, or *Bui* for that matter, precluded the ACCA from examining the

---

[16] Those factors included the following:

> that a Vietnamese defendant was tried before the decision in *Powers*; that there was a five-year delay between the strikes themselves and the remand hearings, where an explanation was necessitated; that the defense struck one black person from the venire; and that a black judge was not convinced that the state's strikes were racially motivated.

*Bui*, 321 F.3d at 1317 (footnote omitted).

"circumstantial evidence" surrounding the Thomas strike to determine whether the record supports the inference that the strike of Thomas was not racially motivated. Thus, the ACCA did not unreasonably apply *Batson* as required by 2254(d)(1).

Notably, neither Petitioner's brief in support of his petition nor his reply brief challenge the ACCA's adjudication of the facts regarding the Thomas strike pursuant to § 2254(d)(2), which was the basis for state court error found by the Eleventh Circuit in *Bui*. (*See* doc. 50 at 61; doc. 54 at 25 (arguing that the ACCA's decision regarding Thomas "was contrary to and an unreasonable application of *Batson*").) Even if he had argued that the ACCA's decision regarding the Thomas strike was based upon an unreasonable determination of the facts, however, the Eleventh Circuit's decision in *Bui* illustrates why the ACCA's decision passes muster under § 2254(d)(2).

As recounted above, the ACCA in *Bush* highlighted several factors supporting its conclusion that the Thomas strike was race neutral, including, in pertinent part, that the "black-white ratio on the jury mirrored that of the venire" and "there were 4 blacks left on the trial jury[.]" *Bush*, 695 So. 2d at 102. In *Bui*, the Eleventh Circuit described the fact that one black venireperson served on the jury as a "significant fact that may be considered circumstantial evidence" of the lack of discriminatory motive by prosecutors, even if, in the final analysis, it "does not itself bar a finding of racial discrimination." *Bui*, 321 F.3d at 1318. It follows that, where four black jurors served on Petitioner's jury, this fact is even more significant and probative of the lack of discrimination than what confronted the Eleventh Circuit in *Bui*.

More importantly, the ACCA in *Bush* reasonably found that "race-neutral reasons were given by the prosecutor for striking 17 of the 18 black persons removed

from the venire." *Bush*, 695 So. 2d at 102. *Bui* described that same factor—the ASC's finding that "race neutral reasons were presented for the other eight strikes of black jurors"—as "the strongest circumstantial evidence" bearing on the question of discriminatory motive. *Bui*, 321 F.3d at 1318. The evidence bore no weight in *Bui*, however, only because the record before the ASC did not support the inference that the reasons articulated at the *Batson* hearing five years after jury selection were the actual reasons for the strikes. *Id.* Here, by contrast, the prosecutors who exercised the strikes contemporaneously provided race-neutral reasons for every strike other than Thomas. Thus, unlike in *Bui*, this factor provides strong circumstantial evidence that the Thomas strike was not discriminatory.

Although Petitioner argues that, for many of the seventeen black venirepersons addressed by prosecutors, the race-neutral reasons they provided were pretext for discrimination, the ACCA's finding that race-neutral reasons were provided for seventeen of the eighteen strikes is supported by the record.[17] Accordingly, although he does not appear to argue otherwise, this court cannot conclude that the ACCA's decision holding that the strike of Thomas did not violate

[17] Recall that the prosecution's burden of production at step two of *Batson* is not onerous. *See Purkett*, 514 U.S. at 768 (explaining that *Batson* "does not demand an explanation that is persuasive, or even plausible"); *see also Madison v. Comm'r, Ala. Dep't of Corr.*, 761 F.3d 1240, 1250 (11th Cir. 2014) (affirming district court's "finding that the state satisfied its low burden at *Batson*'s second step"). The record amply establishes that prosecutors met that "low burden" for seventeen of the eighteen black venirepersons they addressed before the trial court, and that, accordingly, the ACCA's factfinding on this point was reasonable.

*Batson* was based upon an unreasonable determination of the facts before that court.[18]

### 3. *The ACCA did not base its decision regarding the Hamilton strike upon an unreasonable determination of the facts.*

Petitioner next argues the ACCA based its decision upholding the Hamilton strike upon an unreasonable determination of the facts for the following reasons: the ACCA "ignored" that the trial court permitted the prosecutor "'three bites at the apple'" and "that the State failed at two prior attempts" to articulate a race-neutral reason for the Hamilton strike; "nothing in Ms. Hamilton's jury questionnaire provided any indication as to any negative views of the death penalty" and no other part of the record before the ACCA supported such an inference; and comparative juror analysis between Hamilton and several white jurors shows that the ACCA's "holding utterly misinterprets the facts on the record and ignores the fact that six

[18] Consider, too, that, in addition to the ACCA's findings respecting the "circumstantial evidence" that the Thomas strike was not discriminatory, Thomas's testimony during individual voir dire could have provided the State with a race-neutral reason for its peremptory challenge. Thomas was among the 31 venirepersons called for individual voir dire by the defense due to the perceived strength of her support for capital punishment as reflected in her juror questionnaire responses. During her testimony, however, she stated her belief that the crimes which should be punishable by death are "[b]rutal crimes involving children, the elderly, and where a person doesn't have any remorse for what he or she had done." (Doc. 25-7 at 133.)

Prosecutors reasonably could have deduced from this response that, should Thomas not view the victim, Mr. Dominguez, as a child or elderly, or should Petitioner later express remorse for his actions during a penalty phase proceeding, Thomas might not vote to recommend a death sentence. Although prosecutors, the trial court, and the ACCA did not justify the Thomas strike on this basis, it is nevertheless a "potential justification" for the ACCA's decision that is cognizable in AEDPA review. *Pye*, 50 F.4th at 1036; *id*. at 1037–38 (explaining that, where "a state court rejects a petitioner's claim in a written opinion accompanied by an explanation, the federal habeas court reviews only the state court's 'decision' and is not limited to the particular justifications that the state court supplied").

white venire-members were empaneled who expressed even stronger concerns about capital punishment." (Doc. 50 at 61–63.)

Petitioner argued on appeal to the ACCA that the prosecutor's reasons for striking Hamilton "were inadequate and pretextual." *Bush*, 695 So. 2d at 99. The ACCA rejected this claim based upon its review of the record and the circumstances surrounding the Hamilton strike. *Id*. at 100. In arguing now that the ACCA based that decision upon an unreasonable determination of the facts, Petitioner "faces a high hurdle[.]" *King*, 69 F.4th at 870. He must provide "'clear and convincing evidence' that the state court was wrong to credit [the prosecutor's] non-discriminatory justifications for his strikes." *Id*. (quoting 28 U.S.C. § 2254(e)(1)). And, even if he succeeds in that demanding inquiry, "he does not necessarily meet his burden under § 2254(d)(2)." *Pye*, 50 F.4th at 1035. "Depending on the importance of the factual error to the state court's ultimate 'decision,' that decision might still be reasonable 'even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id*. (quoting *Hayes v. Sec'y, Fla. Dep't of Corr*., 10 F.4th 1203, 1224–25 (11th Cir. 2021)).

Petitioner's first argument—that the ACCA "ignored the trial court's 'three bites at the apple' procedure" and ignored the State's purported failure to articulate any race neutral reason for its strike in "two prior attempts" (doc. 50 at 61–62)—fails to establish error under § 2254(e)(1) or (d)(2). *First*, the contention that the ACCA "ignored" the procedure employed by the trial court in soliciting the prosecutor's reasons for the Hamilton strike is inaccurate. The ACCA quoted verbatim the relevant part of the transcript of the first *Batson* hearing, when the

purported "three bites" procedure was employed, in discussing the prosecutor's reasons for the Hamilton strike. *See Bush*, 695 So. 2d at 99–100. What Petitioner really is arguing here is that the ACCA did not draw from that "procedure" the inferences that he would like for it to have drawn. Given the ACCA's plain opinion, however, he cannot present clear and convincing evidence that ACCA "ignored" the procedure at issue.

*Second*, and more importantly, Petitioner mischaracterizes the record in arguing that the trial court permitted "three bites at the apple" and that prosecutors failed in their first two "bites" to articulate a race neutral reason. Instead, the record shows that when the prosecutor first addressed the Hamilton strike, he promptly cited the race-neutral reason upon which the ACCA would later rely:

> This is the Mental Health lady, worked for Mental Health. Her husband is deceased. She equivocated in front of your Honor, as I recall, when she was answering questions. *She states down here that she is for capital punishment but doesn't feel that it is a deterrent. But then again she turns around and says that she thinks it's a definite deterrent when she starts to checking things.* I had a difficult time, quite honestly, her being a Mental Health worker. Over my 17 years I have found that Mental Health folks want to rehabilitate.

(Doc. 25-1 at 22 (emphasis supplied).) Judge Phelps went on to interrogate the prosecutor's statement, specifically remarking that he was prohibited from accepting "general things" like Hamilton's occupation as a "Mental Health" worker, but quickly adducing that the prosecutor's reasons were "the questions on the questionnaire and her demeanor[.]" (*Id.* at 23.) Judge Phelps then reviewed Hamilton's conflicting questionnaire responses about the deterrent value of capital punishment. (*Id.*)

Contrary to Petitioner's argument here, Judge Phelps did not engage in a "dialog with the State to assist the State in determining a race-neutral rationale[.]" (Doc. 50 at 61.) Rather, with no prompting from Judge Phelps, the prosecutor first identified Hamilton by reference to her "Mental Health" occupation and her deceased spouse before providing the race-neutral reason of Hamilton's "equivocation" based upon her questionnaire responses. Only after explaining his reticence based on Hamilton's questionnaire responses did the prosecutor reference any concern based upon Hamilton's "mental health" occupation.[19] Furthermore, it was the trial court that raised Hamilton's "demeanor," probably because of the prosecutor's characterization that Hamilton "equivocated in front of Your Honor[.]" (Doc. 25-1 at 22–23).[20] At most, therefore, Judge Phelps's "dialogue" with the

[19] Even if the prosecutor had provided Hamilton's "mental health" occupation as a reason for his strike prior to citing her inconsistent views on deterrence, that fact would not necessarily support a claim that Hamilton was discriminatorily challenged. The Eleventh Circuit has held that a prospective juror's occupation—including, specifically, employment in the "mental health field"—can provide a legitimate, non-discriminatory basis for a peremptory challenge. *See Madison*, 761 F.3d at 1254 (affirming finding that peremptory strike of venireperson due to her "occupation in the mental health field" was legitimate, non-discriminatory, and not pretextual because the defendant's mental state might be an issue at trial).

[20] To be sure, the prosecutor's remark that Hamilton "equivocated in front of Your Honor, as I recall, when she was answering questions[,]" mischaracterizes the record because Hamilton was not subject to individual voir dire and, therefore, did not answer any questions before Judge Phelps. The transcript fairly suggests the prosecutor simply conflated Hamilton's questionnaire responses with live testimony because the immediate support he offered for his claim of "equivocation" was Hamilton's conflicting responses on her juror questionnaire. Whether it was conflation or simple imprecision on the prosecutor's part, such error was not limited to Hamilton. In the very next strike addressed after the Hamilton strike, that of white venireperson Carroll Jeffcoat, the prosecutor again invoked the venireperson's responses to live questioning: "During colloquy with the Court he was asked questions whether he could weigh death as opposed to life without parole and he tended toward life without parole[.]" (Doc. 25-1 at 24.) Jeffcoat, however, does not appear in the transcript during individual voir dire in any of the three rounds of questioning

prosecutor sought to clarify the prosecutor's rationale for the strike rather than assisting him with conjuring a race-neutral reason after two prior attempts to do so failed. Petitioner's claim that the ACCA unreasonably adjudicated the facts by "ignoring" the procedure by which the prosecutor proffered race-neutral reasons for the Hamilton strike is without merit.

Petitioner next argues that the ACCA unreasonably adjudicated the facts when it "accepted and affirmed the trial court's approval of the strike based upon the purported 'equivocation' in [Hamilton's] jury questionnaire without any further discussion of her views of the death penalty and of her 'demeanor.'" (Doc. 50 at 62.) In support, he asserts that the ACCA's "conclusion impermissibly presumes that views on deterrence equal views on the death penalty" despite that "whether [Hamilton] believed capital punishment is a deterrent or not is an entirely distinct question from whether she had equivocal views on imposing the death penalty, especially given her indication she was 'for it.'" (*Id.*)

The ACCA made the following findings regarding Hamilton's capital punishment views as reflected in her juror questionnaire:

> Her answers on her questionnaire show that she was not opposed to capital punishment. She further indicated that she thought that capital punishment is a deterrent. Yet to another question she stated that she did not think that capital punishment was a deterrent to crime. . . . We find it reasonable for the prosecutor to have cautiously concluded that [Hamilton's] equivocation on whether capital punishment truly deters

---

described previously. The record thus indicates that, regardless of the race of the venireperson, the prosecutor sometimes conflated a venireperson's questionnaire responses with live testimony.

> crime was a real indication that she would not staunchly assert the death penalty.

*Bush*, 695 So. 2d at 100. Petitioner fails to show any unreasonable fact finding by the ACCA. The ACCA properly found that, while Hamilton's questionnaire indicated her support for capital punishment, she expressed inherently conflicting views about whether capital punishment is a deterrent to crime.

Although Petitioner submits that Hamilton's conflicting views on deterrence are "distinct" from the question whether her support for capital punishment was equivocal (*see* doc. 50 at 62), the ACCA did not unreasonably conclude otherwise. The question of capital punishment's deterrent value is inextricably intertwined with society's assessment of the utility and viability of the punishment. In its opinion reaffirming the Eighth Amendment authority of the states to impose capital punishment, the Supreme Court recognized that retribution and "deterrence of capital crimes by prospective offenders" are offered as the "two principal social purposes" served by the death penalty. *Gregg v. Georgia*, 428 U.S. 153, 183 (1976). Just as deterrence is therefore cited as a primary justification for capital punishment, a venerable argument deployed against capital punishment is its asserted lack of deterrent value. *See, e.g., Glossip v. Gross*, 576 U.S. 863, 930–32 (2015) (Breyer, J., dissenting) (examining academic studies about whether capital punishment deters violent crime and concluding that, given the rarity of executions, "it is difficult to believe . . . that such a rare event significantly deters horrendous crimes"). Indeed, the absence of evidence that capital punishment deters certain crimes has been cited by the Supreme Court as a basis for invalidating capital punishment for those offenses. *Kennedy v. Louisiana*, 554 U.S. 407, 444–45 (2008).

Because deterrence therefore sits at the core of this issue, and because "[a] jury is not barred from considering deterrence in its choice of punishment[,]" *Drake v. Kemp*, 762 F.2d 1449, 1460 (11th Cir. 1985) (citations omitted), attorneys naturally endeavor to understand a prospective juror's views on deterrence and reasonably may place significant weight on those views in exercising their peremptory challenges.[21] Since a juror's views about deterrence may provide essential context in assessing the juror's opinion about capital punishment, the prosecutor, the trial court, and the ACCA reasonably interpreted Hamilton's inconsistency on the deterrence questions—especially her plain statement that capital punishment does not deter or prevent crime—as indicating uncertainty about how "staunchly" Hamilton would support capital punishment.[22] Accordingly, the ACCA did not base its decision upon any unreasonable finding of fact respecting Hamilton's equivocation on capital punishment.

Petitioner's final argument respecting the ACCA's purported unreasonable determination of the facts regarding the Hamilton strike is that the ACCA summarily

[21] The composition and structure of the juror questionnaire utilized at Petitioner's trial confirms that the attorneys placed particular emphasis on learning jurors' opinions about deterrence. The questionnaire includes only three questions asking jurors to provide written responses explaining their capital punishment views. The first asks for the juror's general opinion about capital punishment, the second asks whether the juror believes capital punishment deters or prevents crime, and the third asks whether the juror would be able to recommend a death sentence if the evidence supported such a verdict. (Doc. 25-15 at 76.) Thus, one can reasonably infer that learning jurors' opinions about deterrence was as important to the attorneys as was learning whether jurors believed they could recommend a death sentence.

[22] Even Petitioner conceded in his briefing to the ACCA that Hamilton's "no" answer on the question of whether she believed capital punishment deters crime "did not indicate support for the death penalty[.]" (Doc. 25-16 at 82.) The ACCA was plainly justified in giving it that same construction.

rejected his contention that Hamilton "was treated differently from other similarly situated white venire-members." (Doc. 50 at 62.) In support, he asserts that "the State did not strike a single white venire-member who indicated in their questionnaire they were 'for it' like Ms. Hamilton had[,]" that none of the white venirepersons whom the State did strike "were stricken based solely on inconsistent views of deterrence[,]" and that "six white venire-members were empaneled who expressed even stronger concerns about capital punishment." (*Id*. at 63.)

The ACCA found "no evidence" of "disparate treatment between white venirepersons and black venirepersons." *Bush*, 695 So. 2d at 100. Noting Hamilton's "equivocation on whether capital punishment truly deters crime[,]" it further found that "[t]he prosecutor also struck white venirepersons who were opposed to or appeared reluctant to impose the death penalty." *Id*. Because white and black venirepersons were struck for the same reason, it concluded Petitioner's claim of disparate treatment lacked merit. *Id*. (citing *Carrington v. State*, 608 So. 2d 447, 449 (Ala. Crim. App. 1992)).

Petitioner's arguments here fail to show that the ACCA based its decision upon any unreasonable determination of the facts because the record reasonably supports the ACCA's finding that white and black venirepersons at Petitioner's trial were treated similarly. *First*, the ACCA's finding that white venirepersons were struck for the same reasons as Hamilton was reasonable. Review of the record shows that several white venirepersons were struck by the State despite expressing some support for capital punishment, and Petitioner does not contend otherwise. Petitioner's specific argument that the State did not strike any white venirepersons who indicated they were "for" capital punishment in their questionnaire, as did Hamilton, is belied by the record. Several white venirepersons who were struck by

the State indicated support for capital punishment even if they did not simply state "for it" like Hamilton.[23] To be sure, while these white venirepersons may have been equivocal in their support for capital punishment, the ACCA reasonably concluded that Hamilton also was equivocal given her conflicting statements about deterrence. To the extent Petitioner's claim is simply that the stricken white venirepersons were more equivocal than Hamilton, it was not unreasonable—meaning simply that fairminded jurists could agree—for the ACCA to conclude that Hamilton was sufficiently similar to white venirepersons who also were struck due to their equivocal views on capital punishment.

*Second*, Petitioner's claim that the State did not strike white venirepersons who were more equivocal in their support for capital punishment fails to demonstrate any unreasonable adjudication of the facts by the ACCA. Petitioner's argument here and before the ACCA cites six such white comparators: Ria Kamburis, Edward Norman, Charles Parker, Hullan Neese, Jr., Emily Sherer, and LaDonna Brendle, although he attempts a side-by-side comparative juror analysis with only the former three. (*See* doc. 50 at 56–57.) While it is true that Kamburis, Norman, and Parker

[23] For example, Bruce Bannister, a white male, was struck by the State despite that he stated that capital punishment is "appropriate in some cases" *and* that it deters or prevents crime. (Doc. 25-9 at 71.) He also indicated his agreement with several statements implicitly supportive of capital punishment, including that "[j]ustice demands the punishment of criminals[,]" "[u]ntil we find a more civilized way to prevent crime, we must have capital punishment[,]" and "[f]ailure to punish the criminal encourages crime." (*Id*. at 72.) Carroll Jeffcoat, also a white male, was struck by the State despite that he stated he could "approve of capital punishment if the circumstances warrant" and that he could recommend a death sentence if he believes the defendant is beyond rehabilitation. (Doc. 25-11 at 39.) Jeffcoat also indicated his agreement that "[j]ustice demands the punishment of criminals[,]" and, just as did Hamilton, he indicated his agreement with the statements "[c]apital punishment may be wrong but it is the best prevention of crime" and "[f]ailure to punish the criminal encourages crime." (*Id*. at 40.)

indeed expressed some qualifications in their support for capital punishment,[24] the record does not indicate that they are so similarly situated to Hamilton that any disparate treatment accorded them was the product of discrimination against Hamilton. Most notably, unlike Hamilton, who bluntly answered "no" when asked whether "capital punishment deters or prevents crime," each of the three jurors Petitioner cites as comparators indicated their belief that capital punishment does deter or prevent crime to some degree. Specifically, Kamburis wrote "probably prevent" (doc. 25-15 at 90), Norman wrote "some" (doc. 25-15 at 104), and Parker wrote "yes" (doc. 25-15 at 160).

Indeed, while the defense conceded at the second *Batson* hearing that Hamilton was the only venireperson among her comparators who gave internally inconsistent answers about deterrence (doc. 25-3 at 75), it goes beyond any mere superficial inconsistency. Had Hamilton not been struck by the State, she would have been the *only* juror who answered "no" or even expressed minor disagreement with the premise that capital punishment deters or prevents crime.[25] As discussed

---

[24] Kamburis stated she supports the death penalty "depending on [the] circumstances." (Doc. 25-15 at 90.) Norman said he "believe[s] in it a little." (*Id*. at 104.) Parker said he believes in capital punishment "in some cases[.]" (*Id*. at 160.)

[25] The strike list in the record provides the identities of the jurors selected for trial. (Doc. 25-5 at 151–52.) The twelve selected jurors are indicated by highlighter markings that are visible in the electronic record, while the two alternates (who were the final strikes by each party) are highlighted and identified as A1 and A2. In addition to Kamburis, Norman and Parker, all jurors selected for service expressed agreement that capital punishment deters or prevents crime. (*See* doc. 25-9 at 57 (Arrington: "yes"); *id*. at 183 (Martha Davis: "yes"); doc. 25-15 at 146 (Jackson: "It help"); *id*. at 118 (Neese: "possibly"); *id*. at 132 (Sherer: "yes"); doc. 25-13 at 123 (Georgia Thomas: "yes"); *id*. at 234 (Waid: "yes"); doc. 25-14 at 53 (Kropa: "yes"); and doc. 25-15 at 174 (Brendle: "yes, because the criminal is not later let on paroll [sic] to create another crime").) Hamilton stands alone among all her proposed comparators for her negative response to the question.

previously, a juror's views about deterrence can provide important context in assessing that juror's opinion of capital punishment. Given that the prosecutor specifically referenced Hamilton's "no" answer on this question about deterrence when explaining his strike, and considering that every venireperson passed to the jury gave positive responses on the same question, it was reasonable for the ACCA to conclude that Hamilton was not treated disparately. *See Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009) (quoting *United States v. Novaton*, 271 F.3d 968, 1004 (11th Cir. 2001)) ("The prosecutor's failure to strike similarly situated jurors is not pretextual, however, 'where there are relevant differences between the struck jurors and the comparator jurors.'").

In addition to the foregoing, despite that they had three remaining strikes following the Hamilton strike, prosecutors did not strike, and therefore allowed to serve on the jury, black venirepersons whose views on capital punishment and related issues also appeared to be equivocal.[26] For example, Kendrick Arrington, a black male, was not struck by the State despite indicating his belief that "[a]ll criminals are victims of circumstances and deserve to be helped[,]" "[o]nly humane treatment can cure criminals[,]" "I don't believe in capital punishment but I'm not sure it isn't necessary[,]" "[c]orrection is more effective than punishment in preventing crimes[,]" "[n]o thinking individual can believe in capital punishment as a method of preventing crime[,]" and "[t]he state cannot teach the sacredness of human life by destroying it." (Doc. 25-9 at 57–58.) Likewise, Charles Jackson, a black male, was not struck by the State despite that he indicated his agreement that

---

[26] The four black venirepersons selected to serve as jurors were Kendrick Arrington, Martha Davis, Charles Jackson, and Georgia Thomas.

"[c]orrection is civilized; punishment is brutal[,]" "[c]riminals are pathological people who should be corrected, not executed[,]" and "[t]he state cannot teach the sacredness of human life by destroying it." (Doc. 25-15 at 146–47.)

In sum, the record of voir dire demonstrates nothing more than that prosecutors did not have enough strikes to remove every venireperson who expressed some hesitancy about capital punishment or who indicated their agreement with statements implicitly disfavoring capital punishment. Many white venirepersons expressing such views were struck by the State, while others were not. Likewise, some black venirepersons expressing such views, including Hamilton, were struck by the State, while others were not. Accordingly, the ACCA reasonably found that the record does not demonstrate disparate treatment between white and black venirepersons and Petitioner therefore fails to show that the ACCA based its decision regarding the Hamilton strike upon an unreasonable determination of the facts pursuant to § 2254(d)(2).

*4. The ACCA did not unreasonably apply Batson in assessing inconsistencies between strikes of "other" black venirepersons and white venirepersons.*

Petitioner's final argument respecting the ACCA's rejection of his *Batson* claim is that, regarding the "other" black venirepersons he discussed in his appellate briefing, the ACCA failed to provide "a reasonable review of the overwhelming factual record of disparate treatment in this case." (Doc. 50 at 63.) He asserts that neither the trial court nor the ACCA "assessed the challenged strikes with any semblance of a side-by-side analysis to determine whether the State used its strikes

in a racially-neutral manner, and the courts' *Batson* determinations reflected that disconnect and were not supported by the record as a whole." (*Id*. at 64.)

As discussed previously, Petitioner limited his argument at the second *Batson* hearing to a side-by-side comparison of only one black venireperson, Hamilton. (*See* doc. 25-3 at 66 ("Your Honor, for purposes of this hearing the defense will focus on the exclusion of one juror, that is Juror No. 184, Elizabeth Hamilton.").) Petitioner's post-hearing brief in the trial court also did not reference any analysis or comparison of black venirepersons other than Hamilton. (Doc. 25-5 at 90–94.) In short, other than with respect to Hamilton, Petitioner offered nothing in the trial court beyond his prima facie showing—which, again, consisted only of his statistical showing about the State's pattern of strikes—to support his claim of unlawful discrimination against "other" black venirepersons. Because Petitioner did not attempt to rebut the State's race-neutral reasons for striking any venireperson other than Hamilton in the trial court, and therefore did not himself attempt the side-by-side comparison he faults the trial court and the ACCA for omitting, the ACCA found that "he failed to meet his burden of proving purposeful discrimination" as to several other black venirepersons, including Mapson, McCray, Milligan, Walker, Vinson, Casby, Rhodes, and Thomas. *Bush*, 695 So. 2d at 99.

Given all of the above, the ACCA reasonably concluded that Petitioner did not meet his burden of proving discrimination as to venirepersons other than Hamilton. As for the state court's application of *Batson*, Petitioner points to nothing in *Batson* or any other Supreme Court decision which would have required the trial court to scour the voir dire record searching for evidence of pretext and disparate treatment which Petitioner—who bears the ultimate burden of proof under *Batson*—did not himself bring to the court's attention to rebut the State's proffered race-

neutral reasons for its strikes of "other" black venirepersons. Because the ACCA was reviewing the trial court's ruling on Petitioner's *Batson* motion, rather than conducting a de novo review of all *Batson* issues raised by Petitioner on appeal, it did not unreasonably apply *Batson* in rejecting Petitioner's *Batson* claim as to "other black venire-members," including Mapson, McCray, Milligan, Walker, Vinson, Casby, Rhodes, and Thomas.

#### 5. *Conclusion*

Petitioner has failed to show that the ACCA unreasonably applied *Batson*, or that it based its decision denying his *Batson* claim upon any unreasonable determination of the facts based upon the record that was before that court. Accordingly, Petitioner's *Batson* claim is due to be denied.

## II. Claim B – The State Failed to Provide Critical Impeachment Evidence

### A. Petitioner's Allegations

Petitioner alleges the State "failed to disclose critical, material impeachment evidence about several key trial witnesses, including its informant Patricia Pringle and its ballistics and firearm expert witness Lonnie Harden." (Pet. ¶ 75, doc. 1 at 30.) Regarding Pringle, who testified at Petitioner's first trial and whose testimony was read into the record at his second and third trials, Petitioner alleges that prosecutors withheld "a prior inconsistent statement" which "completely contradicted" her inculpatory trial testimony about Petitioner's admission of his involvement in the crime. (Pet. ¶ 78, doc. 1 at 30–31.) He describes the Pringle statement as "classic *Brady* evidence" that was material to both the guilt and penalty phases of his trial. (Pet. ¶¶ 78–79, doc. 1 at 30–31.)

Regarding Harden, the State's firearms and ballistic expert, Petitioner alleges that prosecutors failed to disclose substantial impeachment evidence, including that "Harden had been chastised for presenting inaccurate testimony in other cases and had for years been the subject of professional criticism for the quality of his work"; "[a]t the time of his testimony, he was under investigation within his department because of *misidentification* and other mistakes"; and he "had been demoted before he testified at Mr. Bush's trial, and was terminated from his position thereafter." (Pet. ¶ 81, doc. 1 at 32 (emphasis Petitioner's).) He claims the prosecution's suppression of this evidence "hampered" his attorney's "ability to cross-examine and cast doubt on the critical testimony of this witness." (Pet. ¶ 82, doc. 1 at 32.)

### B. Clearly Established Federal Law

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." "Favorable" evidence subject to disclosure under *Brady* includes both exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). The duty to disclose such evidence "is applicable even though there has been no request by the accused[.]" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281–82.

The third *Brady* component, prejudice, requires further elaboration. "To establish prejudice, the defendant must show that the suppressed evidence was material." *Rimmer v. Sec'y, Fla. Dep't of Corr.*, 876 F.3d 1039, 1054 (11th Cir. 2017) (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *Bagley*, 473 U.S. at 682). The materiality inquiry ultimately asks whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Materiality under *Brady* is "considered collectively, not item by item." *Id*. at 436; *id*. at n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately[.]"). *See also Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1334 (11th Cir. 2009) ("Considering the undisclosed evidence cumulatively means adding up the force of it all and weighing it against the totality of the evidence that was introduced at the trial. That is the way a court decides if its confidence in the guilty verdict is undermined where a suppressed-evidence type of *Brady* claim is involved[.]").

## C. The State Court Decisions

### 1. Factual Background and Context

#### *a. The Pringle Brady claim*

Patricia Pringle was the wife of Petitioner's co-defendant, Edward Pringle. She testified at Petitioner's first trial that "her husband had told her that he and [Petitioner] had committed the three crimes and that [Petitioner] had told her that he

had shot Dominguez, Holmes, and Adams[.]" *Bush*, 695 So. 2d at 82. In pertinent part, her trial testimony recounted Petitioner's visit to her home "two days after" the robbery-murders, during which he told her that he, not Edward Pringle, did the shooting "because he couldn't have anybody looking." (Doc. 25-5 at 20.) Pringle's testimony on cross-examination further alluded to her interaction with police and her eventual revelation to police of Petitioner's confession to her:

Q Okay. When did you tell the police about this conversation?

A I didn't.

Q You didn't, did you?

A No, I didn't.

Q Never did?

A I did, but it wasn't right then. No.

Q Well, that is what I am talking about. You eventually told the police, didn't you?

A Yes.

Q And when was it that you first told the police about it?

A Maybe a week after. I really do not know.

(*Id*. at 22–23.) She acknowledged giving a recorded police statement on August 28, 1981, but denied that any reward on offer influenced her decision to provide the police statement. (*Id*. at 24–25.) Indeed, Pringle testified at Petitioner's first trial that she did not know anything about any reward related to the case. (*Id*. at 23.)

The August 28 police statement referenced by Pringle largely tracks her trial testimony. She described Edward Pringle returning to their home early in the

morning of July 26, 1981, with a check bearing the name of the 7-11 victim, Adams. (Doc. 25-28 at 115.) Later that day, Edward failed in an effort to cash the check, after which he told Patricia about one of the robberies and Petitioner's shooting during the robbery. (*Id*. at 115–16, 118.) She also stated that when Edward left her home on the Saturday evening before the robberies, he was driving the "green Monte Carlo" owned by her employer, who allowed her to drive the car to and from work. (*Id*. at 116.) Although Edward returned in the Monte Carlo early on the Sunday morning after the robberies, Patricia told police that the car "broke down" and she was unable to take it to work later Sunday morning. (*Id*. at 117.) She also told police about Petitioner's visit to her home sometime after the robberies, in which he told her that he, not Edward, did the shooting because he "'couldn't have nobody looking.'" (*Id*. at 120.)

Petitioner alleges that during Rule 32 discovery "the prosecution disclosed—for the first time—a prior inconsistent statement that Patricia Pringle gave police on August 27, 1981." (Pet. ¶ 78, doc. 1 at 30.) The August 27 "Voluntary Statement" was taken at the Montgomery Police Department approximately 16 hours before the August 28 statement described above and referenced in Pringle's trial testimony. In the earlier, allegedly suppressed statement, Pringle acknowledged driving the green Monte Carlo owned by Patricia Pringle's employer but denied that Edward had driven the car since April or March. (Doc. 25-28 at 124.) She told police in the earlier statement that the Monte Carlo broke down on the Friday before the convenience store robberies, that it sat outside her trailer home all weekend, and that no one could have driven it that weekend without her knowing about it. (*Id*.) She also told police she did not see Edward that weekend or any time since. (*Id*.) Police asked her questions about Edward's brother, Cornelius, including whether he owned

an orange ballcap, whether he had ever been in the Monte Carlo with Edward, and whether he owned a gun. (*Id*. at 125.) Patricia denied that she would lie to protect Edward and affirmed that her statement was true. (*Id*.) She did not mention Petitioner or his confession to her.

Petitioner's trial counsel, Mr. Glassroth, testified at the Rule 32 evidentiary hearing that he did not make use of Pringle's August 27 statement at Petitioner's third trial because he "had never seen this statement at any time during any of the trials of Mr. Bush." (Doc. 25-34 at 79.) He further testified that he would have attempted to use the August 27 statement to impeach Pringle's testimony from the first trial "[i]f there were a way to let the jury know without her being present[,]" or to support his argument that Pringle's testimony from the first trial should not be admitted at the third trial. (*Id*. at 80–81.) He was adamant that he had not seen it previously, despite the prosecution's "open file" discovery at trial, that he would not "overlook" such a piece of evidence, and that he would have attempted to use it if he had access to it. (*Id*. at 82.)

*b. The Harden Brady claim*

Lonny Harden was a "Forensic Scientist specializing in ballistics with the Forensic Sciences Department, State of Alabama, Montgomery Division." (Doc. 25-1 at 118.) His testimony concerned the results of his ballistics testing involving the gun investigators recovered and believed to be the murder weapon in both convenience store robberies.[27] At trial, the defense stipulated to Harden's expertise

[27] The ACCA found on direct appeal that Petitioner assisted investigators with recovering the gun. *Bush*, 695 So. 2d at 82. The trial evidence showed that Petitioner first accompanied investigators to a wooded area off a highway near Flomaton, Alabama, where he told them he had discarded the gun. (Doc. 25-2 at 29.) When they could not locate the

in ballistics. (*Id*. at 118–19.) Harden testified that he obtained for testing the .38 caliber Smith and Wesson revolver recovered by police with Petitioner's assistance, two bullets removed from Dominguez during his autopsy, one bullet removed from Adams during his autopsy, and one bullet recovered from the bathroom wall at the Majik Mart, which was believed to be the bullet that passed through Holmes. (*Id*. at 119–22.) Harden's analysis consisted of firing the revolver into a firing tube, recovering the bullets he fired, and microscopically comparing those items with the bullets recovered from Dominguez, Adams, and the Majik Mart wall. (*Id*. at 123.) Based upon his comparison of all the projectiles, Harden assessed and opined that the bullets he examined were fired from the gun police recovered with Petitioner's assistance. (*Id*. 124–25.) The defense did not cross examine Harden about his findings. (*Id*. at 125.)

During Rule 32 proceedings, counsel for Petitioner "obtained from counsel in another, unrelated matter certain disciplinary records relating to Mr. Harden, including documents from the year immediately prior to Mr. Bush's third trial."[28] (Doc. 50 at 90.) The documents consist of two "interoffice memorand[a]" addressed to Harden from C.L. Rabren, the Director of Forensic Sciences at the state agency

---

gun in that area, Petitioner advised that he would retrieve the gun when they got back to Montgomery. (*Id*. at 30.) He told police his wife would recover the gun from a neighbor's home in Smiley Court. (*Id*.) After his wife initially claimed to be ignorant of any gun, police brought her to Petitioner's location and allowed her to speak with him. (*Id*. at 31.) Police then returned to Smiley Court with Petitioner's wife, who went to a neighbor's home and retrieved a gun in a plastic bag. (*Id*.) On the drive back to the police station, Petitioner stated, "'[t]hat's the weapon that was used to shoot all three people.'" (*Id*. at 32.)

[28] The trial record indicates Harden was the last witness on the first day of trial (excluding the day of jury selection), and that he therefore testified on January 29, 1991. (Doc. 25-1 at 125–28.) He also testified about his ballistics analysis at Petitioner's trials in 1981 and 1984. (Doc. 54 at 37–38.)

employing Harden. The first memorandum, dated March 2, 1990, appears related to Harden's work in a case identified only by the Department's case number, in which Harden was criticized for "moving too fast, . . . not paying attention to detail . . . and making errors in [his] reports which are unacceptable." (Doc. 25-24 at 154.) Harden was instructed to "slow down" his work to ensure accuracy and was advised that "accurate reports are a requirement for [his] continued employment with this agency." (*Id.*) The second memorandum, dated April 10, 1990, conveyed Director Rabren's decision to terminate Harden's "Coordinator Status." (Doc. 25-24 at 153.) Director Rabren's memorandum portrays a serious, lengthy, and ongoing problem with Harden's work:

> For the past several years, we have a number of major cases in which you have been involved and where there have been tragic errors in your work. For the past year, I have been reviewing some of your memoranda and have been communicating with you about errors that you continue to make in regards to your casework. Because of such problems, I have decided that you will no longer serve as Coordinator of the Firearms and Toolmarks Discipline for the Department of Forensic Sciences. You are hereby terminated as Coordinator effective immediately.

(*Id.*)

Based upon these disciplinary records, Petitioner sought discovery of Harden's personnel file during Rule 32 proceedings, which was denied. (Doc. 50 at 91.) At the Rule 32 evidentiary hearing, defense attorney Glassroth testified that he was not aware of any problems involving Harden until after Petitioner's third trial. (Doc. 25-34 at 88–89.) He stated that Harden's problems "became a bit of a scandal among the criminal defense community when the news of it became public" because of Harden's former position in the Department and his expert testimony in cases

across Alabama. (*Id*. at 89.) On cross-examination, Glassroth admitted that any question about Harden's credibility or competency certainly was not known around the time of his ballistic analysis in Petitioner's case in 1981. (*Id*. at 94.) On redirect, Glassroth confirmed that the information concerning Harden would have been useful at the time of Petitioner's third trial because Harden "was always fond of telling you how good he was" and Glassroth "would have loved the opportunity to sort of hoist him on his own baton." (*Id*. at 102–03.)

### 2. The Rule 32 Court Rejects Both *Brady* Claims

Following the Rule 32 evidentiary hearing, the trial court entered its Final Order, in which it first denied the Harden *Brady* claims as follows:

> In Part II.P, paragraphs 74-77 of Bush's second amended petition, he alleges the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing that Lonnie Harden, the State's ballistics and firearms expert who testified at trial, had been disciplined or terminated by the Alabama Department of Forensic Sciences for giving inaccurate testimony and deficient work performance.
>
> Glassroth testified that the State had an open file policy regarding discovery. He also stated that he learned of Harden's disciplinary problems some time after the trial and that it would have been useful to have known it at the time.
>
> However, even if the allegations made by Bush concerning Harden's work history are true, there still would have been no *Brady* violation. At trial, testimony other than Harden's established that Bush led police officers to the location of the gun used in the capital murders. Bush positively identified the gun as being the one he used in the capital murders. Harden's testimony that the bullets recovered from the victims were fired from the same gun that was recovered by police simply corroborated other evidence that had already been admitted. Harden's testimony was cumulative, not material, and the allegation that Hardin [sic] had been disciplined certainly was not exculpatory. In

> the light of the evidence presented at Bush's trial, any failure by the State to disclose information regarding possible discrepancies in Harden's analysis in other cases would not have amounted to a *Brady* violation. *See Bush v. State*, 695 So. 2d at 104 (holding that, because Bush confessed and led police to the murder weapon, "the ballistics evidence was neither critical nor subject to varying expert opinion").
>
> Bush offered no evidence at the evidentiary hearing that would establish that if information concerning Harden existed at the time of his last trial and if it were turned over to trial counsel it would have been exculpatory or material. *See Nelson v. Nagle*, 995 F.2d 1549, 1555 (11th Cir. 1993) (holding that "[a] *Brady* violation has three elements: (1) suppression by the prosecution (2) of exculpatory evidence (3) material to the issue at trial or sentencing"). Bush has failed to prove that there is a reasonable probability that if trial counsel had been provided this information prior to trial that the outcome would have been different. Therefore, this allegation is due to be denied by the Court. Rules 32.3, 32.6(b), and 32.7(d), Ala. R. Crim. P.

(Doc. 25-39 at 146–48.) The trial court next addressed the Pringle *Brady* claim.

> The issue regarding a prior statement of Patricia Pringle was not in Bush's second amended complaint. It was first raised at the evidentiary hearing although counsel for Bush had it in her possession for some period of time prior to this hearing. In a recent case, it was held that a Court may refuse to allow a petitioner to amend his petition after the evidentiary hearing. *McWilliams v. State*, CR-01-0235, 2004 WL 918432 (Ala. Crim. App. Apr. 30 2004).
>
> Furthermore, Glassroth testified that he did not know whether the statement had been turned over to first trial counsel but that he was not aware of it at the time of trial. Pringle admitted that she had given another statement to police and such would be notice that there was more than one statement and not qualify as *Brady* material. *Nelson v. Nagle*, 995 F.2d 1549 (11th Cir. 1993).
>
> Bush has failed to prove that the State withheld the statement from first trial counsel and that the outcome would have been different given the overwhelming evidence presented by the State and is due to

> be denied. *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, this allegation fails to meet the requirements of *Brady* and is due to be summarily dismissed. Rules 32. 3, 32. 6 (b), and 32.7 (d), Ala. R. Crim. P.

(Doc. 25-39 at 148–49.)

### 3. The ACCA Affirms Dismissal of Both *Brady* Claims

Addressing the Pringle *Brady* claim first, the ACCA recited the trial court's reasoning in denying the claim on the merits but held that the claim was due to be dismissed on state law procedural grounds. Specifically, the ACCA concluded that, because "Bush freely admits that the alleged suppressed evidence was merely impeachment evidence[,]" and "impeachment evidence" is not cognizable under Rule 32.1(e) as "newly discovered evidence" which may support a grant of relief on a *Brady* claim raised for the first time in a Rule 32 petition, "Bush failed to meet his burden of showing that he was entitled to relief." *Bush*, 92 So. 3d at 148 (citing *Payne v. State*, 791 So. 2d 383, 397 (Ala. Crim. App. 1999)).

The ACCA next addressed the Harden *Brady* claim. The ACCA reproduced the trial court's findings and conclusions denying the claim on the merits and held as follows:

> The circuit court's findings are supported by the record. On direct appeal we stated that Harden's testimony was not material. Therefore, Bush cannot satisfy the requirements of establishing a *Brady* violation because the alleged suppressed evidence was not material.
>
> Moreover, as we stated above, because this alleged *Brady* violation is raised in a postconviction petition, the petitioner must also satisfy the requirements for newly discovered evidence. Bush alleged that the suppressed evidence was impeachment evidence. Thus, Bush

> also failed to meet the requirements of Rule 32.1(e), Ala. R. Crim. P. *See Payne*.

*Bush*, 92 So. 3d at 149.

### D. Review Pursuant to § 2254(d)(1) & (2)

#### 1. The Pringle *Brady* Claim

Although the last state court to address the Pringle *Brady* claim, the ACCA, dismissed the claim on state law procedural grounds, respondent does not assert a procedural default defense. Instead, respondent asks this court to review the lower state court's Rule 32 merits adjudication pursuant to § 2254(d). (Doc. 24 at 11.) Petitioner, too, submits that the lower court's merits decision is due to be reviewed under § 2254. (Pet. ¶ 79, doc. 1 at 31; Doc. 50 at 76–85.) Because the Rule 32 trial court was the last state court to address the Pringle *Brady* claim in a decision on the merits, this court reviews that decision pursuant to AEDPA. *See Eichwedel v. Chandler*, 696 F.3d 660, 669–72 (7th Cir. 2012) (reviewing state trial court's merits decision pursuant to AEDPA where the state appellate court dismissed appeal on procedural grounds but the State did not assert procedural default in federal court).

##### *a. Petitioner's arguments*

Petitioner challenges the Rule 32 court's merits determination pursuant to both § 2254(d)(1) and (2). He first argues the state court unreasonably adjudicated the facts under § 2254(d)(2) when it found that Pringle's prior statement was not suppressed. In support, he contends that Glassroth's testimony at the Rule 32 hearing and counsel's limited cross-examination of Pringle at the first trial establish that neither attorney was provided Pringle's earlier statement. (Doc. 50 at 73–75.)

He also argues that the Rule 32 court unreasonably found that Pringle admitted to providing her prior statement to police because Pringle never admitted giving more than one statement in her trial testimony. (Doc. 50 at 75–76.)

On the materiality of the prior Pringle statement, Petitioner argues the Rule 32 court both "applied a materiality standard that was contrary to *Brady* and . . . misapplied *Brady* to the facts of this case." (Doc. 50 at 76.) Regarding the state court's purported application of "an incorrect standard for materiality," Petitioner highlights the court's finding that he had failed to prove "that the outcome would have been different given the overwhelming evidence presented by the State" had he been provided with Pringle's statement. (Doc. 50 at 77.) He maintains that because materiality under *Brady* requires only a "reasonable probability" of a different result, the state court's imposition of a more demanding standard contravened *Brady*. (*Id*. at 77–78.)

Petitioner also argues that, even if the Rule 32 court had applied the correct materiality standard, that court unreasonably applied *Brady* under § 2254(d)(1) because Pringle's prior statement was material for the following reasons: 1) it "would have raised a substantial question for the jury of whether the witness was 'lying then' or 'lying now'"; 2) its value as impeachment evidence was significant because Pringle's testimony "provided key evidence on the disputed element of perpetrator identification and provided much-needed corroboration to weaker aspects of the State's case"; 3) it would have impeached Pringle's testimony corroborating Petitioner's confession to police; 4) it "would have provided evidentiary support for a defense argument that Cornelius Pringle, whom the surviving witness identified as his assailant, was the true perpetrator and not Mr. Bush"; and 5) it "was material to the outcome of the third trial because it would have

lent further support to defense arguments that Mrs. Pringle's testimony from the first trial had not been subject to constitutionally-sufficient cross-examination, that it was unreliable, and that it should not be admitted at the third trial." (Doc. 50 at 79–85.)

*b. The state court did not apply a materiality standard contrary to Brady, and did not unreasonably apply Brady, in finding that Pringle's prior statement was not material.*

There is no dispute that Pringle's prior inconsistent statement was favorable to Petitioner. Fairminded jurists can agree, however, with the Rule 32 court's holding that this evidence was not material, *i.e.*, that there is no reasonable probability that Petitioner would not have been convicted or sentenced to death if Pringle's prior statement had been disclosed to the defense prior to his trial. In short, considered in the context of all the evidence admitted at trial, and cumulatively with the other evidence Petitioner alleges was unlawfully suppressed, Pringle's prior statement does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Accordingly, this court cannot conclude that the state court unreasonably applied *Brady* in denying Petitioner's claim.[29] Petitioner's arguments to the contrary fail to demonstrate any unreasonable application of *Brady*.

To begin with, the Rule 32 court's invocation of an incorrect (or perhaps simply incomplete) standard of review in addressing the materiality of Pringle's statement does not compel the conclusion that it applied a materiality standard contrary to *Brady*. It is evident the state court understood the *Brady* materiality

[29] Because this court concludes that the Rule 32 court did not unreasonably apply *Brady* on the materiality question, the court does not address Petitioner's contention that the state court unreasonably found that Petitioner failed to prove that prosecutors suppressed Pringle's prior statement.

standard—it correctly defined the standard in its discussion of Petitioner's Harden *Brady* claim. (*See* doc. 25-39 at 148 ("Bush has failed to prove that there is a reasonable probability that if trial counsel had been provided this information prior to trial that the outcome would have been different.").) Petitioner concedes the state court "recited the correct materiality standard" when discussing the Harden *Brady* claim. (Doc. 50 at 77.) To be sure, in its subsequent discussion of the Pringle *Brady* claim, one page later, the state court omitted the "reasonable probability" component of the standard when it found that Petitioner "failed to prove . . . that the outcome would have been different" had counsel been provided with Pringle's statement. (Doc. 25-39 at 149.) And, curiously, the state court cited the Supreme Court's seminal decision on the ineffective assistance of counsel, *Strickland v. Washington*, 466 U.S. 668 (1984), in support of its finding. (*Id.*) But the state court's omission of "reasonable probability" the second time it addressed the materiality of purported *Brady* evidence does not dictate that it inexplicably applied a different, more demanding materiality standard to the Pringle statement.

State courts are presumed to "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citations omitted). Furthermore, § 2254(d)'s "'highly deferential standard for evaluating state court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Id*. (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). Here, where the Rule 32 court correctly recited the *Brady* materiality standard only one page before it omitted the "reasonable probability" component in its second articulation of the standard, AEDPA requires this court to resolve any doubt about whether that court applied the correct standard in favor of the state court. *Id*. at 23–24 (concluding that, where the state supreme court "began its analysis of the prejudice inquiry by setting forth the

'reasonable probability' criterion" of *Strickland*, federal courts are to presume the state court applied the correct standard notwithstanding multiple instances in which it subsequently "used the term 'probable' without the modifier 'reasonably'").

Petitioner ultimately seeks to hold the Rule 32 court to an opinion-writing standard rejected by the Supreme Court. The state court's omission of "reasonable probability" the second time it addressed purported *Brady* evidence "may perhaps be imprecise, but if so it can no more be considered a repudiation of the standard than can [the Supreme Court's] own occasional indulgence in the same imprecision." *Visciotti*, 537 U.S. at 23–24; *see also Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 748 (11th Cir. 2010) ("Although the [state] court did not specifically refer to a 'cumulative' analysis of materiality, or to the United States Supreme Court's discussion of that issue in *Kyles*, our deference to a state court decision does not depend on the use of keywords."); *Smith*, 572 F.3d at 1333 ("In order to merit AEDPA deference the state court need not expressly identify the relevant Supreme Court precedent, nor make a perfect statement of the applicable rule of law, nor provide a detailed opinion covering each aspect of the petitioner's argument."). This court therefore declines to conclude that the state court applied a materiality standard contrary to *Brady* due to its singular omission of the "reasonable probability" component of *Brady*'s materiality standard when discussing the prior Pringle statement.

Petitioner next asserts that, even if the Rule 32 court applied the correct materiality standard, its decision unreasonably applied *Brady* for several reasons. He first contends that Pringle's prior inconsistent statement was material because it "would have raised a substantial question for the jury of whether the witness was 'lying then' or 'lying now.'" (Doc. 50 at 79.) Ultimately, however, he overstates

the likely effect of the prior statement. Had the jury been presented with Pringle's first police statement, it would have easily resolved any question whether Pringle was "lying then" or "lying now" in favor of her trial testimony because, minimally, Pringle's first police statement contained demonstrably false statements about the use and condition of the Monte Carlo owned by her employer.

Recall that Pringle told police in her first statement that the Monte Carlo was "dead" on Friday night before the convenience store robberies, that it sat outside her trailer home all weekend, and that no one could have driven it without her knowing about it. (Doc. 25-28 at 124.) As the ACCA found on direct appeal, however, the surviving victim, Tony Holmes, described "the automobile the assailants were driving . . . as a 1973 white-over-green Chevrolet Monte Carlo[.]" *Bush*, 695 So. 2d at 81. Furthermore, the jury heard the testimony of Martha Morgan, a former Montgomery Police patrol officer, who stated that, after receiving a BOLO for "a 1973 white over green Montecarlo [sic]" following the robberies, she patrolled "several trailer parks" in search of the vehicle. (Doc. 25-1 at 132.) She further testified that she located a matching vehicle around 5:30 a.m. parked outside a trailer in the trailer park where Pringle lived, that the Monte Carlo had not been present outside the trailer in her earlier passes through the area, and that, upon examination, she deduced that the Monte Carlo had recently been driven because the hood was warm and there was no dew or condensation on the vehicle. (*Id*. at 133.)

Jurors thus would have easily concluded that Pringle's first police statement, the crux of which was riddled with her lies about the Monte Carlo, was not reliable because, at that time, she was protecting her husband or, more likely, hoping to avoid harmful consequences that might flow to her from her employer's vehicle, which had been entrusted to her, being involved in two robbery-murders. No doubt,

Pringle's obvious falsehoods to police in her first statement were generally probative of her trustworthiness and jurors could have considered that fact in assessing her credibility and evaluating her testimony. *See, e.g.*, *United States v. Sheffield*, 992 F.3d 1164, 1168 (11th Cir. 1993). But the Rule 32 court did not unreasonably apply *Brady* in concluding that it was not reasonably probable the jury would have been so swayed by Pringle's prior, obviously false statement that it would have repudiated her trial testimony on that basis, much less that it would have failed to convict Petitioner.

Petitioner's next contention about the materiality of Pringle's prior statement rests on the "importance" of her testimony to the State's case at his third trial. He asserts such "importance" is evident because prosecutors "vehemently" fought to introduce her testimony from the first trial and emphasized that testimony in closing arguments at the guilt phase. (Doc. 50 at 80.) Because her testimony was so "pivotal," the argument goes, "any evidence that had the potential to call her veracity into question or otherwise undermine her testimony was certainly material to the outcome of the trial." (*Id*. at 81.) But, as explained above, the prior Pringle statement was demonstrably false on its most salient points about her knowledge of the crime, while her trial testimony was consistent with other evidence the jury heard, including the eyewitness account establishing that her car was the getaway vehicle at the Majik Mart robbery and Petitioner's own confession to being the shooter at both robberies.[30] In other words, nothing before the jury would have

[30] In her trial testimony, Pringle twice admitted that the Monte Carlo entrusted to her by her employer was the vehicle police identified as being used by the perpetrators. (Doc. 25-5 at 25, 27–28.)

corroborated any pertinent part of the prior statement, while other evidence before the jury corroborated Pringle's trial testimony.

In addition, the defense at Petitioner's third trial effectively impeached Pringle's trial testimony notwithstanding any failure to disclose her prior statement. The defense elicited evidence that a significant reward offer was quickly disseminated in the local newspaper after the murders and that Pringle eventually received a reward payment for her information. (Doc. 25-2 at 61–62.) This is significant because Pringle testified at the first trial that she knew nothing about any reward. (Doc. 25-5 at 23.[31]) Thus, the defense demonstrated that Pringle almost certainly knew of a reward, contrary to her trial testimony, and that she in fact eventually received a part of the reward. In closing argument, the defense emphasized this evidence tending to impeach Pringle's testimony as both false and motivated by pecuniary interest:

> And yeah, they read you the testimony of Pat Pringle. Lot of good that did. I couldn't ask a question of a piece of paper. I couldn't ask her about the reward money she got that she denied knowing anything about. . . . Remember that last lawyer, remember the name Mr. Cameron, he was asking her questions about reward money? She said she didn't know about that. She said she showed someone a news article about it; but there wasn't anything about reward money. Well, you heard Mr. Ward. He said the next day there was a sketch, a composite, The Tooth Man, run in the paper along with money available as reward, $30,000.00. We don't know how much Pat Pringle

[31] Pringle testified that Petitioner visited her trailer "two days after" the robbery-murders, which took place in the early morning hours of Sunday, July 26, 1981, and that she showed him a newspaper that included a sketch of the suspect. (Doc. 25-5 at 21.) The headline of the lead story in the Tuesday, July 28 edition of the Montgomery Advertiser read, "$30,000 reward offered in killings" and a sketch of the suspect accompanied the story. (Doc. 25-31 at 135.)

> got. Officer Ward didn't know. And it wasn't in that transcript. We will never know.

(Doc. 25-2 at 89–90.) Because the defense impeached Pringle's testimony in other ways—and more effectively than it could have done with the prior inconsistent statement—the Rule 32 court's conclusion that the prior statement was not material is a reasonable application of *Brady*. *See, e.g.*, *United States v. George*, 95 F.4th 200, 209 (4th Cir. 2024) ("At the same time, however, where the withheld evidence is impeaching but the witness was impeached in other ways at trial, we have held that the withheld evidence was not material.").

Petitioner's third argument about the materiality of Pringle's prior statement appears to again emphasize the importance of Pringle's testimony to his conviction. He asserts that, because the defense sought to place the voluntariness and reliability of his confession in dispute, Pringle's testimony corroborating his confession to having been the shooter at both robberies was essential to proving the State's case. (Doc. 50 at 82.) Since her prior inconsistent statement would have permitted the defense to call her veracity into question, the argument goes, it was material. (*Id*. at 82–83.) For the reasons already discussed, however, Pringle's statement offered limited impeachment value because it demonstrated only that she lied when she first spoke to police.

While Pringle did not inculpate Petitioner in her prior statement, neither did she inculpate anyone else in the robbery-murders. Her prior statement conflicted with her trial testimony in ways that were easily resolved against the veracity of the prior statement. Nothing in the statement would have caused the jury to question the other inculpatory evidence admitted at trial. More importantly, the defense at Petitioner's third trial effectively impeached Pringle's testimony by demonstrating

her likely false testimony about her knowledge of the reward offered by authorities and her interest in obtaining that reward. Thus, the "tendency and force"[32] of Pringle's prior statement as impeachment evidence was limited.

Petitioner's fourth argument is that, "in addition to its significant impeachment value," Pringle's prior statement was exculpatory because it "would have provided evidentiary support for a defense argument that Cornelius Pringle, who the surviving witness identified as his assailant, was the true perpetrator and not Mr. Bush." (Doc. 50 at 83.) It is certainly true that Pringle's first police statement includes references to Cornelius Pringle. Although Patricia was the first to mention Cornelius in that statement, after she did so police asked her several follow-up questions about Cornelius. (Doc. 25-28 at 125.) While Patricia Pringle revealed nothing inculpatory about Cornelius in her first statement, the statement does demonstrate police interest and investigation into Cornelius.

The defense at Petitioner's third trial attempted to persuade the jury that it was Cornelius Pringle, not Petitioner, who shot the victims. And it made abundant use of the best evidence it had on this point: the surviving victim, Holmes, identified Cornelius Pringle as his assailant in both a photo and live lineup. The defense explored with Holmes the sequence of his identification of Cornelius Pringle and how he came to believe he was mistaken in that identification only after investigators told him they believed Petitioner was the assailant. (Doc. 25-2 at 5–8.) Then the defense elicited testimony from the primary investigator confirming that Holmes twice identified Pringle, including in a live lineup, and that Pringle—not Petitioner—had a peculiar front tooth, which was one of the descriptions Holmes

---

[32] *Kyles*, 514 U.S. at 436 n.10.

initially gave of his attacker. (Doc. 25-2 at 56–59.) The defense emphasized this evidence bolstering Holmes's initial identification of Pringle in its closing argument. (Doc. 25-2 at 80–85.) Indeed, the defense's final words to the jury placed Holmes's identification of Cornelius Pringle and his description of a distinguishing feature of Pringle's teeth at the center of the defense's case: "The right result here, Ladies and Gentlemen, is that the man who shot Tony Holmes had a chipped tooth. Chic Bush doesn't have a chipped tooth. It wasn't Chic. Remember that." (Doc. 25-2 at 97.)

Patricia Pringle's prior statement, at most, would have shown only that police were investigating Cornelius Pringle at the time of her statement. The jury would not have been surprised to learn of this fact. The jury knew that his brother, Edward, was involved, it knew Holmes twice identified Cornelius Pringle, and it knew police "picked-up" Cornelius to put him in the lineup before Holmes. Additional evidence that police asked Patricia Pringle about Cornelius would have been cumulative of the more direct evidence demonstrating the police investigation into Cornelius. Accordingly, the Rule 32 court did not unreasonably apply *Brady* in concluding that Pringle's prior statement was not material due to any exculpatory information pertaining to the police investigation of Cornelius Pringle.

Petitioner's fifth and final argument about the materiality of Pringle's prior statement is that, had it been provided, it would have "lent further support to defense arguments that Mrs. Pringle's testimony from the first trial had not been subject to constitutionally-sufficient cross-examination, that it was unreliable, and that it should not be admitted at the third trial." (Doc. 50 at 84.) Petitioner does not cite any authority for the proposition that materiality under *Brady* may be established because the allegedly suppressed evidence arguably bolsters the defense's argument about the inadmissibility of other evidence. The Eleventh Circuit has expressed

skepticism on that point. *See Smith*, 572 F.3d at 1342 n.9 (remarking, "we would be skeptical about concluding that" "*Brady* applies outside the realm of exculpatory evidence and extends to evidence useful to the defense in a fruit-of-the poisonous-tree quest"). Nor does he cite any authority demonstrating that the trial court likely would not have admitted Pringle's testimony had counsel argued against its admissibility with the benefit of her prior statement, rather than simply permitting the defense to make whatever use it could of the statement as impeachment at trial.

For all the reasons discussed herein, the "tendency and force" of Pringle's prior statement as impeachment evidence was not substantial because it was demonstrably false in its most salient aspects and, furthermore, it did not pose conflicts with her trial testimony that the jury would have struggled to resolve. A jury apprised of the statement and other evidence introduced at trial surely would have concluded that Pringle lied in her first police statement hoping to obscure or minimize her connection to the convenience store robberies, whether to protect herself or her husband. While proving that a witness initially lied to police has some impeachment value, considering that the witness's false statement was inconsistent with other evidence admitted at trial, the larger objective for the defense was to show that Pringle lied in her trial testimony. The defense effectively did that by impeaching Pringle's testimony about her lack of knowledge about a reward and it further showed the jury Pringle was interested in obtaining a reward and, in fact, did so. Given these circumstances, the Rule 32 court did not unreasonably apply *Brady* in finding her prior statement immaterial.

### 2. The Harden *Brady* Claim

As discussed above, the ACCA denied this claim on the merits in Petitioner's Rule 32 appeal. *Bush*, 97 So. 3d at 149. This court therefore reviews that decision pursuant to § 2254(d).

#### *a. Petitioner's arguments*

Petitioner argues the Harden disciplinary records were favorable to him as impeachment evidence, that they were suppressed by the State, and that the ACCA's decision holding that the records are not material was contrary to, and unreasonably applied, *Brady*. (Doc. 50 at 92–94.) In support, he contends the ACCA did not apply *Brady*'s materiality standard and that, even if it had, it unreasonably applied *Brady* to the facts. (*Id*. at 94–100.) Considering that Harden's testimony corroborated other identification evidence and provided the only physical and scientific link between Petitioner and the crimes, he asserts, the suppressed disciplinary records were material because they would have provided a powerful opportunity to impeach Harden's testimony and impugn his "methodology and accuracy." (*Id*.)

#### *b. The ACCA's decision is not contrary to, and did not involve an unreasonable application of, Brady.*

As set forth above, the Rule 32 court held that Harden's testimony was "cumulative, not material" because it "simply corroborated other evidence that had already been admitted[,]" including Petitioner's identification of the gun as the murder weapon. (Doc. 25-39 at 147.) Thus, the court reasoned, Harden's employment disciplinary records were not material. (*Id*.) The ACCA recited the relevant part of the lower state court's opinion and stated that its "findings are

supported by the record." *Bush*, 92 So. 3d at 149. Citing its conclusion on direct appeal that "Harden's testimony was not material[,]" the ACCA held that "Bush cannot satisfy the requirements of establishing a *Brady* violation because the alleged suppressed evidence was not material." *Id*.

For the reasons already discussed respecting Petitioner's Pringle *Brady* claim, this court cannot conclude that the ACCA failed to properly apply the *Brady* materiality standard. The ACCA quoted the lower court's correct articulation of the standard and agreed with its holding about the materiality of the Harden impeachment evidence. *Bush*, 92 So. 3d at 149. Petitioner concedes the Rule 32 court "recited the correct materiality standard" but asserts that neither the lower court nor the ACCA applied that standard because both courts discounted the materiality of the Harden impeachment evidence based upon their finding that Harden's testimony was "cumulative" of other evidence, including Petitioner's own identification of the gun as the one he used in the murders. (Doc. 50 at 96.)

The ACCA did not unreasonably apply *Brady* in assessing the materiality of the Harden impeachment evidence by reference to other evidence tending to corroborate Harden's testimony. Where the "tendency and force" of impeachment evidence is asserted to render a witness unreliable, a reviewing court naturally considers other evidence corroborating the witness's testimony to assess whether there is a reasonable probability of a different result absent the testimony that would have been impeached. *See, e.g.*, *United States v. Laines*, 69 F.4th 1221, 1232 (11th Cir. 2023) (finding impeachment evidence consisting of arresting and testifying police officer's prior investigations for misconduct immaterial under *Brady* because the "corroborating evidence would be sufficient to support the jury's guilty verdict even if [the officer] had been totally discredited").

The ACCA reasonably found here that Harden's testimony linking the gun to the murders was cumulative of other evidence before the jury. That evidence included that a gun matching the one examined by Harden was identified by Holmes as the gun used to shoot him and that Petitioner led police to a .38 caliber revolver that he claimed to have used in the murders.[33] Thus, even if the Harden impeachment evidence would have "totally discredited" Harden—and there has been no showing that the problems pervading Harden's work around 1990 were present in 1981, when he conducted the ballistics analysis he testified about at Petitioner's trial—it was reasonable for the ACCA to look to other evidence corroborating the substance of Harden's identification testimony in assessing the materiality of the impeachment evidence. *Laines*, 69 F.4th at 1232.

Petitioner next provides three reasons why the ACCA unreasonably applied *Brady*, even if it applied the correct materiality standard, in finding the Harden impeachment evidence was not material: 1) Harden's testimony "was one of the State's key pieces of identification evidence allegedly linking Mr. Bush to the offense, and it also served to corroborate Mrs. Pringle's prior testimony and Mr. Bush's custodial statements"; 2) Harden's testimony "provided the only physical and scientific evidence of identification purportedly connecting Mr. Bush to the offense"; and 3) the disciplinary records "presented scathing criticism of Mr. Harden's methodology and accuracy" and "would have gone straight to the heart of

[33] Holmes testified that the gun used by his assailant was a "nickel plated .38 special." (Doc. 25-1 at 190.) The gun seized by police with Petitioner's assistance, and provided to Harden for ballistics testing, was described by Harden as "a .38 Smith and Wesson revolver." (Doc. 25-1 at 119.) In his first statement to police, Petitioner described the gun he used to shoot Adams as a ".38 special long" that was "probably" about four to eight inches in total length and was "blue" in color. (Doc. 25-31 at 91–92.)

Mr. Harden's testimony and the weight that it should have been accorded." (Doc. 50 at 97–98.)

Petitioner's arguments do not elevate the "tendency and force" of the Harden employment records beyond what was appreciated by the ACCA. To begin with, Petitioner appears to overstate what the employment records actually show. He alleges, in his most damning claim, that "Mr. Harden had been chastised for presenting inaccurate testimony in other cases[.]" (Pet. ¶ 81, doc. 1 at 32.) Yet, Petitioner has not cited any source or authority describing Harden's "inaccurate testimony" in any case and neither of the disciplinary memoranda he describes in the petition reference Harden having provided "inaccurate testimony." Both memoranda allude to Harden's errors in his casework, including, specifically, errors in his reports and case memoranda. (Doc. 25-24 at 153–54.) The memoranda further reflect that, because of his errors, Harden's casework was receiving heightened scrutiny from his superiors, including the Director of Forensic Sciences, who were closely reviewing his reports and memoranda around the time of his testimony at the third trial. Given this robust level of supervision, nothing in the memoranda, or otherwise alleged in the petition, suggests that Harden's supervisors would have acquiesced in his testifying—three times in ten years—as an expert witness in a capital murder prosecution in which they knew his casework was suspect.

In any event, while Petitioner correctly describes the Harden testimony as tending to corroborate other evidence introduced at trial, including elements of Petitioner's confession, that does not necessitate a finding that his testimony, or the impeachment evidence at issue here, was material. It is obvious from the trial record that the most important evidence introduced at Petitioner's three trials were his two confessional statements, which were corroborated by far more than just Harden's

ballistics analysis. Petitioner's statements reflect detailed knowledge of the convenience store robbery-murders which found corroboration in many other sources of evidence. He knew paramedics had been at the Majik Mart a few minutes prior to the robbery. (Doc. 25-31 at 97, 100.[34]) He knew that Dominguez and Holmes were shot in the bathroom at the Majik Mart, that two shots were fired in the bathroom, and that Dominguez was shot a second time after he "stumbled out of the bathroom" while Petitioner and Pringle were looking for items to steal. (*Id*. at 98.[35]) He knew that no money was taken at the Majik Mart because they could not open the cash register. (*Id*. at 69, 86.) He knew that Adams was shot one time in the office behind the cash register area at the 7-11. (*Id*. at 73–74, 99, 101.[36]) He knew exacting details about how Adams was positioned when he was shot and the immediate result of his injuries.[37] He knew that Adams had opened the cash register

---

[34] Holmes testified that two paramedics "came in and got a cup of coffee" shortly before the eventual assailant made his first entrance at the store. (Doc. 25-1 at 186.)

[35] *See Bush*, 695 So. 2d at 81 (summarizing trial evidence showing where Majik Mart victims were shot); *see also* doc. 25-1 at 49–52 (MPD evidence technician describing location of Dominguez's body at the Majik Mart, areas where large volumes of blood were present, and bullet hole in the bathroom wall from which bullet was recovered); doc. 25-1 at 100–103 (testimony of forensic pathologist describing Dominguez's two entrance wounds and recovery of two bullets from Dominguez).

[36] *See Bush*, 695 So. 2d at 81–82 (summarizing trial evidence showing where Adams was shot at the 7-11); *see also* doc. 25-1 at 80–81 (MPD evidence technician describing location of Adams's body); doc. 25-1 at 106–08 (forensic pathologist describing single entrance wound and recovery of the bullet from Adams).

[37] In both of his statements, Petitioner described Adams as being "kind of turned side ways" when he shot him. (Doc. 25-31 at 78, 99.) He also stated that he shot Adams "[i]n the head or shoulder somewhere" and that Adams fell instantly when he was shot. (*Id*. at 99.) The forensic pathologist testified that Adams had a single entrance wound located on the right side of his neck and that the bullet "shattered the upper cervical spinal cord" and would have "cause[d] instant collapse[.]" (Doc. 25-1 at 106–08.)

in the process of selling a pack of Kool Filter King cigarettes prior to being shot. (*Id*. at 71–72, 83.[38]) He knew checks were among the items taken from the 7-11. (*Id*. at 76.[39]) In short, therefore, Petitioner's statements were corroborated by far more than Harden's testimony about his ballistics testing and analysis. Impeaching Harden's testimony by showing his employers' scrutiny of his work in other cases years after his analysis in this case would have had little effect on the jury's assessment of whether Petitioner's confession was corroborated by other evidence.

Petitioner's argument that the Harden impeachment records are material because they would have impeached "the only physical and scientific evidence of identification purportedly connecting Mr. Bush to the offense" (doc. 50 at 97), is also unavailing. The evidence before the jury showed that, after giving his statements describing the gun he used in the robbery-murders, and following an episode of subterfuge in which he led police on a futile search in a wooded area far from Montgomery, Petitioner assisted police with recovering a gun matching the description provided by Holmes and consistent with the caliber of the gun used to shoot all three victims. Furthermore, the jury learned that Petitioner had stashed the gun in a neighbor's home in Smiley Court. (Doc. 25-2 at 30.) Even without Harden's testimony, it would not have required any undue inferential leap for the jury to conclude that a gun matching the description of the one used in the crimes,

---

[38] The MPD evidence technician who responded to the 7-11 recovered an unopened pack of Kool Filter King cigarettes from the floor near the cash register. (Doc. 25-1 at 82–83.) The former manager of a Montgomery area 7-11 store testified about the price of a pack of cigarettes in 1981 and how that price would be reflected on an open cash register in the process of such a sale. (Doc. 25-1 at 139.)

[39] Recall Patricia Pringle's statement to police describing Edward Pringle's unsuccessful effort to cash a check made out to the 7-11 victim, Adams. (Doc. 25-28 at 115.)

which Petitioner took care to hide in someone else's home, and which was identified by him as the one used in all three shootings, was the murder weapon. Thus, sufficient circumstantial evidence before the jury identified the gun in evidence as the one that was used in the crimes. Impeaching Harden's scientific identification testimony confirming that link by showing problems with his work in other cases would not have presented a substantial impediment to a jury finding that the gun in evidence was the murder weapon.

Petitioner's third argument—that the records were material due to their "scathing criticism of Mr. Harden's methodology and accuracy"—also fails to significantly enhance the "tendency and force" of the Harden disciplinary records. He asserts that, because of Harden's credentials, "the only thing defense counsel could have challenged was the manner in which Mr. Harden conducted his firearm comparisons." (Doc. 50 at 98.) Since the defense lacked "any evidentiary basis to demonstrate Mr. Harden did not act in accordance with his training and experience, defense counsel had nothing upon which to base such a cross-examination." (*Id.*) Armed with the employment records, however, the argument goes, the defense would have attacked Harden's credibility by exploring "the number of errors he has made in similar cases," "the kinds of errors he made," and "specific instances in which he misidentified bullets or drew incorrect conclusions that certain bullets matched certain firearms, along with the extent to which his cases had to be re-analyzed by other State firearm examiners and the number of times they reached different conclusions than Mr. Harden had reached." (Doc. 50 at 98–99.)

The defense at Petitioner's third trial recognized the potential benefit of challenging Harden's testimony even without being aware of his issues at work. The ACCA observed on direct appeal that Petitioner's attorneys filed a pretrial motion

for funds for several experts, including an expert in ballistics "to help his attorneys attack the findings of the state's expert." *Bush*, 695 So. 2d at 103 (internal quotation marks omitted). The defense, however, failed to identify any ballistics expert in its motion. *Id*. Although the trial court therefore denied the motion for funds for a ballistics expert, it "stated that it would reconsider the request if and when a ballistics expert could be found." *Id*. (*See also* doc. 25-3 at 201 (trial court's order provisionally denying defendant's motion for ballistics expert).) The ACCA found that Petitioner never renewed his request by presenting a ballistics expert in support of his earlier motion and, accordingly, he "failed to pursue his request with specific information requested by the court." *Id*.

Thus, the primary reason the defense lacked an "evidentiary basis" to challenge Harden's actions was that the defense apparently abandoned its effort to secure its own expert to "attack" Harden's findings. While Glassroth testified at the Rule 32 hearing that it would have been gratifying to embarrass Harden at trial with evidence of his workplace reprimands,[40] he did not testify that he would have followed through with locating a defense ballistics expert had he known about Harden's issues. In any event, even if the defense had demonstrated Harden's workplace issues to the jury, without tangible evidence challenging his findings in the form of contrary expert opinion, the jury was left with sufficient circumstantial evidence to confirm Harden's identification of the gun even if it found him less credible due to his disciplinary record at the Department of Forensic Sciences.

---

[40] *See* doc. 25-34 at 102–03 ("I would have loved the opportunity to sort of hoist him on his own baton.").

Accordingly, while the "tendency" of the Harden impeachment evidence is evident, its "force" is not substantial when considered in the context of all the trial evidence.

### 3. The State Courts' Cumulative Materiality Analysis Was Not Contrary To, And Did Not Unreasonably Apply, *Brady*.

Petitioner's final argument is that the state courts did not properly consider the cumulative materiality of the allegedly suppressed *Brady* evidence. He acknowledges the "State courts considered the individual materiality of Mrs. Pringle's prior inconsistent statement and the individual materiality of Mr. Harden's disciplinary records," but contends they never "considered the collective, cumulative materiality of those categories of evidence." (Doc. 50 at 101.) He asserts that, "because the State courts failed to address the cumulative weight of the suppressed evidence, their resulting determinations were contrary to clearly established Federal law and involved an unreasonable application of Federal law and cannot be sustained." (*Id*.)

To begin with, this court cannot conclude that, contrary to *Brady* and its progeny, the state courts (meaning, the Rule 32 court and the ACCA) failed to consider the materiality of the alleged *Brady* evidence cumulatively. As this opinion explained previously, the state courts, both the ACCA and the lower court, recited the "correct, overall standard for assessing *Brady* prejudice[,]" *Allen*, 611 F.3d at 748, which Petitioner concedes. (Doc. 50 at 77.) Once again, state courts are presumed to "know and follow the law" and are afforded the benefit of the doubt when assessing whether they have properly applied federal law. *Visciotti*, 537 U.S. at 24. Given this presumption, a state court is not required to "specifically refer to a 'cumulative' analysis of materiality" or otherwise employ "keywords" to be entitled to the deference afforded under AEDPA. *Allen*, 611 F.3d at 748.

In addition, Petitioner concedes here that the state courts considered materiality individually. (Doc. 50 at 101.) The Eleventh Circuit has recognized that a state court's "item-by-item analysis . . . is not inconsistent with a cumulative analysis. Indeed, the only way to evaluate the cumulative effect is to first examine each piece standing alone." *Allen*, 611 F.3d at 749. So, where the state courts correctly recited the *Brady* materiality standard, addressed materiality in a fashion that is not inconsistent with a cumulative analysis, and provided no "affirmative indication" that they failed to consider materiality cumulatively, this court cannot conclude that the state courts' materiality analysis was contrary to *Brady* simply because it did not denote any separate cumulative materiality analysis. *Id.*; *see also Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1293–94 (11th Cir. 2012).[41]

Petitioner's argument that the state courts unreasonably applied *Brady* and its progeny in their implicit analysis of the cumulative materiality of the Harden disciplinary memoranda and the prior Pringle statement rests on the potential of those items to impeach testimony that tended to corroborate aspects of Petitioner's confession. He contends that the testimonies of Pringle and Harden "represent two of the three lines of evidence purportedly connecting Mr. Bush to the alleged offense,

[41] Moreover, the fact that the state courts' "own precedent required [that they] examine prejudice cumulatively is another strong reason for inferring that [they] did so." *Allen*, 611 F.3d at 749. Long before the ACCA's opinion in *Bush*, the ACCA recognized that federal law requires that materiality be considered cumulatively. *Shields v. State*, 680 So. 2d 969, 971 (Ala. Crim. App. 1996) (quoting relevant discussion of "*Bagley* materiality" in *Kyles*). And, indeed, long before its decision in *Bush*, the ACCA explicitly considered the cumulative materiality of the failure to disclose multiple items of evidence in other cases. *Martin v. State*, 839 So. 2d 665, 681 (Ala. Crim. App. 2001) (citing *Kyles*, 514 U.S. at 434). Other than the state courts' failure to explicitly state that they did so here—which, alone, is not sufficient to overcome the presumption that they followed the law—there is no reason to believe they did not do so.

with his coerced custodial statement being the only remaining connection." (Doc. 50 at 101.) He maintains that, had the Harden and Pringle impeachment evidence not been suppressed, "the testimony of Mrs. Pringle and Mr. Harden would have been significantly undermined and the remaining identification link—Mr. Bush's challenged confession—would have limped along alone, stripped of the false corroboration the Pringle and Harden testimony appeared to provide." (*Id*. at 102.)

Petitioner's confession, however, was corroborated by far more than Harden's and Pringle's testimonies; demonstrating that Harden was being scrutinized for shoddy work in other cases, potentially years after his work in Petitioner's case, or that Pringle gave a false statement the first time she spoke with police, would not have seriously undermined the reliability of Petitioner's confession. Ultimately, the defense put the reliability of the confession squarely in question, arguing that the circumstances surrounding Petitioner's interrogation and the content of his statements imply that police fed him the details they needed him to regurgitate in order to pin the blame on him rather than Cornelius Pringle. (Doc. 25-2 at 87–89.) The jury plainly rejected the defense's argument. The confession is therefore powerful evidence of Petitioner's guilt that reduces the "probability of a different outcome" had the impeachment evidence at issue here been available to the defense. *Hamm v. Comm'r, Ala. Dep't of Corr*., 620 F. App'x 752, 785 (11th Cir. 2015). Fairminded jurists can agree with the state courts' determination that, considered cumulatively and in the context of all the trial evidence, the Pringle and Harden impeachment evidence do not cast "the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Accordingly, Petitioner's claims under *Brady* are due to be denied.

## III. Claim C – Petitioner Was Deprived Of His Right To Confront a Witness

### A. Petitioner's Allegations

Patricia Pringle testified at Petitioner's first trial and her testimony was read into the record at his second and third trials. The substance of her testimony consisted of her relating Petitioner's confession to her that he was the shooter. Petitioner alleges the "un-confronted, hearsay evidence from Patricia Pringle did not satisfy the confrontation requirements of the Sixth Amendment to the United States Constitution." (Pet. ¶ 88, doc. 1 at 34.) He cites two reasons the trial court erred in admitting Pringle's testimony from the first trial: "the prosecution failed to demonstrate that it had made sufficient efforts to locate Mrs. Pringle and procure her attendance at trial"; and the cross-examination of Pringle at his first trial "was constitutionally deficient as a result of defense counsel's ineffectiveness and his lack of access to crucial evidence, much of it concealed by the prosecution, which could have been used to impeach Ms. Pringle." (*Id.*)

In support of the claim that prosecutors made insufficient efforts to locate Pringle, Petitioner alleges that, although prosecutors knew early in 1988 that they would be retrying him a third time, they "made little or no effort whatsoever to find [Pringle] until approximately two weeks before they began to present their case-in-chief at Mr. Bush's third trial on January 29, 1991, almost three years later." (Pet. ¶ 90, doc. 1 at 34–35.) He further alleges that, during the two-week period when they endeavored to find Pringle, "they made, at best, minimal efforts to locate her." (Pet. ¶ 91, doc. 1 at 35.) These efforts included the following: a sheriff's deputy in Pensacola, Florida, spent "a handful of hours contacting informers whom he suspected knew relatives of Ms. Pringle"; an investigator for the Montgomery

County District Attorney's office "checked to see if [Pringle] was receiving government benefits in Montgomery"; that same investigator checked to see if Pringle had an Alabama driver's license but, upon discovering that she had a Florida driver's license, "made no effort to contact motor vehicles authorities in Florida to discover her current address"; another investigator "telephoned an official at Holman Correctional Facility, where Edward Pringle is incarcerated, although the record does not reveal what he asked the official or what was communicated to him by Mr. Pringle"; and a prosecutor "telephoned Patricia Pringle's sister, although again there is no evidence as to what he asked her or what she told him." (*Id.*)

In support of his claim that Pringle's cross-examination at the 1981 trial was so deficient that her testimony should not have been admitted in the 1991 trial, Petitioner alleges both that his counsel's cross-examination was "pathetically inadequate" and that it was impeded by counsel's lack of access to information that was not disclosed prior to the 1981 trial. He contends the defense's cross-examination of Pringle at the 1981 trial was constitutionally inadequate on its face because counsel was unprepared to impeach Pringle on her knowledge about a reward, failed to examine her about her "bias arising from a desire to protect her husband[,]" "elicited testimony from Ms. Pringle . . . suggesting that Edward Pringle had implicated Mr. Bush[,]" and referenced "a second gun used in another murder," which left the jury "with the impression that William Bush may have been involved in such an uncharged killing." (Pet. ¶¶ 93–94, doc. 1 at 36.) Petitioner also alleges counsel's cross-examination of Pringle was constitutionally inadequate, whether due to counsel's deficient performance or the prosecution's unlawful suppression of evidence, because counsel did not cross-examine Pringle based upon Holmes's identification of Cornelius Pringle as the gunman. (Pet. ¶ 95, doc. 1 at 36.) Finally,

petitioner alleges the prosecution's suppression of Pringle's prior inconsistent statement precluded counsel from adequately cross-examining her at the first trial. (Pet. ¶ 97, doc. 1 at 37.)

Based upon these allegations about the prosecution's efforts to locate Pringle in advance of Petitioner's third trial and the constitutional inadequacy of the cross-examination of Pringle at the first trial, Petitioner alleges the "Alabama courts' acceptance of the admission of Ms. Pringle's testimony, along with their subsequent failure to grant appropriate relief," "'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" and "'resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence in the State court proceeding.'" (Pet. ¶ 103, doc. 1 at 39 (quoting § 2254(d)(1) & (2)).)

**B. Clearly Established Federal Law**

The Confrontation Clause of the Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. In particular, the Confrontation Clause protects the right of a criminal defendant to cross-examine adverse witnesses. *Ohio v. Roberts*, 448 U.S. 56, 63–64 (1980) (citing *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). But the right to confront witnesses is not absolute: "competing interests, if closely examined, may warrant dispensing with confrontation at trial." *Id.* at 64 (citation and quotation marks omitted). In *Roberts*, the Supreme Court devised a test governing when a trial court may admit hearsay evidence despite that the defendant is unable to cross-examine the declarant. *First*, "the prosecution must either produce, or demonstrate the

unavailability of, the declarant whose statement it wishes to use against the defendant." *Id*. at 65. *Second*, upon a showing that the declarant is unavailable, the prosecution must show that the hearsay evidence bears sufficient "'indicia of reliability'" that the trier of fact has a "'satisfactory basis for evaluating the truth of the prior statement.'" *Id*. at 65–66 (quoting *Mancusi v. Stubbs*, 408 U.S. 204, 213 (1972)).[42] "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id*. at 66.

**C. State Court Proceedings**

**1. The Trial Court Admits Patricia Pringle's Testimony**

The defense opposed the State's motion to admit and read into the record Pringle's testimony at Petitioner's third trial, arguing that "use of this prior testimony would deprive the accused of his rights . . . because he would not be entitled to confront the witness with effective counsel. He was deprived of that opportunity the first time." (Doc. 25-1 at 142.) Prosecutors called several witnesses—including an

---

[42] As Petitioner acknowledges in his brief (*see* doc. 50 at 105 n.31), at the time of his third trial, and throughout his direct appeal, *Roberts* provided the clearly established federal law governing his Confrontation Clause claim. Subsequently, the Supreme Court overruled *Roberts* in *Crawford v. Washington*, 541 U.S. 36, 59 (2004), in which it abandoned *Roberts*' "indicia of reliability" inquiry and held that the Confrontation Clause forbids the admission of "testimonial evidence" except where the declarant is unavailable and "the defendant has had a prior opportunity to cross-examine." Because *Crawford* only applies prospectively, *see Whorton v. Bockting*, 549 U.S. 406 (2007), and because AEDPA requires this court to examine whether the relevant state court decision was contrary to, or unreasonably applied, clearly established federal law at the time of the state court decision, *see Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003), this opinion examines the state court's application of *Roberts* under AEDPA.

Escambia County, Florida, Sheriff's Deputy, investigators from both the Montgomery County District Attorney's office and the Alabama Attorney General's office, and two assistant district attorneys—to testify about their efforts to locate Pringle in the weeks prior to the January 1991 trial. (Doc. 25-1 at 143–76.) Based upon this testimony, Judge Phelps granted the State's motion to read Pringle's prior testimony into the record. (Doc. 25-1 at 176.)

Prior to the reading of Pringle's testimony, Judge Phelps instructed the jury "to consider these answers that you will hear just as if this witness were here in court, and the Court tells you that these answers were given after this witness was under oath." (Doc. 25-1 at 180.) In closing arguments, the prosecutor reminded the jury of Pringle's testimony:

> Read the transcript of Patricia Pringle's statement sworn under oath. She is the one who provided the information that linked the defendant here, William Bush, with this murder. She said that Bush told her, "I was the trigger man", that her husband, Edward Pringle, was not the trigger man. Edward Pringle, who the defense attorney told you is serving life without parole sentence, not the trigger man. She says he said he's the trigger man. He's the man that pulled the trigger. Not only did she say it; but the defendant said it in his second statement.

(Doc. 25-2 at 76–77.) During its deliberations, the jury attempted to accept the prosecutor's invitation to "[r]ead the transcript of Patricia Pringle's" testimony. The jury sent a request to Judge Phelps asking for a copy of Pringle's testimony. (Doc. 25-2 at 154.) Judge Phelps declined the jury's request, asking that jurors "go back and try to remember yourselves what it was" because "we don't ever want to be in the position of giving one portion of the testimony more attention or more emphasis than another." (*Id.*) He offered that if, upon further deliberation, jurors could not

remember Pringle's testimony, to let him know. (Doc. 25-2 at 154–55.) The jury subsequently returned its verdict with no further inquiries about Pringle's testimony.

### 2. The ACCA Rejects Petitioner's Confrontation Clause Claim

On direct appeal, the ACCA described Petitioner's claim of Confrontation Clause error as follows:

> The appellant contends that the trial court erred in admitting the testimony of prosecution witness Patricia Pringle from the first trial of this case. He contends that its admission was improper because, he says, (1) the state allegedly failed to lay a proper predicate for the admission of the testimony by demonstrating that it had made a sufficient and diligent effort to locate the witness and procure her attendance at the trial, and (2) his trial counsel at his first trial was allegedly "constitutionally deficient as a result of his ineffectiveness and lack of access to crucial evidence that could have been used to impeach the witness." Because the state was unable to locate Mrs. Pringle and procure her attendance at the last two trials, her testimony from the first trial was read into evidence at the second and third trials. The appellant preserved this issue for review by timely objection in the trial court on the grounds stated above.

*Bush*, 695 So. 2d at 125.

The ACCA set forth the following findings of fact respecting Pringle's unavailability at Petitioner's third trial:

> A subpoena was issued before the third trial ordering Ms. Pringle to appear as a witness for the state. An attempt was made by the Montgomery County Sheriff's Department to serve the subpoena at her last known address. The subpoena was returned unserved because she had moved and had left no forwarding address. When it was learned that the subpoena had not been served, the state launched a search for her, which covered a period of approximately two weeks. An assistant district attorney, an assistant attorney general, two investigators, and a

> deputy sheriff in Pensacola, Florida, participated in the search. A search of the Alabama drivers' license records disclosed that she had surrendered her Alabama license and had been issued a driver's license in the state of Florida. Acting on reports that she had moved to Pensacola, where she was known to have relatives, a deputy sheriff in Pensacola, who knew her personally, searched for her in that area. He attempted, without success, to contact her through her known friends and relatives. He learned that she had not been seen in the Pensacola area for approximately six months before his search. He also checked the local hospitals and jails and was unable to find any trace of her. The records of the Alabama Department of Human Resources were checked for any record of her receiving public assistance of any kind, and no record was found. Her husband, Edward Pringle, was contacted in prison, as was her sister, Eunice Williams, in Pensacola, and her former employers in Montgomery, all to no avail.

*Id*. at 125–26. Based upon this evidence, the ACCA determined that Pringle "was in fact unavailable for trial." *Id*. at 126. It therefore held "that the state made a good faith effort and exercised due diligence in seeking the presence of the witness at trial. The requirement for the use of former testimony was met in this case." *Id*. at 126.

The ACCA next turned to whether Pringle's prior testimony could be admitted notwithstanding her unavailability. The ACCA quoted the discussion of "reliability" from *Roberts* and observed as follows:

> When a state's witness is unavailable and prior recorded testimony of the witness is admitted, the requirements of the Confrontation Clause are met if that prior testimony is marked with such truthworthiness [sic] that there is no material departure from the reason of the general rule, and if it bears indicia of reliability that would afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement.

*Bush*, 695 So. 2d at 127 (citations omitted). The ACCA then addressed the "trustworthiness" and "indicia of reliability" justifying admission of Pringle's prior testimony in a lengthy discussion:

Having found that the prosecution demonstrated the unavailability of the witness, Mrs. Pringle, we must now determine if her testimony is marked with the required truthworthiness and indicia of reliability. We conclude that it was. These indicia of reliability include the following: The witness was under oath; the testimony was taken before an officer having by law the authority to take testimony and to legally require an opportunity for cross-examination; the proceedings were in a court of record where the testimony was officially recorded; the testimony was taken under circumstances affording the appellant an opportunity to test the credibility of the witness by cross-examination; the testimony was taken in litigation where the issues and the parties are the same as in the present case; and the appellant was represented by competent counsel, as we discuss below. We find that the introduction in evidence at the present trial of Mrs. Pringle's testimony given at a prior trial of this case was constitutionally permissible under the Confrontation Clause. The admission of her testimony was proper under the unavailability hearsay exception.

[. . .]

We next review the appellant's contention that the testimony of Mrs. Pringle should not have been admitted because defense counsel was ineffective in his cross-examination of her in the first trial. He contends that defense counsel in the first trial was ineffective in representing him, in regard to Mrs. Pringle's testimony, for the following reasons: He failed to cross-examine Mrs. Pringle about her possible bias to protect her husband; he failed to object to testimony from Mrs. Pringle that she spoke with the appellant after her husband had told her about the crimes, thus suggesting that Edward Pringle had implicated the appellant; when Mrs. Pringle had denied any knowledge of the gun or the charged crime, he made reference to a second gun used in another murder, thus leaving the jury with the impression that the appellant had been involved in an uncharged killing; and either he did not have the information about Holmes's identification of Cornelius Pringle in a lineup as the gunman in the Majik Market killing or he had it and failed to use it in cross-examination of Mrs. Pringle in order to show her motive to falsely implicate the appellant and shift the blame from Cornelius Pringle, her brother-in-law. He contends that defense

counsel in the first trial did not have the information about Mrs. Pringle's having received some of the reward money and did not properly cross-examine her in reference to the offer of a reward. Last, he contends that "because it was only after Mr. Bush's first trial that Edward Pringle was prosecuted and tried for the Seven–Eleven slaying and attempted murder of Tony Holmes, Mr. Bush's first attorney could not use this information about his involvement in the crime and his vulnerability to prosecution to cross-examine Mrs. Pringle and demonstrate her bias."

[. . .]

We have reviewed the testimony of Mrs. Pringle and particularly her testimony on cross-examination, and applying the plain error analysis, we do not agree with the appellant's contention that trial counsel was ineffective in his cross-examination. His questions substantially comported with the principal purpose behind the confrontation requirement by challenging the witness's veracity. More specifically, contrary to the assertions of the appellant, the cross-examination did address the possible bias of the witness against the appellant because of a possible desire to protect her husband, and also the possibility that her testimony was motivated by the hope of a reward. We note that Lieutenant Ward testified on cross-examination in this case that, on the day after the crimes, a $30,000 reward was offered for information about the crimes, and that this offer was given wide publicity throughout Montgomery. He also testified that Mrs. Pringle received a portion of the reward money. Thus, the jury had this information in the present trial to evaluate in deciding the weight and credibility to give the witness's testimony. Moreover, the appellant's counsel vigorously argued the particular issue of bias created by the receipt of reward money in his closing summation to the jury. The appellant's contention that trial counsel in the first trial could not have used the information of Edward Pringle's involvement in the crimes and his vulnerability to prosecution in cross-examining Mrs. Pringle is not supported by the record. The cross-examination elicited the information from the witness that her husband, Edward Pringle, had been charged with the same crimes as the appellant. There was certainly evidence before the jury of the involvement of Edward Pringle in the commission of the crimes so that it could judge the possible bias

> of the witness in placing the blame for the killings on the appellant instead of on her husband. Of course, the appellant could have argued the possibility of such bias to the jury. In reference to the contention that the appellant was denied effective assistance of counsel because counsel did not have or did not use the information that Holmes had identified Cornelius Pringle as the gunman at a pretrial lineup to use in his cross-examination of the witness, we note that the jury in the instant case had that information for its consideration in weighing the credibility of Mrs. Pringle as well as that of Holmes. In reference to the remaining contentions that trial counsel was ineffective because he failed to object to testimony from the witness that she spoke with the appellant after her husband had told her about the crimes and because he asked a question concerning a second gun involving an unrelated incidence, we find no merit. We find no ineffectiveness of counsel in his cross-examination of the witness nor in his representation of the appellant. We attach no significance to the appellant's statement in brief that "recent revelations of other key information could have been used to destroy Patricia Pringle's testimony," because these "revelations" are not revealed either in his brief to this court or in the record of the trial.

*Id*. at 127–29.

### D. Review Pursuant to § 2254(d)(1) & (2)

#### 1. Petitioner's Arguments

Petitioner argues the ACCA's decision affirming the admission of Pringle's testimony was contrary to, and unreasonably applied, clearly established federal law in three respects. *First*, Pringle's testimony "did not fall within the firmly-rooted hearsay exception for prior testimony" because it "was not subjected to a constitutionally-sufficient opportunity for cross-examination at the 1981 trial[.]" (Doc. 50 at 106.) In support, he asserts that the constitutional violation—whether *Brady* or ineffective assistance of counsel—which caused the defense to fail to make

use of Holmes's identification of Cornelius Pringle at the first trial "prevented defense counsel from pursuing critical lines of questioning of Mrs. Pringle concerning her bias and motivation to implicate Mr. Bush in order to protect her brother-in-law Cornelius." (*Id*. at 107.) In addition, he contends that the suppression of Pringle's first police statement deprived the defense of the opportunity to further impeach her trial testimony. (*Id*.) Petitioner identifies several areas of inquiry that a constitutionally-sufficient cross-examination would have explored with Pringle based upon these undisclosed (or deficiently and prejudicially overlooked) items of evidence. (Doc. 50 at 111, 115.)

*Second*, Petitioner argues the ACCA unreasonably applied clearly established federal law when it held that Pringle was unavailable and that the State made a good faith effort to locate her before trial. (Doc. 50 at 115–17.) He describes the State's efforts to locate Pringle as unduly dilatory and "half-hearted and ineffective," and he maintains that those efforts were not commensurate with the numerous "procedures" available to it in a good faith effort to find Pringle. (*Id*. at 117.)

*Third*, Petitioner argues that, if Pringle's testimony "did not fall within the 'firmly-rooted' hearsay exception for prior testimony" because of the defense's constitutionally-insufficient cross-examination of Pringle, it "also did not fall within any residual hearsay exception." (Doc. 50 at 118.) He maintains that none of the numerous factors identified by the ACCA as providing sufficient "indicia of reliability" respecting Pringle's testimony "provide any additional 'affirmative reason' for rebutting the presumption of unreliability and implicating the residual hearsay exception should the testimony not satisfy the firmly-rooted hearsay exception for prior testimony." (Doc. 50 at 119.) In particular, he cites Pringle's

"bias and motive to fabricate to protect her brother-in-law" as evidence that her testimony was unreliable for purposes of the residual hearsay exception. (*Id.*)

### 2. Petitioner Cannot Demonstrate Sufficient Prejudice to Warrant Habeas Relief.

Assuming without deciding that admission of Pringle's prior testimony at Petitioner's third trial violated his Confrontation Clause rights, and that the ACCA unreasonably applied clearly established federal law in holding otherwise, it remains that Petitioner is not entitled to habeas corpus relief. Where trial error is alleged, this court may not grant habeas corpus relief if the state court error at issue was harmless. *Brecht*, 507 U.S. at 637. "Confrontation Clause transgressions associated with the improper admission of out-of-court statements" are subject to harmless error review under *Brecht*. *Grossman v. McDonough*, 466 F.3d 1325, 1339 (11th Cir. 2006). Thus, to establish "actual prejudice" under *Brecht*, Petitioner must show that the admission of Pringle's testimony "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

"The actual-prejudice inquiry turns on whether [this court has] 'grave doubt' that the jury" would have convicted Petitioner without admission of Pringle's testimony. *Johnson v. Sec'y, Fla. Dep't of Corr.*, 132 F.4th 1309, 1316 (11th Cir. 2025) (quoting *Davis v. Ayala*, 576 U.S. 257, 268 (2015)). The Supreme Court has identified several factors to consider when assessing whether Confrontation Clause error of the sort alleged here was harmless, including the following: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). *See also Al-Amin v. Warden, Ga. Dep't of Corr.*, 932 F.3d 1291, 1302 (11th Cir. 2019) (quoting *Van Arsdall* factors). Ultimately, "'the erroneous admission of evidence is likely to be harmless under the *Brecht* standard where there is significant corroborating evidence or where other evidence of guilt is overwhelming.'" *Johnson*, 132 F.4th at 1316 (quoting *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012)).

Neither the petition nor Petitioner's brief directly address whether admission of Pringle's prior testimony was harmless under *Brecht*. Some of Petitioner's allegations and argument, however, correspond to the *Van Arsdall* factors bearing on the question of harmlessness. For instance, as to the first *Van Arsdall* factor quoted above—"the importance of the witness' testimony in the prosecution's case"—he alleges as follows:

> It is clear that Patricia Pringle's testimony was instrumental in Mr. Bush's case—it was the only evidence that corroborated his statements to police; the jury specifically asked to examine it during their deliberations; and the trial judge relied on it to find the especially-heinous aggravating factor and to eliminate one of the mitigating circumstances.

(Pet. ¶ 102, doc. 1 at 38; *see also* doc. 50 at 103 (asserting "critical role" of Pringle's testimony).)

Petitioner's argument about the importance of Pringle's testimony inflates the value of her testimony and misreads the record in doing so. As discussed in conjunction with Petitioner's *Brady* claims, Petitioner's statements to police were corroborated by far more than just Pringle's testimony. His statements are replete with details about the Majik Mart and 7-11 robbery/murders that were corroborated by the testimonies of the surviving victim, law enforcement officers, and the forensic

pathologist, among others. While Pringle's testimony indeed corroborated Petitioner's own statement identifying himself as the shooter at both scenes, *Van Arsdall* indicates that "the presence . . . of evidence corroborating . . . the testimony of the witness on material points" is a factor that would tend to render the admission of Pringle's testimony harmless. 475 U.S. at 684. Petitioner's own statement identifying himself as the shooter obviously constitutes powerful evidence corroborating Pringle's testimony.

Petitioner also speculates that Pringle's testimony must have been "instrumental" because the jury requested a transcript of Pringle's testimony during deliberations. Ultimately, though, he places undue emphasis on this circumstance. The most logical explanation for the jury's request to review Pringle's testimony is that the prosecutor specifically told the jury at closing to "[r]ead the transcript of Patricia Pringle's statement sworn under oath." (Doc. 25-2 at 76.) It is most likely that, due to the prosecutor's statement, the jury simply expected to have a copy of the testimony to review during deliberations. After Judge Phelps encouraged the jury to deliberate on her testimony without a copy of the transcript, but invited them to "let him know" if they felt they needed a copy after further deliberations, the jury made no further requests related to Pringle's testimony. The jury's request for the transcript of Pringle's testimony is too thin a reed to support a contention that her testimony was so "important" that its admission substantially and injuriously influenced the jury's guilt phase verdict.

Nor can it be said that there is "grave doubt" whether Petitioner would have been sentenced to death had Pringle's testimony not been admitted. Petitioner argues that the trial court relied upon Pringle's testimony in applying the statutory "heinous, atrocious, or cruel" ("HAC") aggravating factor. But the trial court

explicitly based its application of the HAC aggravator "upon the evidence at trial that Larry Dominguez had already been shot and was stumbling or staggering out of the restroom when the Defendant shot him again. . . . The court finds from the evidence presented that William Bush deliberately shot Larry Dominguez in the head in a calculated fashion to avoid later identification after the victim had already been critically wounded." (Doc. 25-39 at 6.) So, Dominguez's murder was "heinous, atrocious, or cruel" because he survived the first shooting only to be shot again as he staggered out of the bathroom in which both he and Holmes had been shot. (*See* doc. 25-3 at 116 ("[T]he Court found that this second shot after he had already been rendered, in effect, helpless, was extremely wicked, cruel or shockingly evil within the purview of the law.").

Furthermore, to the extent Judge Phelps may have predicated his application of the HAC aggravator on his finding that Petitioner shot Dominguez "to avoid later identification[,]" this finding is not inconsistent with Petitioner's own statement that he shot the victims to prevent them from reporting his crimes so that he could escape. (*See* doc. 25-31 at 103 ("I wasn't thinking about the witnesses, just to keep them from getting to a phone and trying to get away.").) Thus, Pringle's testimony, alone, was not the basis for Judge Phelps's application of the HAC aggravating circumstance.

Even if it were, however, it does not follow that admission of Pringle's testimony "substantially and injuriously" influenced Petitioner's sentence. As the ACCA found on direct appeal, "the trial court rendered the sentence of death with its consideration of this aggravating circumstance and, in the alternative, without consideration of this circumstance[,]" *i.e.*, "even without the inclusion of the aggravating circumstance that the crime was especially heinous atrocious, or cruel

compared to other capital offenses, the remaining aggravating circumstances outweighed the mitigating circumstances." *Bush*, 695 So. 2d at 84 (internal quotation marks omitted). (*See also* doc. 25-3 at 117 ("I've weighed the aggravating circumstances against the mitigating circumstances. The Court has done so without heinous, atrocious, and cruel. . . . [E]ven without the heinous, atrocious, and cruel, the Court has found and does hereby find that the aggravating circumstances outweigh the mitigating circumstances.").) Thus, Petitioner's contention that Pringle's testimony was "important" because it was the basis for application of the HAC aggravating circumstance both misreads the record and fails to establish any "grave doubt" whether he would have been sentenced to death absent Pringle's testimony.

The remaining *Van Arsdall* factors do not support a finding that admission of Pringle's testimony "substantially and injuriously" influenced the jury's verdict. As discussed above, Pringle's testimony, the crux of which was Petitioner's confession to her that he shot all victims at both convenience stores, was cumulative of, and corroborated by, Petitioner's own confession. There is no reason to believe that the jury would not have credited Petitioner's admission of his actions, which jurors heard in his own voice in two recorded statements (Doc. 25-2 at 40, 48), had Pringle's corroborating testimony not been admitted. This is especially so considering that, as discussed previously, the defense effectively impeached Pringle's testimony by showing that she likely lied about her knowledge of a reward offered in the case, was interested in receiving a reward, and that she did, in fact, later receive a share of the reward. Lastly, due to Petitioner's confession and the numerous points of evidence corroborating that confession, the prosecution's case overall was strong even without Pringle's testimony. *Van Arsdall*, 475 U.S. at 684.

Accordingly, on balance, the *Van Arsdall* factors support a finding that admission of Pringle's testimony was harmless.

In *Mason v. Allen*, 605 F.3d 1114, 1122 (11th Cir. 2010), the Eleventh Circuit addressed a claim of Confrontation Clause error in which a law enforcement officer "testified that [an] informant told him that Mason committed the murder, and that Mason was 'out of control' and 'out to make a name for himself.'" In guilt phase closing argument, the prosecutor told the jury that the informant's hearsay statements were admissible as a matter of law and that the jury "must simply take" the statements as such. *Id*. The prosecutor further bolstered the informant's unconfronted hearsay statements, arguing that the informant "is obviously known to this defendant, perhaps even a close friend of this defendant[.]" *Id*. (internal quotation marks omitted). The prosecutor also emphasized the informant's unconfronted statements in penalty phase closing arguments. *Id*. Applying *Roberts*, the Eleventh Circuit determined that Mason's Confrontation Clause rights were violated. *Id*. at 1123. Nevertheless, the Court of Appeals held that, applying the *Van Arsdall* factors, the error was harmless under *Brecht*:

> Under this standard, Mason cannot show the prejudice required in order to reverse his conviction. Mason confessed to the murder shortly after being arrested, and the murder weapon was found in his car. Mason's confession was thorough and described in detail the murder scene found by the officers. When viewed in light of the overall strength of the prosecution's case and the presence of corroborating evidence, we cannot say that there was "more than a reasonable possibility that the [Confrontation Clause] error contributed to the [conviction]."

*Id*. at 1124 (quoting *Horsley v. State of Ala*., 45 F.3d 1486, 1493 (11th Cir. 2010)).

So too here. Petitioner cannot show the requisite prejudice under *Brecht*. He confessed to the murders shortly after his arrest. He led police to the murder weapon, which he had stashed in a neighbor's home. His confession described, in exacting detail in some instances, numerous circumstances of the convenience store robbery/murders that were borne out by the trial evidence. Although this court does not here opine that admission of Pringle's statement violated Petitioner's Confrontation Clause rights, or that the ACCA's decision finding no Confrontation Clause error unreasonably applied clearly established federal law, considering the "overall strength of the prosecution's case and the presence of corroborating evidence," *Mason*, 605 F.3d at 1124, this court can confidently conclude that any Confrontation Clause error was harmless under *Brecht*. Accordingly, Petitioner's claim that he is entitled to habeas corpus relief because his Confrontation Clause rights were violated is due to be denied.

## IV. Claim D – The Trial Court's Override of the Jury's Life Recommendation was Arbitrary and Unreliable

### A. Petitioner's Allegations

Petitioner alleges "[t]he trial court's override of the jury's unanimous sentencing verdict and imposition of a death sentence in this case was arbitrary, capricious, discriminatory, and fundamentally unfair, and denied Mr. Bush a fair and reliable sentencing governed by due process." (Pet. ¶ 104, doc. 1 at 39.) He asserts the trial court "provided no meaningful explanation for its rejection of the jury's unanimous life without-parole verdict so as to deny the appellate courts and Mr. Bush any avenue for rational review." (Pet. ¶ 105, doc. 1 at 39.) He claims "the trial court failed to in any way explain why aggravation outweighed mitigation in Mr. Bush's case, or why the jury's considered determination on this same issue and

12-0 resolution to the contrary was improvident." (*Id*., doc. 1 at 40.) He maintains that the trial court failed to take account of the introduction of new mitigating evidence at the third trial, which had not been presented at the first two trials, and which was "duly considered and unanimously credited by the jury[.]" (*Id*.) He further alleges the trial court's override "reflected improper consideration of non-enumerated factors[,]" including that the same trial court had twice previously sentenced Bush to death, Bush's counsel and the trial court "had a particularly tempestuous and ugly relationship[,]" and, given that state court judges in Alabama are popularly elected, the intrusion of the trial court's political calculations in its sentencing decision. (Pet. ¶ 106, doc. 1 at 40–41.)

In addition to the foregoing, Petitioner alleges the "authority to override" previously found in Alabama law[43] "fails to reflect the evolved standards of decency of today's society" because it lacked "adequate standards or safeguards to guide the trial court, thus resulting in inconsistent, unconstitutional applications, functionally unreviewable override decisions, and unequal treatment, all of which occurred in this case." (Pet. ¶ 107, doc. 1 at 41.)

Petitioner also claims his death sentence violates his Fifth and Sixth Amendment rights because "the jury did not make the factfinding necessary for a death sentence to be imposed in this case. Based upon the jury's unanimous life verdict, Mr. Bush should have been sentenced to life in prison without parole." (Pet. ¶ 108, doc. 1 at 41.)

[43] In 2017, the Alabama legislature abolished judicial override. *See* Ala. Code § 13A-5-47(a). The legislature did not make the abolition of judicial override retroactive.

Finally, Petitioner alleges his "Fifth Amendment rights also have been violated under the facts and circumstances of this case[,]" because judicial overrides in Alabama disproportionately result in death sentences. (Pet. ¶ 109, doc. 1 at 41–42.) "This disproportionate treatment of overrides in Alabama has the practical effect of unconstitutionally subjecting a capital defendant to 'be[ing] twice put in jeopardy of life or limb.'" (*Id.* (quoting U.S. Const. Amend. V).)

**B. Clearly Established Federal Law**

Petitioner's claim challenging judicial override draws upon disparate constitutional provisions, including the Fifth, Sixth, Eighth, and Fourteenth Amendments, and Supreme Court decisions interpreting those provisions. (Pet. ¶ 110, doc. 1 at 42.) At the core of his claim is his contention that judicial override resulted in a sentence of death that violated the Eighth and Fourteenth Amendments because it was "arbitrary, capricious, discriminatory, and fundamentally unfair," and therefore denied him "a fair and reliable sentencing governed by due process." (Pet. ¶ 104, doc. 1 at 39.) In *Furman v. Georgia*, 408 U.S. 238, 239–40 (1972), the Supreme Court invalidated state-court-imposed death sentences it held were in violation of the Eighth and Fourteenth Amendments due to the affected states' standardless capital sentencing schemes. The decision effectively imposed a moratorium on capital punishment as states formulated legislative responses to the Court's decision. *Baze v. Rees*, 553 U.S. 35, 88 (2008) (Scalia, J., concurring).

As recognized four years after *Furman*, in *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), the holding of *Furman* is that, because "death is different in kind from any other punishment," "it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious

manner." *See also id*. at 199 ("*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant."). In short, *Furman* and its progeny "mandate[] that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id*. at 189. Accordingly, clearly established federal law holds that the Eighth and Fourteenth Amendments require individualized sentencing and forbid capital sentencing schemes which allow for the arbitrary and capricious imposition of capital sentences.

As to Petitioner's claim that his Fifth and Sixth Amendment rights were violated because "the jury did not make the factfinding necessary for a death sentence to be imposed in this case[,]" (Pet. ¶ 108, doc. 1 at 41), in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that the Fifth Amendment's Due Process Clause and the Sixth Amendment's notice and jury trial guarantees, both applicable to the states via the Fourteenth Amendment, require that "'any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'" 530 U.S. at 476 (quoting *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999)). In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court applied this rule to invalidate a state capital sentencing scheme in which the trial court, alone, was vested with the authority to find the existence of aggravating factors necessary to sentence a defendant to death under state law. *Apprendi* and *Ring* therefore clearly

establish that all facts necessary to impose a sentence of death must be found by a jury.[44]

Finally, although Petitioner argues Alabama's judicial override procedure violated his rights under the Fifth and Fourteenth Amendments because it had the "practical effect of unconstitutionally subjecting" him to "be[ing] twice put in jeopardy of life or limb," (Pet. ¶ 109 (quotation omitted), doc. 1 at 42), he cites no decision of the United States Supreme Court holding that a capital sentencing scheme in which a jury renders an advisory sentencing recommendation followed by judicial sentencing violates the double jeopardy rights of the defendant.[45]

### C. State Court Proceedings

On direct appeal to the ACCA, Petitioner argued the Alabama statute permitting judicial override was, "on its face and as it was applied to the facts of this case," unconstitutional. (Doc. 25-16 at 61.) He challenged the lack of adequate standards to channel the sentencing judge's discretion, stating that, among the few states which permit judicial override of a jury's sentencing recommendation, "*only*

---

[44] Both *Apprendi* and *Ring* were decided after Petitioner's conviction became final on direct review. Neither decision applies retroactively to cases on collateral review. *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004) (holding *Ring* does not apply retroactively); *Blakely v. Washington*, 542 U.S. 296, 324 (2004) (O'Connor, J., dissenting) (citing *Schriro*'s holding regarding *Ring*'s non-retroactivity as indicating, "*a fortiori*," that *Apprendi* also does not apply retroactively).

[45] Petitioner's authority for his double jeopardy claim appears to be Justice Stevens's dissent in *Harris v. Alabama*, 513 U.S. 504, 520 (1995), in which Justice Stevens opined that the "practical effect" of Alabama's judicial override system was that "[a] prosecutor who loses before the jury gets a second, fresh opportunity to secure a death sentence." (Pet. ¶ 109, doc. 1 at 41–42; doc. 50 at 127.)

Alabama permits a trial judge to impose a death sentence without any guidelines for weighing and considering the jury's decision." (*Id*. at 62 (emphasis in original).)[46] He faulted the trial court's sentencing order for failing to give any reason "as to why aggravation outweighed mitigation in Mr. Bush's case or why the jury's determination on the same issue was incorrect." (*Id*. at 65.) He maintained that, applying a proper narrowing standard to "circumscribe the trial court's decisionmaking," like Florida's "*Tedder* standard," "no reasonable person could disagree" with the jury's unanimous life recommendation. (*Id*. at 66.)

Petitioner also argued that, irrespective of its facial unconstitutionality, Alabama's statute permitting override was unconstitutional as it was applied to him because the trial court unconstitutionally applied the HAC aggravator, disregarded the mitigating evidence he presented, "and considered inadmissible evidence about Mr. Bush's juvenile record and his unwarned, uncounseled presentence interview statements." (Doc. 25-16 at 67.)

The ACCA rejected Petitioner's challenge to judicial override, citing, *inter alia*, the intervening decision in *Harris v. Alabama*, 513 U.S. 504 (1995), in which the Supreme Court held that Alabama's judicial override statute did not violate the Eighth Amendment. *Bush*, 695 So. 2d at 93. The ACCA addressed the

---

[46] Petitioner cited and discussed in his appellate brief the Florida Supreme Court's adoption of a standard limiting the trial judge's discretion to override a jury's sentencing recommendation in *Tedder v. State*, 322 So. 2d 880, 910 (Fla. 1975). (Doc. 25-16 at 62–63.) Florida's "*Tedder* standard" required that, for a trial judge to override a jury's recommendation of a life sentence, "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." *Tedder*, 322 So. 2d at 910.

constitutionality of Alabama's override procedure, and Petitioner's argument that adoption of a "*Tedder*-like" standard was constitutionally necessary, as follows:

> Section 13A–5–47(e) prescribes the following standard of review for jury override, which standard meets constitutional requirements: "The whole catalog of aggravating circumstances must outweigh mitigating circumstances before a trial court may opt to impose the death penalty by overriding the jury's recommendation." *Ex parte Jones*, 456 So. 2d [380, 382 (Ala. 1984)]. The appellant's argument that the Alabama Death Penalty Act permits a trial court to impose a death sentence without any standards to guide its discretion is simply not true and ignores the requirements of the override provision.
>
> The appellant argues that we should follow the Florida standard for jury override prescribed in *Tedder v. State*, 322 So. 2d 908 (Fla. 1975). *Tedder* provides that, in order for a trial court to reject a jury's recommendation of a sentence of life imprisonment without parole, "the facts suggesting a sentence of death [must be] so clear and convincing that virtually no reasonable person could differ." *Id*. at 910. The *Tedder* standard is not constitutionally mandated, *Harris v. Alabama*; *Ex parte Jones*, and we have chosen not to read the *Tedder* standard into our death penalty statute.
>
> What we do require is that, before sentencing a defendant to death, the trial court consider all the available evidence; hear arguments on aggravating and mitigating circumstances; enter written findings of fact summarizing the crime and the defendant's participation in it; make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A–5–49, each mitigating circumstance enumerated in § 13A–5–51, and any additional mitigating circumstance offered pursuant to § 13A–5–52; consider and weigh the advisory verdict of the jury; consider and weigh the presentence investigation report; consider and weigh the mitigating and aggravating circumstances; and determine that the aggravating circumstances outweigh the mitigating circumstances. We believe that this scheme adequately channels the trial court's discretion so as to prevent arbitrary results. The Eighth Amendment does not require the

> state to define the weight the sentencing judge must accord an advisory verdict. *Harris v. Alabama*.
>
> > "[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. *Murry v. State*, 455 So. 2d 53 (Ala. Cr. App. 1983), *rev'd on other grounds*, 455 So. 2d 72 (Ala. 1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. *Moore v. Balkcom*, 716 F.2d 1511 (11th Cir. 1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation."
>
> *Clisby v. State*, 456 So. 2d 99, 102 (Ala. Cr. App. 1983). We are convinced, after reviewing the record in this case, that the trial court complied with the sentencing scheme of Alabama's death penalty statute and that the sentence that it imposed, overriding the jury's verdict, met constitutional requirements and was not arbitrary, discriminatory, or fundamentally unfair.

*Bush*, 695 So. 2d at 93–94.

### D. Review Pursuant to § 2254(d)(1) & (2)

#### 1. Petitioner's arguments

Petitioner asserts the trial court's override, "and its affirmance by the Court of Criminal Appeals, was unreasonable and contrary to clearly established Federal law, which requires non-arbitrary application of State capital punishment

procedures." (Doc. 50 at 120.) His briefing, however, fails to engage with the ACCA's reasoning in its opinion—there is not a single citation of the ACCA's opinion throughout the brief's approximately nine pages of argument on this claim—to show precisely how the ACCA unreasonably applied clearly established federal law. Instead, he cites the following as "reasons illustrating the Circuit Court's override of the jury's recommendation was arbitrary and unconstitutional": Judge Phelps ignored evidence about Petitioner's drug-induced impairment; Judge Phelps failed to clarify his finding that aggravating circumstances outweighed mitigating circumstances; Judge Phelps's supposedly "tempestuous" relationship with defense counsel; and Alabama's partisan elections for trial judges. (*Id*. at 120–23; *id*. n.34.[47]) He briefly tosses in the *Apprendi* and *Ring* Fifth and Sixth argument without acknowledging the non-retroactivity of those decisions. (*Id*. at 124.) He claims that override "fails to reflect the evolved standards of decency of today's society[,]" but fails to cite any Supreme Court decision holding as much. (*Id*.) He then discusses judicial and academic criticism of Alabama's judicial override, citing, *inter alia*, a dissenting opinion in *Harris*, a dissent from the denial of certiorari in *Woodward v. Alabama*, 571 U.S. 1045 (2013), a report authored by the Equal Justice Initiative, a law review article, and some concurring opinions in a Florida state court decision. (*Id*. at 124–26.) How any of this "criticism" is supposed to demonstrate that the ACCA unreasonably applied clearly established federal law in 1995 is left unexplained.

### 2. The ACCA did not unreasonably apply clearly established federal law.

[47] Several of these arguments were not presented to the ACCA in Petitioner's facial and as-applied challenge to Alabama's judicial override on direct appeal. (Doc. 25-16 at 60–67.)

Although he acknowledges the existence of the Supreme Court's *Harris* opinion—multiple times he cites the dissent in *Harris*—Petitioner fails to concede that *Harris* disposes of his Eighth Amendment challenge to Alabama's judicial override, especially in the framework of AEDPA review. In *Harris*, the Supreme Court held that the Eighth Amendment does not require a sentencing judge to "ascribe any particular weight to the verdict of an advisory jury." *Harris*, 513 U.S. at 509, 514–15. The Court found as follows: "Consistent with established constitutional law, Alabama has chosen to guide the sentencing decision by requiring the jury and judge to weigh aggravating and mitigating circumstances." *Id*. at 511. Thus, Alabama was not required, as Petitioner argued on direct appeal to the ACCA, to adopt a "*Tedder*-like" standard to channel trial judges' "discretion so as to prevent arbitrary results." *Id*.

*Harris* was good law in 1995, when both it and the ACCA's opinion affirming Petitioner's conviction and sentence were issued, and it has not been overruled by the Supreme Court since. *See Miller v. Comm'r, Ala. Dep't of Corr*., 826 F. App'x 743, 749 (11th Cir. 2020) ("Given *Harris*, which remains binding precedent, we cannot hold that Alabama's use of an advisory jury to recommend punishment in Mr. Miller's case was unconstitutional."). Only the Supreme Court is empowered to determine that "evolving standards of decency" now require the overruling of *Harris*. Accordingly, Petitioner's Eighth Amendment challenge to Alabama's judicial override is foreclosed, and the ACCA's decision affirming his sentence could not have unreasonably applied clearly established federal law.

Petitioner's Fifth and Sixth Amendment challenges to judicial override also fail. *First*, it does not appear that he presented these challenges to the ACCA. Thus, the ACCA could not have unreasonably applied clearly established federal law in

failing to address claims that were not presented to it. *Second*, as discussed previously, his Fifth and Sixth Amendment claim respecting the absence of constitutionally-required jury factfinding is dependent upon Supreme Court authorities, *Apprendi* and *Ring*, which are not retroactively applicable to his case. *Third*, even if those decisions were retroactively applicable, his claim is without merit.

In *Lee*, the Eleventh Circuit held that, where a jury in Alabama has convicted a defendant of capital murder during a robbery, the jury's guilt-phase verdict "necessarily includes" a positive finding of the existence of the statutory aggravating circumstance that "'the capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit . . . robbery[.]'" 726 F.3d at 1197–98 (quoting Ala. Code § 13A-5-49(4)). The Eleventh Circuit in *Lee* concluded that "[n]othing in *Ring*—or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict." *Id*. at 1198. Thus, where the jury's guilt-phase verdict includes all factfinding necessary to impose a death sentence, the Sixth Amendment is not violated. *Id*. Petitioner was convicted of capital murder occurring during a robbery. *Bush*, 695 So. 2d at 80. Hence, the jury's verdict implicitly included a finding that the robbery-murder aggravating circumstance was present. That is all the jury fact-finding required by the Constitution to support Petitioner's death sentence.

As for Petitioner's claim that judicial override violates his Fifth and Fourteenth Amendment double jeopardy rights, he did not present such claim to the ACCA when he challenged his sentence in that court and, in any event, he cites no clearly established federal law holding that Alabama's judicial override violates double jeopardy protections in the Constitution.

Lastly, to the extent Petitioner intends any Fourteenth Amendment due process challenge to judicial override, he fails to demonstrate any error. Judge Phelps's sentencing order explains in detail which aggravating circumstances, in addition to the one implicit in the jury's guilt phase verdict, he found supported by the evidence. (Doc. 25-39 at 5–7.) The order also presents Judge Phelps's findings respecting statutory and nonstatutory mitigating circumstances, including his finding that the jury's unanimous advisory vote constitutes a mitigating circumstance. (*Id.* at 7–8.) Petitioner complains that Judge Phelps failed to explain his judgment that the aggravating circumstances outweigh the mitigating circumstances and that consequently meaningful appellate review is impossible. (Doc. 50 at 122–23.) As the ACCA found on direct appeal, however, Judge Phelps's order comported with Alabama law and with the requirements of the Constitution. *Bush*, 695 So. 2d at 94. The ACCA did not unreasonably apply clearly established federal law in dispensing with any Fourteenth Amendment due process claim. *See Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1336 (11th Cir. 2012) (citing *Harris*, 513 U.S. 504) (rejecting claim that "Alabama's judicial override scheme violates . . . the Due Process Clause of the Fourteenth Amendment").

In sum, Petitioner fails to show that the ACCA unreasonably applied clearly established federal law when it rejected his claim that Alabama's judicial override was unconstitutional both on its face and as applied to him. What he has presented here is a series of fragmented arguments that largely were not presented to the ACCA, are redundant of other claims in his petition, and, in any event, fail to demonstrate error on the part of the ACCA. Accordingly, this claim is due to be denied.

## V. Claim E – Alabama is Precluded From Executing Petitioner

Petitioner alleges that his "cognitive and adaptive deficits are such that he cannot be subject to execution" pursuant to the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002). (Pet. ¶¶ 111–14, doc. 1 at 42–44.) By separate order (doc. 59 at 35–36), this court found that the ACCA's decision rejecting Petitioner's *Atkins* claim in his Rule 32 appeal was based upon an objectively unreasonable determination of the facts pursuant to § 2254(d)(2). Petitioner was afforded a federal court evidentiary hearing on his *Atkins* claim and the court will address the merits of his claim *de novo* by separate order.

## VI. Claim F – The Trial Court Refused to Consider Mitigating Evidence

### A. Petitioner's Allegations

Petitioner alleges his "custodial statements . . . provided un-contradicted evidence that he was significantly impaired and disturbed at the time Mr. Dominguez was shot, as a consequence of [his] use of narcotic drugs." (Pet. ¶ 118, doc. 1 at 45–46.) He contends his statements both attribute his actions to the effects of drugs he consumed and cite his need for money to buy additional drugs as the impetus for the robberies. (*Id.*) "Despite this un-contradicted evidence of drug intoxication," he asserts, "Judge Phelps failed to even consider it in determining whether to find a statutory or non-statutory mitigating circumstance." (Pet. ¶ 119, doc. 1 at 46.) Specifically, Petitioner faults the trial court for failing to conclude that his intoxication established two statutory mitigating circumstances: that his "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired"; and that the crime was

committed while he "was under the influence of extreme mental or emotional disturbance." (*Id*. (quoting Ala. Code § 13A-5-51(2) & (6)).)

Petitioner also alleges that it was "even more flagrant and prejudicial error" for Judge Phelps to refuse to "give any consideration to [his] narcotics intoxication as *non-statutory* mitigating evidence[.]" (Pet. ¶ 121, doc. 1 at 47 (emphasis Petitioner's).) He maintains that evidence of his drug intoxication was plainly mitigating evidence that the trial court was constitutionally required to afford full consideration and due weight in its sentencing determination. (*Id*.)

**B. Clearly Established Federal Law**

The petition cites *Hitchcock v. Dugger*, 481 U.S. 393, 398–99 (1987), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), in support of Petitioner's contention that "[i]t was the duty of the trial court not only to allow Mr. Bush to present mitigating evidence, but also to give full consideration and weight to all the mitigating evidence presented on behalf of Mr. Bush, including evidence which did not fit within a statutory mitigating circumstance." (Pet. ¶ 122, doc. 1 at 47.) *Eddings* involved a sixteen-year-old offender who pleaded *nolo contendere* to a first-degree murder charge based upon his shooting of a law enforcement officer. 455 U.S. at 106. "In mitigation, Eddings presented substantial evidence at the [sentencing] hearing of his troubled youth." *Id*. at 107. This included evidence about Eddings's parents' lack of guidance and their inability to control his behavior, that Eddings was subject to "excessive physical punishment," "that Eddings was emotionally disturbed in general and at the time of the crime, and that his mental and emotional development were at a level several years below his age." *Id*. Mental health professionals also testified about Eddings's amenability to treatment for his mental conditions and

described his potential to be rehabilitated, including to the point that he would not pose a danger to society. *Id*. at 107–08.

In sentencing Eddings to death, the trial court found that three aggravating circumstances were present and that only Eddings's age was a mitigating factor in his punishment. 455 U.S. at 108. The trial court appeared to believe that it was precluded by law from considering Eddings's background evidence as mitigating: "Nor can the Court in following the law, in my opinion, consider the fact of this young man's violent background." *Id*. at 109 (internal quotations omitted) (emphasis removed).

The Supreme Court in *Eddings* applied its earlier holding in *Lockett v. Ohio*, 438 U.S. 586 (1978), which established that "'the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 604). The Court emphasized that the Oklahoma trial court's fundamental misunderstanding of the law caused it to refuse to even consider whether Eddings's compelling background evidence was mitigating. *Id*. at 113 (finding, "it is clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that *as a matter of law* he was unable even to consider the evidence") (emphasis in *Eddings*).

The rule of *Eddings* is straightforward: "Just as the State may not by statute preclude the sentencer from considering any mitigating factor [as happened in *Lockett*], neither may the sentencer refuse to consider, *as a matter of law*, any

relevant mitigating evidence." 455 U.S. at 113–14 (emphasis in *Eddings*). While the sentencer, and an appellate court on review, "may determine the weight to be given relevant mitigating evidence[,] . . . "they may not give it no weight by excluding such evidence from their consideration." *Id*. at 114–15.

*Hitchcock*, also cited in the petition, applied the rule of *Eddings* to invalidate a Florida state court death sentence because "the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances" relating to the defendant's troubled background and capacity for rehabilitation. 481 U.S. at 398–99. *Hitchcock* articulates the clearly established federal law flowing from this line of cases as follows: "[I]n capital cases, the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." *Id.* at 394 (citations and internal quotation marks omitted)

### C. State Court Proceedings

Petitioner's recorded custodial statements, admitted in full at his trial, include multiple self-reports of his drug use the night of the murders. In his first statement, he was asked why he shot Adams at the 7-11. He responded, "I was nervous, I was out of my head, but I remember shooting up man some bam, you know bam." (Doc. 25-31 at 77.) He explained that "bam" is "speed" and that he and Pringle "shot" "bam" right before they set out to do the robbery at the Majik Mart. (*Id.*) He also stated, "see really, I'm just starting in this, shooting dope, I ain't been no dope shooter, I just started in this dope." (*Id.*) He later stated that the need to get money for more drugs motivated his and Pringle's decision to rob the Majik Mart. (*Id*. at 83.) His second statement was consistent with the first statement regarding his use

of drugs that night. (Doc. 25-31 at 97, 99.) At the conclusion of the second statement, the following exchange occurred:

> Q: William, I'm going to ask you one more time why did you shoot the people at these two stores?
>
> A: Like I say, I was on drugs I'm messed up. I ain't never did nothing like this before. Not rob or shoot nobody.
>
> Q: Now I would like for you to be as honest with me as you can for the reason for shooting these three subjects. Did you in fact shoot these three subjects where there would be no witnesses left to the crime?
>
> A: I wasn't thinking about witnesses, just to keep them from getting to a phone and me trying to get away.
>
> Q: You was trying to do what?
>
> A: Keep them from getting to a phone so I could get away.

(Doc. 25-31 at 103.)

The defense did not present any guilt phase defense based upon Petitioner's intoxication or drug abuse. Nor did the defense present any evidence or witness testimony about Petitioner's intoxication or drug abuse in the penalty phase of trial. Nevertheless, defense counsel argued in closing at the penalty phase that Petitioner's statements evidence drug usage that satisfied the statutory mitigating circumstance that Petitioner was "under mental or emotional disturbance or distress, or something like that." (Doc. 25-3 at 20.)

In his sentencing order, Judge Phelps found as follows: "The Defendant contends in a written statement that he was under the influence of narcotics at the time of the capital offense. The Court does not find from the evidence that the

Defendant was under the influence of extreme mental or emotional disturbance." (Doc. 25-39 at 7.) Judge Phelps further found that Petitioner's capacity to "appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired." (*Id*. at 8.) Although Judge Phelps found some nonstatutory mitigating circumstances in his order (*id*.), he did not find that Petitioner's evidence of intoxication constituted nonstatutory mitigating evidence.

On direct appeal to the ACCA, Petitioner argued that Judge Phelps "failed to consider" his "uncontradicted evidence that [he] was significantly impaired and disturbed at the time Mr. Dominguez was shot as a consequence of his use of narcotic drugs shortly before the killing[.]" (Doc. 25-16 at 49.) He argued that his statements regarding his intoxication established two statutory mitigating circumstances: that his "capacity . . . to appreciate the criminality of his conduct or to conform his conduct was substantially impaired" and "that the crime was committed while the defendant was under the influence of extreme mental or emotional disturbance." (*Id*. at 50–51.) While he acknowledged that Judge Phelps at least addressed evidence of his drug use in his finding regarding the "extreme mental or emotional disturbance" statutory mitigator, he maintained that, because Judge Phelps "did not address obviously relevant evidence of Mr. Bush's narcotics intoxication in refusing to apply the 'substantial impairment' mitigating circumstance," the ACCA was required to "presume that [Judge Phelps] failed to consider such evidence in making this determination." (*Id*. at 52.)

In addition to the foregoing, Petitioner argued to the ACCA that Judge Phelps unconstitutionally erred in refusing "to give any consideration to William Bush's narcotics intoxication as nonstatutory mitigating evidence, even if he did not believe

it severe enough to rise to the level of the statutory mitigating circumstance of 'substantial impairment.'" (Doc. 25-16 at 53.) He asserted that Judge Phelps's failure to mention evidence of Petitioner's intoxication in the portion of the sentencing order addressing nonstatutory mitigating evidence compels the conclusion that such evidence was not considered by Judge Phelps. (*Id*. at 53–54.)

The ACCA rejected Petitioner's claim. After discussing *Eddings* and other authorities outlining constitutional requirements relating to mitigating evidence at sentencing, the ACCA found as follows:

> In more specific regard to the appellant's argument that the trial court refused and/or failed to consider as a mitigation that he was "significantly impaired and disturbed" at the time of the commission of the charged offense because of his use of "mind-altering" drugs, we do not agree that the trial court refused or failed to consider the possibility that the appellant was using drugs at the time he committed the offense. The sentencing order shows that the trial court considered the appellant's contention that he was under the influence of narcotics at the time of the offense. From the trial court's findings that the appellant was not under the influence of extreme mental or emotional disturbance at the time of the commission of the offense, that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired, and that he knew "full well what he was doing and [that] what he was doing was wrong," it is obvious that the trial court considered the appellant's alleged use of drugs at the time of the offense and found that the evidence did not support a finding that it constituted a mitigating circumstance. We agree with this finding. The confessions of the appellant clearly show that he knew what he was doing and that he knew that it was wrong. Even assuming as true his allegations of his "shooting up" a "couple" of times that night on "speed" or "bam," the evidence was insufficient to show that he was so intoxicated or affected by the drugs that he was incapable of appreciating and controlling his conduct. He indicated that he was not a regular drug user. His rendition of the events of that evening is clear and concise. Moreover, he did not

> give drugs as the reason for the shootings. His reasons were to eliminate the possibility of witnesses and to "try to keep them from getting to a phone so [the appellant] could get away."

*Bush*, 695 So. 2d at 89–90.

### D. Review Pursuant to § 2254(d)(1) & (2)

#### 1. Petitioner's Arguments

In his brief, Petitioner argues the ACCA's rejection of his claim that evidence of his intoxication established the two statutory mitigating circumstances discussed above "was based upon 'erroneous factual findings directly contradicted by the record and a record that was insufficient to support its conclusions.'" (Doc. 50 at 134 (quoting *Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1319 (11th Cir. 2013)).) Primarily, he contends the ACCA's explanation that Petitioner claimed to have shot the victims to keep them from getting to a phone, rather than because of his intoxication, "was unreasonable based on the facts in the record as a whole[,]" because Petitioner plainly attributed the shooting to the effects of "bam," and an "instinctual desire to escape is not inconsistent with substantial impairment[.]" (*Id.* at 135.) He therefore asserts that the ACCA's decision regarding the statutory mitigating circumstances "was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

Petitioner also argues that the ACCA's decision affirming the trial court's failure to cite his drug use as a nonstatutory mitigating circumstance likewise runs afoul of § 2254(d)(2). He asserts that "[e]vidence of drug use prior to the offense, in particular, is probative of the existence of a nonstatutory mitigating circumstance." (Doc. 50 at 138 (citing *Parker v. Dugger*, 498 U.S. 308, 318–23

(1991)).) He contends the ACCA's failure "to make any determination of whether the Circuit Court's rejection of Mr. Bush's intoxication evidence was a nonstatutory circumstance was supported by the evidence" "was unreasonable and not fairly supported by the record as a whole." (*Id*. at 138–39.)

### 2. Analysis pursuant to § 2254(d)(1) & (2)

At the outset, it is important to identify and distinguish Petitioner's claim and his supporting arguments. As reviewed above, the petition appears to allege that the ACCA unreasonably applied clearly established federal law when it rejected Petitioner's claim that Judge Phelps refused to consider evidence of Petitioner's narcotics intoxication when evaluating one statutory mitigating circumstance and as nonstatutory mitigating evidence. (Pet. ¶¶ 120–22, doc. 1 at 47.) He even alleges that the "trial and appellate courts' failure to consider the undisputed mitigating evidence of Mr. Bush's narcotics intoxication . . . 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law[.]" (Pet. ¶ 124, doc. 1 at 48 (quoting § 2254(d)(1)).) Yet, as also reviewed above, Petitioner's argument in support of this claim in his brief appears to focus on the state courts' purported unreasonable determinations of fact pursuant to § 2254(d)(2). (*See* doc. 50 at 131–39 (two subheadings of argument invoking only § 2254(d)(2)).) Of course, Petitioner may not amend his petition in his merits brief, and, where the two are in conflict, the petition controls. Nevertheless, because the petition also cites § 2254(d)(2) (*see* Pet. ¶ 124, doc. 1 at 48), out of an abundance of caution, this court will address Petitioner's claims and argument under both provisions of § 2254(d).

Any claim that the ACCA unreasonably applied clearly established federal law pursuant to § 2254(d)(1) is without merit. The record before the ACCA demonstrates that both the trial court and the ACCA understood that evidence of Petitioner's intoxication was cognizable as potential mitigating evidence. There is nothing in the record showing that, as in *Eddings* or *Hitchcock*, the trial court and the ACCA refused to consider, or believed they were precluded by law from considering, whether Petitioner's evidence of drug intoxication was mitigating, whether as to statutory or nonstatutory mitigating circumstances. Indeed, as discussed by the ACCA, the trial court expressly considered the evidence in relation to the lone statutory mitigating circumstance for which the defense had argued it was applicable at the penalty phase. *See Bush*, 695 So. 2d at 90.

The record therefore shows that the state courts received the evidence, without imposing any limitation on Petitioner's ability to offer such evidence, considered the evidence, and simply found that it was insufficient to establish any statutory or nonstatutory mitigating circumstances. *See Bush*, 695 So. 2d at 90 ("[W]e do not agree that the trial court refused or failed to consider the possibility that the appellant was using drugs at the time he committed the offense. [. . .] [I]t is obvious that the trial court considered the appellant's alleged use of drugs at the time of the offense and found that the evidence did not support a finding that it constituted a mitigating circumstance. We agree with the finding."). The ACCA's decision affirming the trial court is therefore consistent with *Eddings*. *See* 455 U.S. at 113 (finding that the trial judge's statement that "he could not 'consider the fact of this young man's violent background'" made clear "that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact"). Unlike in *Eddings* and *Hitchcock*, Judge Phelps and the ACCA did not believe themselves to be precluded

from considering Petitioner's evidence of drug intoxication. They simply found "it wanting as a matter of fact." *Id*. Accordingly, the ACCA did not unreasonably apply clearly established law in rejecting Petitioner's claim.

The remaining question is whether, as Petitioner argues in his brief, the ACCA based its decision upon any unreasonable determination of the facts under § 2254(d)(2). To review, "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at 301. Furthermore, this court must "presume the state court's factual findings are correct, and the petitioner has the burden to rebut those facts by clear and convincing evidence." *Wellons*, 695 F.3d at 1206 (citing 28 U.S.C. § 2254(e)(1)). And, even if Petitioner produces "clear and convincing evidence" that the ACCA erred in its factfinding, "he does not necessarily meet his burden under § 2254(d)(2)." *Pye*, 50 F.4th at 1035. "Depending on the importance of the factual error to the state court's ultimate 'decision,' that decision might still be reasonable 'even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id*. (quoting *Hayes*, 10 F.4th at 1224–25).

The specific factual findings by the ACCA that Petitioner challenges under § 2254(d)(2) appear to be the following: 1) the ACCA's finding that Petitioner "did not give drugs as the reason for the shootings. His reasons were to eliminate the possibility of witnesses and to 'try to keep them from getting to a phone so [he] could get away'" (*Bush*, 695 So. 2d at 90); and 2) the ACCA's finding that Petitioner "indicated that he was not a regular drug user" (*id*.). (Doc. 50 at 134–35.) In neither instance does Petitioner demonstrate error under § 2254(d)(2).

*First*, it was reasonable for the ACCA to conclude that Petitioner "did not give drugs as the reason for the shootings." As excerpted above, at the conclusion of Petitioner's second statement, the investigator asked Petitioner to "be as honest with me as you can for the reason for shooting these three subjects." (Doc. 25-31 at 103.) The reason Petitioner gave after that prompt was "to keep them from getting to a phone and me trying to get away." (*Id.*) He then repeated that explanation. (*Id.*) To be sure, across both of his statements, Petitioner indicated that he was on "bam" and was "messed up" or "out of [his] head." But the ACCA reasonably concluded that, given the investigator's solemn demand for utmost honesty, Petitioner's final explanation for his actions was most plausible, as it reflected the rational calculus of someone processing information and assessing how best to maximize his chance of escaping undetected.

*Second*, the ACCA's finding that Petitioner "indicated that he was not a regular drug user" was not unreasonable within the meaning of § 2254(d)(2). The ACCA no doubt was relying upon Petitioner's own admission that he "ain't been no dope shooter, [he] just started in this dope." (Doc. 25-31 at 77.) Nowhere in Petitioner's statements does he indicate that he was a regular drug user despite being a novice "bam" user. Nor was there any evidence put on by the defense to establish Petitioner's history of drug use. Furthermore, although Petitioner's presentencing report reflects Petitioner's self-report that he "has experimented with drugs, marijuana and cocaine"—notably, shooting "bam" is not included in this self-report of experimentation—nothing in the report establishes that Petitioner was a regular drug user at the time of the offense. (Doc. 25-5 at 102–07.) Accordingly, the ACCA's finding was reasonable.

In any event, even if Petitioner had produced clear and convincing evidence that the ACCA erred in this finding, he still would not be entitled to relief under § 2254(d)(2) because the ACCA's finding about the regularity of Petitioner's drug use was not "important" to the ACCA's ultimate decision. *Pye*, 50 F.4th at 1035. As the ACCA found, Petitioner's "rendition of the events of that evening is clear and concise[,]" *Bush*, 695 So. 2d at 90, and the ACCA's finding that Petitioner "did not give drugs as the reason for the shootings" is reasonable. Any error relating to whether Petitioner did or did not indicate that he was a regular drug user was inconsequential to the ACCA's ultimate decision. Accordingly, Petitioner has failed to demonstrate that the ACCA based its decision upon any unreasonable determination of the facts in the record before that court.

Finally, the court addresses the thread running through Petitioner's arguments under both § 2254(d)(1) and (2). He appears to argue that, because he invoked his drug use when explaining his actions, and the state courts otherwise credited parts of his inculpatory custodial statements, the state courts were required to accept his claim of drug-induced impairment for purposes of assessing statutory and nonstatutory mitigating circumstances. Having failed to sufficiently credit those "uncontradicted" self-reports of impairment for mitigation purposes, the argument goes, the state courts violated his rights. But what the state courts did here was assess the credibility of the evidence before them and render judgment accordingly. The state courts did not ignore or refuse to consider Petitioner's evidence of drug intoxication. To the contrary, they considered the evidence but simply found it lacking. There is no tension in the state courts' accepting Petitioner's inculpatory admission that he shot all three victims while discrediting his self-serving claim to have been so "messed up" or "out of his head" that evidence of his drug use was

inherently and significantly mitigating. The obvious principle applied by the state courts is simple: Petitioner's inculpatory admission to having shot all three victims was persuasive and credible while his attempt to deflect moral culpability for his actions by blaming drug use was not.

If Petitioner wanted the state courts to credit any contention that his drug use provided a durable explanation for his actions, such that statutory and nonstatutory mitigating circumstances were established, it was incumbent upon him to present probative and credible evidence on that point. Yet there was no testimony from any witnesses about Petitioner's regular drug use around that time or about Petitioner's behavior that night. Nor was there any expert testimony linking Petitioner's actions with drug intoxication.[48] There was only the defense's brief argument in closing at the penalty phase that Petitioner's statements support a finding that he was "under mental or emotional disturbance or distress, or something like that." (Doc. 25-3 at 20.) The ACCA did not unreasonably apply clearly established federal law, and did not base its decision upon any unreasonable determination of the facts, in rejecting that argument. *See, e.g., Tompkins v. Moore*, 193 F.3d 1327, 1337–38 (11th Cir. 1999) (finding evidence "that a defendant was intoxicated with alcohol or drugs at

[48] The defense filed a pretrial motion for funds to retain a psychologist to assist with "presentation of evidence in mitigation of the alleged crime." (Doc. 25-3 at 155.) After the defense identified a "forensic psychologist" it wished to retain for this purpose, the trial court granted the motion and approved funds of $4,000. (Doc. 25-3 at 201.) Judge Phelps entered an order permitting Petitioner's examination by the defense psychologist while in pretrial custody. (Doc. 25-3 at 203.) Glassroth recalled at the Rule 32 hearing that the defense "got approval for a mental health person." (Doc. 25-34 at 69.) He also testified that he would have presented any beneficial information provided by the psychologist in the guilt or penalty phase of trial and that his failure to offer such expert psychological testimony or evidence implies that whatever the psychologist reported to the defense "didn't set off any bells that I could use it in any way." (*Id*. at 98–99.)

the time of the capital offense is unreliable and of little use as mitigating circumstances evidence when it is predicated solely upon the defendant's own self-serving statements"). Petitioner's claim that the state courts erred in failing to consider "undisputed" and "uncontradicted" evidence of his narcotics intoxication is due to be denied.

## VII. Claim G – Petitioner Was Denied the Effective Assistance of Counsel

### A. Petitioner's Allegations

Petitioner alleges that he received ineffective assistance of his counsel at all phases of his third trial in four respects: 1) in the guilt phase, counsel "did not investigate or present evidence showing that . . . [Petitioner] was not the triggerman and did not even know that his codefendant intended to rob and kill the store clerk" (Pet. ¶¶ 128–29, doc. 1 at 49); 2) also in the guilt phase, counsel failed to challenge the admission of Petitioner's custodial statements on the ground that he could not have knowingly and voluntarily waived his right to remain silent due to his limited "intellectual capacity" and failed to present evidence to the jury showing that Petitioner did not knowingly and voluntarily waive his right to remain silent (Pet. ¶¶ 135–40, doc. 1 at 51–52); 3) at the sentencing hearing before Judge Phelps, counsel failed to "introduce compelling and readily available evidence of Mr. Bush's profound intellectual impairments" (Pet. ¶¶ 143–44, doc. 1 at 53–54); and 4) at both the penalty phase of trial before the jury and the judicial sentencing hearing, counsel failed to "present[] evidence that Mr. Bush was an alcohol and drug abuser, was under the influence of drugs at the time of the Majik Mart offense, and otherwise suffered from the effects of substance abuse" (Pet. ¶ 147, doc. 1 at 55). Petitioner

also alleges the cumulative effect of these alleged errors by counsel denied him the effective assistance of counsel. (Pet. ¶ 152, doc. 1 at 56.)

### B. Clearly Established Federal Law

The clearly established federal law governing a claim of ineffective assistance of counsel is the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). Broadly, *Strickland* requires the petitioner to show both that his counsel performed deficiently and that such deficient performance prejudiced the outcome of the petitioner's trial (or appeal). *Id*. at 687. To show deficient performance, the petitioner must show that his counsel's performance "fell below an objective standard of reasonableness." *Id*. at 688. "In other words, the petitioner must establish that no competent counsel would have taken the action that his counsel did take." *McNabb v. Comm'r, Ala. Dep't of Corr.*, 727 F.3d 1334, 1339 (11th Cir. 2013) (quotation omitted). In reviewing the actions and omissions of counsel, courts are to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable processional assistance." *Strickland*, 466 U.S. at 689.

*Strickland*'s prejudice prong requires that the petitioner "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome[.]" *Id*. This requires more than a showing that counsel's errors "had some conceivable effect on the outcome of the proceeding[.]" *Id*. at 693. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. In a capital case in which ineffective assistance is alleged to have prejudiced the petitioner's sentence, "the prejudice inquiry asks 'whether there is a reasonable probability that,

absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Sealey v. Warden, Georgia Diagnostic Prison*, 954 F.3d 1338, 1355 (11th Cir. 2020) (quoting *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 935 (11th Cir. 2011)).

Where review of an ineffective assistance of counsel claim is governed by AEDPA, review is "doubly deferential." *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1323 (11th Cir. 2013).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (quotation and citation omitted). So, while satisfying *Strickland*'s deferential inquiry is "never an easy task[,]" *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105.

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question

> is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id*. (citation omitted). If the answer to this question is "yes," the federal court lacks the power to grant habeas relief. *Pye*, 50 F.4th at 1042.

The practical effect of applying the "doubly deferential" standards of *Strickland* and AEDPA in tandem is that "it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Gissendaner*, 735 F.3d at 1323.

### C. Review Pursuant to § 2254(d).

#### 1. Petitioner's claim challenging counsels' guilt phase investigation and presentation of evidence related to his purported lack of intent to kill.

##### *a. State court proceedings*

Petitioner presented this claim in his second amended Rule 32 petition. (Doc. 25-24 at 175.) After the Rule 32 evidentiary hearing, the Rule 32 court denied the claim as follows:

> [Petitioner] alleges that trial counsel were ineffective for failing to investigate and present evidence that even if Bush was at the crime scene, he was not the shooter and did not know that the codefendant intended to rob and shoot the store clerk or, in the alternative, that he (Bush) lacked the requisite intent due to his severe intoxication.
>
> Claims of inadequate investigation must be shown with specificity as to what information would have been obtained and, assuming such evidence is admissible, whether its admission would have produced a different result. *Nelson v. Hargett*, 989 F.2d 847(5th Cir. 1993).

> No evidence was presented as to what evidence was available or could have been obtained and presented to support these claims. Furthermore, Bush in his confessions stated that he was the shooter and did not state that drugs or intoxication were factors. Again, the Court finds that Bush has failed to meet his burden of proof or prove any factual basis to support these allegations and these allegations are due to be denied. Rule 32.3, 32.6(b) and 32.7(d), Ala. R. Crim. P.

(Doc. 25-39 at 134–35.)

On appeal, the ACCA affirmed. The ACCA reviewed its findings on direct appeal about the defense strategy at Petitioner's third trial and held that Petitioner failed to prove that his counsel performed deficiently:

> On direct appeal, we made the following observations about counsel's defense at Bush's third trial:
>
>> "It is apparent from the arguments of [Bush's] trial counsel, the cross-examination of the state's witnesses, and the assertions made in [Bush's] brief that his defense theory was mistaken identity. In furtherance of this theory, he sought to bolster Holmes's identification of Edward Pringle's brother, Cornelius Pringle, as the robber-assailant. He also points out that a number of fingerprints were lifted from the scene of the charged crime and that one matched his. He attempted to discredit the testimony of Patricia Pringle, the wife of Edward Pringle—that her husband had told her that he and [Bush] had committed the three crimes and that [Bush] had told her that he had shot Dominguez, Holmes, and Adams—by showing that she had received reward money for furnishing that information to the authorities. Finally, he attempted to discredit his incriminating statements by attempting to make it appear that the statements were obtained by coercion and in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966)."

> 695 So. 2d at 82. Counsel clearly had a defense theory that he argued to the jury. The fact that Bush was convicted does not make his counsel's performance ineffective.
>
> > "The fact that this defense strategy was ultimately unsuccessful with the jury does not render counsel's performance deficient. *See Johnson v. State*, 769 So. 2d 990, 1001 (Fla. 2000) ('Simply because the ... defense did not work, it does not mean that the theory of the defense was flawed.' (quoting trial court's order))."
>
> *Heath v. State*, 3 So. 3d 1017, 1029 (Fla. 2009). "Hindsight does not elevate unsuccessful trial tactics into ineffective assistance of counsel." *People v. Eisemann*, 248 A.D.2d 484, 484, 670 N.Y.S.2d 39, 40–41 (1998).
>
> Moreover, at the evidentiary hearing, Glassroth was not questioned as to why he presented the defense that he did. Accordingly, we presume that counsel's performance was reasonable. *See Grayson v. Thompson*, [257 F.3d 1194, 1218 (11th Cir. 2001),] *supra*.

*Bush*, 695 So. 3d at 160–61.

*b. Petitioner's argument*

Petitioner does not address this claim of error in his brief in support of the petition. (*See* doc. 50 at 140–53.) Rather, his brief addresses only his claims that counsel were ineffective in failing to present evidence of his intellectual limitations to demonstrate that his *Miranda* waiver was not knowing and voluntary and as evidence in mitigation of his sentence at the judicial sentencing phase. (*Id.*; *see also* doc. 54 at 47 (Petitioner's reply brief) ("In his initial brief, Mr. Bush raised two independent claims of ineffective assistance of counsel arising from the failure of his defense counsel, Mr. Glassroth, to investigate and utilize evidence of his

intellectual disabilities[.]").) Accordingly, no argument is presented in support of this claim of guilt phase ineffective assistance of counsel.

*c. The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

The ACCA reasonably found that Petitioner failed in his Rule 32 petition, and at the Rule 32 evidentiary hearing, to demonstrate why defense counsel's guilt phase investigation and presentation were deficient. Counsel vigorously cross-examined the surviving victim, Holmes, and the State's lead investigator about Holmes's identification of Cornelius Pringle as the assailant who shot Holmes and Dominguez. Like the Rule 32 petition, the instant federal petition is devoid of specific allegations showing what else counsel could have investigated and presented to the jury in support of a defense theory that Petitioner was not the triggerman or that he lacked the intent to kill. Because the petition is silent on this question, and Petitioner does not even address this claim in his merits briefing, this court cannot conclude that the ACCA's decision unreasonably applied *Strickland*, or that it based its decision upon any unreasonable determination of the facts. Accordingly, this ineffective assistance subclaim is due to be denied.

**2. Petitioner's claim that counsel failed to introduce evidence showing that he did not understand his *Miranda* warnings and did not knowingly and intelligently waive his right to remain silent.**

*a. State court proceedings*

Petitioner challenged the voluntariness of his statements on direct appeal, *Bush*, 695 So. 2d at 121, and, in his Rule 32 petition, he challenged counsel's effort to prove that his statements were not knowingly and voluntarily given. (Doc. 25-24

at 169–72.) Following the Rule 32 evidentiary hearing, the Rule 32 court dismissed Petitioner's claim as follows:

> Some of the grounds most strenuously argued by Bush concern his custodial statements. In Part II, paragraphs (f) (g) (h) and (i), he alleges that his trial attorneys failed to properly challenge the voluntariness of his statements and that he did not knowingly and intelligently waive his *Miranda* rights.
>
> In support of these contentions, Dr. Richard Leo, a social research psychologist, testified about the techniques used by the police when obtaining Bush's statement. Dr. Leo stated that some factors present here, such as the time the statements were taken, the length of time involved, contradictory accounts given, Bush being handcuffed some of the time and the use of the bible, were not good police techniques and could render a confession coercive.
>
> With regard to Bush's mental capacity, evidence showed that his IQ tested between 69 and 74. There was also evidence that he had a seventh grade education although in 1979, when he was 29 years old, he read below the 4th grade level. He received technical training, was able to work, and maintained a relationship with his common law wife.
>
> The voluntariness of his statements was addressed by the trial court in detail in *Bush II* and again in this case on appeal. His educational level was also addressed and the Court of Criminal Appeals found his confessions to be knowingly and voluntarily made. *Bush v. State*, 695 So. 2d [at] 121-124.
>
> This Court had the opportunity to observe Dr. Leo and assess his testimony. In addition, the Court has reviewed the record and transcripts of Bush's statements that affirmatively show he voluntarily and knowingly waived his *Miranda* rights and that his statements were knowingly and voluntarily made. This Court finds that Bush has failed to show that he did not intelligently waive his *Miranda* rights or that his statements were not voluntarily made and that he has failed to meet his burden of proof as to these allegations. Rule 32.3, Ala. R. Crim. P.

(Doc. 25-39 at 127–29.)

On appeal, the ACCA affirmed. The ACCA recited the Rule 32 court's reasoning and added the following:

> We specifically found in our opinion on direct appeal that Bush's statements to the police were not involuntary. Therefore, Bush could not satisfy the requirements of *Strickland*.
>
> Also, Glassroth was not questioned at the evidentiary hearing about his strategy in regard to Bush's confession. Glassroth did say that the confession and Patricia Pringle's testimony were the most important evidence against Bush. If the record is silent as to the reasons behind counsel's actions, we presume that counsel's actions were reasonable. *See Brooks v. State*, 929 So.2d 491, 497 (Ala. Crim. App. 2005).

*Bush*, 92 So. 3d at 153.

*b. Petitioner's argument*

Petitioner argues the ACCA's decision was contrary to, and unreasonably applied, clearly established federal law because the ACCA presumed counsel's performance was adequate and failed to "consider other relevant circumstances" probative of counsel's deficient performance. (Doc. 50 at 143–44.) Petitioner also argues that the ACCA's decision was based upon an unreasonable determination of the facts "because the record evidence shows that Mr. Bush's claim of intellectual disability has merit and that defense counsel had no articulable strategy for not using helpful evidence in support of Mr. Bush's claim, especially the evidence that already was readily available." (*Id*. at 144.) He asserts the ACCA "unreasonably assumed the presumption of effective assistance outweighed the record evidence of defense counsel's deficient performance, even though the record as a whole supports only a contrary determination, and thus habeas relief is warranted pursuant to § 2254(d)(2)." (*Id*.)

Petitioner further argues that the ACCA unreasonably applied *Strickland* in finding that he could not show prejudice. (Doc. 50 at 147–48.) He asserts the ACCA's finding on direct appeal that his statements were voluntary "does not mean that evidence impacting on its reliability and weight can no longer have a 'reasonable probability' of affecting the result of the proceeding." (*Id*. at 147 (citing *Strickland*, 466 U.S. at 691–94).) He also argues the ACCA's decision is based upon an unreasonable determination of the facts pursuant to § 2254(d)(2) because, since the ACCA could not know on direct appeal "what the evidence of Mr. Bush's intellectual disabilities will show, it is impossible for the court to know what weight that evidence should be given[.]" (*Id*. at 148.) Thus, he submits, the ACCA's finding on the prejudice prong "was based on 'a record that was insufficient to support its conclusions' and was an unreasonable determination on the record as a whole." (*Id*. (quoting *Burgess*, 723 F.3d at 1319).)

*c. The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

As set forth above, the ACCA's discussion of this claim is brief. The ACCA reproduced the Rule 32 court's reasoning and held simply that, because of its prior holding that Petitioner's confessions were voluntarily and intelligently given, Petitioner could not establish deficient performance or prejudice. *Bush*, 92 So. 3d at 152–53. Despite its brevity, however, the ACCA's discussion was more than commensurate with the argument Petitioner presented to that court. Petitioner's brief in the ACCA argued only that his three IQ scores in the record (69, 74, and 75) place "him in the bottom 1 to 3% of this country intellectually[,]" and that this evidence "would have been significant because it undermines any finding that Mr. Bush was able to make the knowing and intelligent relinquishment of his rights that

is required under *Miranda* and its progeny." (Doc. 25-36 at 87.) In total, he presented the ACCA with two paragraphs of argument, one of which consists mostly of a string of citations (with only one such citation including any parenthetical explanation of its relevance). (*Id*. at 87–88.) Given his minimal development of this claim in the Rule 32 court,[49] and his minimal argument in the ACCA, he will be hard-pressed to show that the ACCA's decision unreasonably applied *Strickland* or was based upon any unreasonable determination of the facts.

In this court, Petitioner points to two Rule 32 evidentiary hearing exhibits as providing the evidence of his "intellectual disabilities" which should have caused counsel to further investigate his deficiencies and present evidence of such in opposition to the admission of his custodial statements and to persuade the jury that his statements were not voluntary and reliable. (Doc. 50 at 143.) Those exhibits include a batch of Alabama Department of Corrections documents consisting of Petitioner's results on tests of intelligence (the Revised Beta and Wechsler Adult Intelligence Scale) and academic achievement (the Wide Range Academic Test) and another intelligence test administered as part of Dr. Karl Kirkland's psychological evaluation of Petitioner before his retrial in 1984. (Doc. 25-31 at 120–34, 144–53.) These documents provide evidence that Petitioner's IQ is in the borderline range (scores on the Wechsler tests included in the exhibits include a 74 on the WAIS in

[49] Petitioner queried Glassroth at the Rule 32 evidentiary hearing about whether he "attempted to litigate the suppression of the statement at the third trial" in 1991. (Doc. 25-34 at 67.) Although Petitioner asked if Glassroth "consider[ed] putting on any additional evidence[,]" (*id*. at 68), he did not ask Glassroth why he did not present evidence of Petitioner's intellectual limitations to challenge admission of his statement or challenge its voluntariness and reliability before the jury. *Bush*, 92 So. 3d at 153.

1979 and a 75 on the WAIS-R in 1984) and that he was able to read at approximately the third to fourth grade level.

Given this record, this court cannot conclude that the ACCA unreasonably applied *Strickland* in concluding that Petitioner failed to demonstrate deficient performance and prejudice. On the deficient performance prong, as the ACCA observed, Petitioner failed to develop a record sufficient to support his claim that no reasonable attorney would have performed as did Glassroth. Petitioner had Glassroth on the stand at the Rule 32 evidentiary hearing but did not ask him any questions about his understanding of Petitioner's cognitive and intellectual limitations, what steps he took to investigate Petitioner's limitations as they relate to his ability to knowingly and intelligently waive his constitutional rights, whether his own interactions with Petitioner caused him to question Petitioner's ability to knowingly and intelligently waive his rights due to any intellectual impairments, and why he did not challenge the voluntariness of Petitioner's statements on those grounds despite evidence of Petitioner's borderline intellectual functioning.[50] Accordingly, the state courts were not provided with evidence rebutting *Strickland*'s "strong presumption" that Glassroth provided competent assistance and, consequently, this court is unable to conclude that no fairminded jurist could agree with the ACCA's conclusion on the deficient performance prong. *See Wood v. Allen*, 542 F.3d 1281, 1303–05 (11th Cir. 2008) (finding that, where trial counsel obtained a pretrial psychological evaluation showing the defendant's "mental deficiencies"

[50] Again, as discussed previously, the defense obtained funds to retain a "mental health" expert and the record indicates that expert examined Petitioner before trial. The results of that "mental health" evaluation were not presented at Petitioner's trial and Glassroth testified at the Rule 32 hearing that the absence of any such presentation of evidence at Petitioner's trial implies that Glassroth did not believe the results of the "mental health" evaluation to be beneficial for Petitioner.

but elected not to present such evidence at trial, the presumption that counsel performed reasonably is not rebutted where the record is silent on counsel's "best interest" reasoning in foregoing presentation of "mental deficiency" evidence).

But, even if Petitioner could show that the ACCA unreasonably adjudicated *Strickland*'s deficient performance prong, he still would not be entitled to relief. On *Strickland*'s prejudice prong, fairminded jurists can agree with the ACCA's conclusion that there is no reasonable probability that the defense would have succeeded in excluding Petitioner's statements from evidence, or that the jury would not have convicted Petitioner, had the defense presented evidence of Petitioner's intellectual limitations in the guilt phase of Petitioner's trial.

Prior to Petitioner's third trial, the Eleventh Circuit recognized that "[m]ental retardation does not by itself prevent a defendant from voluntarily waiving his rights." *Dunkins v. Thigpen*, 854 F.2d 394, 399 (11th Cir. 1988) (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)). In general, a court may find that a "defendant with a low IQ voluntarily and knowingly waived his *Miranda* rights where he interacted normally and intelligently with the arresting agents and . . . was familiar with the criminal justice system." *United States v. Calles*, 271 F. App'x 931, 939 (11th Cir. 2008) (citations and quotations omitted).

The state court record includes extensive proceedings about Petitioner's interactions with law enforcement and the voluntariness of his confessions. (*See* doc. 25-4 at 86 (lengthy transcript of suppression hearing from Petitioner's second trial).) In particular, these issues were litigated in a motion to suppress filed prior to Petitioner's second trial, at which Glassroth also served as one of Petitioner's trial attorneys. On direct appeal after that second trial, the ACCA addressed the

admissibility of Petitioner's confessions at length, finding, ultimately, that Petitioner was not coerced into providing his confessions and that he knowingly, intelligently, and voluntarily waived his rights. *Bush*, 523 So. 2d at 549–57. On direct appeal of Petitioner's third trial, the ACCA explicitly "reaffirm[ed] and adopt[ed]" its prior holding about the admissibility of Petitioner's confessions. *Bush*, 695 So. 2d at 121. The ACCA's findings of fact in those opinions respecting Petitioner's knowing and intelligent waiver of his rights are presumed correct and may be rebutted by Petitioner here only with clear and convincing evidence showing that the state courts erred.

The ACCA plainly found that Petitioner interacted "normally and intelligently," *see Calles*, 271 F. App'x at 939, with the law enforcement officers involved in obtaining his statements. Specifically, the ACCA found as follows: "The contents of the statements . . . show a reasoned and logical discussion of appellant's participation in the crimes. The answers of appellant flow smoothly and logically; reflect a competent recitation of the facts; and give indication of spontaneity, cooperation, and voluntariness." *Bush*, 523 So. 2d at 556. Petitioner points to nothing in the extensive state court record showing that the ACCA clearly and convincingly erred in these findings respecting his "normal and intelligent" interactions. In addition, the ACCA found that Petitioner was "familiar with the criminal justice system," *see Calles*, 271 F. App'x at 939. The ACCA observed that Petitioner "was a mature 31-year-old man and was not inexperienced in the ways of crime and its detection." *Bush*, 523 So. 2d at 555. Accordingly, notwithstanding his low intelligence, Petitioner was capable of knowingly and intelligently waiving his *Miranda* rights, and Petitioner has failed to demonstrate clear and convincing error in the ACCA's findings that he in fact did so.

Rather than demonstrate any clear and convincing error by the ACCA, Petitioner points to the IQ scores and associated records cited above and argues that additional investigation would have uncovered still more evidence—the kind he has mustered in support of his *Atkins* claim—that would have so profoundly altered the picture that the trial court would have had to exclude his confessions or, minimally, the jury would have "given Mr. Bush's statements only the weight and attributed them only the reliability they deserved based on an understanding of the characteristics of the accused in addition to the circumstances of the interrogation." (Doc. 50 at 146–47.) Fairminded jurists, however, can agree with the ACCA's conclusion that there is no reasonable probability that evidence of Petitioner's borderline intellectual functioning, or even evidence of "mental retardation," *Dunkins*, 854 F.2d at 399, would have required the trial court to exclude his confessions given the record evidence showing that he understood his rights and knowingly and intelligently waived them. *See Castillo v. Sec'y, Fla. Dep't of Corr*., No. 21-13252, 2024 WL 2873904 at *4 (11th Cir. June 7, 2024) (holding that the state court reasonably applied federal law in finding no *Miranda* violation despite that a Spanish-speaking defendant with "limited" "mental capabilities" needed multiple explanations of his rights before affirming his understanding).

Likewise, fairminded jurists can agree that there is no reasonable probability that the jury would have essentially repudiated the substance of Petitioner's confessions—notwithstanding those statements' corroboration by other evidence *and* the record evidence showing that Petitioner understood his rights, intelligently waived them, and voluntarily engaged in a "reasoned and logical discussion" with police—had the defense presented evidence about his borderline intellectual functioning and elementary reading abilities.

For all the foregoing reasons, the ACCA reasonably applied *Strickland* in concluding that Petitioner did not demonstrate deficient performance or prejudice due to counsel's failure to present additional evidence about his intellectual abilities in the guilt phase of his trial.

**3. Petitioner's claim that counsel should have introduced evidence of his intellectual limitations as mitigation in the judicial sentencing phase.**

*a. State court proceedings*

In his amended Rule 32 petition, Petitioner alleged that his counsel "failed to present mitigating evidence to the court at the judicial sentencing hearing, including evidence about . . . his unusually low intelligence and learning disabilities[.]" (Doc. 25-24 at 30.) Later in the petition, he alleged counsel should have presented "evidence about Mr. Bush's learning difficulties, low IQ and limited reading ability, including evidence demonstrating his poor school performance despite consistent attendance; his having to repeat grades in school; his difficulties with reading and language comprehension; and his ending his education in the seventh grade." (*Id*. at 33.) He asserted that his "deficiencies would have been reflected in school records as well through testimony of teachers or others aware as Mr. Bush grew up of his limited cognitive abilities." (*Id*.) He maintained that, had this evidence been presented, "the outcome of petitioner's suppression hearing, trial and sentencing would have been different." (*Id*.)

The Rule 32 court summarily rejected this claim as follows:

> Petitioner alleges that trial counsel was ineffective for failing to present certain mitigating evidence during the sentencing hearing. Matters relating to mitigating circumstances were raised by appellate counsel

> and addressed on appeal. In *Bush v. State*, 695 So. 2d 70 (Ala. Crim. App. 1995), *aff'd*, 695 So. 2d 138 (Ala. 1997), the court of Criminal Appeals reviewed these issues under the plain error rule and found that the failure or refusal to consider certain mitigating factors did not rise to the level of plain error.
>
> In a recent case, *Williams v. State*, 2000 WL 337510 (Ala. Crim. App. March 31, 2000), the court held that such a finding under the plain error standard on direct appeal constitutes a finding of no prejudice under the test for ineffective assistance of counsel as enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).
>
> Furthermore, the procedural bars of Rule 32 apply in death penalty cases. *Williams*, *supra*; *State v. Tarver*, 629 So. 2d 14 (Ala. Crim. App. 1993). The Court having considered the matter is of the opinion that these claims would be procedurally barred pursuant to Rule 32 and that there is no prejudice under the *Strickland* test.

(Doc. 25-39 at 113–14.)

On appeal, the ACCA first determined that, pursuant to the Alabama Supreme Court's intervening opinion in *Ex parte Taylor*, 10 So. 3d 1075 (Ala. 2005), the Rule 32 court's finding that some of Petitioner's ineffective assistance claims, including the instant claim, were procedurally barred under the ACCA's *Williams* decision could not stand. *Bush*, 92 So. 3d at 133–34. Nevertheless, the ACCA observed that it "may affirm a ruling if it is correct for any reason" and that it "has affirmed the denial of postconviction petitions when the postconviction court erroneously relied on *Williams*." *Id*. at 134–35. The ACCA then determined that Petitioner failed to adequately plead his judicial sentencing ineffective assistance claim under Rules 32.3 and 32.6(b). *Id*. at 135. In reaching that conclusion, the ACCA stated it was "puzzled as to why Bush makes this assertion when Bush's counsel on direct appeal argued that the circuit court erred in not considering 'significant' mitigating

evidence, which included Bush's lack of education [and] his low IQ[.]" *Id*. The ACCA then made the following relevant findings about this claim:

> The record also shows that Bush was evaluated by a psychologist before trial and that Bush's IQ scores ranged from 69 to 84. Bush also testified before the circuit court at the motion-to-suppress hearing. The circuit court had the unique opportunity of observing Bush throughout three trials. Also, at the Rule 32 hearing, Stephen Glassroth, Bush's trial attorney testified that he did not remember a lot of specifics about the case because of the amount of time that had passed, but he was sure that if the psychologist's testimony had been favorable to Bush he would have called the psychologist to testify.

*Id*. at 136–37. The ACCA therefore held that this ineffective assistance claim was correctly dismissed by the Rule 32 court. *Id*. at 137.

*b. Petitioner's arguments*

Petitioner contends that evidence of his "intellectual disabilities" is obviously mitigating, that counsel "had knowledge of [his] profound intellectual impairments," and that counsel's "failure to further investigate and present helpful information was objectively unreasonable and grossly ineffective." (Doc. 50 at 149.) He asserts that, "[u]nder the circumstances," the ACCA's "determination that Mr. Bush had not shown deficient performance by his trial counsel . . . was contrary to, and involved an unreasonable application of, clearly established Federal law and involved an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." (*Id*. at 149–50 (citing § 2254(d)).)

As to prejudice, Petitioner argues that, "had the trial court been presented with evidence of [his] intellectual disabilities when it was weighing the aggravating and mitigating circumstances, there is a reasonable probability of a different result,

particularly (again) when one considers the jury had unanimously recommended life." (*Id*. at 150.) He asserts that evidence of his "intellectual impairments" provide "grounds for satisfying one of Alabama's statutory mitigating factors"—namely, "that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." (*Id*. at 151 (quotation marks omitted).) He maintains that "whether standing alone as a statutory mitigating factor, or combined with other mitigating evidence considered and not considered . . . counsel's failure to introduce during the sentencing phase of Mr. Bush's trial any evidence of his intellectual functioning deficits satisfies the prejudice prong of *Strickland*." (*Id*.)

Petitioner also argues the ACCA unreasonably applied *Strickland* in relying upon state pleading standards in rejecting his claim. He claims the ACCA's decision "was myopically focused on the 'specific witnesses or evidence' that the [ACCA] wanted Mr. Bush to proffer, rather than the existing evidence of Mr. Bush's intellectual disabilities and the proffers that Mr. Bush did make," and that, therefore, the ACCA "failed to consider the totality of the evidence and its determination to reject Mr. Bush's claim was contrary to and involved an unreasonable application of Federal law." (Doc. 50 at 152 (citing § 2254(d)(1)).) He contends that, contrary to the ACCA's finding that he "failed to identify any specific witnesses or evidence that counsel should have introduced to support this claim[,]" he in fact "did identify specific witnesses and evidence," which, he asserts, included his claim that counsel should have presented "school records" and "testimony of teachers or others aware as Mr. Bush grew up of his limited cognitive abilities." (*Id*. at 152–53 (quotation marks omitted).) Thus, he argues, the ACCA's "determination that Mr. Bush failed to identify specific witnesses and evidence that trial counsel should have introduced

'was based upon a combination of erroneous factual findings directly contradicted by the record and a record that was insufficient to supports its conclusions.'" (*Id*. at 153 (quoting *Burgess*, 723 F.3d at 1319).)

*c. The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

The ACCA's determination that Petitioner failed to sufficiently plead his ineffective assistance claim pursuant to Rule 32.6(b) is a ruling on the merits of the claim for purposes of AEDPA review in federal habeas corpus. *Freeman v. Comm'r, Ala. Dep't of Corr*., 46 F.4th 1193, 1220 (11th Cir. 2022) (citing *Boyd v. Comm'r, Ala. Dep't of Corr*., 697 F.3d 1320, 1331 (11th Cir. 2012)). The question before this court, therefore, is whether "fairminded jurists could disagree on the correctness" of the ACCA's decision that Petitioner failed to plead sufficient facts to support his claim of ineffective assistance of counsel. *Harrington*, 562 U.S. at 101 (quotation and citation omitted). Upon review, this court concludes that fairminded jurists "could disagree about the correctness" of the ACCA's decision.

On the deficient performance prong, Petitioner alleges that his counsel did not investigate whether his intellectual capacity might provide mitigating evidence. (Pet. ¶ 143, doc. 1 at 53; *see also* doc. 50 at 148 (stating, "counsel failed to investigate and develop evidence about Mr. Bush's intellectual disabilities to use in support of mitigation"). This claim, however, is belied by the record. The defense requested appointment of a defense psychological expert for assistance with preparing counsel's presentation of mitigating evidence, the trial court granted the defense's request, and, indeed, the record indicates Petitioner was examined by this psychologist. As best this court can tell, the defense psychologist's pretrial

examination of Petitioner has never been made part of the record in state or federal court.

While Glassroth testified that one can infer from his failure to offer any psychological expert opinion or evidence at trial that the psychologist's report or opinion was not beneficial to the defense (Doc. 25-34 at 98–99), his retention of the psychologist demonstrates his effort to at least investigate Petitioner's intellectual capacity. Because it therefore appears that Glassroth investigated Petitioner's intellectual capacity and thereafter made a strategic decision not to present evidence of Petitioner's intellectual limitations at the sentencing phase, the ACCA reasonably found that Petitioner has not alleged sufficient facts rebutting the presumption that Glassroth performed reasonably. *See Wood*, 542 F.3d at 1303–04.

On the prejudice prong, the ACCA reasonably concluded that Petitioner did not plead sufficient facts to support his claim that he was prejudiced by Glassroth's performance. The amended Rule 32 petition alleges simply that, "[h]ad trial counsel presented this evidence, the court would not have rejected the jury's life verdict and the outcome of petitioner's case would have been different." (Doc. 25-24 at 31.) He did not allege any facts showing why Judge Phelps would not have sentenced him to death. In his federal petition, he alleges that "evidence of impaired cognitive function is unquestionably mitigating" (Pet. ¶ 144, doc. 1 at 54), but he does not allege any facts showing that Judge Phelps would have found his impairments so profound and compelling that he would not have overridden the jury's sentencing recommendation.

Petitioner's brief treads closest to providing a viable argument for a finding of prejudice. He argues, "intellectual impairments are grounds for satisfying one of

Alabama's statutory mitigating factors, Ala Code [§] 13A-5-51(6), which provides that 'capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.'" (Doc. 50 at 151.) The only authority he cites for this contention is *Brownlee v. Haley*, 306 F.3d 1043, 1069–70 (11th Cir. 2002), in which he explains the Eleventh Circuit reversed "a finding of no prejudice, in part, because of defense counsel's failure to introduce borderline mental retardation evidence—including an IQ range of 67, 68 and 75—during [the] jury sentencing phase[.]" (Doc. 50 at 151.)

The "in part" employed in Petitioner's explanation of *Brownlee*'s holding obscures the other, more significant mitigating evidence the Eleventh Circuit emphasized in addition to Brownlee's "borderline mental retardation" in its finding of prejudice. That evidence included Brownlee's "serious psychiatric illnesses" and "extensive drug abuse, particularly on the night in question." 306 F.3d at 1071. Specifically, Brownlee suffered "schizotypal personality disorder," which is "marked by thought disturbance, paranoid ideation, and excessive social anxiety." *Id*. In addition, Brownlee experienced "frequent seizures," including "terrifying episodes in which he would lose consciousness, cause significant damage to his surroundings and his own body, and fall to the floor convulsing, with his mouth foaming, his eyes rolling back in his head, and his tongue in danger of being swallowed. One episode even involved Brownlee's effort to jump out the window of a second-story apartment." *Id*. The expert testimony in the state court showed that "the combination of Brownlee's intellectual functioning and psychiatric disorders left him with 'diminished capacity.'" *Id*.[51] So, considering that

[51] In addition, unlike here, the evidence of Brownlee's "extensive drug abuse, particularly on the night in question" consisted of testimony from percipient witnesses, and an expert

Brownlee's counsel failed "to investigate, obtain, or present *any* mitigating evidence to the jury," *id*. at 1070 (emphasis in *Brownlee*), it is hardly surprising the Eleventh Circuit found the uniquely compelling effect of Brownlee's combined poor intellectual functioning *and* severe psychiatric disorders sufficient to establish prejudice.

Such is not the case here. *First*, unlike in *Brownlee*, counsel here *did* present mitigating evidence at the penalty phase of trial, all of which was before Judge Phelps at the judicial sentencing hearing. Indeed, counsel's presentation of mitigating evidence persuaded the jury to return a unanimous life recommendation in a case in which previous juries returned death recommendations by votes of 12-0 and 11-1. This mitigating evidence resulted in Judge Phelps's finding of nonstatutory mitigating circumstances, including that petitioner "was a productive member of society," that he was remorseful, that his life "has value," and that he "made a spiritual conversion" while incarcerated. (Doc. 25-39 at 8.) *Second*, and more pertinently, Petitioner does not point to any severe psychiatric disorders which, as in *Brownlee*, combine with his poor intellectual functioning to demonstrate "diminished capacity." He therefore provides no authority that his borderline intellectual functioning can satisfy Alabama's "substantial impairment" statutory mitigating circumstance.

To be sure, even if it does not alone satisfy any statutory mitigating circumstance, as Petitioner argues, borderline intellectual functioning has been recognized as generally mitigating, and, had such evidence been presented in the

---

witness, rather than Brownlee's own self-serving statements. 306 F.3d at 1047–49, 1052–53.

judicial sentencing phase, Judge Phelps might have found it to constitute a nonstatutory mitigating circumstance. But that does not mean that there is a reasonable probability of a different result, much less that the ACCA unreasonably resolved that question. As the ACCA found, Judge Phelps observed Petitioner's testimony at a lengthy suppression hearing and "had the unique opportunity of observing Bush throughout three trials." 92 So. 3d at 137. While evidence of Petitioner's borderline IQ scores and academic difficulties would have provided some mitigating value, nothing alleged in the Rule 32 petition, or in the federal habeas petition, demonstrates that such evidence is so compelling that it would have caused Judge Phelps to strike a different balance in his weighing of aggravating and mitigating circumstances.[52] Accordingly, the ACCA did not unreasonably apply clearly established federal law in concluding that Petitioner did not plead sufficient facts to establish that there is a reasonable probability that he would not have been sentenced to death had his counsel presented evidence of his intellectual impairments at the judicial sentencing hearing.

#### 4. Petitioner's claim challenging counsel's failure to adequately present mitigation evidence that he was an alcohol and drug abuser, was under the influence of

[52] Recall that Judge Phelps found three aggravating circumstances established by the evidence, including that Dominguez's murder was especially heinous, atrocious, or cruel. (Doc. 25-39 at 5–7.) The HAC aggravating circumstance in Alabama is "particularly powerful." *Boyd v. Allen*, 592 F.3d 1274, 1302 n.7 (11th Cir. 2010). Such powerful aggravating evidence weighs heavily in the sentencing calculus, even in the face of substantial mitigating evidence. *See Thornell v. Jones*, 602 U.S. 154, 164 (2024) (finding error where federal court in habeas review "failed adequately to take into account the weighty aggravating circumstances in this case[,]" including Arizona's analogue to Alabama's HAC aggravator); *see also Pye*, 50 F.4th at 1049 ("We've repeatedly held that even extensive mitigating evidence wouldn't have been reasonably likely to change the outcome of sentencing in light of a particularly heinous crime and significant aggravating factors.").

**drugs at the time of the Majik Mart crime, and otherwise suffered from the effects of substance abuse.**

*a. State court proceedings*

Although the defense argued in its jury penalty phase closing statement that Petitioner's statements to investigators evidence drug-induced impairment satisfying Alabama's "substantial impairment" statutory mitigator, the defense did not present evidence in the guilt, penalty, or judicial sentencing phases of trial about Petitioner's drug usage, including on the night of the robbery/murder. In his amended Rule 32 petition, Petitioner alleged this failure resulted in ineffective assistance. (Doc. 25-24 at 32–33.) The Rule 32 court summarily dismissed the claim based upon its finding that the ACCA's opinion on direct appeal, in which that court held that the trial court did not err in failing to credit evidence of Petitioner's drug intoxication, "constitutes a finding of no prejudice under the test for ineffective assistance of counsel[.]" (Doc. 25-39 at 113.) The Rule 32 court also concluded that "procedural bars" under Rule 32 apply to bar this claim "and that there is no prejudice under the *Strickland* test." (*Id*. at 113–14.)

On appeal, Petitioner argued that the Rule 32 court erroneously dismissed this claim along with other claims challenging counsel's failure to investigate and present mitigating evidence at the judicial sentencing phase. (Doc. 25-36 at 35–44.) He specifically argued counsel's error precluded the sentencer, Judge Phelps, from being able "to consider evidence that Mr. Bush was an alcohol and drug abuser, was under the influence of drugs at the time of the Majik Mart crime, and otherwise suffered from the effects of substance abuse." (*Id*. at 42.)

The ACCA affirmed the Rule 32 court's dismissal of this claim in the same passage in which it addressed the Rule 32 court's dismissal of his claim about counsel's failure to present evidence of his intellectual impairments at the judicial sentencing phase. *Bush*, 92 So. 3d at 133–37. Thus, the ACCA held that the Rule 32 court erroneously dismissed this ineffective assistance claim on the basis of plain error review conducted on direct appeal, but that, notwithstanding that error, the claim was due to be dismissed because Petitioner "failed to plead sufficient facts to satisfy the requirements of Rule 32.3 and Rule 32.6(b)[.]" *Id*. at 135.

*b. Petitioner's arguments*

Petitioner does not address or present argument in support of this claim in his merits briefing. (Doc. 50 at 140–53.) Petitioner's merits briefing focuses entirely on his ineffective assistance claims related to counsel's failure to investigate and present evidence of his intellectual impairments in the guilt and sentencing phases of his trial. (*See* doc. 54 at 47 (petitioner's reply brief) ("In his initial brief, Mr. Bush raised two independent claims of ineffective assistance of counsel arising from the failure of his defense counsel, Mr. Glassroth, to investigate and utilize evidence of his intellectual disabilities[.]").)

*c. The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

The ACCA's holding that, pursuant to Rule 32.6(b), Petitioner did not plead sufficient facts to support his claim of ineffective assistance is a ruling on the merits of the claim for purposes of AEDPA review in federal habeas corpus. *Freeman*, 46 F.4th at 1220. The ACCA's determination that this claim was insufficiently pleaded is not contrary to, and did not involve any unreasonable application of, clearly

established federal law and is not based upon any unreasonable determination of the facts. On the deficient performance prong of *Strickland*, Petitioner did not allege in his Rule 32 petition, and does not allege here, what additional evidence counsel should have presented regarding his drug abuse and intoxication. The only evidence of Petitioner's intoxication in the record consists of his self-serving claims in his custodial statements that he had been "shooting bam" and was "messed up" and "out of his head." Judge Phelps considered this evidence but found it insufficient to establish any mitigating circumstance. Given this circumstance, the need for Petitioner to specifically plead what more counsel should have done on this front was glaring. Because he did not do so, the ACCA's conclusion that he did not plead adequate facts to establish deficient performance under *Strickland* is reasonable.

Petitioner's allegations are also inadequate on the prejudice prong of *Strickland*. To begin with, he cannot show prejudice based upon his claim that this evidence should have been presented to the jury at the penalty phase of trial. (Pet. ¶ 148, doc. 1 at 55.) The jury returned a unanimous life recommendation. Petitioner could not have received a better outcome in the jury penalty phase. Likewise, as to the judicial sentencing phase, Petitioner failed to adequately allege prejudice. Again citing the Eleventh Circuit's decision in *Brownlee*, Petitioner appears to argue that, had Judge Phelps "been able to consider Mr. Bush's level of intoxication, combined with his low IQ, there is a reasonable probability that it would have altered the court's appraisal of his moral culpability." (*Id.*) This contention fails, however, because, unlike in *Brownlee*, the evidence of Petitioner's intoxication is meager, self-serving, and unsubstantiated, and he has not alleged evidentiary sources that would show otherwise. More importantly, as discussed above, the Eleventh Circuit in *Brownlee* specifically relied upon the combination of Brownlee's severe

psychiatric disorders (schizotypal and seizure disorders), his intellectual impairments, *and* his drug abuse and intoxication to conclude that prejudice was established where counsel had failed to present *any* mitigating evidence whatsoever. *See* 306 F.3d at 1072. The substantial and material distinctions here plainly obviate the authority Petitioner confers on *Brownlee*.

Petitioner's allegations, in state and federal court, are insufficient to support this claim of ineffective assistance of counsel. Petitioner's lack of supporting argument in his merits brief only confirms this deficiency. The ACCA's decision affirming the dismissal of this ineffective assistance of counsel claim is not contrary to, and did not involve any unreasonable application of, clearly established federal law and is not based upon any unreasonable determination of the facts. Accordingly, this ineffective assistance subclaim is due to be denied.

**5. Petitioner's claim about the cumulative effect of counsel's errors.**

*a. State court proceedings*

The ACCA addressed Petitioner's claim alleging that the cumulative effect of counsel's errors deprived him of the effective assistance of counsel as follows:

> Bush last argues that even if we conclude that none of the instances he cites constitute ineffective assistance of counsel, the cumulative effect of those instances of ineffective assistance of counsel require reversal.
>
> As we stated in *Brooks v. State*, 929 So.2d 491 (Ala. Crim. App. 2005):
>
> > "Other states and federal courts are not in agreement as to whether the 'cumulative effect' analysis applies to *Strickland* claims. As the Supreme Court of North Dakota

noted in *Garcia v. State*, 678 N.W.2d 568, 578 (N.D. 2004):

> "'Garcia argues that even if trial counsel's individual acts or omissions are insufficient to establish he was prejudiced, the cumulative effect was substantial enough to meet *Strickland*'s test. *See Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) ("In making this showing, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland*'s test"); *but see Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990) ("cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own").'

"*See also Holland v. State*, 250 Ga. App. 24, 28 (2001) ('Because the so-called cumulative error doctrine is inapplicable, each claim of inadequacy must be examined independently of other claims, using the two-prong standard of *Strickland v. Washington*.' (footnote omitted)); *Carl v. State*, 234 Ga. App. 61, 65 (1998) ('Georgia does not recognize the cumulative error rule.'); *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998) ('Not surprisingly, it has long been the practice of this Court to individually assess claims under *Strickland v. Washington*, 466 U.S. 668 (1984). *See, e.g., Hoots v. Allsbrook*, 785 F.2d 1214, 1219 (4th Cir. 1986) (considering ineffective assistance claims individually rather than considering their cumulative impact.).').

"We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel. However, the Alabama Supreme Court has held that the cumulative effect of prosecutorial misconduct necessitated a new trial in *Ex parte Tomlin*, 540 So. 2d 668, 672 (Ala. 1988) ('We need not decide whether either of the two errors, standing alone,

> would require a reversal; we hold that the cumulative effect of the errors probably adversely affected the substantial rights of the defendant and seriously affected the fairness and integrity of the judicial proceedings.'). Also, in *Ex parte Bryant*, 951 So. 2d 724 (Ala. 2002), the Supreme Court held that the cumulative effect of errors may require reversal.
>
> > "If we were to evaluate the cumulative effect of the ineffective assistance of counsel claims, we would find that Brooks's substantial rights were not injuriously affected. *See Bryant* and Rule 45, Ala. R. App. P."
>
> 929 So. 2d at 514. We likewise find no cumulative error warranting reversal.

*Bush*, 92 So. 3d at 161–62.

*b. Petitioner's argument*

Petitioner's merits brief does not address his claim of cumulative ineffective assistance of counsel. (Doc. 50 at 140–53.)

*c. The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

This court has determined that the ACCA reasonably concluded that none of Petitioner's individual ineffective assistance claims have merit. The instant claim asserts the "cumulative effect" of counsel's alleged errors deprived him of the effective assistance of counsel. The Eleventh Circuit has several times been confronted with the question of "whether a claim of ineffective assistance of counsel may be based on the 'cumulative effect' of multiple non-prejudicial errors by counsel when no individual error standing alone would warrant a finding of

prejudice under *Strickland*." *Borden*, 646 F.3d at 823. That court has repeatedly avoided resolving the question. *See, e.g., id*. ("Because Borden has not sufficiently pled facts that would establish prejudice—cumulative or otherwise—we decline to elaborate further on the concept of 'cumulative effect' for fear of issuing an advisory opinion on a hypothetical issue."); *Hunt v. Comm'r, Ala. Dep't of Corr.*, 666 F.3d 708, 731–32 (11th Cir. 2012) ("Even if we were to determine that clearly established federal law mandates a cumulative-effect analysis of ineffective-assistance claims, Hunt would not be entitled to relief: he has not shown that in this case the cumulative effect of counsel's alleged errors amounted to ineffective assistance."); *Tarleton v. Sec'y, Fla. Dep't of Corr.*, 5 F.4th 1278, 1292 (11th Cir. 2021) ("In this case, we need not reach the issue of whether cumulative error is cognizable in habeas proceedings."). Given that well after the ACCA rendered its decision in this case it remained unclear in the Eleventh Circuit whether this claim is even cognizable under clearly established federal law, this court is hard-pressed to conclude that the ACCA unreasonably applied *Strickland* in summarily dismissing the claim.

Nevertheless, assuming this claim is cognizable under clearly established federal law, the ACCA did not unreasonably apply *Strickland*. Petitioner has not plausibly alleged any error, individually or cumulatively, that supports any claim that, had his counsel not so erred, it is reasonably probable that he would not have been convicted. His guilt phase allegations of ineffective assistance—that counsel failed to pursue a defense focused on his purported lack of intent to kill and failed to present evidence of his intellectual deficiencies to challenge admission of his confessions and persuade the jury that his confessions were not voluntary and reliable—do not cumulate together to show prejudice. This is so because the former claim of guilt phase ineffective assistance is wholly unsupported by specific

allegations and Petitioner does not even argue in favor of the claim in his merits brief. Nothing in the petition or merits briefing proffers, specifically, what more counsel could have done to persuade the jury that Petitioner "was not the triggerman and did not even know that his codefendant intended to rob and kill the store clerk." (Pet. ¶ 128, doc. 1 at 49.) Because this claim is wholly unsupported, the only remaining guilt phase claim—that relating to counsel's failure to present evidence of Petitioner's intellectual limitations—has nothing with which to cumulate to show guilt phase prejudice.

Nor can Petitioner show that any error, individually or cumulatively, could have prejudiced him at the penalty phase of his trial considering the unanimous 12-0 life recommendation counsel obtained from the jury.

As for the judicial sentencing phase, the ACCA reasonably concluded that the errors Petitioner alleged do not cumulate to render it reasonably probable that he would not have been sentenced to death. The only claim Petitioner has presented with any real force or record support—that counsel failed to present evidence of his intellectual impairments as mitigating evidence—is insufficient to establish prejudice. Petitioner's remaining claim, that counsel failed to adequately present evidence of his drug abuse and intoxication as mitigating evidence, is not supported by specific allegations of what more counsel could have done and how it would have made a difference at sentencing. Thus, the claim adds no appreciable weight to any cumulative ineffectiveness analysis. The ACCA's decision rejecting Petitioner's cumulative ineffectiveness claim therefore was reasonable.

## VIII. Claim H – The Trial Judge Deprived Petitioner of the Basic Tools Necessary to an Effective Defense.

### A. Petitioner's Allegations

Petitioner claims "Alabama's statutory limit on attorney compensation" "hampered" his counsel's ability provide an effective defense at trial. (Pet. ¶ 155, doc. 1 at 57.) He alleges that, at the time of his third trial, "a defense attorney in a capital case received $20 per hour for out-of-court work with maximum compensation of $1,000 for such work per phase of trial." (*Id.*) Although his attorneys challenged the statutory limitations on compensation in a pretrial motion, Judge Phelps "appears to have ignored the motion." (*Id.*) He also alleges that his attorneys faced especially demanding responsibilities because this was his third trial and the attorneys were "obligated to review ten years of proceedings including the transcripts of two previous trials, and to locate many documents that had long since been lost or misplaced and interview numerous witnesses who had since moved or disappeared." (Pet. ¶ 156, doc. 1 at 57–58.) He claims the "refusal of the Alabama courts to waive the limitation on the amount of compensation available to defense counsel violated" his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law," and "resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." (Pet. ¶ 157, doc. 1 at 58 (quotation marks omitted) (citing § 2254(d)(1) & (2)).)

### B. Clearly Established Federal Law

Petitioner does not cite any Supreme Court decision that enunciates, or even applies, the clearly established federal law governing his claim that Alabama's attorney compensation limits violated his constitutional rights. He also does not address this claim in his merits briefing. In this void of authority, the court presumes that the clearly established federal law governing Petitioner's claim is that which has been set out in addressing some of Petitioner's other claims, including his claims challenging the constitutionality of his sentence on due process and Eighth Amendment grounds, and his claim alleging that he received the ineffective assistance of his counsel.

**C. State Court Proceedings**

The defense filed a pretrial motion to declare Alabama's statutory fee limitation in capital cases unconstitutional. (Doc. 25-4 at 21–26.) On direct appeal of his conviction, Petitioner again challenged the constitutionality of the statutory fee limitation. (Doc. 25-16 at 95.) He cited cases in other jurisdictions which invalidated statutory fee caps. (*Id*. at 96.) He argued Alabama's statutory fee limitation "violated the due process and equal protection clauses of the Fourteenth Amendment, [his] Sixth Amendment right to counsel, the takings clause of the Fifth Amendment, the cruel-and-unusual punishment clause of the Eighth Amendment, and parallel provisions of the Alabama Constitution." (*Id*. at 97.)

The ACCA addressed Petitioner's claim as follows:

> The appellant further contends that Alabama's system for compensating attorneys appointed to represent indigent defendants set out in § 15–12–21 is unconstitutional[. . . .] We find no merit in this contention. The Alabama Supreme Court in *Ex parte Grayson*, 479 So. 2d 76 (Ala.), *cert. denied*, 474 U.S. 865, (1985), held that our system

> for compensating appointed attorneys does not violate principles of due process or equal protection. It also held in *Sparks v. Parker*, 368 So. 2d 528 (Ala. 1979), *appeal dismissed*, 444 U.S. 803 (1979), that § 15–12–21 does not constitute an unlawful taking of property in violation of the Fifth Amendment. We also find no violation of the right to counsel and of the protection against cruel and unusual punishment. We find no violation here of either the federal or state constitution. The record reflects that the appellant has been ably represented at trial and on appeal by experienced counsel. It does not indicate in any way that counsel's efforts were deterred or diminished by the fees and expenses allowed by the statute. In fact, the appellant's counsel illustrates the thoroughness with which he prepared for and represented the appellant by the following statement in his brief:
>
>> "Because [the appellant] was being tried for the third time for a 1981 offense, defense counsel was obligated to review 10 years' worth of proceedings including the transcripts of two previous trials, and to locate many documents that had long since been lost or misplaced, and interview numerous witnesses who had moved or disappeared."

*Bush*, 695 So. 2d at 105 (footnote omitted).

### D. Review Pursuant to § 2254(d)(1) & (2)

Although he alleges the ACCA's decision on this claim is both "'contrary to, and involved an unreasonable application of, clearly established Federal law,' and 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[,]'" (Pet. ¶ 157, doc. 1 at 58 (quoting § 2254(d)(1) & (2))), Petitioner fails to cite any such "clearly established Federal law" in his petition or merits briefing and he does not identify any specific factual finding by the ACCA that was unreasonable. This failing alone is dispositive of his claim.

There is no doubt that Alabama's statutory compensation cap in effect at the time of Petitioner's trial imposed hardships on appointed defense counsel. Attorneys were obligated to provide zealous representation in demanding, emotional cases which required far more of their time than was reasonably compensated under the statute. But this fact alone does not result in a constitutional violation. Petitioner does not allege or explain how his rights were violated if his attorney provided him with effective assistance notwithstanding any professional hardships caused by Alabama's compensation limits.[53] Nor does Petitioner specifically allege that his counsel failed to provide effective representation due to the fee cap. Glassroth's testimony at the Rule 32 hearing indicates that it was the demanding trial schedule enforced by Judge Phelps, rather than any fee cap, that presented the greatest hardship:

> Q. Do you remember whether -- how late at night you had to go during this case?
>
> A. I couldn't tell you the exact time. But we were pushed pretty hard. You know, these things are pretty stressful in the first place. And back in '91, we were asked to do these things for very little money. That was before the Court of Criminal Appeals had ruled in the *Ex parte May* case or the *May v. State* case that held that an attorney's office overhead expenses were part of the reasonable expenses that the statute for compensation addressed.
>
> But we were—we did a lot of work and worked late. I couldn't tell you how late we went, but it was after dark. Then you would have to go back to the office. I remember Spud and I going back and trying

---

[53] As another district court observed when confronted with a claim challenging perceived structural problems in Alabama's capital appointment system, "petitioner does not explain how, if the representation he received at trial comported with his Sixth Amendment right to counsel, any of these purported structural infirmities would give rise to an actional habeas claim for him." *Lee v. Thomas*, Civ. Act. No. 10-0587-WS-M, 2012 WL 1965608, at *55 (S.D. Ala. May 30, 2012), *affirmed*, 726 F.3d 1172 (11th Cir. 2013).

> to get ready for what would come the next day. Under the best of conditions, these kinds of cases are grueling and absolutely emotionally draining. Then to have them where you're actually being pushed to work that late, it really takes a lot out of you.
>
> And at that time we were having sequestered juries. So the court was being solicitous to the jurors and trying to get as much done with the jury being sequestered, I think, and didn't really care about what toll it took on us or what we had to do to be ready and to be most rested and effective. I've got to tell you it was not a pleasant experience.
>
> Q. Did that present any particular problems for you that you remember?
>
> A. Who knows. I couldn't point to anything to say that it did or it didn't. I've got to believe that I wasn't at my peak level of performance because when you're mentally exhausted and you don't have enough time between events to sort of recuperate or recover or just recharge to get ready for the next day, it's pretty tough. Most judges are quite sympathetic and understand that. And we lawyers do an enormous service in handling these cases. I think over the years the various courts have recognized that and are a lot more understanding of the need to recess at a reasonable time to allow us to do what we had to do than Judge Phelps was.

(Doc. 25-34 at 83–85.) Glassroth's only specific testimony about the statutory fee cap was his speculation that the cap was still in effect at the time of trial in 1991. (*Id*. at 84.) He simply did not indicate that the cap affected his representation in any way.

Given this record, and considering Petitioner's failure to cite any clearly established federal law which the ACCA might have unreasonably applied or identify any factual finding the ACCA might have unreasonably determined, this court is constrained to conclude that this claim is due to be denied.

## IX. Claim I – Execution After Inordinate Delay Caused by State Actors Violates the Eighth Amendment

### A. Petitioner's Allegations

Petitioner alleges that, at the time he filed his petition in 2012, he had been on death row for approximately thirty years and that carrying out his execution "would constitute cruel and unusual punishment because it would effectuate the constitutionally-legitimate purposes of capital punishment negligibly, it at all." (Pet. ¶ 159, doc. 1 at 58.) He claims executing him after such delay would advance neither of the justifications—retribution and deterrence—proffered in support of capital punishment in *Gregg v. Georgia* "more effectively than would requiring him to serve a term of life imprisonment without parole." (Pet. ¶ 162, doc. 1 at 59.) He also alleges his execution "would violate the Eighth Amendment" because "he has already been forced to endure almost thirty years of incarceration under a sentence of death on Alabama's death row." (Pet. ¶ 164, doc. 1 at 60.) He claims "state actors" have caused "substantial, unwarranted delay" resulting in his prolonged suffering of "inherent cruelties." (Pet. ¶ 165, doc. 1 at 60.) "The gravamen of both prongs of [his] claim is not simply inordinate delay; rather it is inordinate delay largely or wholly attributable to state actors." (Pet. ¶ 166, doc. 1 at 61.) He contends that he has experienced such inordinate delay "not because of his own filing of unsuccessful discretionary appeals but because Alabama officials violated fundamental provisions of the United States constitution in his first and second trials." (*Id.*) "After a certain amount of state-caused delay," he asserts, "the State forever forfeits its right to execute a condemned person and the inmate becomes constitutionally ineligible to be executed." (Pet. ¶ 167, doc. 1 at 61.) He assures, however, that this court "need not establish a bright-line rule in Mr. Bush's case

regarding how much delay results in forfeiture[,]" because "the inordinate delay here is sufficient to establish his ineligibility to be executed." (*Id*.)

**B. Clearly Established Federal Law**

In addressing some of Petitioner's previous claims, this court discussed the requirements imposed by the Eighth Amendment in state capital sentencing schemes. Petitioner references some of that clearly established federal law in his discussion of this claim. (*See, e.g*., doc. 50 at 154–55.) What he does not do is cite in the petition, or in his merits briefing, any Supreme Court decision holding that the Eighth Amendment prohibits execution of an inmate following "inordinate delay" caused by state actors.

In essence, Petitioner's claim is premised not upon any Supreme Court holding but rather opinions authored by Supreme Court Justices respecting the denial of certiorari review. In particular, he cites Justice Stevens's memorandum respecting the denial of certiorari in *Lackey v. Texas*, 514 U.S. 1045, 115 S. Ct. 1421, (1995). (Doc. 50 at 155.) In that memorandum, Justice Stevens described as "novel" the "question whether executing a prisoner who has already spent some 17 years on death row violates the Eighth Amendment's prohibition against cruel and unusual punishment." *Id*. He explained his view that it is "arguable" whether execution after seventeen years on death row serves either retribution or deterrence. *Id*. He also argued that reasons for the delay matter in the constitutional analysis he proposed:

> Closely related to the basic question presented by the petition is a question concerning the portion of the 17-year delay that should be considered in the analysis. There may well be constitutional significance to the reasons for the various delays that have occurred in petitioner's case. It may be appropriate to distinguish, for example,

> among delays resulting from (a) a petitioner's abuse of the judicial system by escape or repetitive, frivolous filings; (b) a petitioner's legitimate exercise of his right to review; and (c) negligence or deliberate action by the State.

*Id*. Justice Stevens observed that "[o]ften a denial of certiorari on a novel issue will permit the state and federal courts to 'serve as laboratories in which the issues receives further study before it is addressed by this Court.'" *Id*. (quoting *McCray v. New York*, 461 U.S. 961, 963 (1983) (Stevens, J., respecting denial of certiorari)). He expressed his hope that Lackey's "novel" claim, "with its legal complexity and its potential for far-reaching consequences," would receive such treatment in the lower courts. *Id*.

## C. State Court Proceedings

Petitioner first presented this claim in his brief in support of his petition for certiorari review to the Alabama Supreme Court during direct review of his conviction and sentence. (Doc. 25-20 at 94–100.) He cited Justice Stevens's memorandum in *Lackey* and described the lower court proceedings that occurred following the Supreme Court's denial of certiorari in *Lackey*. (*Id*. at 97–99.)

The ASC granted Petitioner's request for certiorari review and addressed Petitioner's *Lackey* claim on the merits. The ASC first recounted what happened in the lower courts in *Lackey* after Justice Stevens opined on the viability of Lackey's claim:

> Bush relies primarily upon *Lackey v. Scott*, 885 F. Supp. 958 (W.D. Tex. 1995), a case in which an inmate claimed that his lengthy incarceration on death row constituted cruel and unusual punishment. There, the federal district court stayed the execution in order to address the issue, but the Fifth Circuit Court of Appeals vacated the stay,

> holding that this particular claim was barred. *See Lackey v. Scott*, 52 F.3d 98 (5th Cir. 1995). On Lackey's petition, the Supreme Court issued a per curiam order granting a stay of execution "pending the district court's consideration of petitioner's petition for a writ of habeas corpus." *Lackey v. Scott*, 514 U.S. 1093 (1995). The district court, based upon *Fearance v. Scott*, 56 F.3d 633 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995) (which held that the legal theory underlying a *Lackey* claim is not novel and thus does not meet the novelty exception to the abuse-of-the-writ doctrine), dismissed Lackey's claim as an abuse of the writ. *See* 83 F.3d at 117. On appeal, the Fifth Circuit affirmed, holding that "Lackey's claim . . . fails on the merits, because *White* [*v. Johnson*, 79 F.3d 432 (5th Cir.1996), *cert. denied*, 519 U.S. 911 (1996)], holds that inordinate delay in carrying out an execution does not violate the prisoner's Eighth Amendment rights. *Id*. at 439." *Lackey v. Johnson*, 83 F.3d 116, 117 (5th Cir.), *cert. denied*, 519 U.S. 911 (1996).

*Ex parte Bush*, 695 So. 2d at 139. The ASC then addressed a Ninth Circuit opinion discussing a similar *Lackey* claim in the context of a request to stay that habeas petitioner's execution. In that case, *McKenzie v. Day*, 57 F.3d 1461, 67–68 (9th Cir. 1995), the Ninth Circuit denied the stay based upon its conclusion that the petitioner's *Lackey* claim was "highly unlikely" to succeed if litigated to completion. Based upon these authorities, the ASC found "no merit in Bush's argument that the same constitutional protections that have kept him from being executed for the past 16 years are simultaneously violating his constitutional rights." 695 So. 2d at 140.

### D. Review Pursuant to § 2254(d)(1) & (2)

#### *1. Petitioner's Arguments*

In his merits brief, under the heading "The State Courts Unreasonably Denied Relief," Petitioner argues as follows:

> Carrying out the execution of Mr. Bush after more than thirty-two years on death row would violate his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United State Constitution, 'result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' and 'result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"

(Doc. 50 at 157–58 (quoting § 2254(d)(1) & (2)).) He does not, however, cite the ASC's opinion denying this claim. Nor does he explain his contention that the ASC's decision is contrary to, or unreasonably applied, clearly established federal law, or that it was based upon some unreasonable determination of the facts. What he does, instead, is highlight "shifting public sentiment" in support of his contention that "the State courts made unreasonable determinations of law in finding that the execution of Mr. Bush would not violate the Eighth Amendment." (*Id*. at 158–59.) Much of this "shifting public sentiment" is based on actions by courts and legislatures in foreign countries. (*See id*. (discussing legislative and judicial determinations in South Africa, Great Britain, and the European Commission on Human Rights).)

*2. The ASC did not unreasonably apply clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

The Eleventh Circuit has held that *Lackey* claims lack merit and are unsupported by clearly established federal law:

> Petitioner can identify no case in which the Supreme Court has held that prolonged confinement on death row violates a prisoner's constitutional rights. The only Supreme Court acts involving this issue are denials of petitions for writs of certiorari. *See, e.g., Allen v. Ornoski*, 546 U.S. 1136 (2006) (denying certiorari where the petitioner had been

> on death row for 23 years). The state circuit court, in denying Petitioner's motion for post-conviction relief, relied on *Lackey v. Texas*, 514 U.S. 1045 (1995), in which the Supreme Court denied a petition for writ of certiorari where the plaintiff alleged that a 17-year confinement on death row was a violation of his Eighth Amendment rights. The district court also noted that Petitioner cannot point to a decision of the Supreme Court that warrants relief.
>
> Especially given the total absence of Supreme Court precedent that a prolonged stay on death row violates the Eighth Amendment guarantee against cruel and unusual punishment, we conclude that execution following a 31-year term of imprisonment is not in itself a constitutional violation. As the Ninth Circuit noted, "Numerous other federal and state courts have rejected *Lackey* claims." *Allen v. Ornoski*, 435 F.3d 946, 959 (9th Cir. 2006), *cert. denied*, 546 U.S. 1136 (2006) (citing cases); *see, e.g., Chambers v. Bowersox*, 157 F.3d 560, 568, 570 (8th Cir. 1998) (noting that death row delays do not constitute cruel and unusual punishment because delay results from the "desire of our courts, state and federal, to get it right, to explore ... any argument that might save someone's life"); *White v. Johnson*, 79 F.3d 432, 439 (5th Cir. 1996) ("The state's interest in deterrence and swift punishment must compete with its interest in insuring that those who are executed receive fair trials with constitutionally mandated safeguards . . . . White has benefited from this careful and meticulous process and cannot now complain that the expensive and laborious process of habeas corpus appeals which exists to protect him has violated other of his rights."). We therefore deny Petitioner's claim on this issue.

*Thompson v. Sec'y for Dep't of Corr.*, 517 F.3d 1279, 1283–84 (11th Cir. 2008). *See also Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009) (finding that habeas petitioner is not entitled to a certificate of appealability on his *Lackey* claim because it is "foreclosed" by *Thompson*).

In addition to the foregoing, Petitioner's characterization of the record supporting his *Lackey* claim is misleading. He claims the "inordinate delay" he has experienced "is largely or wholly attributable to state actors . . . because State

officials violated fundamental provisions of the United States Constitution and State law during his first, second and third trials." (Doc. 50 at 157.) Granted, Petitioner's 1981 conviction was vacated based upon a 1983 federal court stipulation that he received the ineffective assistance of counsel or, alternatively, his due process rights under *Brady* were violated. But he was promptly retried in 1984. His 1984 conviction was reversed due to faulty jury instructions and he was tried a third time in 1991. All proceedings since his third conviction became final in 1997 have been at Petitioner's behest: he pursued state postconviction relief under Rule 32 from late 1998 through early 2012, and he has been litigating in federal court, including substantial proceedings on his *Atkins* claim, since filing his federal habeas petition in 2012. So far, he has not demonstrated, in state or federal court, that his constitutional rights at his third trial were violated, or that he suffered constitutionally cognizable prejudice from any such violation.

While Petitioner might reasonably contend that a small part of the delay he has experienced is attributable to "violations" by "State officials," it is grossly unreasonable to assert that all (or even most) of it is. Rather, it appears most of the delay he has experienced is attributable to his pursuit of the many postconviction remedies afforded death-sentenced inmates under state and federal law and the careful, deliberate review courts afford litigants like Petitioner. Petitioner's own case demonstrates the purpose and benefit of this careful review: state and federal courts have twice found reversible errors and awarded him a new trial, while this court has found additional state court error warranted a federal evidentiary hearing on his *Atkins* claim. It cannot be that the review of which Petitioner has availed himself effects a constitutional violation if, by Petitioner's estimation, it takes too long or if it succeeds in uncovering some state court error. *See Knight v. Florida*,

528 U.S. 990 (1999) (Thomas, J., concurring in the denial of certiorari) ("I write only to point out that I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.").

Petitioner's *Lackey* claim mischaracterizes the record, is unsupported by clearly established federal law, and is foreclosed by Eleventh Circuit precedent. The ASC's decision rejecting the claim is not contrary to, and did not unreasonably apply, clearly established federal law, and is not based upon any unreasonable determination of the facts. Accordingly, this claim is due to be denied.

## X. Claim J – The State Courts Failed to Fully Transcribe All Rule 32 Proceedings

### A. Petitioner's Allegations

Petitioner alleges "a significant portion of the extensive Rule 32 record before the Alabama Circuit Court is missing and has never been provided to [him]. The State's failure to transcribe the entire record has significantly prejudiced [his] ability to obtain relief from his unconstitutional conviction and sentence and unfairly stands to benefit the State in its attempt to place procedural barriers to the reversal of [his] conviction and sentence." (Pet. ¶ 170, doc. 1 at 62.) Specifically, he alleges that, over the six years in which his Rule 32 petition was pending before the Rule 32 court, "[m]any of the debates on substantive issues—such as discovery, motions to dismiss, and numerous other matters—were conducted in open court . . . [in] sixteen hearings at which the parties put forth and preserved their arguments." (Pet. ¶ 171, doc. 1 at 62.) He claims "seven of the sixteen hearing transcripts are completely

missing; an eighth hearing transcript begins in mid-thought and is clearly incomplete; and a ninth is only half-included." (Pet. ¶ 172, doc. 1 at 63.) "The missing hearing transcripts also include exhibits and contain critical portions of the record related to claims raised, default, discovery, and other issues impacting [his] Rule 32 petition." (*Id.*)

Petitioner's efforts to obtain complete transcripts of the missing hearings were unsuccessful in the Rule 32 court and, although the ACCA "directed the Circuit Court to supplement the record with the missing transcripts, the transcripts described above were not provided." (Pet. ¶¶ 173–75, doc. 1 at 63.) He maintains that "[n]o court reporter has ever acknowledged that notes or tapes have been lost or destroyed, and there has never been a finding that the transcripts of the missing hearings are unavailable." (Pet. ¶ 177, doc. 1 at 64.) He claims the "failure of the State to provide [him] with a full transcription of the extensive Rule 32 proceedings violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution[.]" (Pet. ¶ 178, doc. 1 at 64.)

**B. Clearly Established Federal Law**

The petition appears to cite one Supreme Court decision, *Dobbs v. Zant*, 506 U.S. 357 (1993) (per curiam), as providing the clearly established federal law holding that the Constitution "mandates the availability of a full transcript in capital cases to secure meaningful appellate review." (Pet. ¶ 169, doc. 1 at 62.) In addition to *Dobbs*, Petitioner's merits brief proffers an earlier Supreme Court decision, *Gardner v. Florida*, 430 U.S. 349 (1977), as an instance in which the Court recognized "the fundamental, constitutional due process right of a capital defendant

to have the complete record upon which his conviction and sentence rests in order to allow for meaningful review[.]" (Doc. 50 at 161.)

*Dobbs* involved a death-sentenced Georgia inmate litigating a federal habeas claim that his counsel provided ineffective assistance at sentencing. 506 U.S. at 357–58. "The District Court rejected this claim after holding an evidentiary hearing. Because a transcript of the closing arguments made at sentencing was, by the State's representation, unavailable, the District Court relied on the testimony of petitioner's counsel regarding the content of his closing argument to find that counsel had rendered effective assistance." *Id*. at 358. After the habeas petitioner "located a copy of the transcript of the penalty phase arguments," and that transcript "flatly contradicted the account given by counsel in key respects[,]" the petitioner moved the federal appellate court reviewing the district court's decision "to supplement the record on appeal with the sentencing transcript[,]" which the appellate court denied. *Id*. The appellate court "held that the law of the case doctrine prevented it from revisiting its prior rejection of petitioner's ineffective-assistance claim. The court acknowledged the manifest injustice exception to law of the case, but refused to apply the exception, reasoning that its denial of leave to supplement the record left petitioner unable to show an injustice." *Id*.

The Supreme Court held "that the Court of Appeals erred when it refused to consider the full sentencing transcript." 506 U.S. at 358. The Court noted that it has "emphasized before the importance of reviewing capital sentences on a complete record." *Id*. (citing *Gardner*, 430 U.S. at 361). The Court explained that the petitioner was potentially prejudiced by the appellate court's refusal to review the transcript because the appellate court "acknowledged" "its refusal to review the transcript left it unable to apply the manifest injustice exception to the law of the

case doctrine, and hence unable to determine whether its prior decision should be reconsidered." *Id*. at 359.

In *Gardner*, the Supreme Court found a due process violation in Florida state capital sentencing procedures which allowed "a trial judge to impose the death sentence on the basis of confidential information which is not disclosed to the defendant or his counsel." 430 U.S. at 358. The defendant, Gardner, was convicted of first-degree murder for beating his wife to death with a "blunt instrument." *Id*. at 351. While the jury deliberated his sentence, the trial judge ordered the completion of a presentence investigation report ("PSI"). *Id*. at 352. The jury then returned its advisory verdict, finding that the mitigating circumstances outweighed the aggravating and that, accordingly, Gardner should be sentenced to life. *Id*. at 352–53. A little more than two weeks after trial, the PSI was completed, and two days after completion the trial judge entered his "findings of fact and judgment sentencing petitioner to death." *Id*. at 353. The trial judge found one aggravating circumstance, that the murder was especially heinous, atrocious, and cruel, and found no mitigating circumstances. *Id*. The judge therefore concluded that the aggravating circumstances outweighed the mitigating and sentenced Gardner to death.

"As a preface to that ultimate finding, [the trial judge] recited that his conclusion was based on the evidence presented at both stages of the bifurcated proceeding, the arguments of counsel, and his review of 'the factual information contained in said pre-sentence investigation.'" 430 U.S. at 353 (citation omitted). The PSI "contained a confidential portion which was not disclosed to defense counsel." *Id*. "The trial judge did not comment on the contents of the confidential portion. His findings do not indicate that there was anything of special importance

in the undisclosed portion, or that there was any reason other than customary practice for not disclosing the entire report to the parties." *Id*.

The plurality opinion in *Gardner* held that, to the extent it allowed "a trial judge to impose the death sentence on the basis of confidential information which is not disclosed to the defendant or his counsel[,]" 430 U.S. at 358, this procedure violated due process of law. The opinion identified two principle rationales in support. *First*, the plurality opinion remarked that, because "death is a different kind of punishment from any other which may be imposed[,]" "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Id*. at 357–58. *Second*, the plurality opinion recognized that "the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause." *Id*. at 358. This is so because the "defendant has a legitimate interest in the character of the procedure which leads to the imposition of the sentence even if he may have no right to object to a particular result of the sentencing process." *Id*. (citation omitted).

Justice White's concurring opinion explained why Florida's procedure violated the Eighth Amendment, and why that conclusion warranted relief without the need of any due process analysis:

> Here the sentencing judge indicated that he selected petitioner Gardner for the death penalty in part because of information contained in a presentence report which information was not disclosed to petitioner or to his counsel and to which petitioner had no opportunity to respond. A procedure for selecting people for the death penalty which permits consideration of such secret information relevant to the character and record of the individual offender, fails to meet the need for reliability in the determination that death is the appropriate punishment[.] . . . This conclusion stems solely from the Eighth Amendment's ban on cruel and

> unusual punishments[,] . . . and my conclusion is limited . . . to cases in which the death penalty is imposed. I thus see no reason to address in this case the possible application to sentencing proceedings in death or other cases of the Due Process Clause, other than as the vehicle by which the strictures of the Eighth Amendment are triggered in this case.

430 U.S. at 363–64 (internal quotations and citations omitted).

The Supreme Court has subsequently "adopted Justice White's concurrence as the rule of *Gardner* and explained that the holding of *Gardner* is that '[a] procedure for selecting people for the death penalty which permits consideration of . . . secret information relevant to the character and record of the individual offender violates the Eighth Amendment's requirement of reliability in the determination that death is the appropriate punishment.'" *Muhammad v. Sec'y, Fla. Dep't of Corr.*, 733 F.3d 1065, 1073–74 (11th Cir. 2013) (quoting *O'Dell v. Netherland*, 521 U.S. 151, 162 (1997)).

Given all of the above, the clearly established federal law proffered by Petitioner as governing this claim forbids a reviewing court from prejudicially refusing to consider available, relevant transcriptions of trial proceedings bearing on a habeas claim before it and forbids a sentencing court from basing a death sentence on "secret information" that is relevant to the offender but is not available to him.

### C. State Court Proceedings

On appeal of the denial of his Rule 32 petition, Petitioner argued that "the record on appeal is woefully inadequate" because "nearly half the proceedings held below are missing from this record." (Doc. 25-36 at 54.) He described the Rule 32 court's practice of settling important matters like motions for discovery and motions to dismiss claims on procedural grounds in open court after oral argument, and

claimed that, of the seventeen hearings before the Rule 32 court, seven were missing any transcription in the record and two others were only partially included. (*Id.*) He cited *Dobbs* and argued that his ability to show that his rights were violated was compromised by the failure to provide transcripts for all Rule 32 proceedings. (*Id.* at 57.) Specifically, he argued that the State persuaded the Rule 32 court to dismiss many of his claims on procedural grounds at hearings which are not transcribed in the record and are, therefore, unable to be reviewed. (*Id.* at 59–60.) He claimed that "[c]ompelling [him] to defend himself on this record would violate his rights to due process, equal protection and a reliable determination of punishment[,]" and asserted that his conviction and sentence were due to be "reversed" pursuant to "Alabama law and the Fifth, Sixth, Eighth and Fourteenth Amendments[.]" (*Id.* at 61.)

The ACCA rejected Petitioner's claim. That court first set forth the following findings about the hearings petitioner alleged were missing from the record.

> Judge Joseph Phelps sentenced Bush to death, but he retired before the postconviction proceedings were initiated. Judge Sally Greenhaw presided over and denied the Rule 32 petition. When Judge Greenhaw retired from the bench the case was assigned to Judge Truman Hobbs. Judge Hobbs disposed of the motions to supplement the record.
>
> The original record sent to this Court was five volumes. In September 2004, Bush filed his first motion to supplement the record. The record was supplemented with an additional seven volumes. Bush filed a second motion in October 2004. That motion was denied. In November 2004, Bush filed a third motion to supplement and that motion was denied. Bush moved to reconsider, and the record was supplemented with one additional volume. Bush then filed motions to supplement in June 2006 and July 2006. Those motions were denied. Bush asserts that the following hearings are still missing from the record.

The certified record that was filed with this Court shows the following:

*July 8, 1999*. An order issued by Judge Greenhaw shows that Judge Greenhaw set the matter for a status conference hearing on July 8, 1999. Before the hearing Bush moved for discovery of the prosecution files. On July 16, 1999, Judge Greenhaw issued an order granting Bush discovery of "materials in the possession of the Montgomery County District Attorney's Office."

*September 15, 1999*. The record contains an order issued by Judge Greenhaw setting the case for a status and discovery hearing on September 15, 1999. The record also contains a letter that states: "The Court held a status conference on September 15, 1999, where some of these pending matters were argued by both parties. There have been no rulings, however, on any of these pending issues." (C.R. 212.)

*October 5, 2000*. The record contains an order dated October 5, 2000, issued by Judge Greenhaw dismissing several claims and directing Bush to file amended pleadings. On that date, Judge Greenhaw also set the case for a status hearing on February 20, 2001.

*February 7, 2001*. The record contains a letter from defense counsel to Judge Greenhaw that contains the following reference: "We therefore look forward to the scheduled conference call with the Court to be placed by [the assistant attorney general] at 3:00 this afternoon." (Supplemental record, vol. 1, p. 105.) It appears that the call addressed the motions that were identified in the letter. The letter also states that it was defense counsel's intent to call the court's attention to motions that were still pending and the possibility of continuing the evidentiary hearing.

*February 20, 2001*. The February 20, 2001, hearing is contained in the record. We find no indication that part of this hearing is missing. This hearing addressed discovery matters.

*April 17, 2001*. A hearing held on April 17, 2001, is contained in the record. This hearing addressed discovery.

> *July 8, 2002*. On July 8, 2002, the circuit court issued an order setting a briefing schedule on the applicability to Bush's case of the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). Several months were devoted to briefing that issue.
>
> *December 2 and 20, 2002*. The record indicates that on December 2, 2002, a conference call was conducted concerning discovery and that the December 20, 2002, hearing concerned discovery. On December 30, 2002, Judge Greenhaw issued five discovery orders granting discovery motions filed by Bush and one order dismissing two of the claims in the postconviction petition.
>
> It is uncontested that all the orders issued by the circuit court and all the motions filed by both Bush and the State are contained in the record that was certified to this Court. After each identified hearing date, orders were issued by the circuit court. Those orders are all contained in the record.

*Bush*, 92 So. 3d at 143–44 (footnote omitted).

The ACCA next discussed ASC authority outlining two approaches "where the record is incomplete for purposes of appeal." 92 So. 3d at 144 (citing *Ex parte Godbolt*, 546 So. 2d 991 (Ala. 1987)). In short, where the defendant is represented by the same attorney during trial and on appeal, "the failure to supply a complete record is not error per se and will not work a reversal absent a specific showing of prejudice." *Id*. (quoting *Ingram v. State*, 779 So. 2d 1225, 1280 (Ala. Crim. App. 1999)). Where the defendant is "represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to warrant reversal." *Id*. at 145 (quoting *Ingram*, 779 So. 2d at 1280). While the ASC does not impose any "mechanistic approach" in these situations, the prevailing rule is that the reviewing court must "be able to conclude affirmatively that no substantial right of

the appellant have been adversely affected by the omissions from the transcript." *Id*. (internal quotations and citations omitted).

The ACCA next concluded that, because Petitioner was represented by the same attorney in Rule 32 proceedings in both the Rule 32 court and the ACCA, Petitioner was required to "make a specific showing of prejudice from the failure to record and preserve the proceedings he claims should have been included in the record on appeal." *Bush*, 92 So. 3d at 145 (quotation marks and citation omitted). The ACCA found, however, that "Bush failed to make any specific allegations as to how he was prejudiced by the incomplete record." *Id*. The ACCA reasoned as follows: "After reviewing the record in its entirety we are able to gleam what occurred at the status hearings the transcripts of which are missing from the record. Also, we have all the motions that were filed and the rulings that were made as a result of those motions. For those reasons, we find no reversible error." *Id*.

### D. Review Pursuant to § 2254(d)(1) & (2)

#### *1. Petitioner's Arguments*

Petitioner's brief meticulously recounts his efforts, over a period of years, to obtain transcripts for the missing proceedings before the Rule 32 court. (Doc. 50 at 163–65.) He argues the ACCA "rendered a decision contrary to, and an unreasonable application of established Supreme Court precedent in *Dobbs* and *Gardner*." (*Id*. at 165.) The ACCA's error, he contends, lies in its holding that he failed to show prejudice due to the absence of transcripts. (*Id.*) He asserts the ACCA "held that Mr. Bush did not need the transcripts for his capital defense, placed the burden on Mr. Bush's counsel to remember everything that was argued and resolved at each hearing, and required Mr. Bush to point to a particular prejudice resulting

from the missing record." (*Id.*) The ACCA's "standard is contrary to and an unreasonable application of *Dobbs* and *Gardner* because those cases both presume that a *complete record* is required for purposes of review and do not require such a particularized, 'specific' showing of prejudice." (*Id*. (emphasis petitioner's).)

In essence, Petitioner contends the ACCA's holding inverts the presumption he claims underlies both *Dobbs* and *Gardner*. Where those decisions presumed that prejudice resulted from an incomplete record, he asserts, the ACCA presumed that Petitioner was not prejudiced and placed the burden on him to prove otherwise. (*Id*. at 165–66.) And it held him to this burden despite that he necessarily lacked the ability to meet the ACCA's demand "because the records are missing." (*Id*. at 166.)

Petitioner also attacks the ACCA's findings of fact pursuant to § 2254(d)(2). He argues that he "demonstrated to the State courts that he was prejudiced because the missing records related to holdings and factual development of his ineffective assistance of counsel claims addressed in the Rule 32 proceedings that Mr. Bush now cannot present to this Court." (Doc. 50 at 166.) He cites as an example the hearing before the Rule 32 court on July 8, 1999, which "addressed initial motions to dismiss and concerned the 'specificity' and sufficiency of pleading ineffective assistance of counsel claims." (*Id*. at 166–67.) He states subsequent hearings on September 15, 1999, and February 20, 2001, addressed the same issues and are also missing. (*Id*. at 167.) He also cites instances in which discovery matters were addressed at hearings that are not transcribed in the record. He claims "substantial arguments" about discovery at various proceedings are missing, and that the missing hearings include "significant rulings that shaped the record upon which the lower court denied Mr. Bush's Rule 32 claims, primarily for lack of specificity." (*Id.*) He summarizes his argument that he was prejudiced as follows:

> [W]here a record was preserved and made available to Mr. Bush, he has been able to present this Court with numerous meritorious claims that deserve habeas relief. But with respect to the claims that Mr. Bush has not been able to advance in these proceedings, and with respect to the additional evidence and arguments in the unrecorded hearings that might support his current claims, Mr. Bush's inability to rely on the Rule 32 record he meticulously developed is plainly prejudicial under *Dobbs* and *Gardner* and, therefore, the State courts' application of Federal law to the facts of this claim was unreasonable and habeas relief should be granted.

(*Id*. at 167–68.)

*2. The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon any unreasonable determination of the facts.*

Petitioner cites no authority holding that the failure to provide a transcription of all state postconviction proceedings, like Rule 32 proceedings in Alabama, implicates the same constitutional protections at issue when the state has failed to provide a full transcript or complete record of a criminal defendant's trial. The cases he proffers as providing the clearly established federal law governing his claim, *Dobbs* and *Gardner*, concern, respectively, an incomplete trial transcript and a "secret" portion of a presentence investigation report relied upon by the trial court at sentencing. Neither is concerned with the failure to fully transcribe and provide transcriptions of state *postconviction* proceedings.

Courts have long recognized that many of the procedural protections afforded at trial do not apply in the postconviction context. *See, e.g.*, *Barbour v. Haley*, 471 F.3d 1222, 1231 (11th Cir. 2006). So, for instance, neither the Eighth Amendment nor the Sixth Amendment require that a state provide counsel to a defendant in state postconviction proceedings, including those challenging a conviction and sentence

of death. *Id*. Petitioner's claim is concerned entirely with the failure to provide transcripts of several postconviction hearings at which, it appears, the parties "debated" the applicability of provisions of Rule 32 to some of Petitioner's claims and whether he was entitled to discovery in support of some of his claims. (Pet ¶ 171, doc. 1 at 62.) These plainly were not proceedings "'where the court and jury hear[d] testimony, receive[d] evidence, and decide[d] the questions of guilt and punishment.'" *Barbour*, 471 F.3d at 1231 (quoting *Murray v. Giarratano*, 492 U.S. 1, 89 (1989)). Accordingly, Petitioner fails to show that the constitutional protections at issue in *Dobbs* and *Gardner* apply with the same force in the Rule 32 proceedings at issue in his claim.

Nevertheless, even assuming that Petitioner's constitutional rights may be implicated by the failure to provide transcripts of all postconviction hearings, it does not follow that he is entitled to relief. First, the ACCA's requirement that he show prejudice flowing from the failure to provide full and complete transcriptions is consistent with federal law. The Eleventh Circuit has long held that "in a federal habeas corpus case brought by a state prisoner, the absence of a perfect transcript does not violate due process absent a showing of specific prejudice." *White v. State of Fla., Dep't of Corr.*, 939 F.2d 912, 914 (11th Cir. 1991). Hence, the Constitution did not relieve Petitioner of the obligation to show the ACCA how the absent and defective Rule 32 transcripts prejudiced his appeal. *Id*.

Nothing in *Dobbs* or *Gardner* holds otherwise. The entire *Dobbs* decision consists of six substantive paragraphs. Although the Court certainly noted its previous emphasis on "the importance of reviewing capital sentences on a complete record[,]" 506 U.S. at 358, one does not find in *Dobbs* any holding that a habeas petitioner complaining about the absence of a portion of the trial transcript need not

demonstrate how that circumstance prejudices habeas review of his conviction or sentence. Nor does one find in *Dobbs* anything substantiating Petitioner's argument that a court must presume prejudice due to a missing transcript, or that an "incomplete record, *in and of itself*, is inherently prejudicial." (Doc. 50 at 166 (emphasis Petitioner's).)

The holding of *Dobbs* was simply that the Eleventh Circuit Court of Appeals should have considered a portion of the trial transcript, which the State had represented was missing, but which was presented to that court while it was reviewing the district court's denial of habeas corpus relief. Prejudice was not "presumed" by the Supreme Court. Rather, the Court recognized the potential for prejudice to be established because the transcript "flatly contradicted" testimony of the habeas petitioner's trial attorney taken at a federal evidentiary hearing on whether the attorney provided ineffective assistance of counsel. The Court's holding specifically relied upon these "particular circumstances," including, in addition to the foregoing, the Eleventh Circuit's refusal to consider the transcript pursuant to its rigid application of the "the law of the case," to find error. 506 U.S. at 359. These many "particular circumstances" of *Dobbs* are not present here.

*Gardner* also does not contain any holding applicable to Petitioner's claim. As set forth above, the holding of *Gardner* is simply that the Eighth Amendment forbids a capital sentencing scheme permitting the imposition of a death sentence based upon "secret information relevant to the character and record" of the defendant. *Muhammad*, 733 F.3d at 1073–74 (citation and internal quotations omitted). In sum, therefore, the ACCA's conclusion that Petitioner was required to show how he was prejudiced by the absence in the record of full transcripts of some hearings before the Rule 32 court during postconviction proceedings was not

contrary to, and did not unreasonably apply, *Dobbs*, *Gardner*, or any other clearly established federal law.

Nor did the ACCA base its decision upon any unreasonable determination of the facts based upon the record before that court. Petitioner appears to argue that the ACCA based its decision upon an unreasonable determination of the facts because he did demonstrate that he was prejudiced by the absence of hearing transcripts. (Doc. 50 at 166.) He states, the "missing records related to holdings and factual development of his ineffective assistance of counsel claims addressed in the Rule 32 proceedings that Mr. Bush now cannot present to this Court." (*Id.*) He cites as examples hearings concerning the "specificity" and "sufficiency" of his pleading of ineffective assistance claims and his requests for discovery. (*Id.* at 166–67.) Yet he does not reference even one specific ineffective assistance of counsel claim which, it is asserted, he is unable to present in this court due to the absence of a transcript.

An Alabama state court's dismissal of a postconviction claim as insufficiently specific or insufficiently pleaded is a ruling on the merits of that claim for federal habeas corpus purposes and, as such, is subject to review under the AEDPA. *Freeman*, 46 F.4th at 1208 n.12. If the Rule 32 court dismissed Petitioner's ineffective assistance claims as insufficiently specific or inadequately pleaded, provided that he proceeded to exhaust his claims, nothing in federal law precluded him from presenting those claims in his federal habeas petition. Petitioner therefore does not substantiate any contention that he is unable to present claims to this court due to the absence of some hearing transcripts from his Rule 32 proceedings.

In addition to its Final Order following the Rule 32 evidentiary hearing, the Rule 32 court issued several written orders memorializing its reasoning in dismissing

Petitioner's ineffective assistance claims, and, as the ACCA found, those orders are in the record. (Doc. 25-39 at 102–52.) Those orders provide an accounting of the Rule 32 court's ruling on every ineffective assistance subclaim presented in Petitioner's Rule 32 petition, and Petitioner does not argue otherwise. Indeed, Petitioner's Second Amended Rule 32 Petition, filed in December 2002, demonstrates that the absence of hearing transcripts did not preclude meaningful appellate review of the Rule 32 court's disposition of his ineffective assistance claims. In that petition, Petitioner indicated the written order disposing of every ineffective assistance subclaim previously dismissed by the Rule 32 court. (Doc. 25-25 at 168–80.)

Accordingly, as the ACCA found, there is no mystery surrounding the Rule 32 court's disposition of Petitioner's ineffective assistance claims, notwithstanding the absence of some hearing transcripts. There is a reasoned decision by the Rule 32 court addressing every claim presented to it and discussed at the hearings. Petitioner was not precluded from seeking review of the dismissal of those claims in the ACCA. Nor was he rendered unable to present those claims in this court due to any missing transcripts. The ACCA therefore did not base its decision upon any unreasonable determination of the facts.

For all the foregoing reasons, this claim is due to be denied.

## CERTIFICATE OF APPEALABILITY

In pertinent part, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides as follows: "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the

applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

A certificate of appealability is necessary before a petitioner may pursue an appeal in a habeas corpus proceeding. 28 U.S.C. § 2253. To mandate the issuance of a certificate of appealability, a petitioner must make a "substantial showing of the denial of a constitutional right." § 2253(c)(2); *see also Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). Generally, such a showing requires something more than absence of frivolity, and it is a higher standard than the good faith requirement of 28 U.S.C. § 1915(d). *See Clements v. Wainwright*, 648 F.2d 979, 981 (5th Cir. 1981). In short, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot*, 463 U.S. at 893 and n.4) (internal quotations omitted). Based upon careful consideration, Petitioner has made a substantial showing of the denial of a constitutional right on the following issues:

a. Claim A: Whether the District Attorney used his peremptory strikes to remove black venire-members on the basis of their race; and

b. Claim E: Whether the State is precluded from executing Petitioner due to his alleged intellectual disability.

Accordingly, it is ORDERED that a Certificate of Appealability is granted as to the issues listed above.

**CONCLUSION**

For the foregoing reasons, it is ORDERED that Petitioner William Bush's claims for habeas corpus relief, individually and cumulatively, are DENIED and his petition for writ of habeas corpus is DISMISSED.

An appropriate final judgment will follow.

DONE, on this the 30th day of September 2026.

R. AUSTIN HUFFAKER, JR.
CHIEF UNITED STATES DISTRICT JUDGE